ROBERT S. REMAR (SBN 100124)
PHIL A THOMAS (SBN 248517)
LEONARD CARDER, LLP
1188 Franklin Street, Suite 201
San Francisco, California 94109
Telephone: 415-771-6400
Facsimile: 415-771-7010
rremar@leonardcarder.com
pthomas@leonardcarder.com

Attorneys for Defendants
INTERNATIONAL LONGSHORE AND WAREHOUSE UNION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PACIFIC MARITIME ASSOCIATION, a California corporation;<br><br>Plaintiffs,<br><br>v.<br><br>INTERNATIONAL LONGSHORE AND WAREHOUSE UNION, an unincorporated labor organization.<br><br>Defendants. | Case No. CV-08-2244-CW<br><br>**OPPOSITION TO PACIFIC MARITIME ASSOCIATION'S EX PARTE APPLICATION FOR ORDER CONFIRMING ARBITRATION AWARD, FOR ISSUANCE OF A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION** |

## INTRODUCTION

The war in Iraq is the most important issue facing our country today. The right of the people to demonstrate against this war, and to raise their collective voices in an attempt to bring it to an end, is a core First Amendment activity. The framers of the Constitution warned that their successors would be tempted to embark on imperial adventures, and guaranteed freedom

1

OPPOSITION TO PMA'S EX PARTE APPLICATION FOR ORDER CONFIRMING ARBITRATION AWARD, FOR ISSUANCE OF A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION
CASE NO. CV-08-2244-CW

LEONARD CARDER, LLP
ATTORNEYS
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TELEPHONE: (415) 771-6400    FAX (415) 771-7010

of speech and assembly in part so that the majority of citizens could hold their leaders accountable. In this spirit, Defendant International Longshore and Warehouse Union has consistently opposed the U.S. war in Iraq. ILWU and its members have been active in the campaign to end this war and bring the troops home. Large scale demonstrations against the war are likely to take place on May 1, 2008, and many ILWU members are likely to participate.

Plaintiff Pacific Maritime Association is seeking an injunction that would effectively prohibit longshore workers from participating in anti-war demonstrations on May 1; an injunction that would severely limit the collective voice of those expressing the view of the vast majority of Americans. The multinational corporations that make up the PMA have profited greatly from this war, so it is not surprising that they would try to muzzle those with a different point of view.

ILWU has, and will continue to, comply with its obligations under its collective bargaining agreements with PMA, and with arbitratral decisions interpreting these agreements. PMA, however, seeks in this action to obtain by injunction a near-complete silencing of the voices of longshore workers. Such an injunction is barred by the Norris-LaGuardia Act, which protects labor disputes from judicial interference, and by the First and Thirteenth Amendments to the U.S. Constitution

## STATEMENT OF FACTS

### I.      Parties To This Action

Plaintiff PMA is an association of shipping lines, and stevedoring and marine terminal companies which operate in ports throughout California, Oregon and Washington. (McEllrath Decl. ¶2). PMA serves as the collective bargaining and payroll agent for its member companies. (Id.). Defendant ILWU is the collective bargaining representative of all longshore

LEONARD CARDER, LLP
ATTORNEYS
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TELEPHONE: (415) 771-6400    FAX (415) 771-7010

LEONARD CARDER, LLP
ATTORNEYS
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TELEPHONE: (415) 771-6400    FAX (415) 771-7010

workers employed by PMA-member companies in the ports of California, Oregon and Washington. (McEllrath Decl. ¶3).

## II.    The Applicable Collective Bargaining Agreement

The wages, hours, and terms and conditions of employment for ILWU-represented longshore workers employed by PMA-member companies are governed by a coast-wide collective bargaining agreement known as the Pacific Coast Longshore and Clerks Agreement ("PCL&CA"), which is in effect through July 1, 2008. (McEllrath Decl. ¶5). The PCL&CA is set forth in two documents, (1) the Pacific Coast Clerks Contract Document ("PCCCD"), which governs the terms and conditions of employment for marine clerks employed by PMA member companies, and (2) the Pacific Coast Longshore Contract Document ("PCLCD"), which governs the terms and conditions of employment for longshore workers employed by PMA member companies. (Id., Exh. A).

Section 9.3 of the PCLCD obligates the Union to supply "[c]ompetent men with adequate experience or training … for all tools and equipment to be operated by longshoremen." (McEllrath Decl. ¶6). Section 9.31 permits the Joint Port Labor Relations Committees to "provide for the availability of the necessary men when there are not sufficient such competent longshoremen available." (Id.). Section 8.51 requires each dispatching hall to "furnish on any day required up to at least they agreed to number of gangs and supporting men[.]" (Id.).

To implement the requirements of Section 9.3, the PMA and each affiliated Longshore Division local union jointly create and maintain lists of "Registered" and "Identified Casual" workers in each port covered by the Agreement. (McEllrath Decl. ¶7). Only Registered longshore workers and Identified Casuals are eligible for dispatch to longshore jobs covered by the PCLCD. (Id.). The list of Registered workers is further divided into "Class A" fully

Registered workers and "Class B" limited Registered workers. (McEllrath Decl. ¶8).  Only

fully Registered Class A longshore workers are eligible for membership in ILWU. (Id.).

Longshore workers in each of these categories generally receive daily assignments

through dispatch halls operated jointly by the PMA and the ILWU longshore and clerks local

unions in each port. (McEllrath Decl. ¶9).  Workers are dispatched to various PMA employers

each day, depending on the number and location of ships that happen to be in port. (Id).  Class

A workers have priority in dispatch to all available jobs for which they are qualified, followed

by Class B registrants. (McEllrath Decl. ¶10).  Identified Casual longshore workers are hired

for a day only after all the available Registered longshore workers have been dispatched, and

only if needed to alleviate the staffing shortages caused by the fluctuating demand for

waterfront labor. (Id.).  Dispatch procedures are governed by Section 8.4 of the PCLCD, which

provides in relevant part:

> **8.41** First preference of employment and dispatch shall be given to fully
> registered longshoremen who are available for employment covered by Section
> 1 of this Contract Document in accordance with the rules and regulations
> adopted by the Joint Port Labor Relations Committee.  A similar second
> preference shall be so given to limited registered men.  The Joint Coast Labor
> Relations Committee shall be authorized to effectuate such preferences in such
> manner and for such times and places as it determines in its discretion.

> **8.42** Dispatching of men and gangs shall be under the principle of low-man,
> low-gang, first-to-be-dispatched, except where local dispatching rules provide
> otherwise for dispatching of special skilled men and gangs.

Employers are permitted to employ some skilled longshore workers on a "steady" basis

under Sections 9.43 and 14.6 of the PCLCD. (McEllrath Decl. ¶11).  Steady workers are not

dispatched through the dispatch hall, but rather report to the same employer at the same work

location every day. (Id.).  Only Registered longshore workers are eligible for steady positions.

LEONARD CARDER, LLP
ATTORNEYS
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TELEPHONE: (415) 771-6400    FAX (415) 771-7010

LEONARD CARDER, LLP
ATTORNEYS
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TELEPHONE: (415) 771-6400    FAX (415) 771-7010

(Id.).  A Registered longshore worker who quits or is discharged from a steady position retains the right to be dispatched to other jobs from the hall.  (Id.).

Nothing in the PCLCD requires any longshore worker to report to the hall on any particular day.  (McEllrath Decl. ¶12).  Under Section 8.34 of the PCLCD, a Registered longshoreman who fails to work for 30 days (whether through the dispatch hall or in a steady position) may be "deregistered."  (Id)  Deregistration is the equivalent of termination in most other occupations, as deregistered longshore worker is no longer allowed to work in any job covered by the PCLCD.  (Id.).  Casual longshore workers may obtain work only through the dispatch halls.  (McEllrath Decl. ¶13).  Nothing in the PCLCD requires any casual longshore worker to report to the dispatch hall on any particular day.  (Id.).  Under dispatching rules established by the Labor Relations Committees of each port, casual workers who fail to work a particular number of hours in a month are subject to removal from the casual lists.  (Id.).  Workers removed from the casual list are no longer allowed to work in any job covered by the PCLCD.  (Id.).

Section 11.1 of the PCLCD provides that "there shall be no strike, lockout, or work stoppage for the life of this Agreement."  (McEllrath Decl. ¶14).  Under Section 12.31 of the PCLCA, each local union has the right to hold one "regularly scheduled a stop-work meeting each month during overtime hours on the second shift."  (Id.).  Under Section 12.32, this meeting can be rescheduled by mutual agreement of the PMA and ILWU.  (Id.).

Under Section 17 of the PCLCD, labor disputes concerning the terms of the PCLCD are resolved through the following exclusive grievance/arbitration procedure.  (McEllrath Decl. ¶15).  A dispute is first considered by the JPLRC in the port where it arose.  (Id.).  If the JPLRC cannot reach an agreement that will settle the dispute, the matter will generally be submitted to

the appropriate Area Arbitrator. (Id.). Under section 17.261, any decision of the JPLRC or of

the Area Arbitrator is subject to appeal before the Joint Coast Labor Relations Committee

("JCLRC"). (Id.). In the event the JCLRC fails to reach agreement, the matter is then

submitted to the Coast Arbitrator, whose determination is final and binding under sections

17.55 and 17.57. (Id.).

### III.    PMA Denies ILWU Request To Move Stop-Work Meetings To May 1, 2008; ILWU Agrees Not To Change Scheduled Meeting Times And Dates

In the past, PMA has generally agreed to allow the ILWU to change its monthly one-

shift, stop-work meeting when a timely request is made. (McEllrath Decl. ¶16). For example,

in 1999, PMA agreed to allow ILWU to change the date of its April stop-work meeting so that

the Union could participate in rallies opposing the expected execution of death row inmate

Mumia Abu-Jamal, who is widely believed to have been wrongly convicted of killing a police

officer. (Id.). In agreeing to the change, Phil Resch, Senior Vice President of Operations for

PMA, stated:

> The ILWU uses these meetings to conduct union business and to communicate
> with their members. ... How the ILWU chooses to use this meeting time is up to
> their discretion. When a request to change the date is made in advance and
> agreed upon by our members, there is little, if any, impact on the maritime
> industry.

(Id., Exh. B).

At the ILWU Longshore Division Caucus, held from January 28 to February 8, 2008,

the delegates adopted a resolution to move the May, 2008 stop-work meeting to the day shift on

May 1, 2008 in order to allow longshore workers to express their opposition to the war in Iraq.

(McEllrath Decl. ¶17). By letter dated March 6, 2008, ILWU informed its Longshore Division

locals of the Caucus resolution. (McEllrath Decl. ¶18, Exh. C). ILWU urged each local to

LEONARD CARDER, LLP
ATTORNEYS
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TELEPHONE: (415) 771-6400    FAX (415) 771-7010

OPPOSITION TO PMA'S EX PARTE APPLICATION FOR ORDER CONFIRMING ARBITRATION AWARD, FOR ISSUANCE OF A
TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION
CASE NO. CV-08-2244-CW

inform PMA that it would be moving the May stop-work meeting to the day shift of May 1, 2008. (Id.). Various Longshore Division locals informed PMA that they would be moving the May stop-work meeting to the day shift of May 1. (McEllrath Decl. ¶19, Exh.D).

By letter dated March 17, 2008, PMA informed ILWU that it would not agree to the Union's proposed change of the time and date of the May, 2008 stop-work meeting. (McEllrath Decl. ¶20, Exh. E). By letter dated April 3, 2008, PMA reiterated its position that it would not agree to ILWU's proposed change of the time and date of the May, 2008 stop-work meeting. (McEllrath Decl. ¶21, Exh. F). In this letter, PMA also demanded that ILWU "take the following steps by no later than April 9, 2008" and threatened to "commence appropriate legal proceedings if ILWU did not do so. (Id.). Specifically, PMA demanded that ILWU:

[a]. Confirm to PMA in writing that the ILWU and its local unions will not engage in a stop-work meeting, work stoppage, or other job action on May 1;
[b]. Remove all postings from the ILWU's website that suggest a stop-work meeting, work stoppage, or other job action will occur on May 1;
[c]. Immediately notify ILWU members, via announcements at the joint dispatch, the joint dispatch tape, by special bulleting, and by publication on its website that the May 1, 2008 stop-work meeting is cancelled and that there will be no work stoppage or job action on that date; and
[d]. Instruct ILWU members to report for work as they normally would on the day shift of May 1, 2008 and fill all labor orders placed with the Joint Dispatch hall by the Employers as required by the PCL&CA.

(Id.).

By letter dated April 8, 2008, ILWU informed PMA that "no local will move its regularly scheduled May stop-work meeting to the day side of May 1, 2008. (McEllrath Decl. ¶22, Exh. G). By this letter, any written notification by any local to so move is retracted and the dictates of Section 12 of the PCL&CA will be adhered to." (Id.). ILWU rejected PMA's demand that "the Union communicate such to its members by a specified structure and within artificial timelines unilaterally developed by the Pacific Maritime Association is rejected. (Id.).

LEONARD CARDER, LLP
ATTORNEYS
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TELEPHONE: (415) 771-6400    FAX (415) 771-7010

The Employers have no contractual standing to dictate the manner or method that the Union communicates with its members." (Id.). ILWU also responded to PMA's threatened legal action by stating:

> Moreover, the Industry arbitrators lack authority to hear any non contractual based issue, much less one that is speculative. The PCL&CA grievance machinery is not designed to resolve speculative issues. Doing so would lead to endless arbitrations over issues involving rumors, perceptions, and posturing. Such is the case here. If any local fails to meet the contractual needs of the Employers on May 1 such would then and only then be a violation of the PCL&CA and appropriate contractual remedies could then be sought.

(Id.).

ILWU sent copies of the April 8 letter along with a copy of PMA's April 3 letter, to all ILWU Longshore Division locals, thereby communicating to all ILWU members that the May 1 stop-work meeting was cancelled. (McEllrath Decl. ¶23). Moreover, shortly thereafter, the ILWU removed all references to a May 1 stop-work meeting from its two official websites, www.ilwu.org and www.contract2008.org. (Id.).

By letter dated April 11, 2008, PMA accused the Union of refusing to take the necessary steps to communicate that the May 1 stop-work meeting had been cancelled. (McEllrath Decl. ¶24, Exh. H). PMA also referenced, as a matter of "particular concern," communication on other non-ILWU websites. (Id.). By letter dated April 15, 2008, ILWU responded to PMA's accusations by explaining that the ILWU has only two websites under its control and reiterating the position that no ILWU Longshore Division local will move the regularly scheduled May stop-work meeting to the day shift on May 1, 2008. (McEllrath Decl. ¶25, Exh. I). ILWU recommended that PMA-member companies "take into consideration as they plan May 1 operations that manpower may be limited as members exercise their right to express themselves politically." (Id.).

LEONARD CARDER, LLP
ATTORNEYS
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TELEPHONE: (415) 771-6400    FAX (415) 771-7010

## IV.    The Coast Arbitrator's Award

On April 23, 2008, PMA raised the issue of a possible work stoppage on May 1, 2008 at a meeting of the Joint Coast LRC. (McEllrath Decl. ¶26). The JCLRC did not reach agreement as to whether any work stoppage was likely or whether any action should be taken by either party. (Id.)

On April 24, 2008, the PMA raised the issue of a possible work stoppage on May 1, 2008 before the Coast Arbitrator. (McEllrath Decl. ¶27). The Coast Arbitrator's order reads in relevant part:

### BENCH DECISION AND ORDER OF THE COAST ARBITRATOR

There is an obligation under Section 12.2 of the Agreement for the Union to inform members of their responsibility under the Agreement. When the Union took an action which might have led some members to believe that they had no obligation to report as normal, whether a reality or not, it seems to me the Union had to go one step further and tell the members, without affecting their political decisions, that the ports are open, the Agreement applies, and they are expected to do whatever it is they are required to do under the Agreement.

I am not going to direct how the Union does that at this point, because it seems to me that is none of my business. And it is none of the Employers; business, unless they have some more.

(Id., Exhibit J).

Immediately thereafter, ILWU officers notified the Longshore Division Negotiating Committee of the Coast Arbitrator's April 24, 2008 decision. (McEllrath Decl. ¶28). When the ILWU is in bargaining with the PMA, the Negotiating Committee is the highest governing body of the Union. (Id.). The Negotiating Committee is composed of officers of ILWU local unions representing longshore workers at all west coast ports. (Id.). Each member of Negotiating Committee is responsible for communicating information regarding bargaining and other ILWU/PMA matters to one or more local unions. (Id.). ILWU officers instructed the

LEONARD CARDER, LLP
ATTORNEYS
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TELEPHONE: (415) 771-6400    FAX (415) 771-7010

Committee members to inform their local unions of the Coast Arbitrator's Award and of the necessity of complying with it.  (Id.).

On April 30, 2008, PMA returned to the Coast Arbitrator, claiming that ILWU was not in compliance with the April 24, 2008 award.  (McEllrath Decl. ¶29).  The Coast Arbitrator found that "Union efforts, to comply with the order of April 24, 2008, based on sufficient evidence, [were] ineffective."  (Id.).  The Coast Arbitrator then granted the following motions:

    a.   The Union has not effectively complied with the April 24, 2008 ruling, in violation of Section 17.57.

    b.   Any deliberate and/or concerted action of directing Longshoremen, Clerks and others that they are not to work, or that they are not working, on May 1, 2008 is a violation of Sections 11.1, and 11.2 of the PCLCD and PCCCD.

    c.   There shall be no unilateral concerted job action or illegal work stoppage in violation of the Agreement during the May 1, 2008 day shift.

    d.   The Union shall take immediate and affirmative steps to notify its Locals and members of their contractual obligation and direct all members to report to work as they normally do during the day shift on May 1, 2008.

(Id., Exhibit K).

## ARGUMENT

### I.   The Norris-LaGuardia Act Prohibits This Court From Issuing The Injunction Sought By PMA

The Norris-LaGuardia Act ("NLGA" or "Act"), 29 U.S.C. § 101 *et seq.*, deprives this Court of the jurisdiction necessary to issue the injunction PMA seeks.  The TRO must be denied by the Court as a matter of law.

### A.   The Activity PMA Seeks To Enjoin Is A 'Labor Dispute' Protected From Injunction By The Norris-LaGuardia Act

In enacting the Norris-LaGuardia Act "**Congress was intent upon taking the federal courts out of the labor injunction business**, except in ... very limited circumstances[.]"

LEONARD CARDER, LLP
ATTORNEYS
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TELEPHONE: (415) 771-6400    FAX (415) 771-7010

*Jacksonville Bulk Terminals, Inc. v. ILA.*, 457 U.S. 702, 712 (1982) (emphasis in original).

Congress did so because it unequivocally found federal labor injunctions to be "abuses of

judicial power." *BNSF Railway v. Teamsters Local 174*, 203 F.3d 703, 707 (9th Cir. 2000),

*quoting Milk Wagon Drivers' Union v. Lake Valley Farm Products*, 311 U.S. 91, 102 (1940).

"Congress deliberately included a broad definition [of labor disputes] to overrule judicial

decisions that had unduly restricted the Clayton Act's labor exemption from the antitrust laws"

*Id.* at 709 (brackets in original), *quoting Jacksonville Bulk Terminals*, 457 U.S. at 712.

Similarly, "[e]qually expansive is the test that the Supreme Court fashioned for determining

whether a particular controversy is a labor dispute. Simply, 'the employer-employee

relationship [must be at] the matrix of the controversy.'" *BNSF*, 203 F.3d at 709, *see also* n.6

(collecting cases). Particularly relevant here is the Supreme Court's holding in *Jacksonville*

*Bulk Terminals*, 457 U.S. at 717, that "the Norris-LaGuardia Act applies to work stoppages

instituted for political reasons[.]" The statutory definition of 'labor dispute' thus encompasses

all of the activity predicted in PMA's Proposed Order.[1]  No injunction may be issued in this or

---

[1] Section 13 of the NLGA provides:

(a) A case shall be held to involve or to grow out of a labor dispute when the case involves persons who are engaged in the same industry, trade, craft, or occupation; or have direct or indirect interests therein; or who are employees of the same employer; or who are members of the same or an affiliated organization of employers or employees; whether such dispute is

    (1) between one or more employers or associations of employers and one or more employees or associations of employees;

    (2) between one or more employers or associations of employers and one or more employers or associations of employers; or

    (3) between one or more employees or associations of employees and one or more employees or associations of employees; or when the case involves any conflicting or competing interests in a "labor dispute" (as defined in this section) of "persons participating or interested" therein (as defined in this section).

(b) A person or association shall be held to be a person participating or interested in a labor dispute if relief is sought against him or it, and if he or it is engaged in the same industry, trade, craft, or occupation in which such dispute occurs, or has a direct or indirect interest therein, or is a member, officer, or agent of any association composed in whole or in part of employers or employees engaged in such industry, trade, craft, or occupation.

(c) The term "labor dispute" includes any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or

LEONARD CARDER, LLP
ATTORNEYS
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TELEPHONE: (415) 771-6400    FAX (415) 771-7010

any other case "involving or growing out of any labor dispute to prohibit any person from …

[c]easing or refusing to perform any work[.]" 29 U.S.C. § 104.[2]

### B. No Injunction Is Permissible Under The *Boys Markets* Exception To The NLGA

A second exception to the general prohibition of injunctions in labor disputes permits

enforcement by injunction of a union's duty to honor its contractual commitment to arbitrate

rather than strike.3 *Boys Markets Inc. v. Retail Clerk's Union, Local 770,* 398 U.S. 235 (1970).

---

seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee. 29 U.S.C. §113.

[2] Section 4 of the NLGA provides:
No court of the United States shall have jurisdiction to issue any restraining order or temporary or permanent injunction in any case involving or growing out of any labor dispute to prohibit any person or persons participating or interested in such dispute (as these terms are herein defined) from doing, whether singly or in concert, any of the following acts:
    (a) Ceasing or refusing to perform any work or to remain in any relation of employment; …
    (d) By all lawful means aiding any person participating or interested in any labor dispute who is being proceeded against in, or is prosecuting, any action or suit in any court of the United States or of any State;
    (e) Giving publicity to the existence of, or the facts involved in, any labor dispute, whether by advertising, speaking, patrolling, or by any other method not involving fraud or violence;
    (f) Assembling peaceably to act or to organize to act in promotion of their interests in a labor dispute;
    (g) Advising or notifying any person of an intention to do any of the acts heretofore specified;
    (h) Agreeing with other persons to do or not to do any of the acts heretofore specified; and
    (i) Advising, urging, or otherwise causing or inducing without fraud or violence the acts heretofore specified[.]  29 U.S.C. § 104.

[3] The Supreme Court has created an exception to the NLGA that permits enforcement by injunction both of a contractual agreement to arbitrate, *Textile Workers v. Lincoln Mills,* 353 U.S. 448 (1957), and of the arbitrator's award that results. *ILA Local 1291 v. Philadelphia Marine Trade Ass'n.* 389 U.S. 64 (1967). This exception exists to further the strong federal policy of supporting and enforcing parties' commitments to be bound by the private dispute settlement mechanisms agreed to in a collective bargaining agreement.[3] *See, e.g., United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 599 (1960). However, the exceptions, if applicable, must be narrowly construed. *Buffalo Forge Co. v. Steelworkers,* 428 U.S. 397, 407 (1976); *see also Camping Construction Co. v. District Council of Iron Workers,* 915 F.2d 1333, 1343-1347 (9th Cir. 1990). Where a court has jurisdiction to issue an injunction, it must "issue the narrowest possible injunction necessary" to protect an employer's rights. *Southern Ohio Coal Co. v. United Mine Workers of Am,* 551 F.2d 695, 709 (6th Cir. 1977). For example, the 9th Circuit has held that a district court may not enjoin an alleged secondary boycott, despite the fact that such union conduct may violate the National Labor Relations Act. *Smith's Management Corp. v. IBEW Local 357,* 737 F.2d 788 (9th Cir. 1984). Only if such union conduct is adjudged by an arbitrator to be in violation of the no-strike clause in the applicable collective bargaining agreement may an injunction be issued. *Northern Stevedoring and Handling Corp. v. ILWU Local 60,* 685 F.2d 344 (9th Cir. 1982); *Alyeska Pipeline Serv. Co. v. IBT,* 557 F.2d 1263 (9th Cir. 1979).

OPPOSITION TO PMA'S EX PARTE APPLICATION FOR ORDER CONFIRMING ARBITRATION AWARD, FOR ISSUANCE OF A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION
CASE NO. CV-08-2244-CW

The Supreme Court was careful to note in this case that "[o]ur holding ... is a narrow one. We do not undermine the vitality of the Norris LaGuardia Act." 398 U.S. at 253. The *Boys Markets* exception does not apply to all strikes in violation of a no-strike agreement; rather, it permits enjoining only those strikes precipitated by an issue that is itself arbitrable.[4] *Buffalo Forge Co., supra* at 407 (sympathy strikes in violation of no-strike clause may not be enjoined). Thus, as the Ninth Circuit has explained, "when a union is merely striking, rather than striking **over something it should be arbitrating**, the NLGA applies with full force" and the court lacks jurisdiction to issue an injunction. *Camping Construction*, 915 F.2d at 1346 (emphasis in original).

Here, according to PMA's own allegations, the Unions would be striking on May 1, 2008 in order to protest the war in Iraq—an issue clearly not covered by any applicable collective bargaining agreement. The facts presented in the instant case are strikingly similar to those in *Jacksonville Bulk Terminals,* a case in which a different longshore union refused to

---

It follows that in confirming and enforcing the Coast Arbitration award here, this Court is prohibited from awarding any relief that the Coast Arbitrator declined to award. It is a matter of long-standing labor law and policy that the courts are prohibited from usurping the functions properly entrusted to the arbitrator chosen by the parties to resolve their contractual disputes, including determining what remedies are appropriate when a violation of a collective bargaining agreement is found. *Steelworkers v. American Manufacturing Co.*, 363 U.S. 564, 569 (1960); *Enterprise Wheel, supra* at 596-97, 599 ("the question of interpretation of the collective bargaining agreement is a question for the arbitrator"); *Buffalo Forge, supra* at 412 ("[i]t is incredible to believe that the courts would always view the facts and the contract as the arbitrator would; and it is difficult to believe that the arbitrator would not be heavily influenced or wholly preempted by judicial views of the facts and the meaning of the contracts if this procedure is to be permitted").

[4] *Boys Markets* permits a district court to enjoin a strike in violation of a no-strike clause in a collective bargaining agreement only after the court "decides that the case is one in which an injunction would be appropriate despite the Norris-LaGuardia Act." *Id.* at 254, *quoting Sinclair Refining v. Atkinson*, 370 U.S. 195, 228 (1962) (Brennan, J. dissenting). Further, when an employer seeks to enjoin a strike alleged to be "over a grievance which both parties are contractually bound to arbitrate, the District Court may issue no injunctive order until it first holds that the contract does have that effect; and the employer should be ordered to arbitrate, as a condition of his obtaining an injunction against the strike." *Id.* Finally, "the District Court must, of course, consider whether issuance of an injunction would be warranted under ordinary principles of equity:[1] whether breaches are occurring and will continue, or have been threatened and will be committed; [2] whether they have caused or will cause irreparable injury to the employer; and [3] whether the employer will suffer more from the denial of an injunction than will the union from its issuance. *Id.*

LEONARD CARDER, LLP
ATTORNEYS
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TELEPHONE: (415) 771-6400    FAX (415) 771-7010

handle cargo bound for the Soviet Union. 457 U.S. at 704-705. There, the Supreme Court considered—and rejected—the employers' argument that the political issues underlying the strike could be considered arbitrable,[5] and denied the request for an injunction. *Id.* at 721.

Further, as of the commencement of this action there are no arbitrable issues in dispute between PMA and ILWU. There are no stop-work meetings scheduled in conflict with Section 12 of the PCLCA. PMA's sole claim of an arbitrable issue is that there will be a shutdown in violation of Section 11.1 of the PCLCA on May 1, 2008. Thus, what PMA seeks is anticipatory relief – a preemptive ruling based on what it assumes will happen. Section 17.52 of the PCLCA establishes unequivocally that the power of the Arbitrator is "limited strictly to application and interpretation of the Agreement as written." Here, the essence of PMA's claim is that ILWU is on the verge of violating:

1.  Section 11.1, which provides that "[t]here shall be no strike, lockout or work stoppage for the life of this Agreement" and,

2.  Section 8.51, which provides that "[e]ach dispatching hall shall furnish on any day required up to at least the agreed to number of gangs and supporting men, as well as up to any number agreed to, or arrived at through Contract procedures, in the future."

However, to date there has been no work stoppage nor is there presently a failure to furnish gangs and supporting workers. Importantly, the language of Sections 11.1 and 8.51 necessarily covers actual events, not *prospective* work stoppages or *prospective* failures to furnish workers. Even if *Boys Markets* could be held to support enjoining a strike over an issue that an employer could take to arbitration, it could not do so in the instant case.

///

---

[5] "whether viewed as an expression of the Union's moral outrage at Soviet military policy or as an expression of sympathy for the people of Afghanistan ..." 457 U.S. at 721.

LEONARD CARDER, LLP
ATTORNEYS
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TELEPHONE: (415) 771-6400    FAX (415) 771-7010

LEONARD CARDER, LLP
ATTORNEYS
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TELEPHONE: (415) 771-6400    FAX (415) 771-7010

## C.    Even If The Underlying Issue Is Arbitrable, No Injunction May Be Awarded Without An Evidentiary Hearing

Even if this Court were to find, as a matter of law, that it has jurisdiction to issue an injunction, the NLGA would prohibit the Court from doing so without first conducting a full evidentiary hearing. *Northern Stevedoring*, 685 F.2d 344, 347-49 (reversing injunction where district court enforced arbitration award without conducting an evidentiary hearing); *see also Enterprise Wheel & Car Corp.*, 363 U.S. 593.[6] Section 7 of the NLGA provides that this Court lacks jurisdiction to enter an injunction  except (1) "after hearing the testimony of witnesses in open court (with opportunity for cross-examination) in support of the allegations of a complaint made under oath, and testimony in opposition thereto, if offered," and (2) "after findings of fact by the court, to the effect

**(a)**    That unlawful acts have been threatened and will be committed unless restrained or have been committed and will be continued unless restrained, ...;
**(b)**    That substantial and irreparable injury to complainant's property will follow;
**(c)**    That as to each item of relief granted greater injury will be inflicted upon complainant by the denial of relief than will be inflicted upon defendants by the granting of relief;
**(d)**    That complainant has no adequate remedy at law; and
**(e)**    That the public officers charged with the duty to protect complainant's property are unable or unwilling to furnish adequate protection.

29 U.S.C §107

---

[6] Cases PMA has cited in other actions and may cite herein for the proposition that no hearing is required will not support such a conclusion. In *PMA v. ILWU and ILWU Local 19*, 517 F.2d 1158 (9th Cir. 1975) and *PMA v. ILWU*, 304 F. Supp. 1315 (N.D. Cal. 1969), the district court conducted a full evidentiary hearing before issuing an injunction. 517 F.2d at 1161 n.1 (quoting trial court's factual findings based on clear and convincing evidence after taking testimony in court); 304 F. Supp. at 1319 (stating that findings supporting injunction are based on "oral and written evidence"). In *Alyeska Pipeline Servs. v. Teamsters*, 557 F.2d 1263, 1266-67 (9th Cir. 1977), the district court denied the injunction motion and the Ninth Circuit made no mention of the NLGA hearing requirement. *PMA v. ILWU*, 454 F.2d 262 (9th Cir. 1971), likewise makes no mention of the requirement and certainly does not indicate that the district court issued an injunction without conducting a hearing. *PMA v. ILWU*, Case No. C 96-4106 FMS, 1997 WL 229811, 1997 U.S. Dist. LEXIS 6017 (N.D. Cal. May 1, 1997) addressed a motion for confirmation of an arbitration, *not* a motion for injunctive relief and expressly held that the NLGA did not apply because no injunction was sought.

OPPOSITION TO PMA'S EX PARTE APPLICATION FOR ORDER CONFIRMING ARBITRATION AWARD, FOR ISSUANCE OF A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION
CASE NO. CV-08-2244-CW

LEONARD CARDER, LLP
ATTORNEYS
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TELEPHONE: (415) 771-6400    FAX (415) 771-7010

## II.    The Injunction PMA Seeks Would Violate Defendants' Constitutionally Protected Rights Of Speech, Association And Assembly

Even if all of the above conditions are met, this Court retains discretion to issue or deny the requested injunction. *Boys Markets, supra* at 253-254. No injunction may be awarded unless injunctive relief is "just and proper." *Overstreet v. Carpenters Local 1506,* 409 F.3d 1199, 1206 (9th Cir. 2005). District courts exercise discretion "by focusing on a familiar set of four equitable factors: the movant's likelihood of success on the merits; the possibility of irreparable harm to the moving party; the extent to which the balance of hardships favors each party; and whether the public interest will be advanced by granting the preliminary relief." *Id.* at 1207. In weighing the balance of hardships, the court must determine whether the grant of an injunction "presents a significant risk that the First Amendment will be infringed." *Id.* at 1209.

There can be no doubt that ILWU and its constituent local unions enjoy the full protections of the First and Fourteenth Amendments to the U.S. Constitution and their counterparts in the California Constitution.[7] The Supreme Court long ago held that the state may not "impair the effective exercise of the right to discuss freely industrial relations which are matters of public concern." *Thornhill v. Alabama*, 310 U.S. 88, 104 (1940). Further, **"the streets are natural and proper places for the dissemination of information and opinion**; and one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Id.* at 105-106, quoting *Schneider v. New Jersey*, 308 U.S. 147, 161 (1939) (emphasis supplied). Workers' right to organize, as

---

[7] It is well-established that the free speech protections of the California Constitution, particularly those that protect the right to demonstrate in places accessible to the general public, are broader than those found in the U.S. Constitution. *Robins v. Pruneyard Shopping Center* (1979) 23 Cal.3d 899, affirmed *sub nom Pruneyard Shopping Center v. Robins*, 447 U.S. 74 (1980), *see also Fashion Valley Mall v. NLRB*, (2007) 42 Cal.4[th] 850.

guaranteed by the National Labor Relations Act, "comprehends whatever may be appropriate and lawful to accomplish and maintain such organization." *Thomas v. Collins*, 323 U.S. 516, 534 (1945).

Such assembly rights are not limited to those occasions when 'industrial relations' or 'labor disputes,' however these terms may be construed, are to be discussed. Instead:

> The right of the people peaceably to assemble for the purpose of petitioning Congress for a redress of grievances, or for any thing else connected with the powers or the duties of the national government, is an attribute of national citizenship, and, as such, under the protection of, and guaranteed by, the United States. The very idea of a government, republican in form, implies a right on the part of its citizens to meet peaceably for consultation in respect to public affairs and to petition for a redress of grievances.

*Hague v. CIO*, 307 U.S. 496, 513 (1939), *quoting U.S. v. Cruikshank*, 92 U.S. 542, 552-553 (1875). "No expression of a contrary view has ever been voiced by this court." *Hague, supra* at 513. "Citizenship of the United States would be little better than a name if it did not carry with it the right to discuss national legislation and the benefits, advantages, and opportunities to accrue to citizens therefrom." *Id.*

## A.    The Injunction PMA Seeks Would, If Awarded, Constitute An Unconstitutional Prior Restraint Of Speech, Association and Assembly

The Supreme Court has made it clear that "prior restraints on speech … are the most serious and least tolerable infringement on First Amendment rights." *Nebraska Press Ass'n. v. Stuart*, 427 U.S. 539, 559 (1976). To ensure that speech is protected against prior restraints, the Court holds that "[a]ny system of prior restraints of expression comes to this Court bearing a heavy presumption against constitutional validity." *New York Times v. United States*, 403 U.S. 713, 714 (1971). Because picketing and distribution of literature are "not fundamentally different from the function of a newspaper," the prohibition of prior restraints applies with

LEONARD CARDER, LLP
ATTORNEYS
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TELEPHONE: (415) 771-6400    FAX (415) 771-7010

equal force with regard to such activity. *Organization for a Better Austin v. Keefe,* 402 U.S. 415, 419 (1971).

The Court has defined a prior restraint as an "administrative or judicial order[] forbidding certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States,* 509 U.S. 544, 550 (1993) (internal quotations omitted), *see also Near v. Minnesota,* 283 U.S. 697 (1931) (enforcement of statutory restraint by injunction of future speech is an unconstitutional prior restraint). Because the Union Defendants, or indeed anyone found to have violated the PMA' desired injunction, could conceivably be barred from challenging its constitutionality in a contempt proceeding, *Walker v. City of Birmingham,* 388 U.S. 307, 321 (1968), it is essential that no such injunction be awarded.

**B.    The Injunction PMA Seeks Would, If Awarded, Constitute An Unconstitutional Content-Based Restriction On Speech**

The Supreme Court has stated that "above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter or its content." *Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 95-96 (1972). Restrictions on speech based on that the content of that speech are presumptively invalid. *Turner Broadcasting v. FCC,* 512 U.S. 622 (1994). A law that treats speech by or on behalf of a labor organization  differently from a how it treats other speech is an unconstitutional content-based restriction on speech. *Carey v. Brown,* 447 U.S. 455 (1980).

PMA, under the guise of enforcing the Coast Arbitrator's award, is in fact seeking to have this Court enjoin hypothesized future speech by the Union Defendants and their members based on content PMA anticipate will be part of any such speech. Specifically, PMA wants this

LEONARD CARDER, LLP
ATTORNEYS
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TELEPHONE: (415) 771-6400    FAX (415) 771-7010

Court to require the Unions to restrict their members' ability to express their views about the war in Iraq. Judicial action to enforce a private agreement is considered state action within the meaning of the Fourteenth Amendment. *Shelley v. Kramer,* 334 U.S. 1, 14 (1948). Action by this Court to prevent longshore workers from expressing views about the Iraq war on May 1, 2008 would thus constitute an unconstitutional content-based restriction on these individuals' rights of speech and assembly.

### III.    The Injunction PMA Seeks Would, If Awarded, Compel Involuntary Servitude In Violation Of The Thirteenth Amendment

Longshore work is fundamentally different from most other jobs in that **longshore workers are not subject to discipline by their employers if they fail to show up for work.** At its core, the injunction sought by PMA would compel longshoremen to work on May 1, 2008, regardless of their own inclinations. Such an injunction would do great violence to the hardest-won of all American freedoms—the freedom from forced labor. The Thirteenth Amendment to the United States Constitution provides that "neither slavery nor involuntary servitude, except as punishment for a crime where of the party shall have been duly convicted, shall exist within the United States, or any place subject to their jurisdiction." This Amendment "denounces a status or condition, irrespective of the manner or authority by which it is created." *Clyatt v. United States,* 197 U.S. 207, 216 (1905). The Thirteenth Amendment is "a charter of universal civil freedom for all persons, of whatever race, color, or estate, under the flag." *Bailey v. Alabama,* 219 U.S. 229, 241 (1911). The prohibition of involuntary servitude holds "[e]ven though a person may come to a job voluntarily[.]" *U.S. v. Mussry* 726 F.2d 1448, 1454 n. 6 (9th Cir, 1984), *cert. denied* 469 U.S. 855 (1984), *citing U.S. v. Harris,* 701

LEONARD CARDER, LLP
ATTORNEYS
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TELEPHONE: (415) 771-6400    FAX (415) 771-7010

F.2d 1094, 1100 (4th Cir. 1983), *cert. denied* 463 U.S. 219 (1983). The PMA has no right to deny that freedom to longshore workers through this or any other legal action. [8]

Congress and the courts have long recognized that employers would attempt to use the legal process to get around the clear mandate of the Thirteenth Amendment. For example, the Supreme Court has prohibited the use of the criminal conviction exception "to compel the service or labor by making it a crime to refuse or fail to perform it. Such laws would furnish the readiest means of compulsion." *Bailey, supra* at 243. While the government "may impose involuntary servitude as punishment for a crime, … it may not compel one man to labor for another …" *Id.* at 244. Compulsory labor also cannot be imposed for breach of a contract or non-payment of a debt:

> When the master can compel and the laborer cannot escape the obligation to go on, there is no power below to redress and no incentive above to relieve a harsh overlordship or unwholesome conditions of work. Resulting depression of working conditions and living standards affects not only the laborer under the system, but every other with whom his labor comes into competition. Whatever social value there may be, and of course it is great, in enforcing contracts and collection of debts, Congress has put it beyond debate that no indebtedness warrants the right to be free from compulsory service.

*Pollock v. Williams,* 322 U.S. 4, 18 (1944).

"A person commits the offense of holding another to involuntary servitude under 18 U.S.C. § 1584 when she 'knowingly and willfully holds to involuntary servitude ... any other person for any term.'" *U.S. v. Veerapol.* 312 F.3d 1128, 1132 (9th Cir. 2002), *cert denied* 538 U.S. 981 (2003). In the criminal context, 'involuntary servitude' "necessarily means a condition of servitude in which the victim is forced to work by the defendant by the use or

---

[8] PMA may cite *Itasca Lodge 2029 v. Railway Express Agency,* 391 F.2d 657, 663 (8th Cir. 1968), in which the Eighth Circuit held that the Thirteenth Amendment did not grant a union the right to call a membership meeting during normal working hours. *Itasca* is distinguishable from the instant case, however, as Defendant ILWU has not called a membership meeting during normal working hours, and has instructed its constituent local unions not to do so.

LEONARD CARDER, LLP
ATTORNEYS
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TELEPHONE: (415) 771-6400    FAX (415) 771-7010

threat of physical coercion or by the use or threat of coercion through law or the legal process." *Id*, quoting *U.S. v. Kozminski*, 487 U.S. 931. 952 (1988). The term 'legal coercion' "simply means the use of the law, the legal process, or legal institutions to compel service." *U.S. v. Alzanki*, 54 F.3d 994, 1002 n.6 (1st Cir. 1995), *cert. denied* 516 U.S. 1111 (1996).

The Thirteenth Amendment is unique in Constitutional jurisprudence in that it "extends beyond state action." *U.S. v. Kozminski, supra* at 943. In fact, the Thirteenth Amendment is more restrictive of the ability of private entities to compel servitude than it is of the government's ability to do so. "[T]he Court has recognized that the prohibition against involuntary servitude does not prevent the State or Federal Governments from compelling their citizens, by threat of criminal sanction, to perform certain civic duties." *Id.* at 943-944 (citing cases upholding compulsory jury and military service). By this reasoning, Courts have rejected union arguments that the Thirteenth Amendment should preclude the Government from enjoining strikes under the national emergency provisions of the Labor-Management Relations Act, 29 U.S.C. § 178. *See, e.g. U.S. v. ILWU*, 78 F.Supp. 710 (D.C.Cal. 1948), *U.S. v. UMWA*, 330 U.S. 330 U.S. 258 (1947). However, an injunction sought by the Government in order to protect the national interest is fundamentally different from a case in which a private party seeks to obtain an injunction solely in order to protect its own interests. PMA represents the interests not of the government, but of the employers of longshore labor, including many foreign-owned corporations. PMA's attempt to use this injunction proceeding to compel longshore labor on May 1, 2008 is clearly barred by the Thirteenth Amendment to the U.S. Constitution.

///

OPPOSITION TO PMA'S EX PARTE APPLICATION FOR ORDER CONFIRMING ARBITRATION AWARD, FOR ISSUANCE OF A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION
CASE NO. CV-08-2244-CW

LEONARD CARDER, LLP
ATTORNEYS
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TELEPHONE: (415) 771-6400    FAX (415) 771-7010

**CONCLUSION**

For the foregoing reasons, PMA is not entitled to the temporary restraining order it seeks and its motion must be denied in its entirety.

DATED: April 30, 2008

Respectfully submitted,

LEONARD CARDER, LLP

By: _____
Phil A Thomas
Attorneys for Defendants

LEONARD CARDER, LLP
ATTORNEYS
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TELEPHONE: (415) 771-6400     FAX (415) 771-7010

OPPOSITION TO PMA'S EX PARTE APPLICATION FOR ORDER CONFIRMING ARBITRATION AWARD, FOR ISSUANCE OF A TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION
CASE NO. CV-08-2244-CW