BRENDAN DOLAN, State Bar No. 126732
MORGAN, LEWIS & BOCKIUS LLP
One Market Street
San Francisco, CA  94105
Tel:  415.442.1000
Fax:  415.442.1001
*bdolan@morganlewis.com*

CLIFFORD D. SETHNESS, State Bar No. 212975
JASON M. STEELE, State Bar No. 223189
MORGAN, LEWIS & BOCKIUS LLP
300 South Grand Avenue
Twenty-Second Floor
Los Angeles, CA  90071-3132
Tel:  213.612.2500
Fax:  213.612.2501
*csethness@morganlewis.com*
*jsteele@morganlewis.com*

*Attorneys for Plaintiff*
PACIFIC MARITIME ASSOCIATION

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PACIFIC MARITIME ASSOCIATION, a California corporation, <br><br> Plaintiff, <br><br> v. <br><br> INTERNATIONAL LONGSHORE AND WAREHOUSE UNION, an unincorporated labor organization, <br><br> Defendant. | Case No. CV-08-2244 CW <br><br> Hon. Claudia Wilken <br><br> **PLAINTIFF PMA'S NOTICE OF MOTION AND MOTION FOR CONFIRMATION OF LABOR ARBITRATION AWARDS; MEMORANDUM OF POINTS AND AUTHORITIES** <br><br> *[29 U.S.C. § 185]* <br><br> Date:        July 3, 2008 <br> Time:       2:00 p.m. <br> Courtroom: 2 |

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1-LA/994642.2

PMA'S MOTION FOR CONFIRMATION OF
AWARDS – CV 08-2244 CW

**TO THE DEFENDANT AND ITS ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that, on July 3, 2008 at 2:00 p.m., or as soon thereafter as this motion may be heard in Courtroom 2 of this Court, located at 1301 Clay Street, Suite 400 S, Oakland, CA 94612, Plaintiff Pacific Maritime Association ("PMA") will and hereby does move for an order confirming the two awards issued on April 30, 2008 by Coast Arbitrator John Kagel pursuant to the collective bargaining agreement between PMA and Defendant International Longshore and Warehouse Union ("ILWU").

This motion is made on the grounds that the arbitration awards are final and binding interpretations of the parties' collective bargaining agreement and are entitled to confirmation pursuant to Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185.

The motion is based on this Notice of Motion, the Memorandum of Points and Authorities below, the Declaration of Richard Marzano, all documents filed in this action, and any further evidence and argument that may be presented at the hearing.

Dated: May 28, 2008                    MORGAN, LEWIS & BOCKIUS LLP

By _____ / s / _____
    Brendan Dolan
    Attorneys for Plaintiff
    PACIFIC MARITIME ASSOCIATION

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

PMA'S MOTION FOR CONFIRMATION OF
AWARDS – CV 08-2244 CW

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................ 1

II. STATEMENT OF FACTS .................................................................................. 2

    A.  The Parties........................................................................................... 2

    B.  The Collective Bargaining Agreement................................................ 2

    C.  The ILWU Calls A Strike in Violation of the PCLCA ......................... 3

    D.  The Coast Arbitrator's Awards ........................................................... 5

    E.  The ILWU Goes on Strike, Shutting Down All 29 West Coast Ports .................. 6

III. THE COAST ARBITRATOR'S AWARDS ARE FINAL AND BINDING
INTERPRETATIONS OF THE PCLCA AND SHOULD BE CONFIRMED BY
THIS COURT ...................................................................................................... 6

    A.  Confirming the Awards Furthers the Strong Federal Policy in Favor of
Labor Arbitration ................................................................................. 6

    B.  The Court Must Defer to the Arbitrator's Interpretation of the CBA .................... 7

    C.  The ILWU's Constitutional Defenses Fail Under Well-Settled Law ................ 8

        1.  The First Amendment Does Not Apply Because Judicial
Enforcement of a Private Contract Does Not Constitute State
Action.................................................................................... 9

        2.  The First and Thirteenth Amendments Do Not Bar Enforcement of
Arbitration Awards Prohibiting a Union From Engaging in a
Politically-Motivated Work Stoppage ..................................... 10

IV. CONCLUSION ................................................................................................... 12

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

PMA'S MOTION FOR CONFIRMATION OF
AWARDS – CV 08-2244 CW

1

## TABLE OF AUTHORITIES

2

### FEDERAL CASES

3

*Alexander v. U.S.*, 509 U.S. 544 (1993)................................................................ 11

4

*Barnes v. Logan*, 122 F.3d 820 (9th Cir. 1997) ................................................... 7

5

*Buffalo Forge Co.  v. United Steelworkers of America*, 428 U.S. 397 (1976).................... 6

6

*Cable Investment, Inc. v. Woolley*, 680 F.Supp. 174 (M.D. Pa. 1987) ............................ 9

7

*Columbia Broad. System, Inc. v. Democratic National Committee*, 412 U.S. 94
(1973)............................................................................................ 9

8

9

*Davis v. Prudential Securities, Inc.*, 59 F.3d 1186 (11th Cir. 1995)............................. 9

10

*International Longshoremen's Association v. Allied International, Inc.*, 456 U.S.
212 (1982)....................................................................................... 11

11

*International Olympic Committee v. San Francisco Arts & Athletics*, 781 F.2d 733
(9th Cir. 1986)................................................................................... 9

12

13

*Jacksonville Bulk Terminals v. ILA*, 457 U.S. 702 (1982)........................................ 6, 11

14

*Millmen Local 550 v. Wells Exterior Trim*, 828 F.2d 1373 (9th Cir. 1987) ...................... 6

15

*New Orleans Steamship Association v. Gen'l Longshore Workers*, 626 F.2d 455
(5th Cir. 1980)............................................................................... 2, 10, 11

16

*PMA v. ILWU*, 304 F.Supp. 1315 (N.D. Cal. 1969) .................................................. 1, 7

17

*PMA v. ILWU, et al.*, 517 F.2d 1158 (9th Cir. 1975)............................................... 1, 7

18

*PMA v. ILWU Local 10*, 1997 U.S.Dist. LEXIS 6017 (N.D. Cal. 1997)........................ 1, 7

19

*Parks v. "Mr. Ford"*, 556 F.2d 131 (3d Cir. 1977) ............................................... 9

20

*Public Utilities Commission v. Pollak*, 343 U.S. 451 (1952) ................................... 9

21

*San Francisco-Oakland Newspaper Guild v. Tribune Public Co.*, 407 F.2d 1327
(9th Cir. 1969).................................................................................. 8

22

23

*Shelley v. Kramer*, 334 U.S. 1 (1948) ........................................................... 9

24

*Sprewell v. Golden State Warriors*, 266 F.3d 979 (9th Cir. 2001) ............................... 8

25

*Stead Motors of Walnut Creek v. Automotive Machinists Lodge No. 1173, IAM*,
886 F.2d 1200 (9th Cir. 1989).................................................................... 8

26

*United Brotherhood of Carpenters and Joiners of America, Local No. 1780 v.
Desert Palace, Inc.*, 94 F.3d 1308 (9th Cir. 1996)............................................... 6

27

28

*United Egg Producers v. Standard Brands, Inc.*, 44 F.3d 940 (11th Cir. 1995) ............... 9

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

ii

PMA'S MOTION FOR CONFIRMATION OF
AWARDS – CV 08-2244 CW

*United Steelworkers of America v. Warrior & Gulf Nav. Co.*, 363 U.S. 574 (1960) ......... 6

*United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593 (1960) .............. 7, 8

## DOCKETED CASES

*PMA v. ILWU, et al.*, No. C-06-6148 ............................................................................ 1, 7

*PMA v. ILWU, et al.*, No. C-07-4618 ............................................................................ 1, 7

## FEDERAL STATUTES

29 U.S.C. § 158(b) ...................................................................................................... 11

29 U.S.C. § 185 ......................................................................................................... 1, 6

U.S. Const., Amendment I ............................................................................................ 9

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

PMA'S MOTION FOR CONFIRMATION OF
AWARDS – CV 08-2244 CW

1    <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2    **I.    <u>INTRODUCTION</u>**

3    Plaintiff Pacific Maritime Association ("PMA") seeks routine judicial confirmation of two

4    labor awards issued against Defendant International Longshore and Warehouse Union ("ILWU")

5    pursuant to the parties' collective bargaining agreement.[1]  The Coast Arbitrator, the final

6    authority under the contract's grievance-arbitration machinery, ruled that the ILWU's planned

7    work stoppage on May 1, 2008 violated the contract's no-strike clause.  The ILWU ignored the

8    awards, bringing the waterfront industry to a standstill and causing significant harm to PMA's

9    members.

10    In confirming the Coast Arbitrator's awards, this Court will follow a long line of similar

11    confirmations.  In the past three decades, the Ninth Circuit and the Northern District of California

12    repeatedly have confirmed the Coast Arbitrator's awards prohibiting the ILWU from striking in

13    violation of the labor contract, including in *PMA v. ILWU, et al.,* No. C-07-4618 (N.D. Cal. Jan.

14    8, 2008); *PMA v. ILWU, et al.,* No. C-06-6148 (N.D. Cal. Mar. 30, 2007); *PMA v. ILWU Local*

15    *10*, 1997 U.S. Dist. LEXIS 6017 (N.D. Cal. May 1, 1997); *PMA v. ILWU, et al.,* 517 F.2d 1158,

16    1163 (9th Cir. 1975); *PMA v. ILWU*, 304 F. Supp. 1315, 1318 (N.D. Cal. 1969), *aff'd,* 454 F.2d

17    262, 264 (9th Cir. 1971).

18    This precedent is not surprising.  Section 301 of the Labor Management Relations Act, the

19    federal statute that animates the strong policy favoring arbitration of labor disputes, requires

20    district courts to confirm any labor arbitration award that "draws its essence" from the contract.

21    Under this highly deferential standard of review, the court may not second-guess the arbitrator's

22    interpretation; instead, it must confirm an award that is even *arguably* based on the terms of the

23    agreement.  There is no doubt that the awards at issue here – issued after full evidentiary hearings

24    by a nationally-respected arbitrator – are based squarely on the terms of the longshore contract

25    and are therefore entitled to confirmation.

26    To avoid being held to its no-strike promise, the ILWU will argue that confirmation

27    ───────────────────

[1]    The awards, both issued on April 30, 2008, are attached as Exhibits D and E to the Declaration of Richard Marzano.

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1                                      PMA'S MOTION FOR CONFIRMATION OF
                                             AWARDS – CV 08-2244 CW

1  somehow violates the First and Thirteenth Amendments to the Constitution. This is entirely

2  meritless. The Coast Arbitrator's awards have nothing to do with the ILWU's political views;

3  they simply prohibit the ILWU from striking in violation of the contract, whatever the motivation

4  for the strike. Confirming those awards simply enforces the parties' bargain, as Section 301

5  requires; it does not prohibit speech or require involuntary servitude. Indeed, the courts have held

6  unequivocally that the First and Thirteenth Amendments are not a basis for refusing to confirm an

7  arbitrator's award that the union's work stoppage violates the collective bargaining agreement.

8  *See, New Orleans Steamship Ass'n v. Gen'l Longshore Workers*, 626 F.2d 455 (5th Cir. 1980)

9  (First and Thirteenth Amendments do not bar confirmation of labor arbitrator's award prohibiting

10  union from politically-motivated work stoppage that violates CBA's no-strike clause).

11  Accordingly, PMA respectfully requests that the Court grant its motion and confirm the

12  Coast Arbitrator's awards in full.

13  **II.    STATEMENT OF FACTS**

14  **A.    The Parties**

15  PMA is a multi-employer association of shipping, stevedoring and terminal companies

16  operating in ports along the West Coast. There are more than 80 PMA member company

17  employers. PMA is the bargaining representative for its members, and handles their labor

18  relations issues with respect to longshoremen and marine clerks. Defendant ILWU is the

19  exclusive bargaining representative for all longshore workers and marine clerks employed by

20  PMA's members in ports in California, Oregon, and Washington. (Declaration of Richard

21  Marzano ("Marzano Dec."), ¶¶ 2-3.)

22  **B.    The Collective Bargaining Agreement**

23  The ILWU and PMA, on behalf of their respective members, entered into the Pacific

24  Coast Longshore and Clerks Agreement 2002-2008, effective as of July 1, 2002 ("PCLCA"). The

25  PCLCA covers longshore workers and marine clerks employed by PMA members. The PCLCA

26  is, and at all times mentioned herein was, in full force and effect. (Marzano Dec., ¶ 4.)

27  Section 11 of the PCLCA, entitled "NO STRIKES, LOCKOUTS AND WORK

28  STOPPAGES," provides in part as follows:

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

PMA'S MOTION FOR CONFIRMATION OF
AWARDS – CV 08-2244 CW

> "11.1 There shall be no strike, lockout or work stoppage for the life of this Agreement."

> "11.2 The Union or the Employers, as the case may be, shall be required to secure observance of this Agreement."

> "11.43 Application of Contract Grievance Machinery."

> "11.431 The grievance machinery, pending investigation and adjudication of on the job disputes, requires that work shall be performed in accordance with specific provisions of the Agreement, or if the matter is not covered by the Agreement, work shall be continued as directed by the employer."

(Marzano Dec., ¶ 4, Ex. A.)

Section 17 of the PCLCA, entitled "JOINT LABOR RELATIONS COMMITTEES, ADMINISTRATION OF AGREEMENT AND GRIEVANCE PROCEDURES," provides a mandatory procedure for the presentation, adjustment and settlement of grievances, with binding arbitration as the final step, and states in part as follows:

> "17.15. The grievance procedure of this Agreement shall be the exclusive remedy with respect to any disputes arising between the Union or any person working under this Agreement or both, on the one hand, and the Association or any employer acting under this Agreement or both, on the other hand, and no other remedies shall be utilized by any person with respect to any dispute involving this Agreement until the grievance procedure has been exhausted."

> "17.16. Pending investigation and adjudication of such disputes work shall continue and be performed as provided in Section 11."

> "17.24. In the event that the Employer and Union members of any Joint Port Labor Relations Committee shall fail to agree upon any question before it, such question shall immediately be referred at the request of either party to the Area Arbitrator for hearing and decision, and the decision of the Area Arbitrator shall be final and conclusive except as otherwise provided in Section 17.26 [relating to appeals]."

> "17.57. All decisions of Arbitrators shall be observed and/or implemented. No decision of an Area Arbitrator, interim or final, can be appealed unless it is observed and/or implemented."

The ILWU, its officers and members, and all persons working under the PCLCA, are under a duty to abide by the above-mentioned no strike and grievance and arbitration provisions of the PCLCA. (Marzano Dec., ¶ 4, Ex. A.)

**C.     The ILWU Calls A Strike in Violation of the PCLCA**

On January 28, 2008, the ILWU Longshore Caucus – a representative body of longshore

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

3

PMA'S MOTION FOR CONFIRMATION OF
AWARDS – CV 08-2244 CW

workers, clerks and foremen that governs the Longshore Division of the ILWU – held a two-week conference in San Francisco, California, at which delegates voted "to support a resolution calling for an eight-hour 'stop-work' meeting during the day-shift on Thursday, May 1 at ports in CA, OR and WA to protest the war by calling for the immediate, safe return of U.S. troops from Iraq." (Marzano Dec., ¶ 5.)

According to the resolution, posted by Robert McEllrath, International President of the ILWU, on a website for the planned work stoppage, www.uslaboragainstwar.org, "it is time to take labor's protest to a more powerful level of struggle by calling on unions and working people in the U. S. and internationally to mobilize for a 'No Peace No Work Holiday' May 1, 2008 for 8 hours to demand an immediate end to the war and occupation in Iraq and Afghanistan and the withdrawal of U. S. troops from the Middle East ...." (Marzano Dec., ¶ 6.)

The work stoppage was widely publicized. The ILWU informed PMA of its intent to proceed with the action, published an announcement on its website and in its monthly newsletter to members, and Mr. McEllrath personally sent letters to the AFL-CIO, the Change to Win Coalition, and other labor organizations seeking their support. As Mr. McEllrath stated, "[t]he Caucus has spoken on this important issue and I've notified the employers about our plans for 'stop work' meetings on May 1." (Marzano Dec., ¶ 7.)

The ILWU attempted to characterize the planned work stoppage as a monthly stop-work meeting permitted under the PCLCA. Section 12.3 of the PCLCA provides for monthly stop-work meetings only during overtime hours on the second shift. Any stop-work meeting at any other time requires PMA approval. (Marzano Dec., ¶ 8.)

After a series of letters and verbal communications between Mr. McEllrath and James McKenna, President and CEO of PMA, the ILWU eventually agreed not to hold a stop-work meeting on May 1. But the ILWU refused to guarantee that there would be no work stoppage on May 1 or to take specific steps to notify its membership to report for duty as normal on that day. (Marzano Dec., ¶¶ 9-14, Ex. B.) Instead, the ILWU continued to encourage the work stoppage. The April 2008 edition of *The Dispatcher,* the ILWU's official newspaper, included an article entitled "Stop work meetings on May 1 will focus on Iraq war." (Marzano Dec., ¶ 13, Ex. C.)

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

4

PMA'S MOTION FOR CONFIRMATION OF
AWARDS – CV 08-2244 CW

### D.    The Coast Arbitrator's Awards

On April 23, 2008, PMA submitted this dispute to Coast Arbitrator John Kagel, the final step in the PCLCA's arbitration process.  The Coast Arbitrator held a hearing at 9 a.m. on April 24, 2008, in which he received evidence and arguments from both PMA and the ILWU.  The Coast Arbitrator ruled in PMA's favor and ordered the ILWU to notify all of its members to report as normal on May 1, 2008. (Marzano Dec., ¶ 15.)

Having received no confirmation that the ILWU had complied with the Coast Arbitrator's Award, PMA again raised the issue with the Coast Arbitrator on the morning of April 30, 2008.  The Coast Arbitrator received evidence and argument from PMA and the ILWU and issued a written decision in PMA's favor.  In his Award, the Coast Arbitrator incorporated by reference his April 24, 2008 award and concluded that "the Union's efforts to comply with the April 24, 2008 order fell short of the intent of the Agreements."  The Coast Arbitrator's Award stated:

1.    The Union has not effectively complied with the April 24, 2008 ruling, in violation of Section 17.57.

2.    Any deliberate and/or concerted action of directing Longshoremen, Clerks and others that they are not to work, or that they are not working, on May 1, 2008 is a violation of Sections 11.1, and 11.2 of the PCLCD and PCCCD.

3.    There shall be no unilateral concerted job action or illegal work stoppage in violation of the Agreement during the May 1, 2008 day shift.

4.    The Union shall take immediate and affirmative steps to notify its Locals and members of their contractual obligation and direct all members to report to work as they normally do during the day shift on May 1, 2008.

(Marzano Dec., ¶ 16, Ex. D.)

The ILWU once again refused to comply with the award.  Rather than direct its members to report for work as normal, the ILWU continued to encourage its members not to report to work on May 1. (Marzano Dec., ¶ 17.)

On the afternoon of April 30, 2008, PMA again approached the Coast Arbitrator with fresh evidence of the ILWU's failure to comply with the awards.  After a telephonic hearing in which both parties were represented, the Coast Arbitrator issued another decision in PMA's favor. In the award, the Coast Arbitrator found "evidence in the form of tape transcripts and documents

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

5

PMA'S MOTION FOR CONFIRMATION OF
AWARDS – CV 08-2244 CW

1   which confirm concerted activity to not work on May 1, 2008 day shift.  That evidence shows a

2   violation of the award issued this morning, now called C-04-2008, and Sections 11.1 and 11.2 of

3   the PCCCD and PCLCD."  The Coast Arbitrator concluded that "[t]he Union, its Officers and

4   members are in violation of the orders of the Coast Arbitrator set forth in C-04-2008 which is

5   incorporated herein by reference." (Marzano Dec., ¶ 18, Ex. E.)

6           **E.      The ILWU Goes on Strike, Shutting Down All 29 West Coast Ports**

7           As PMA and its members feared, on May 1, 2008, the ILWU and its locals carried

8   through with their plans for a complete coastwise work stoppage, leaving dozens of vessels idle in

9   the ports and causing significant harm to PMA's members.  In a press release issued the same

10  day, the ILWU's President, Mr. McEllrath, stated that the membership was "standing-down on

11  the job and standing up for America."  The press release also confirmed that the ILWU's strike

12  was coastwide, involving all 25,000 longshore workers at all 29 West Coast ports. (Marzano

13  Dec., ¶ 19, Ex. F.)

14  **III.    THE COAST ARBITRATOR'S AWARDS ARE FINAL AND BINDING
15          INTERPRETATIONS OF THE PCLCA AND SHOULD BE CONFIRMED BY
            THIS COURT**

16          **A.      Confirming the Awards Furthers the Strong Federal Policy in Favor of Labor
17                  Arbitration**

18          Section 301 of the Labor Management Relations Act ("LMRA"), which gives the federal

19  courts jurisdiction over "suits for violation of contracts between an employer and a labor

20  organization," 29 U.S.C. § 185(a), reflects this nation's strong policy in favor of the arbitration of

21  labor disputes. *See, United Steelworkers of America v. Warrior & Gulf Nav. Co.,* 363 U.S. 574,

22  578 (1960); *United Brotherhood of Carpenters and Joiners of America, Local No. 1780 v. Desert*

23  *Palace, Inc.,* 94 F.3d 1308, 1312 (9th Cir. 1996).  To effectuate this policy, on a motion under

24  Section 301, the district court must either confirm or vacate the arbitrator's award. *Millmen Local*

25  *550 v. Wells Exterior Trim,* 828 F.2d 1373, 1375 (9th Cir. 1987).

26          The Supreme Court has held specifically that Section 301 authorizes the federal courts to

27  "enforce an arbitrator's decision that [a] strike violates the collective-bargaining agreement."

28  *Jacksonville Bulk Terminals v. ILA*, 457 U.S. 702, 711 n. 10 (1982).  *See also, Buffalo Forge Co.*

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

6                    PMA'S MOTION FOR CONFIRMATION OF
                    AWARDS – CV 08-2244 CW

*v. United Steelworkers of America*, 428 U.S. 397, 405 (1976) ("were the issue arbitrated and the strike found illegal, the relevant federal statutes as construed in our cases would permit an injunction to enforce the arbitral decision"); *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 599 (1960) (affirming district court's order "that defendant corporation must promptly abide by the valid, complete and binding decision and award made by the arbitrator").

Confirming the arbitrator's award is particularly familiar territory for the parties in this case. The Ninth Circuit and district courts routinely confirm and enforce awards by the Coast Arbitrator prohibiting the ILWU and its locals from striking in violation of the PCLCA. *See, PMA v. ILWU, et al.,* No. C-07-4618 (N.D. Cal. Jan. 8, 2008) (confirming Coast Arbitrator's award barring ILWU from engaging in work stoppage in violation of PCLCA); *PMA v. ILWU, et al.,* No. C-06-6148 (N.D. Cal. Mar. 30, 2007) (confirming Coast Arbitrator's award prohibiting union members from walking off job); *PMA v. ILWU Local 10*, 1997 U.S. Dist. LEXIS 6017 (N.D. Cal. May 1, 1997) (confirming Coast Arbitrator's award prohibiting strike); *PMA v. ILWU, ILWU Local 19,* 517 F.2d 1158, 1163 (9th Cir. 1975) (affirming confirmation of Coast Arbitrator's award barring work stoppage); *PMA v. ILWU*, 304 F. Supp. 1315, 1318 (N.D. Cal. 1969) (confirming Coast Arbitrator's award requiring ILWU to cease work stoppage), *aff'd,* 454 F.2d 262, 264 (9th Cir. 1971).

PMA asks this Court to follow this well-worn path and confirm the Coast Arbitrator's awards in this case.

## B.    The Court Must Defer to the Arbitrator's Interpretation of the CBA

There is a heavy presumption in favor of confirming a labor arbitrator's award under Section 301. The award should be confirmed as long as it "draws its essence from the collective bargaining agreement." *United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 599 (1960). This is an extraordinarily deferential standard of review: "an award must be confirmed if the arbitrators even arguably construed or applied the contract and acted within the scope of their authority." *Barnes v. Logan,* 122 F.3d 820, 821 (9th Cir. 1997).

In a confirmation action under Section 301, the court may not review the merits of the award or substitute its interpretation for that of the arbitrator. *Enterprise Wheel & Car Corp.,*

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

7

PMA'S MOTION FOR CONFIRMATION OF
AWARDS – CV 08-2244 CW

*supra,* 363 U.S. at 599 (holding that the courts "have no business overruling [the arbitrator] because their interpretation of the contract is different from the arbitrator's"). The Ninth Circuit has repeatedly affirmed this broad standard of judicial deference to a labor arbitrator's award:

> It is not the function of the courts to review the merits of arbitration awards. The interpretation of a collective bargaining agreement is a question for the arbitrator. It is the arbitrator's construction that was bargained for, and so far as the arbitrator's decision concerns construction of the contract, the courts have no business overruling him, because their interpretation of the contract is different than his.

*San Francisco-Oakland Newspaper Guild v. Tribune Pub. Co.,* 407 F.2d 1327, 1327 (9th Cir. 1969) (per curiam). "Deference is the rule; rare is the exception." *Stead Motors of Walnut Creek v. Automotive Machinists Lodge No. 1173, IAM,* 886 F.2d 1200, 1209 (9th Cir. 1989). *See also, Sprewell v. Golden State Warriors,* 266 F.3d 979, 986 (9th Cir. 2001) ("Judicial scrutiny of an arbitrator's decision in a labor dispute is 'extremely limited'"). "[A] mere ambiguity in the opinion accompanying an award" is not a basis for refusing to enforce the award. *Enterprise Wheel & Car Corp.,* 363 U.S. at 598. Nor may confirmation be denied because the award lacks detailed factual findings or analysis, for "'arbitrators have no obligation ... to give their reasons for an award' at all." *Stead Motors*, 886 F.2d at 1203 (quoting *Enterprise Wheel & Car Co.*, 363 U.S. at 598).

The Coast Arbitrator's April 30, 2008 awards plainly "draw their essence" from the PCLCA. The Coast Arbitrator, John Kagel, is a well-respected national arbitrator. His awards were issued after full hearings in which both sides presented evidence and argument for their respective positions. The awards are based on the facts presented at the hearings and the express provisions of the PCLCA. They are entitled to full confirmation by this Court under LMRA § 301.

### C.    The ILWU's Constitutional Defenses Fail Under Well-Settled Law

PMA anticipates that the ILWU will repeat a version of the argument it made in opposition to PMA's earlier application for a TRO – that enforcing the awards would violate the First and Thirteenth Amendments to the Constitution. Not so. As the courts have held in these very circumstances, a union may not use the Constitution as a smokescreen to break its promise

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

8

PMA'S MOTION FOR CONFIRMATION OF
AWARDS – CV 08-2244 CW

1    not to strike in violation of a collective bargaining agreement.

2        1.    *The First Amendment Does Not Apply Because Judicial Enforcement of a Private Contract Does Not Constitute State Action*

3

4        The First Amendment states that "Congress shall make no law ... abridging the freedom of

5    speech ... or the right of the people peaceably to assemble, and to petition the government for a

6    redress of grievances." U.S. Const., Amendment I.  This "is a restraint on government action, not

7    that of private persons." *Columbia Broad. Sys., Inc. v. Democratic Nat'l Comm.*, 412 U.S. 94, 114

8    (1973) (quoting *Public Utilities Comm'n v. Pollak*, 343 U.S. 451 (1952)).  Thus, judicial

9    enforcement of private contracts, such as collective bargaining agreements, does not constitute

10   state action. *See, United Egg Producers v. Standard Brands, Inc.,* 44 F.3d 940, 942-43 (11th Cir.

11   1995) (where "parties in positions of equal bargaining power agree ... to restrain, in a limited

12   degree, their First Amendment rights ... we hold that court enforcement of that agreement is not

13   government action for First Amendment purposes"); *Cable Inv., Inc. v. Woolley*, 680 F. Supp.

14   174, 178 (M.D. Pa. 1987) ("where state courts take action to enforce the right of private persons

15   which are permitted but not compelled by law, there is no state action for constitutional

16   purposes").  Indeed, "if ... every private right were transformed into government action by the

17   mere fact of court enforcement of it, the distinction between private and governmental action

18   would be obliterated." *United Egg Producers, supra,* 44 F.3d at 943.

19       Seeking to obliterate that distinction completely, the ILWU relied on *Shelley v. Kramer*,

20   334 U.S. 1 (1948), in which the Supreme Court held that enforcement of a racially restrictive

21   covenant could constitute state action under the Fourteenth Amendment.  *Shelley,* however, is a

22   narrow exception to the well-established state action requirement.  Indeed, the courts have

23   expressly refused to expand *Shelley* beyond the racial discrimination context. *See, Davis v.

24   Prudential Secs., Inc.,* 59 F.3d 1186, 1191 (11th Cir. 1995) (rejecting argument that court

25   enforcement of private contract constituted state action and explaining that "[t]he holding of

26   *Shelley* ... has not been extended beyond the context of race discrimination"); *Parks v. "Mr.

27   Ford",* 556 F.2d 131, 136 (3d Cir. 1977) (explaining that the *Shelley* doctrine "has been limited to

28   cases involving racial discrimination").  *See also, Int'l Olympic Comm. v. San Francisco Arts &*

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

9                    PMA'S MOTION FOR CONFIRMATION OF
                     AWARDS – CV 08-2244 CW

1    *Athletics,* 781 F.2d 733, 737 (9th Cir. 1986) (rejecting argument under *Shelley* that judicial

2    enforcement of rights constituted state action under Fifth Amendment).  The ILWU's First

3    Amendment argument must be rejected for this reason alone.

4              2.        *The First and Thirteenth Amendments Do Not Bar Enforcement of*
               *Arbitration Awards Prohibiting a Union From Engaging in a Politically-*
5              *Motivated Work Stoppage*

6              The ILWU's constitutional defenses fail fundamentally because the Coast Arbitrator's

7    Awards do not limit speech or require any individual to perform personal services.  The Coast

8    Arbitrator merely concluded that the ILWU violated the PCLCA by facilitating a strike during the

9    day shift on May 1, 2008. (Marzano Dec., Ex. D, E.)  The awards had nothing to do with the

10   content of the ILWU's speech or the political motivation for the strike.

11             The courts have considered and rejected the very argument the ILWU advances here.  In

12   *New Orleans Steamship Ass'n v. Gen'l Longshore Workers*, 626 F.2d 455 (5th Cir. 1980), the

13   President of the International Longshoremen's Association (the union representing longshore

14   workers at ports on the Atlantic and Gulf Coasts) instructed the ILA's members to boycott all

15   shipments to or from the Soviet Union.  The ILA's work stoppage was "not motivated by any

16   hope for economic gain or by any dispute with any employer members, but was purely a political

17   protest." *Id.* at 459.  When the next vessel arrived at a port in Louisiana to pick up corn bound for

18   the Soviet Union, the longshore workers refused to load it.  In response, the employers filed

19   grievances under the three collective bargaining agreements governing ILA workers at that port,

20   claiming that the work stoppage violated the contract's no-strike clause.  After separate hearings,

21   all three arbitrators found for the employers and ordered the ILA to cease and desist from the

22   boycott. *Id.* at 459-60.

23             The employers filed an action in federal court to confirm the awards under LMRA § 301,

24   and the court enforced all three awards.  The ILA appealed, arguing that its protest was purely

25   political and therefore the district court's order violated the First and Thirteenth Amendments. *Id.*

26   at 462.  The Fifth Circuit squarely rejected the ILA's constitutional arguments.  The court

27   explained that, although the First Amendment is phrased in absolute terms, "the Congress may

28   regulate labor relations affecting interstate commerce and the federal courts may implement

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

10

congressional policy by enjoining action that obstructs it ...." *Id.* at 463.  The court noted that "[t]he first amendment 'does not protect behavior made unlawful by legitimate legislation or regulation, enacted for purposes unrelated to the suppression of free expression.'" *Id.* (citations omitted).  Nor was the enforcement order an invalid "prior restraint" on speech:

> The argument that the injunction against the refusal to work ships is a "prior restraint" on speech does not withstand analysis.  Neither President Gleason nor any other ILA officer or member is enjoined from speaking.  They are enjoined simply from continuing a work stoppage ....

*Id.*[2]

The ILA's Thirteenth Amendment argument also missed the mark:

> The court's order prohibits only a concerted work stoppage, and cannot be construed as an edict requiring an individual to perform personal services.  An employee remains free to quit his employment at any time.  The argument that the district court injunction enforced a promise to render personal services has, therefore, been rejected on numerous occasions by the Supreme Court.

*Id.* at 463.  Accordingly, the court concluded, "neither the first nor the thirteenth amendment was violated by either injunction." *Id.  See also, Jacksonville Bulk Terminals, Inc. v. Int'l Longshoremen's Ass'n*, 457 U.S. 702, 711 n. 10 (1982) (noting that employer may obtain injunction enforcing arbitrator's award that politically-motivated work stoppage violates collective bargaining agreement).

The Fifth Circuit's analysis applies with full force here.  The Coast Arbitrator's awards simply require the ILWU to keep its promise not to strike.  That the May Day work stoppage was politically motivated is irrelevant.  Confirming these two awards will not prohibit the ILWU or its members from expressing their political views and it will not compel involuntary servitude.  Accordingly, as in *News Orleans Steamship Ass'n,* there no constitutional bar to confirming the Coast Arbitrator's awards.[3]

---

[2]    The ILWU's "prior restraint" argument also fails because the work stoppage is over. *See, Alexander v. U.S.*, 509 U.S. 544, 550 (1993) (prior restraints are "administrative and judicial orders forbidding certain communications when issued *in advance* of the time that such communications are to occur") (emphasis added).

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

11

PMA'S MOTION FOR CONFIRMATION OF
AWARDS – CV 08-2244 CW

IV.     **CONCLUSION**

For all of the foregoing reasons, PMA respectfully requests that this Court confirm the two Awards issued by the Coast Arbitrator on April 30, 2008.

Dated:  May 28, 2008                                    MORGAN, LEWIS & BOCKIUS LLP


By _____/ s /_____
                                                         Brendan Dolan
                                                         Attorneys for Plaintiff
                                                         PACIFIC MARITIME ASSOCIATION

---

[3]     For the same reasons, the courts have held that the Constitution does not preclude injunctions against secondary boycott activity that violates the National Labor Relations Act, 29 U.S.C. § 158(b)(4).  *See, e.g., Jacksonville Bulk Terminals, supra,* 457 U.S. at 718-19 (Congress gave National Labor Relations Board power to petition federal court for injunction prohibiting politically-motivated secondary boycott activity); *Int'l Longshoremen's Ass'n v. Allied Int'l, Inc.,* 456 U.S. 212, 226 (1982) ("We have consistently rejected the claim that secondary picketing by labor unions in violation of § 8(b)(4) is protected activity under the First Amendment").

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

12                    PMA'S MOTION FOR CONFIRMATION OF
                                     AWARDS – CV 08-2244 CW

1   BRENDAN DOLAN, State Bar No. 126732
    MORGAN, LEWIS & BOCKIUS LLP
2   One Market Street
    San Francisco, CA  94105
3   Tel:  415.442.1000
    Fax:  415.442.1001
4   *bdolan@morganlewis.com*

5   CLIFFORD D. SETHNESS, State Bar No. 212975
    JASON M. STEELE, State Bar No. 223189
6   MORGAN, LEWIS & BOCKIUS LLP
    300 South Grand Avenue
7   Twenty-Second Floor
    Los Angeles, CA  90071-3132
8   Tel: 213.612.2500
    Fax: 213.612.2501
9   *csethness@morganlewis.com*
    *jsteele@morganlewis.com*
10
    *Attorneys for Plaintiff*
11  PACIFIC MARITIME ASSOCIATION

12              UNITED STATES DISTRICT COURT

13          NORTHERN DISTRICT OF CALIFORNIA

14  PACIFIC MARITIME ASSOCIATION, a          Case No. CV-08-2244 CW
    California corporation,
15                                           Hon. Claudia Wilken
                    Plaintiff,
16                                           **DECLARATION OF RICHARD
          v.                                 MARZANO IN SUPPORT OF PLAINTIFF
17                                           PMA'S MOTION FOR CONFIRMATION
    INTERNATIONAL LONGSHORE AND              OF LABOR ARBITRATION AWARDS**
18  WAREHOUSE UNION, an
    unincorporated labor organization,       Date:      July 3, 2008
19                                           Time:      2:00 p.m.
                    Defendant.               Courtroom: 2
20

21

22

23

24

25

26

27

28

1

### DECLARATION OF RICHARD MARZANO

2    I, Richard Marzano, declare as follows:

3    1.    I am the Director of Contract Administration and Arbitration for the Pacific

4  Maritime Association ("PMA"), the plaintiff in this case.  As the Director of Contract

5  Administration and Arbitration, I oversee and coordinate several aspects of PMA's administration

6  of the collective bargaining agreement with the International Longshore and Warehouse Union

7  ("ILWU") and its various locals in ports along the West Coast.  I have personal knowledge of the

8  facts set forth in this declaration, and would testify competently as to those facts if called as a

9  witness.

10    2.    PMA is a multiemployer collective bargaining association whose members include

11  stevedoring, terminal, and shipping companies that employ dockworkers in ports throughout the

12  United States Pacific Coast.  PMA represents these employers in the negotiation, administration,

13  and enforcement of collective bargaining agreements governing waterfront employment.

14    3.    The ILWU is a labor organization with headquarters in San Francisco.  The ILWU

15  is, and at all times mentioned herein was, the duly certified collective bargaining representative

16  for dockworkers employed by members of PMA on the Pacific Coast.  The ILWU negotiates and

17  enters into collective bargaining agreements with PMA, covering terms and conditions of

18  employment of dockworkers employed by PMA members on the Pacific Coast.

19    4.    The ILWU and PMA, on behalf of their respective members, entered into the

20  Pacific Coast Longshore and Clerks Agreement 2002-2008, effective as of July 1, 2002

21  ("PCLCA").  The PCLCA covers longshore workers and marine clerks employed by PMA

22  members.  The PCLCA has been in full force and effect since 2002.  True and correct copies of

23  the relevant portions of the PCLCA are attached hereto as **Exhibit A**.

24    5.    On January 28, 2008, the ILWU Longshore Caucus – a representative body of

25  longshore workers, clerks and foremen that governs the Longshore Division of the ILWU – held a

26  two-week conference in San Francisco, California, at which delegates voted "to support a

27  resolution calling for an eight-hour 'stop-work' meeting during the day-shift on Thursday, May 1

28  at ports in CA, OR and WA to protest the war by calling for the immediate, safe return of U.S.

1  troops from Iraq."

2       6.       According to the resolution, posted by Robert McEllrath, International President of

3  the ILWU, on a website for the planned work stoppage, *www.uslaboragainstwar.org*, "it is time

4  to take labor's protest to a more powerful level of struggle by calling on unions and working

5  people in the U. S. and internationally to mobilize for a 'No Peace No Work Holiday' May 1,

6  2008 for 8 hours to demand an immediate end to the war and occupation in Iraq and Afghanistan

7  and the withdrawal of U. S. troops from the Middle East ...."

8       7.       The work stoppage was widely publicized.  The ILWU informed PMA of its intent

9  to proceed with the action, published an announcement on its website and in its monthly

10 newsletter to members, and Mr. McEllrath personally sent letters to the AFL-CIO, the Change to

11 Win Coalition, and other labor organizations seeking their support.  Mr. McEllrath stated that

12 "[t]he Caucus has spoken on this important issue and I've notified the employers about our plans

13 for 'stop work' meetings on May 1."

14      8.       The ILWU initially attempted to characterize the planned work stoppage as a

15 monthly "stop-work" meeting permitted under the PCLCA.  Section 12.3 of the PCLCA provides

16 for monthly stop-work meetings only during overtime hours on the *second shift*.  Any stop-work

17 meeting at any other time requires PMA approval.

18      9.       In March and April, James McKenna, President and CEO of PMA, and Mr.

19 McEllrath exchanged several written communications regarding the planned stop-work meeting

20 on May 1.  True and correct copies of these communications are attached hereto as **Exhibit B**.

21      10.      On March 17, 2008, James McKenna, President and CEO of PMA, sent Mr.

22 McEllrath a letter stating that the Employers would *not* agree to a May 1 stop-work meeting, and

23 considered any such job action to be in direct violation of the contracts.  Mr. McKenna requested

24 that the ILWU confirm by March 26, 2008 that the May 1 stop-work meeting would not occur.

25 The ILWU did not respond to PMA's letter.

26      11.      Thereafter, at a meeting on or about March 31, 2008, Mr. McEllrath orally

27 indicated to Mr. McKenna that there would be no stop-work meeting on May 1, but did not state

28 that no other work stoppages would occur.  After the meeting, Mr. McKenna sent Mr. McEllrath

1    another letter, stating that PMA would not consent to a work stoppage or any other action aimed

2    at disrupting port operations.

3        12.    Mr. McKenna again asked the ILWU to confirm by April 9, 2008, in writing, that

4    the ILWU would not engage in any May 1 work stoppage.  Mr. McKenna also requested that Mr.

5    McEllrath remove the aforementioned postings and letters from the ILWU website and take steps

6    to ensure that all ILWU members would report to work on May 1 and perform their duties as

7    expected.

8        13.    The ILWU responded on April 8, 2008 by letter from Mr. McEllrath to Mr.

9    McKenna.  Mr. McEllrath stated that no ILWU local union would move its regularly scheduled

10   May stop-work meeting to the day shift on May 1, but explicitly declined to communicate to the

11   ILWU membership that there will be no stop-work meeting or other job action on May 1.

12   Instead, the ILWU in its April 2008 *Dispatcher* newsletter featured an article entitled "*Stop work*

13   *meetings on May 1 will focus on Iraq war.*"  A true and correct copy of these portions of the

14   *Dispatcher* are attached hereto as **Exhibit C**.

15       14.    Mr. McKenna responded with another request that the ILWU take the affirmative

16   steps outlined in his April 9 letter.  The ILWU again refused, with Mr. McEllrath stating in a

17   letter that "the Longshore Division Caucus recently approved a resolution calling for a May 1

18   protest against the Iraq war.  Consequently, *members from various locals will participate in*

19   *planned events on May 1*." (emphasis added.)  Mr. McEllrath went on to explain that manpower

20   may be limited on May 1.

21       15.    On April 23, 2008, PMA submitted this dispute to Coast Arbitrator John Kagel,

22   the final step in the PCLCA's arbitration process.  The Coast Arbitrator held a hearing at 9 a.m.

23   on April 24, 2008, in which he received evidence and arguments from both PMA and the ILWU.

24   The Coast Arbitrator ruled in PMA's favor and ordered the ILWU to notify all of its members to

25   report as normal on May 1, 2008.

26       16.    Having receiving no confirmation that the ILWU had complied with the Coast

27   Arbitrator's Award, PMA again raised the issue with the Coast Arbitrator on the morning of April

28   30, 2008.  The Coast Arbitrator received evidence and argument from PMA and the ILWU and

issued a written decision in PMA's favor, a true and correct copy of which is attached hereto as

**Exhibit D**.  In his Award, the Coast Arbitrator incorporated by reference his April 24, 2008

award and concluded that "the Union's efforts to comply with the April 24, 2008 order fell short

of the intent of the Agreements."  The Coast Arbitrator's Award stated:

> 1. The Union has not effectively complied with the April 24, 2008 ruling, in violation of Section 17.57.
>
> 2. Any deliberate and/or concerted action of directing Longshoremen, Clerks and others that they are not to work, or that they are not working, on May 1, 2008 is a violation of Sections 11.1, and 11.2 of the PCLCD and PCCCD.
>
> 3. There shall be no unilateral concerted job action or illegal work stoppage in violation of the Agreement during the May 1, 2008 day shift.
>
> 4. The Union shall take immediate and affirmative steps to notify its Locals and members of their contractual obligation and direct all members to report to work as they normally do during the day shift on May 1, 2008.

17.     The ILWU once again refused to comply with the award.  Rather than direct its

members to report for work as normal, the ILWU and its locals continued to inform its members

that there would be a work stoppage on May 1.

18.     On the afternoon of April 30, 2008, PMA again approached the Coast Arbitrator

with fresh evidence of the ILWU's failure to comply with the awards.  After a telephonic hearing

in which both PMA and the ILWU were represented, the Coast Arbitrator issued another decision

in PMA's favor, a true and correct copy of which is attached hereto as **Exhibit E**.  In the award,

the Coast Arbitrator found "evidence in the form of tape transcripts and documents which

confirm concerted activity to not work on May 1, 2008 day shift.  That evidence shows a

violation of the award issued this morning, now called C-04-2008, and Sections 11.1 and 11.2 of

the [PCLCA]."  The Coast Arbitrator concluded that "[t]he Union, its Officers and members are

in violation of the orders of the Coast Arbitrator set forth in C-04-2008 which is incorporated

herein by reference."

19.     As PMA and its members feared, on May 1, 2008, the ILWU and its locals carried

through with their plans for a complete coastwise work stoppage, leaving dozens of vessels idle in

the ports and causing significant economic harm to PMA's members.  The ILWU issued a press

1   release the same day, a true and correct copy of which is attached hereto as **Exhibit F**.

2          I declare under penalty of perjury under the laws of the United States of America that the

3   foregoing is true and correct.

4          Executed this **27** day of May, 2008, at San Francisco, California.

5

6                                                    Richard Marzano

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Exhibit A

# PACIFIC COAST LONGSHORE CONTRACT DOCUMENT

July 1, 2002 – July 1, 2008

*Between*

INTERNATIONAL LONGSHORE AND
WAREHOUSE UNION

*and*

PACIFIC MARITIME ASSOCIATION

———————

Name _____

Port _____

Local No. _____ Reg. No. _____

## SECTION 11

## NO STRIKES, LOCKOUTS, AND WORK STOPPAGES

**11.1**  There shall be no strike, lockout or work stoppage for the life of this Agreement.

**11.2**  The Union or the Employers, as the case may be, shall be required to secure observance of this Agreement.

**11.3**  How work shall be carried on.

**11.31**  In the event grievances or disputes arise on the job, all men and gangs shall continue to work as directed by the employer in accordance with the specific provisions of the Agreement or if the matter is not covered by the Agreement, work shall be continued as directed by the employer.

**11.4**  Exceptions and Procedures for Health and Safety and Onerous Workload.

**11.41**  Health and safety exception. Longshoremen shall not be required to work when in good faith they believe that to do so is to immediately endanger health and safety. Only in cases of bona fide health and safety issues may a standby be justified. The Union pledges in good faith that health and safety will not be used as a gimmick. The employer shall have the option of having the men who raise a question of health and safety stand by until a decision is reached or "working around" the situation until it can be resolved, and no further work shall be performed on that disputed operation until the health and safety issue is resolved.

**11.42**  Onerous workload exception. Longshoremen on cargo handling operations shall not be required to work when in good faith they believe that to do so will result in an onerous workload. The Union pledges in good faith that the onerous workload claim will not be used as a gimmick. The employer

shall have the option of having the men claiming onerousness stand by until a decision is reached or "working around" the situation until it can be resolved.

**11.421**  When a man is directed to take his own relief without a man being assigned to relieve him, this does not automatically present a question of onerousness of work or individual speedup for the men remaining on the job, regardless of the basic gang structure involved. A change in operations or manning to remove unnecessary men, or the handling of larger loads does not, in and of itself, automatically present any question of onerousness of work or individual speedup.

**11.422**  The procedure provided in Section 11.42 shall not apply on operations where the Association and the Union have agreed to changed operations or reduced manning under Sections 10.3 and 10.5. If claims of onerousness are presented in such cases, they shall be referred to the Joint Coast Labor Relations Committee.

**11.4221**  The foregoing Section 11.422 is intended to mean that agreements reached on changed operations or reduced manning in accordance with the Contract procedures shall not be challenged as being onerous operations if no further change has been made following such agreement. In other words, claims of onerousness shall not be used to challenge agreed manning if the operation is unchanged in all respects. Any such challenges shall be referred to the Joint Coast Labor Relations Committee.

**11.43**  General Procedures for Health and Safety and Onerous Disputes.

**11.431**  The men must ask their steward to bring the question of health, safety or onerousness to the attention of the foreman or walking boss in immediate charge of the operation. The steward and his immediate superior (gang boss, hatch

NO STRIKES, LOCKOUTS, AND
WORK STOPPAGES

SECTION 11

SECTION 11

NO STRIKES, LOCKOUTS, AND
WORK STOPPAGES

boss, etc.) are the only individuals who shall present the situation to the foreman or walking boss.

**11.432** If agreement cannot be reached in Section 11.431 the Business Agent shall be called. (The walking boss, gang boss or hatch boss and the Business Agent or steward, who are responsible and safety-minded individuals should be able to determine whether a condition is safe or unsafe.)

**11.433** If agreement cannot be reached in Section 11.432, an immediate Joint Port Labor Relations Committee meeting shall be called on the job.

**11.434** If agreement cannot be reached in Section 11.433, the Area Arbitrator shall be called to the job for an immediate ruling.

**11.44** Health and Safety Procedure.

**11.441** The Area Arbitrator shall make an immediate ruling as to how work shall proceed. After the work proceeds the Arbitrator shall make a further ruling that a bona fide health or safety issue did or did not exist.

**11.442** Where the Arbitrator decides or where agreement is reached in any one of the steps under Section 11.43 that the employers were correct, the men shall not be paid for standby time, if involved.

**11.443** Where the Arbitrator decides or where agreement is reached in any one of the steps under Section 11.43 that the men were correct, the men shall be paid for standby time, if involved.

**11.444** If the Arbitrator decides or it is agreed at any step under Section 11.43 that an unsafe condition exists which can be corrected, the men shall work as directed to correct such condition.

**11.445** If it is determined at any step under Section 11.43 that the condition claimed to be unsafe is in fact safe, the men shall resume work as directed and failure to resume work as directed shall be cause to remove the men from the payroll as of the time of standby.

**11.446** If during a period of standby on an issue of health and safety any man leaves his place of work except upon instructions of the walking boss, he shall be removed from the payroll as of the time of standby regardless of how the issue is settled. Any man who so leaves without obtaining his own replacement shall be automatically subject to appropriate penalties under the grievance machinery.

**11.45** Onerous Work Load Procedure.

**11.451** The Area Arbitrator shall make an immediate ruling as to whether the original direction of the employer did or did not impose an onerous workload.

**11.452** After the employer has directed the men as to how work shall proceed on the basis of the Arbitrator's ruling and the work proceeds in accordance with the direction of the employer, the Arbitrator shall make a further ruling that a bona fide question of onerousness of the workload did or did not exist.

**11.453** Where the Arbitrator decides or where agreement is reached in any one of the steps under Section 11.43 that to work in accordance with the employer's original direction did not impose an onerous workload and the employer exercised his option to have the men claiming onerousness stand by until a decision is reached, the men shall not be paid for standby time and may be required to work beyond the time the shift otherwise would end to make up the time the men stood by.

**11.4531** Such makeup time shall not exceed 2 hours, and the work will be performed at the rate applicable.

The first 8 hours of time paid for, including "makeup" time on the standard first and second shift and the first 5 hours of time paid for, including "makeup" time on the third shift shall be paid at the appropriate shift rates. If work goes beyond the standard shifts as set forth in Section 2.4 in order to complete as much as possible of a regular or extended shift, such work shall be paid at the appropriate shift overtime rate. When "makeup" time is worked, and the work goes beyond 5 hours without a meal period, the employees involved shall have the option of going to a meal on their own time and returning to complete the "makeup" time, or of finishing the "makeup" time without going to a meal.

**11.454**  Where the Arbitrator decides or where agreement is reached in any one of the steps under Section 11.43 that the original direction of the employer as to how work should proceed did impose an onerous workload and the employer exercised his option to have the men stand by until a decision is reached, the men shall be paid for standby time.

**11.455**  If the Arbitrator decides or it is agreed at any one of the steps under Section 11.43 that the original direction of the employer does not impose an onerous workload and if the men are directed to resume work as originally directed, any failure to resume work as directed shall be the cause to remove the men from the payroll as of the time the men were directed by the employer to stand by if the employer had not directed them to "work around" the situation, or as of the time the men fail to resume work as directed.

**11.456**  If during a period of standby on an onerous issue any man leaves his place of work except upon instructions of the walking boss, he shall be removed from the payroll as of the time of standby regardless of how the issue is settled. Any man who so leaves without obtaining his own replacement

shall be automatically subject to appropriate penalties under the grievance machinery.

**11.46**  Application of Contract Grievance Machinery.

**11.461**  The grievance machinery, pending investigation and adjudication of on the job disputes, requires that work shall be performed in accordance with specific provisions of the Agreement, or if the matter is not covered by the Agreement, work shall be continued as directed by the employer. Exceptions to this arise only where longshoremen in good faith believe that to do so is to immediately endanger health and safety or in good faith believe that to do so imposes an onerous workload.

**11.462**  The preceding procedures apply specifically to issues initially presented as being a dispute under health or safety or a dispute as to onerousness. On all other issues, the authority of the walking boss or foreman to remove men from the payroll for cause is not disturbed.

**11.463**  Should the Arbitrator rule that the issue of health or safety or onerousness was raised as a gimmick, the Employers may process the matter through the grievance procedure for appropriate penalties.

**11.464**  The contract machinery is the same in all disputes. The preceding procedures covering disputes on health and safety and onerousness are not intended to modify the basic grievance machinery structure.

**11.5**  Picket Lines. *(See Addenda, Picket Line Language.)*

**11.51**  Refusal to cross a legitimate and bona fide picket line, as defined in this paragraph, shall not be deemed a violation of this Agreement. Such a picket line is one established and maintained by a union, acting independently of the ILWU longshore locals, about the premises of an employer with whom it is engaged in a bona fide dispute over wages, hours or

working conditions of employees, a majority of whom it represents as the collective bargaining agency. Collusive picket lines, jurisdictional picket lines, hot cargo picket lines, secondary boycott picket lines and demonstration picket lines are not legitimate and bona fide picket lines within the meaning of this Agreement.

**11.52** If an ILWU longshore local located within the confines of the United States whose members are not covered by this Agreement is engaged in a legitimate, bona fide, nonjurisdictional and noncollusive strike concerning wages, hours or working conditions of its members, no longshoreman under this Agreement shall be required to perform work hereunder respecting cargo that normally, without such strike, would be handled by members of such ILWU longshore local but which has been handled or is destined to be handled by other workers engaged in strikebreaking activities under established and legitimate trade union principles.

## SECTION 12

## MEETINGS FOR REGISTERED LONGSHOREMEN

**12.1** In addition to other qualifications specifically set forth in this Contract Document, all registered longshoremen in order to remain qualified and eligible for dispatch through the dispatching hall must be familiar with all the provisions of the Agreement, including all working, dispatching and safety rules and the requirements of conformance and performance under the Agreement.

**12.2** To this end it shall be the duty of the Union to inform all registered Union longshoremen of their collective and individual responsibilities under the Agreement. Similarly, it shall be the duty of the Joint Port Labor Relations Committee to inform

all registered nonunion longshoremen of such responsibilities. Meetings for such purposes shall be scheduled by mutual consent of the Joint Port Labor Relations Committee.

**12.3** Stop-Work Meetings.

**12.31** Each local shall have the right to hold 1 regularly scheduled stop-work meeting each month during overtime hours on the second shift. *(See Addenda, Scheduling of Meetings.)*

**12.311** In a port where such regularly scheduled stop-work meetings are held, the scheduled date during the month shall be the same for the longshore local and the clerks' local.

**12.32** Any other stop-work meetings must be mutually agreed to by PMA and the Union and PMA shall receive at least 1 week's notice of such nonscheduled meetings. They shall not occur more often than once a month.

**12.4** Any registered longshoreman refusing to attend such respective meetings or creating a disturbance which frustrates the purpose of the same shall be suspended or dropped from the registered list at the discretion of the Joint Port Labor Relations Committee.

## SECTION 13

## NO DISCRIMINATION

**13.1** There shall be no discrimination in connection with any action subject to the terms of this Agreement (including at work sites, joint dispatch halls, training sites, and other locations, when reasonably related to employment covered by this Agreement) either in favor of or against any person because of membership or nonmembership in the Union, activity for or against the Union or absence thereof, race, creed, color, sex (including gender, pregnancy, sexual orientation), age (forty or over), national origin, religious or political beliefs, disability,

conditions and practices of the men on the job. It is further intended that this program will produce mutually practical and effective recommendations regarding corrections of accident-producing circumstances and conditions.

## SECTION 17

## JOINT LABOR RELATIONS COMMITTEES, ADMINISTRATION OF AGREEMENT, AND GRIEVANCE PROCEDURES

**17.1**  Joint Labor Relations Committees.

**17.11**  The parties shall establish and maintain, during the life of this Agreement, a Joint Port Labor Relations Committee for each port affected by this Contract Document, 4 Joint Area Labor Relations Committees, and a Joint Coast Labor Relations Committee. Each of said Labor Relations Committees shall be comprised of 3 or more representatives designated by the Union and 3 or more representatives designated by the Employers. Each side of the committee shall have equal vote.

**17.12**  The duties of the Joint Port Labor Relations Committee shall be:

**17.121**  To maintain and operate the dispatching hall.

**17.122**  To exercise control of the registered lists of the port, as specified in Section 8.3.

**17.123**  To decide questions regarding rotation of gangs and extra men.

**17.124**  To investigate and adjudicate all grievances and disputes according to the procedure outlined in this Section 17.

**17.125**  To investigate and adjudicate any complaint against any longshoreman whose conduct on the job, or in the dispatching hall, causes disruption of normal harmony in the relationship of the parties hereto or the frustration and/or vio-

lation of the provisions of the working or dispatching rules or of this Agreement. The application of this Section 17.125 shall not negate the procedure for penalties as provided for in Section 17.7.

**17.126**  To carry out such other functions as are assigned to it herein or by the parties, directly or through the Joint Coast Labor Relations Committee.

**17.13**  There shall be a Joint Area Labor Relations Committee for each of the 4 port areas (Southern California, Northern California, Columbia River and Oregon Coast Ports, and Washington). Such Committee shall investigate and adjudicate grievances not settled at the local level. The Area Joint Labor Relations Committee step may be eliminated by agreement at the area level or may be bypassed by agreement at the port level.

**17.14**  The Joint Coast Labor Relations Committee shall function in the administration of this Agreement as provided herein and shall investigate and adjudicate grievances as provided herein.

**17.141**  All meetings of the Joint Coast Labor Relations Committee and all arbitration proceedings before the Coast Arbitrator shall be held in the City and County of San Francisco, State of California, unless the parties shall otherwise stipulate in writing.

**17.15**  The grievance procedure of this Agreement shall be the exclusive remedy with respect to any disputes arising between the Union or any person working under this Agreement or both, on the one hand, and the Association or any employer acting under this Agreement or both, on the other hand, and no other remedies shall be utilized by any person with respect to any dispute involving this Agreement until the grievance procedure has been exhausted.

**17.151** Any dispute in which the Association or the Union asserts that any dispatching hall is dispatching employees who were not entitled to be dispatched or who were dispatched out of sequence as to other persons entitled to priority dispatch shall be subject to prompt resolution through the grievance procedure of the Agreement when a complaint is filed by either party with the Joint Port Labor Relations Committee. If such complaint is not resolved within 7 days from the date of filing, the matter shall be referred to the Area Arbitrator whose decision shall be final and binding. The grievance procedure shall then be deemed "exhausted."

**17.16** Pending investigation and adjudication of such disputes work shall continue and be performed as provided in Section 11.

**17.2** Grievances arising on the job shall be processed in accordance with the procedure hereof beginning with Section 17.21. Other grievances as to which there are no specific provisions herein shall be processed in accordance with the provisions hereof beginning with Section 17.23.

**17.21** The gang steward and his immediate supervisor, where the grievance is confined to 1 gang, or any 1 steward who is a working member of an affected gang where the grievance involves more than 1 gang or a dock operation, shall take the grievance to the walking boss, or ship or dock foreman in immediate charge of the operation.

**17.22** If the grievance is not settled as provided in Section 17.21, it shall be referred for determination to an official designated by the Union and to a representative designated by the Employers.

**17.23** If the grievance is not settled as provided in Section 17.21 or Section 17.22 or does not arise on the job, it shall be referred to the Joint Port Labor Relations Committee which shall have the power and duty to investigate and adjudicate it.

**17.24** In the event that the Employer and Union members of any Joint Port Labor Relations Committee shall fail to agree upon any question before it, such question shall be immediately referred at the request of either party to the appropriate Joint Area Labor Relations Committee for decision.

**17.25** In the event that the Employer and Union members of any Joint Area Labor Relations Committee fail to agree on any question before it, such question shall be immediately referred at the request of either party to the Area Arbitrator for hearing and decision, and the decision of the Area Arbitrator shall be final and conclusive except as otherwise provided in Section 17.26.

**17.26** The Joint Coast Labor Relations Committee has jurisdiction to consider issues that are presented to it in accordance with this Agreement and shall exercise such jurisdiction where it is mandatory and may exercise it where such jurisdiction is discretionary as provided in Section 17.261, Section 17.262 and other provisions of this Agreement.

**17.261** Any decision of a Joint Port or Joint Area Labor Relations Committee or of an Area Arbitrator claimed by either party to conflict with this Agreement shall immediately be referred at the request of such party to the Joint Coast Labor Relations Committee (and, if the Joint Coast Labor Relations Committee cannot agree to the Coast Arbitrator, for review). The Joint Coast Labor Relations Committee, and if it cannot agree, the Coast Arbitrator, shall have the power and duty to set aside any such decision found to conflict with the Agreement and to finally and conclusively determine the dispute. It shall be the duty of the moving party in any case brought before the Coast Arbitrator under the provisions of this Section 17.261 to

make a prima facie showing that the decision in question conflicts with this Agreement, and the Coast Arbitrator shall pass upon any objection to the sufficiency of such showing before ruling on the merits.

**17.262** The Joint Coast Labor Relations Committee and the Coast Arbitrator shall have power to review decisions relative to the operation of dispatching halls, or the interpretation of port working and dispatching rules, or discharges, or pay (including travel pay and penalty rates), but shall exercise it in any case only if the Committee decides to review the specific case.

**17.263** When either the Union or the Association claims that there has been a violation of Section 13 by anyone bound by this Agreement, the grievance shall be submitted to the Joint Coast Labor Relations Committee and shall be resolved there or referred to the Coast Arbitrator for hearing and decision in accordance with the applicable contract provisions.

**17.27** In the event that the Employer and Union members of the Joint Coast Labor Relations Committee fail to agree on any question before it, including a question as to whether the issue was properly before the Coast Labor Relations Committee, such question shall be immediately referred at the request of either party to the Coast Arbitrator for hearing and decision, and the decision of the Coast Arbitrator shall be final and conclusive.

**17.271** Referrals to the Coast Arbitrator must be submitted and heard by the Coast Arbitrator within 6 months following the date of disagreement at the Coast Labor Relations Committee level. Referrals not submitted within 6 months shall be considered "dropped."

**17.28** Miscellaneous provisions.

**17.281** Should either party fail to participate in any of the steps of the grievance machinery, the matter shall automatically move to the next higher level.

**17.282** If the local grievance machinery becomes stalled or fails to work, the matter in dispute can be referred at once by either the Union or the Association to the Joint Coast Labor Relations Committee for disposition.

**17.283** The hearing and investigation of grievances relating to discipline by return to the dispatching hall (Section 17.7), penalties (Section 17.8) and dispatching hall personnel (Section 8.23) shall be given precedence over all other business before the Joint Port and Joint Area Labor Relations Committees and before the Area Arbitrator. Either party may request that:

(a) grievances arising under Section 17.7 or involving dispatch hall disputes (except those covered by Section 17.151) be processed initially and from step to step within 24 hours; and

(b) failures to observe Area Arbitrators' awards be processed to the next step within 24 hours.

**17.284** Nothing in this Section 17 shall prevent the parties from mutually agreeing upon other means of deciding matters upon which there has been disagreement.

**17.3** Business Agents.

**17.31** To aid in prompt settlement of grievances and to observe Agreement performance, it is agreed that Business Agents as Union representatives shall have access to ships and wharves of the employer to facilitate the work of the Business Agent, and in order that the employer may cooperate with the Business Agent in the settlement of disputes the Business Agent shall notify the representative designated by the employer before going on the job.

**17.4** When any longshoreman (whether a registered longshoreman or an applicant for registration or a casual longshoreman) claims that he has been discriminated against in violation of Section 13 of this Agreement, he may at his option and expense, or either the Union or the Association may at its option and at their joint expense, have such complaint adjudicated hereunder, which procedure shall be the exclusive remedy for any such discrimination.

**17.41** Such remedy shall be begun by the filing of a grievance with the Joint Port Labor Relations Committee setting forth the grievance and the facts as to the alleged discrimination. Such a grievance shall be timely if presented within 10 days of the occurrence of the alleged discrimination. Such grievance shall be investigated by the Joint Port Labor Relations Committee at a regular or special meeting of the Committee at which the individual involved shall be permitted to appear to state his case, at which time he may present oral and written evidence and argument.

**17.411** With respect to any claim of violation of Section 13, the Joint Port Labor Relations Committee shall extend the time for filing of such claim beyond the time established in Section 17.41 whenever such extension is necessary because the period of limitation otherwise applicable is determined to be unlawful or because in the judgment of the Committee in the exercise of its sound discretion, such an extension is otherwise necessary to prevent inequity but in no event shall the time for filing of such claims be extended beyond 6 months from the date of the occurrence of the alleged discrimination.

**17.42** Either the Employers, the Union or the man involved may appeal the decision of the Joint Port Labor Relations Committee. Such appeal shall be to the Joint Coast Labor Relations Committee by letter addressed to the Joint Coast La-

bor Relations Committee. To be timely, such appeal must be delivered or mailed within 7 days of the decision of the Joint Port Labor Relations Committee.

**17.421** If such an appeal is taken within the time limits allowed, the Joint Coast Labor Relations Committee shall either confirm or reverse or modify the decision of the Joint Port Labor Relations Committee without any further hearing, or order a further hearing and thereupon issue its decision on the basis of the entire record including that at both hearings.

**17.43** An appeal from the decision of the Joint Coast Labor Relations Committee can be presented to the Coast Arbitrator (or by agreement of the Joint Coast Labor Relations Committee to an Area Arbitrator) by the individual involved, the Employers or the Union. An appeal to the Coast Arbitrator filed by an applicant for registration or a casual longshoreman involving the subject of registration shall be permitted only for those grievances which the Joint Coast Labor Relations Committee, in its sole discretion, certifies to the Coast Arbitrator that the facts introduced in support of the grievance into the record of the prior proceedings, if unrebutted, may support a finding of a violation of the grievant's Section 13 rights under this Agreement. Appeal shall be by a written request for an arbitrator's hearing mailed or delivered to the Union and the Employer representatives of the Joint Coast Labor Relations Committee if by an individual, or to the individual and the other party's representative on the Joint Coast Labor Relations Committee if by either the Union or the Employers. Such an appeal shall be timely only if such request for an arbitrator's hearing is so filed in writing with the Joint Coast Labor Relations Committee no later than 7 days after issuance of the decision of the Joint Coast Labor Relations Committee from which an appeal to an arbitrator is taken.

**17.431** The arbitration procedure shall be carried on in accordance with the procedures generally applicable under this Agreement for arbitration before the Coast Arbitrator.

**17.5** Arbitrators and Awards.

**17.51** The parties shall have an arbitrator for each of the said 4 port areas and a Coast Arbitrator.

**17.511** The Area Arbitrator shall be appointed by the Joint Coast Labor Relations Committee and shall serve at its discretion. If any Area Arbitrator shall at any time be unable or refuse or fail to act, the Joint Coast Labor Relations Committee shall select a successor or substitute.

**17.512** The Coast Arbitrator shall be selected by the Joint Coast Labor Relations Committee to serve a term coextensive with the term of the Agreement. The Coast Arbitrator may be reappointed for the term of the next Agreement by mutual agreement of the Parties. The Coast Arbitrator shall be a highly qualified neutral arbitrator with maritime experience, located on the West Coast. If the Committee fails to agree on the selection of the Coast Arbitrator, the individual shall be selected by a 6-person panel of prominent industry representatives: 3 selected by the Union and 3 selected by the Employers.

**17.5121** If after thirty (30) days, the Panel is unable to select a Coast Arbitrator, the Panel shall submit to the Federal Mediation and Conciliation Service (FMCS) a request for a list of seven (7) highly qualified neutral arbitrators with maritime experience, located on the West Coast. If the Union and the Employer representatives agree that the list is unacceptable, they may jointly request that the FMCS provide a second list. In the event, the Parties cannot mutually select a Coast Arbitrator from the FMCS Panel, the selection shall be determined by a striking process. The first strike shall be determined

arising under the Agreement including cases dealing with the resumption or continuation of work.

**17.53** Arbitrators' decisions must be based upon the showing of facts and their application under the specific provisions of the written Agreement and be expressly confined to, and extend only to, the particular issue in dispute. The arbitrators shall have power to pass upon any and all objections to their jurisdiction. If an arbitrator holds that a particular dispute does not arise under the Agreement, then such dispute shall be subject to arbitration only by mutual consent.

**17.54** In the event the parties agree that an arbitrator has exceeded his authority and jurisdiction or that he is involved in the industry in any other position of interest which is in conflict with his authority and jurisdiction, he shall be disqualified for any further service.

**17.55** All decisions of the arbitrators, except as provided in Sections 17.261 and 17.6, shall be final and binding upon all parties. Decisions shall be in writing signed by the arbitrator and delivered to the respective parties.

**17.56** All expenses and salaries of the arbitrators shall be borne equally by the parties, except where specifically provided herein to the contrary.

**17.57** All decisions of arbitrators shall be observed and/or implemented. No decision of an Area Arbitrator, interim or formal, can be appealed unless it is observed and/or implemented.

**17.6** Informal hearings and interim rulings.

**17.61** When a grievance or dispute arises on the job and is not resolved through the steps of Sections 17.21 and 17.22, and it is claimed that work is not being continued as required by Section 11, a request by either party shall refer the matter to the Area Arbitrator (or by agreement of the Joint Coast Labor Relations Committee to the Coast Arbitrator) for his considera-

tion in an informal hearing; such referral may be prior to formal disagreement in any Joint Labor Relations Committee or upon failure to agree on the question in the Joint Area Labor Relations Committee. Such hearing may be ex parte if either party fails or refuses to participate, provided that the arbitrator may temporarily delay an ex parte hearing to permit immediate bona fide efforts to settle an issue without a hearing.

**17.62** The arbitrator shall act with his powers limited strictly to the application and interpretation of the Agreement as written. The parties shall have the right to present such views as they wish to the arbitrator, but it shall not be necessary to have a shorthand or stenotype reporter present to report the proceedings nor shall employment of counsel be necessary. The arbitrator, on this basis, shall promptly issue an oral interim ruling with respect to the grievance or dispute and thereafter confirm it in writing. An interim ruling shall be binding on the parties regarding the particular issue on the particular ship on the particular occasion but shall not be a precedent for other cases. Any interim ruling shall be binding unless reversed by a contrary decision after a formal hearing.

**17.63** If either party is dissatisfied with the interim ruling, the question shall be immediately referred at the request of such party to the arbitrator for hearing and decision in accordance with the normal procedure under Section 17.5 of this Agreement; the arbitrator shall then proceed as if there had been a failure to agree on the question by the Joint Port Labor Relations Committee, provided that the arbitrator may temporarily delay a hearing to permit prompt bona fide efforts to settle the question in the Port or Area Joint Labor Relations Committee.

**17.64** The use of the informal procedure leading to an interim ruling can be waived by consent of both parties with respect to any particular dispute or grievance. If at the begin-

ning of the informal procedure either party establishes a good faith claim that an issue, other than a dispute with respect to Section 11, is of general significance or that the formal procedure will be necessary to settle such issue, the arbitrator shall rule that the informal procedure be bypassed regarding such issue. In the absence of such waiver or decision to bypass, the arbitrator shall hold an informal hearing and issue an interim ruling regarding the dispute in accordance with the procedure set forth above.

**17.7** Discipline by return to the dispatching hall.

**17.71** The employer shall have the right to return to the dispatching hall any man (or to send home any nonregistered man) for incompetence, insubordination or failure to perform the work as required in conformance with the provisions of this Agreement.

**17.72** Such longshoreman shall not be dispatched to such employer until his case shall have been heard and disposed of before the Joint Port Labor Relations Committee, and no other employer shall refuse employment to such longshoreman on the basis of such return to the dispatch hall.

**17.73** If any man feels that he has been unjustly returned to the dispatching hall or dealt with, his grievance shall be taken up as provided in Section 17.2 beginning with Section 17.23.

**17.74** In case of return to the dispatching hall without sufficient cause, the Joint Port Labor Relations Committee may order payment for lost time or reinstatement with or without payment for lost time.

**17.75** When an employer returns a gang to the dispatching hall for cause, its gear priority terminates and such employer may carry on work at the hatch or gear involved without delay. The hatch or gear involved shall not stand idle because of any action or nonaction of the Union or longshoremen or the dis-

patching hall. A replacement gang shall be dispatched promptly upon order of the employer. Until the replacement gang turns to or if one is not ordered or cannot be dispatched, any other gang employed by the employer shall shift to the hatch or gear involved as directed by the employer. The returned gang shall not be redispatched to the job involved unless it is the only available gang and the Association requests that it be dispatched. The provisions of Sections 17.73 and 17.74 shall apply with respect to any gang returned to the dispatching hall for cause.

**17.8**  Penalties for work stoppages, assault, pilferage, drunkenness, drug abuse and peddling, safety violations and other offenses.

**17.81**  All longshoremen shall perform their work conscientiously and with sobriety and with due regard to their own interests shall not disregard the interests of the employer. Any employee who is guilty of deliberate bad conduct in connection with his work as a longshoreman or through illegal stoppage of work shall cause the delay of any vessel shall be fined, suspended, or for deliberate repeated offenses for which he has been found guilty under the Contract procedures, cancelled from registration. A determination that an onerous or health and safety claim made in good faith shall be disallowed is not a finding that a man is guilty of an offense within the meaning of this Section. Any employer may file with the Union a complaint against any member of the Union and the Union shall act thereon and notify the Joint Port Labor Relations Committee of its decision within 30 days from the date of receipt of the complaint. An employer shall not be required to appear nor need he participate in discipline by the Union of its members beyond the filing of complaints.

**17.811**  If within 30 days thereafter the Employers are dissatisfied with the disciplinary action taken under Section 17.81,

then the following independent procedure of Section 17.82 may be followed, which procedure shall also be applicable in the case of longshoremen not members of the Union.

**17.82**  The Joint Port Labor Relations Committee has the power and duty to impose penalties on longshoremen who are found guilty of stoppages of work, assault, refusal to work cargo in accordance with the provisions of this Agreement, or who leave the job before relief is provided, or who are found guilty of pilfering or broaching cargo or of drunkenness or who in any other manner violate the provisions of this Agreement or any award or decision of an arbitrator. In determining penalties neither the parties nor the arbitrators shall consider offenses that predate by 5 years or more the date of a current offense.

**17.821**  Assault.

**17.8211**  For first offense assault: Minimum penalty, 1 year suspension from work. Maximum penalty, discretionary.

**17.8212**  For second offense assault: mandatory cancellation from registered list upon request of either party.

**17.8213**  In either case such conviction shall not be dependent upon the existence of a prior court decision, nor shall the determination of guilt await a court decision.

**17.822**  Pilferage.

**17.8221**  For first offense pilferage: Minimum penalty, 60 days' suspension from work. Maximum penalty, discretionary.

**17.8222**  For second offense pilferage: Mandatory cancellation from registered list upon request of the employer.

**17.823**  Drunkenness or smoking in prohibited areas.

**17.8231**  First offense: Suspension for 15 days.

**17.8232**  Second offense: Suspension for 30 days.

**17.8233** Succeeding offenses: Minimum penalty, 60 days suspension. Maximum penalty, discretionary.

**17.824** Abuse of or use of controlled substances and/or drugs on the job or in or around any employment premises or the dispatch hall.

**17.8241** First offense: Suspension for 15 days.

**17.8242** Second offense: Suspension for 30 days.

**17.8243** Succeeding offenses: Minimum penalty, 60 days suspension. Maximum penalty, discretionary.

**17.825** Sale and/or peddling of controlled substances and/or drugs on the job or in or around any employment premises or the dispatch hall.

**17.8251** For first offense: Minimum penalty, 1 year suspension from work. Maximum penalty, discretionary.

**17.8252** For second offense: Mandatory cancellation from registered list upon request of either party.

**17.8253** In either case such conviction shall not be dependent upon the existence of a prior court decision, nor shall the determination of guilt await a court decision.

**17.826** An employee found to be in violation of reasonable verbal instructions, posted employer safety rules, and/or the PCMSC shall attend a 1-day safety class approved by the Coast Labor Relations Committee without pay. Failure to attend and complete the class as scheduled without a valid excuse shall result in suspension from work until the class is completed. In addition, the employee shall be subject to the following minimum discipline, which shall be applied uniformly without favoritism or discrimination.

**17.8261** First Offense: Letter of warning.

**17.8262** Second Offense: Suspension from work for 15 days.

**17.8263** Third Offense: Suspension from work for 60 days. Maximum penalty, discretionary.

**17.8264** Fourth Offense: Subject to deregistration.

**17.827** An employee who, knowingly and flagrantly disregards reasonable verbal instructions, posted employer safety rules, and/or the PCMSC, and who intentionally causes significant damage to equipment or cargo, or who intentionally injures himself or others, shall be subject to the following minimum discipline, which shall be applied uniformly without favoritism or discrimination.

**17.8271** First Offense: Suspension from work for 90 days. Maximum penalty, discretionary.

**17.8272** Second Offense: Subject to deregistration.

**17.828** Grievances arising under Sections 17.826 and 17.827 shall be subject to the grievance procedure of Section 17, with the following exceptions.

**17.8281** Grievances arising under Sections 17.826 and 17.827 shall be heard by the local parties within 30 days of the employee being cited. In the event the parties fail to resolve the grievance within the 30-day time period, the grievance shall be referred to the Area Arbitrator, at the request of either party, for an immediate hearing and decision.

**17.8282** In determining whether a violation under Sections 17.826 and 17.827 is a first, second, third or fourth offense, Section 17.82 shall govern.

**17.829** An employee released from the job for being under the influence of alcohol or drugs may request that his/her union representative report to the job. If the union representative, having observed the employee, believes the employee was unjustly released, he will discuss the case immediately with the employer. If the employer and union representative are unable to

reach agreement, or if the union representative does not immediately respond to the request to come to the job, the case shall be immediately referred at the request of either party to the Joint Port Labor Relations Committee which shall have the power and duty to investigate and adjudicate it. If the Joint Port Labor Relations Committee members present are unable to reach agreement, and/or if no Union member of the Joint Port Labor Relations Committee responds to the request to come to the job within 1 hour, the Area Arbitrator shall be immediately called to the job to decide if the employee was properly released. If the released employee fails to contact his/her union representative, or if the employee leaves the job, the employee shall be guilty as charged. Where an employee is guilty of working under the influence of alcohol or drugs the employee shall be subject to the penalties found in Section 17, and shall be referred to the ILWU-PMA employee assistance program.

**17.83** Suspensions under the foregoing provisions shall follow convictions by either the Union grievance machinery or by the Joint Port Labor Relations Committee, either of whom shall accept a prior court decision. The court decision will be considered by the parties and they shall discount the penalties set forth above accordingly. Where a fine has been assessed then the days off on suspension shall be discounted at the rate of $5.00 per day. Any man suspended under these provisions shall not be dispatched for work in any port covered by this Agreement until the suspension penalty has been served.

**17.84** Any longshoremen having records of habitual drunkenness or whose conduct on the job or in the dispatching hall causes disruption of normal harmony in the relationship of the parties hereto, or who physically assault anyone in the dispatching hall or on the job, or who have records of working in a manner that is hazardous to themselves or that endangers oth-

er workers shall not be dispatched to operate or used to operate any hoisting or mechanical equipment or devices or to supervise the operation of such equipment; or they shall be subject to such other remedy as the Joint Port Labor Relations Committee shall mutually consider appropriate.

**17.85** In the event of disagreement at the Joint Port Labor Relations Committee level as to the imposition of penalties under this Section 17.8, the issue shall be processed immediately through the grievance procedure, and to the Area Arbitrator, if necessary.

**17.86** The rules and penalties provided hereinabove shall be applicable to fully registered longshoremen and, except where a more stringent rule or penalty is applicable pursuant to Section 17.861, to limited registered longshoremen and to nonregistered longshoremen.

**17.861** More stringent rules and penalties than those provided hereinabove that are applicable to limited registered longshoremen or to nonregistered longshoremen or to both such groups may be adopted or modified by unanimous action of the Joint Coast Labor Relations Committee and, subject to the control of such Committee so exercised, more stringent rules and penalties applicable to limited registered men or nonregistered men or to both groups that are provided in existing and future local joint working, dispatching, and registration rules and procedures or by mutually agreed practices shall be applicable.

## SECTION 18

## GOOD FAITH GUARANTEE

**18.1** As an explicit condition hereof, the parties are committed to observe this Agreement in good faith. The Union commits the locals and every longshoreman it represents to observe

this commitment without resort to gimmicks or subterfuge. The Employers give the same guarantee of good faith observance on their part.

## SECTION 19

## UNION SECURITY

**19.1** All present fully registered employees who are members of the Union on the date of execution of the Agreement, shall remain members of the Union in good standing as a condition of employment.

**19.2** All present fully registered employees who are not members of the Union on the date of execution of the Agreement shall become and remain members in good standing of the Union as a condition of employment.

**19.21** The Union hereby agrees to indemnify the Association and each member of the Association against any award, judgment, loss or expense arising out of a legal claim made against the Association or any company that is a member of the Association by a registered longshoreman or clerk, described in Section 19.2, because of deregistration or denial of full work opportunity at the request of the Union or any Union local pursuant to the provisions of Section 19.2.

**19.3** Any employee who becomes fully registered during the life of the Agreement shall, 30 days thereafter, become and remain a member of the Union in good standing as a condition of employment.

**19.4** A fully registered employee who, 30 days after said registration, has failed to acquire or thereafter maintain membership in the Union as here provided shall be removed from the registration list and deregistered 30 days after notice from the Union that he is not a member in good standing.

**19.5** A Union member shall be considered in good standing if he makes timely tender of the periodic dues, and initiation fees uniformly required as a condition of becoming and remaining a member in the Union.

## SECTION 20

## PAY GUARANTEE PLAN, RULES, AND ADMINISTRATION

This Pay Guarantee Plan continues and is an extension of the Pay Guarantee Plan provided in the Memorandum of Understanding of February 10, 1972, as amended through July 1, 1993.

### Preamble

The basic intention of the Pay Guarantee Plan (hereinafter PGP) is to provide a weekly income to eligible registered men.

**20.1** For each year of the Agreement the Employers will have a contingent liability for the Pay Guarantee Plan for the following amounts:

| | | |
|---|---|---|
| First year | (7/1/02 to 6/30/03) | $24,960,000 |
| Second year | (7/1/03 to 6/30/04) | $20,020,000 |
| Third year | (7/1/04 to 6/30/05) | $20,020,000 |
| Fourth year | (7/1/05 to 6/30/06) | $24,960,000 |
| Fifth Year | (7/1/06 to 6/30/07) | $20,020,000 |
| Sixth Year | (7/1/07 to 6/30/08) | $20,020,000 |

**20.11** In the first year $6,240,000 will be made available each quarter; in the second year $5,005,000 will be made available in each quarter; in the third year $5,005,000 will be made available each quarter; in the fourth year $6,240,000 will be made available each quarter, in the fifth year $5,005,000 will be made available in each quarter; in the sixth year $5,005,000 will be made available in each quarter.

Exhibit B



# Pacific Maritime Association
## Headquarters

March 17, 2008

Mr. Robert McEllrath, International President
International Longshore and Warehouse Union
1188 Franklin Street, 4th Floor
San Francisco, CA 94109

Re:    **Coastwise ILWU Stop Work Meeting Scheduled May 1, 2008**

Dear Bob:

The Employers have learned that each ILWU local will hold a stop work meeting during the day shift on May 1, 2008. Along with publicized letters from the ILWU to other labor organizations regarding the work stoppage, several ILWU locals have sent letters to PMA, giving notice that they will hold a stop-work meeting during the day shift on May 1, 2008.

The Employers are not agreeable to such stop-work meetings taking place on the day shift of May 1, 2008.

As the Union is aware, Section 12.31 of the PCL&CA provides that each local has the right to hold *"…1 regularly scheduled stop-work meeting each month during overtime hours on the second shift."* Section 12.32 is clear that only through joint agreement can the Union hold stop-work meetings during periods other than the "regularly scheduled stop-work meeting." Explicit in the Agreement, and supported by decisions of Area Arbitrators and the Coast Arbitrator, is the fact that the Union does not have the right to unilaterally hold stop-work meetings in violation of the stop-work meeting provisions.

The Employers reiterate that they are not agreeable to the ILWU withholding labor and stopping all work, coastwise, during the day shift on May 1, 2008. The Employers consider the Union's unilateral job action scheduled for May 1st to be a direct violation of Sections 11.1, 11.31, 12.3 and 18.1. Absent immediate confirmation by March 26, 2008, that the ILWU will take all necessary steps to ensure the membership fully complies with its obligations under the Agreement and agrees to hold all May stop-work meetings in accordance with Section 12.31, the Employers will move the matter to the Coast Arbitrator.

Sincerely,

James C. McKenna
President and CEO



**Pacific Maritime Association**
Headquarters

April 3, 2008

<u>**Via First Class Mail**</u>

Mr. Robert McEllrath, International President
International Longshore and Warehouse Union
1188 Franklin Street, 4th Floor
San Francisco, CA 94109

Re:    **Assurances and Communications Concerning Coastwide ILWU Stop Work Meeting
Scheduled for May 1, 2008**

Dear Bob:

This letter is to follow up on our conversation yesterday concerning the ILWU's planned May 1 work stoppage at all ports in California, Oregon, and Washington. As described in my letter of March 17 and again during our discussion yesterday, PMA does not consent to a stop-work meeting or any other effort to disrupt port operations. In response, you informed me that the ILWU would not hold a stop-work meeting on May 1. The ILWU's web site still indicates, however, that the May 1 work stoppage will be held as originally scheduled. Additionally, the ILWU has sent well-publicized letters to other unions asking for their support on May 1. Therefore, the Employers believe that further action by the ILWU is needed in order to ensure that a work stoppage does not occur on May 1.

Although we certainly do not object to the ILWU making a public statement or announcement concerning its views on the war in Iraq, PMA views any stop-work meeting, work stoppage, or other job action that disrupts port operations as a violation of the PCL&CA and an unlawful secondary boycott under federal labor law. PMA must take all steps necessary to protect its Member Companies against an unlawful work stoppage, and it is prepared to begin legal and contractual actions that would prevent any work stoppage from occurring. Unless the ILWU unequivocally communicates that it will not hold a stop-work meeting, work stoppage, or other job action on May 1, PMA will have no choice but to enforce its rights under the law and the PCL&CA.

Specifically, the ILWU must take the following steps by no later than April 9, 2008 or PMA will commence appropriate legal proceedings:

Mr. Robert McEllrath
April 3, 2008
Page 2

1.      Confirm to PMA in writing that the ILWU and its local unions will not engage in
        a stop-work meeting, work stoppage, or other job action on May 1;

2.      Remove all postings from the ILWU's web site that suggest a stop-work meeting,
        work stoppage, or other job action will occur on May 1;

3.      Immediately notify ILWU members, via announcements at the joint dispatch, the
        joint dispatch tape, by special bulleting, and by publication on its web site, that
        the May 1, 2008 stop-work meeting is cancelled and that there will be no work
        stoppage or job action on that date; and

4.      Instruct ILWU members to report for work as they normally would on the day
        shift of May 1, 2008 and fill all labor orders placed with the Joint Dispatch hall by
        the Employers as required by the PCL&CA.

We look forward to hearing from you regarding this matter.

                          Sincerely,

                          James C. McKenna
                          President and CEO

# INTERNATIONAL LONGSHORE & WAREHOUSE UNION
### AFL-CIO



1188 FRANKLIN STREET
SAN FRANCISCO
CALIFORNIA 94109
(415) 775-0533
(415) 775-1302 FAX
www.ILWU.org

**ROBERT McELLRATH**
President

**JOSEPH R. RADISICH**
Vice President

**WESLEY FURTADO**
Vice President

**WILLIAM E. ADAMS**
Secretary-Treasurer

April 8, 2008

**VIA FACSIMILE: (415) 348-8392**
**(and First Class Mail)**

J.C.M.
APR 0 9 2008

James C. McKenna
President & CEO
Pacific Maritime Association
555 Market Street, 3rd Floor
San Francisco, CA 94105

Mr. McKenna:

In response to your letter of April 3, 2008 and to the letters from your Area Managers to the Longshore Division Locals of the same date, know that no local will move its regularly scheduled May stop work meeting to the day side of May 1, 2008. By this letter, any written notification by any local to so move a stop work meeting is retracted and the dictates of Section 12 of the PCL&CA will be adhered to. May stop work meetings will be conducted as regularly scheduled.

That being said, your demand that the Union communicate such to its members by a specified structure and within artificial timelines unilaterally developed by the Pacific Maritime Association is rejected. The Employers have no contractual standing to dictate the manner or method that the Union communicates with its members.

Moreover, the Industry arbitrators lack authority to hear any non contractual based issue, much less one that is speculative. The PCL&CA grievance machinery is not designed to resolve speculative issues. Doing so would lead to endless arbitrations over issues involving rumors, perceptions and posturing. Such is the case here. If any local fails to provide a work force to meet the contractual needs of the Employers on May 1 such would then and only then be a violation of the PCL&CA and appropriate contractual remedies could then be sought.

Sincerely,

Robert McEllrath

Robert McEllrath
International President

cc: All Longshore Division Locals with Attachment -- PMA letter dated April 3, 2008

opl/O.P.E.I.U. LOCAL 29 - AFL-CIO



# Pacific Maritime Association
## Headquarters

April 11, 2008

<u>***Via Messenger Service and Fax No. 415-775-1302***</u>

Mr. Robert McEllrath, President
International Longshore and Warehouse Union
1188 Franklin Street, 4th Floor
San Francisco, CA 94109

Dear Bob:

On April 9, 2008, PMA received your letter in which the Union stated the ILWU will not be holding any stop-work meetings on May 1, 2008 during the day shift. The letter advised that *"any written notification by any local to so move a stop work meeting is retracted and the dictates of Section 12 of the PCL&CA will be adhered to. May stop work meetings will be conducted as regularly scheduled."*

The Union's refusal to take certain steps to effectively communicate to its longshore division membership that there shall be no stop-work meetings on May 1, 2008 is troubling. Presently, the Employers have received no assurances from any of the coastwise ILWU locals that labor orders will be filled as normal and as required by contract during the day shift on May 1, 2008. Of particular concern is the fact that despite your communication to PMA on April 9, 2008, certain media outlets and websites, including an ILWU-sponsored site, continue to publicize the planned ILWU work stoppage on May 1, 2008. For instance, http://maydayilwu.googlepages.com/home, a website created specifically to publicize the ILWU's May 1, 2008 activities, indicates that in San Francisco, prior to the rally at Justin Herman Plaza, people are to gather in front of the Local 10 Joint Dispatch Hall at 10:30 a.m. The same website announces that following the May 1st march and rally, at 6:00 p.m., a Potluck Celebration will be held at the ILWU Local 34 joint dispatch hall.

The Union's contention that the Industry arbitrators are prohibited from making speculative rulings on "non contractual based issues" is not relevant to the subject at hand. The Employers' position has not been based on speculation but on the fact that it has repeatedly been announced that the Union has scheduled their coastwise stop-work meeting during the day shift on May 1, 2008. The Union has held or attempted to hold unauthorized work stoppages in the past. Industry arbitrators have consistently and prospectively held that such meetings are a violation of Sections 12.3 and 12.32, as well as Section 11.1 of the PCL&CA. Industry arbitrators, including the Coast Arbitrator,

have issued orders requiring the Union to take certain necessary steps, similar to those contained in PMA's April 3, 2008 letter, to inform and direct the membership that such unauthorized stop work meetings shall not be held. The last such action occurred just one year ago when an ILWU local desired to hold an unauthorized stop-work meeting on May 1, 2007.

The Union's refusal to take any and all steps necessary to ensure and direct the ILWU membership meet their contractual obligation to supply and fill ordered labor on the May 1, 2008 day shift requires the Employers seek appropriate relief. The Union correctly points out that should any local fail to provide ordered labor during the day shift of May 1, 2008, a violation of the PCL&CA would exist. Taking after the fact action to address a planned and scheduled coastwise illegal work stoppage would not result in labor orders being filled as required. Terminal and vessel operations expecting to work would be idle. The steps outlined in the April 3, 2008 letter are designed to address the continuing uncertainty the Industry and shipping public currently face. It is neither unreasonable nor unprecedented for the Union to take affirmative steps to direct its membership to maintain compliance with the PCL&CA.

Absent immediate confirmation that the steps outlined in PMA's April 3, 2008 letter have been taken, PMA will seek enforcement of its rights under the PCL&CA and the law.

Sincerely,

James C. McKenna
President and CEO


cc:    Coast Steering Committee
       Area Managers



# INTERNATIONAL LONGSHORE & WAREHOUSE UNION
### AFL-CIO

1188 FRANKLIN STREET
SAN FRANCISCO
CALIFORNIA 94109
(415) 775-0533
(415) 775-1302 FAX
www.ILWU.org

**ROBERT McELLRATH**
President

**JOSEPH R. RADISICH**
Vice President

**WESLEY FURTADO**
Vice President

**WILLIAM E. ADAMS**
Secretary-Treasurer

April 15, 2008

**VIA FACSIMILE: (415) 576-3297**
**(and First Class Mail)**

J.C.M.
APR 1 6 2008

James C. McKenna
President & CEO
Pacific Maritime Association
555 Market Street, 3rd Floor
San Francisco, CA 94105

Mr. McKenna:

In response to your letter of April 11, 2008, be advised that, contrary to your assertion that an "ILWU-sponsored" web site is publicizing a "planned ILWU work stoppage on May 1, 2008," the ILWU sponsors only two web sites: they are http://www.ilwu.org/ and http://contract2008.org/.

As I told you in my April 8, 2008 letter, no ILWU Local will move its regularly scheduled May stop-work meeting to the day shift of May 1, 2008.

That being said, as you know, the Longshore Division Caucus recently approved a resolution calling for a May 1 protest against the Iraq war. Consequently, members from various locals will participate in planned events on May 1. The level of participation will vary from port to port.

Jim, in good faith, I informed you of the resolution immediately following the Caucus. I did so to ensure that the Industry would have ample time to formulate contingency plans. Many locals utilized the available contractual apparatus to attempt to substitute regularly scheduled May stop-work meetings for May 1. That was done in good faith to neutralize any cost to the Industry.

Nonetheless, you denied our requests to reschedule regularly scheduled May work-stop meetings for May 1. That is your right and the ILWU acknowledged your position by letter on April 8, 2008.

By this letter, and despite what the ILWU considers to be an irresponsible and irrational response on PMA's part, the Union's contractual obligation to Sections 8 and 11 of the PCL&CA is hereby acknowledged. Orders for work on May 1 will be accepted.

PMA member companies should, however, take into consideration as they plan May 1 operations that manpower may be limited as members exercise their right to express themselves politically.

Sincerely,

Robert McEllrath
International President

66/O.P.E.I.U. LOCAL 29 - AFL-CIO

TOTAL P.01

Exhibit C



**IMPORTANT NOTICE:** MAY IS MEDICAL & DENTAL CHOICE MONTH— PAGE 6

# The DISPATCHER

### Published by the International Longshore and Warehouse Union

Vol. 66, No. 3    www.ilwu.org    March 2008

## Longshore Caucus meets on contract priorities

page 2



## ILWU endorses Barack Obama

page 3

## SPECIAL FEATURE: Women in the ILWU

page 5



POSTMASTER S

Exhibit D

So. San Francisco, CA 94109-6800



### INSIDE

Meet the Longshore Negotiating Committee . . . . . . . . . . . . . . page 2
Members speak out . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . page 4
New ILWU history exhibit is ready for the road . . . . . . . . . . . page 7

2 • *The* **DISPATCHER**

March 2008

# Longshore Division holds contract caucus

Nearly 100 Longshore Caucus delegates met in San Francisco from January 28 to February 8 to discuss dozens of resolutions that will shape the union's approach to bargaining the new longshore contract. The existing longshore contract expires on July 1, 2008.

Representatives from every West Coast port were represented at the Caucus, including ILWU longshore officials from Canada, Hawaii, and Alaska who participated as observers because they have

similar but separate longshore contracts. IBU officials and members attended, along with ILWU rank-and-file members from Bay Area locals. A contingent of retirees was also on hand and they participated in every session.

The delegates elected Joe Cortez of Local 13 as Caucus Chair, Frank Ponce de Leon from Local 13 as Secretary, and John Tousseau of Local 63 and Scott Mason of Local 23 as Sergeants-at-Arms.

The ILWU Coast Committee presid-

ed along with the Caucus officials on a stage in front of the room that included President Bob McEllrath, Vice President Joe Radisich, Coast Committeemen Ray Ortiz and Leal Sundet.

Many delegates were veterans of previous caucuses, but this was the first time for some.

"Everyone at the Caucus was trying to address issues and solve problems," said Jennifer Gumm, a first-time delegate from Local 12 in Coos Bay, Oregon. "The

continued on page 3

## THE 2008 COAST NEGOTIATING COMMITTEE


International President Bob McEllrath


International Vice President Joe Radisich


Coast Committeeman Leal Sundet


Coast Committeeman Ray Ortiz Jr.


Tony DePaul, Local 23, Wash./PS. Rep.


Jim Daw, Local 8, Ore./Col. River Reg. Rep.


Herald Ugles, President Local 19, Wash./PS. Reg. Rep.


Melvin Mackay, President Local 10, N. Calif. Reg. Rep.


John Philbrook, President Local 21, Small Ports Rep., Ore./Col. River Reg.


Duane Johnson, Secretary-Treasurer Local 51, Small Ports Rep., Wash./PS. Reg.


Marc Cuevas, President Local 54, Small Ports Rep., Calif. Reg.


Danny Miranda, President Local 94, Foremen/Walking Bosses Rep.


John Tousseau, Local 63, Marine Clerks Rep


Joe Cortez, Local 13, S. Calif. Reg. Rep.


Richard Cavalli, President Local 34, Marine Clerks Rep.

## THE 2008 COAST SAFETY NEGOTIATING COMMITTEE


Jeff Smith, President Local 8, Ore./Col. River Reg. Rep.


Cameron Williams, Local 19, Wash./PS. Reg. Rep.


Trent Willis, Business Agent Local 10, N. Calif. Reg. Rep.


Tracy Burchett, Local 53, Small Ports Rep.


Paul Wieser, President Local 98, Foremen/Walking Bosses Rep.

## Letters to *The Dispatcher*

Dear Editor,

Much has been written in the *Dispatcher* about immigration and undocumented workers. Most of what I have read has missed the mark. The culprits are not our fellow workers!

Rarely do people wake up on a nice sun-shining morning and out of the blue decide to migrate. On the contrary—most people flee their homelands out of need.

Since the passage of NAFTA our fellow workers south of the border have seen their purchasing power plummet by 50 percent!!! Think about that! Think about making 50 percent less in 2008 than you did in 1993 (the year NAFTA was enacted).

continued on page 8


Adrian Diaz, Dispatcher Local 63, Marine Clerks Rep.


Tim Podue, Executive Board, Local 13, S. Calif. Reg. Rep.


Pete Favazza, Local 13, M&R Rep.

March 2008                                                                                    *The* DISPATCHER  • 3

# ILWU endorses Barack Obama for President

The ILWU International Executive Board endorsed Senator Barack Obama for President on February 28th, concluding that he is "the best candidate for our union and for working families."

Board members made their decision after an extensive process that involved interviewing the major campaigns and examining their positions on key issues that will impact ILWU members in the coming years. Republican Presidential candidates were not interviewed because they failed to address the key issues below, including:

**Bringing our troops home safely from Iraq.** Ending the war continues to be a concern of Executive Board members, rank-and-file union members, and the general public. Obama's record on the Iraq war was an important factor in winning the ILWU endorsement. "By speaking out early against the war, Obama took leadership at a time when others were reluctant," said International President McEllrath.

**Supporting the rights of workers to join unions without employer threats** is a priority. Obama pledged to support the

"Employee Free Choice Act" that would create new rules to make it easier for workers to join a union. But actually passing the "Employee Free Choice" in Congress will require a huge effort from all union members – and a President who will make it a top priority and help deliver enough votes for the proposal to become law.

**Making quality, affordable health care available to all Americans** is another pledge that will require some heavy lifting from union members in order to become law. All major Presidential candidates declined to support the single-payer approach favored by the ILWU. Obama has pledged to sign a universal health care bill by the end of his first term.

**Re-thinking "free trade" agreements** has been a concern of the ILWU since the first fight over NAFTA. While Obama, has expressed some troubling "free trade" views in the past, his recent criticism of NAFTA and his commitment to oppose the Central American Free Trade Agreement (CAFTA) made an important difference.

"No candidate is perfect on all the issues, but America's working families



President McEllrath greets Senator Barack Obama at the San Francisco Labor Council.

are ready for someone with a fresh approach who will put people first and hold corporations more accountable," said ILWU International President

Bob McEllrath. "Obama met with us, listened to our concerns, and we think he'll do the best job on the issues that matter to working families."



Several dozen Working America canvassers knock on doors across Oregon every day, including this one in the Portland area. About two of three people asked will sign up to join the AFL-CIO's community affiliate program, and many will register to vote. They will then be contacted by union volunteers and staff about elections and updates on where their elected officials stand on working families issues.

## Oregon longshore workers gear up to make a difference

By Jennifer Sargent

With all of the talk of Presidential politics, how many of us are thinking of statewide races—our next state representatives, members of Congress and ballot measures that could have a big impact on ILWU jobs and families?

In Oregon, working on elections has become a way of life for more

ILWU members. By leveraging their volunteer hours through the Oregon AFL-CIO's political program, and making strategic political contributions, they've helped make working families a force to be reckoned with.

In 2006, Local 8 "B Woman" Megan Premo was released to the state federation's Labor 2006 campaign. She contributed to the final tally of 200,000 phone calls, 7,000 door knocks and 65,000 worksite fliers and 5 union members. Local 5 Business Agent Ryan Takas was named "Volunteer of the Week" by the Oregon AFL-CIO for taking the initiative to canvass—by himself, in the rain.

In a small state like Oregon, this kind of legwork makes a big difference—especially when unions combine resources and work together. Voter turnout among Oregon AFL-CIO's affiliate unions was 78 percent, compared to 68 percent of the general electorate. This extra turnout has helped Oregon elect six union members to the state legislature. The state's governor was once a union Steelworker and Bricklayer, and the Labor commissioner is a union Electrician. Oregon has the second highest minimum wage in the nation, at $7.95 an hour. And for the past ten years, union members have helped defeat a slew of anti-union ballot measures brought into the state from right-wing anti-labor organizations.

This year, Oregon's ILWU members are poised again to help elect candidates that are committed to

working families—and pledged to work with the Oregon AFL-CIO and their community affiliate, *Working America*.

"Working America allows people who don't have a union at work to join the AFL-CIO directly," Tom Chamberlain, President of the Oregon AFL-CIO, told the Dispatcher. "Two-thirds of people that canvassers talk to will sign up, and one in five will immediately write a letter to an elected official. It's what makes democracy work for busy working people. We're proud to once again have Longshore involvement in our political program."

Working America also allows the union to communicate with a whole new universe of voters who are swelling the union-oriented ranks by about 50 percent. A strong program in 2008 will amplify the positive election results in 2006 which made it possible for working families to be heard in the 2007 Legislative Session on issues they'd been fighting for all along.

"During the 2002 lockout, Longshore workers in Washington and California could collect unemployment benefits, but Oregon shut us out," said Local 5 President Jeff Smith. "So in 2007, with a majority in the state House and Senate, we worked with the AFL-CIO and other unions to successfully change the law. It was the first time when enough legislators cared about us – and it changed because we got more involved."

## Longshore contract caucus *cont'd*

debates were intense at times, but almost always respectful. I was impressed with the process and all the unity in the room, even when there were disagreements."

Many veteran participants also noted that the tone of this gathering was more unified and less factional than previous Caucus meetings.

Many issues were debated at the Caucus including:

• A variety of strategies for protecting and improving jobs and benefits in the longshore industry.
• Safety problems, including dramatic details of more than a dozen deaths that have occurred on the docks since 2002, along with suggestions for improving safety conditions.

• Approaches for reducing dangerous air pollution that is plaguing many ports and nearby communities—causing serious diseases including cancer and threatening to delay or derail port improvement projects.

Before ending on February 8, the caucus took action on two final items.

The body selected the Negotiating Committee that will oversee bargaining, along with a Safety Negotiating Committee that will seek improvements and protections in the Pacific Coast Maritime Induststry Safety Code.

The Negotiating Committee will soon be convened by the Coast Committee to begin developing the

Union's proposal document out of the resolutions adopted at the Caucus.

The Caucus also adopted a resolution calling for stop-work meetings during the day shift on May 1 to support U.S. troops in Iraq by calling on the Bush administration to bring them back home safely now.

---

## *The* DISPATCHER
www.ilwu.org

Craig Merrilees
*Editor and Communications Director*

Tom Price
*Assistant Editor*

The Dispatcher (ISSN 0012-3765) is published monthly except for a combined July/ August issue, for $5.00 a year and $10.00 a year for non-members by the ILWU, 1188 Franklin St., San Francisco, CA 94109. Periodical postage paid at San Francisco, CA. The Dispatcher welcomes letters, photos and other submissions to the above address. © ILWU, 2008

ILWU TITLED OFFICERS

ROBERT McELLRATH
President

JOSEPH R. RADISICH        WESLEY FURTADO
Vice President            Vice President

WILLIAM E. ADAMS
Secretary-Treasurer



Published by the International Longshore and Warehouse Union

# DISPATCHER

www.ilwu.org

VOL 66, NO 4 • APRIL 2008

## THE INSIDE NEWS

LETTERS TO THE EDITOR ............ 2

Obama meets ILWU in
Portland ............................... 2

May Day "stop work"
to protest war ...................... 2

Students help Blue
Diamond workers ................. 3

Longshore contract
negotiations begin ............... 4

Tacoma guards organize
with Community ................... 4

Cleaner air and justice
for port truckers .................. 5

MEMBERS SPEAK OUT ............. 5

ILWU scholarship programs ..... 6

NEWS & NOTES ....................... 6

TRANSITIONS .......................... 6

Building political power
in the Delta .......................... 7

INTERNATIONAL NEWS ............ 7

BOOKS & VIDEOS ..................... 8



photo and Orson

# Workers win tough fight at Rite Aid warehouse

After a tough two-year battle, the workers at Rite Aid's distribution center in Lancaster, CA, won their fight to join ILWU warehouse Local 26. They prevailed despite Rite Aid's all-out effort to squash their organizing drive. They overcame the flaws in U.S. labor law that make it almost impossible for workers to form unions. And they gave the ILWU its largest mainland organizing victory that anyone can remember, sending a hopeful signal to other workers on the inland end of the maritime logistics chain.

"I am so happy right now," organizing committee member Ignacio "Nacho" Meza said just after the March 14 vote count. "We had to make sacrifices, but we showed that if we stand together, if we speak up, we can make changes for ourselves, our families and the people who come after us." Rite Aid fired Meza in January 2007 for his support of the union, but had to rehire him six months later as part of a settlement with the National Labor Relations Board (NLRB).

The million-square-foot warehouse where Meza works serves more than 500 Rite Aid retail outlets in the Pacific Southwest. Most of its inbound freight and inventory is shipped from the Pearl River Delta in China through the Ports of Los Angeles and Long Beach, then trucked 80 miles up to the desert in Antelope Valley.

> "... we showed that if we stand together... we can make changes for ourselves, our families and the people who come after us."
>
> – Ignacio "Nacho" Meza

As logistics work has moved inland to places like Lancaster, employment has gone up—but working standards have gone down. Most of the new jobs are lower-paid and non-union. In fact, many companies hire through temp agencies, leaving workers with even fewer rights, little or no benefits, and less protection than other non-union workers.

Workers at Rite Aid's Lancaster facility began organizing in March 2006. They wanted an end to mandatory overtime piled on top of ten-hour shifts, and to address punishing production quotas. They'd had enough of sweating through desert summers with no air conditioning in their work areas, and being employed "at will" with no job security. More than anything else, they wanted to be treated decently.

"Finally we can have some respect and dignity," committee member Debbie Kaliff said. "This is huge. It levels the playing field for us."

Rite Aid responded to the workers' concerns with an all-out anti-union campaign that landed it on the wrong side of the law. A months-long investigation by the National Labor Relations Board found enough evidence to try Rite Aid on 49 labor law violations. These included disciplining, demoting, suspending and firing union supporters; threatening that people would lose their raises if they voted for the union; interrogating people about their union activities and sympathies, and publicly disparaging union supporters.

The company settled in May 2007 rather than face an NLRB judge, but

continued on page 3

Postmaster: Send address changes to The Dispatcher, 1188 Franklin St., San Francisco, CA 94109-6800.

Exhibit E



# LETTERS TO THE *DISPATCHER*

*Dear Editor,*

I'm glad to see the ILWU is taking a strong stand against symbols of racial hatred, including nooses. I saw racial hatred up close when I travelled around the country in 1971 after serving in the army. I travelled on freight trains and hitchhiked to Mississippi where I saw firsthand how racism and segregation were still being practiced.

I became registered at Local 13 in 1995, and worked at different ports on the west coast since 1974.

I still remember what we were taught in the Methodist Church when I was growing up: "red, yellow, black and white, we are all precious in God's sight." It's important for our union to speak out whenever we see symbols of hatred and racism.

– Neal Schreiner
North Edwards, CA

*Dear Editor,*

My dad, Joseph Stevenson, was a member of Local 10 when he was a young man. He marched down Market Street with Harry Bridges in July of 1934 after Bloody Thursday. He then became a member of the Warehouse Union, Local 6.

Dad always said that the ILWU will always stand up for the "little guy." Today, I'm deeply concerned about a proposition on the California Ballot this June 3rd that would outlaw rent control anywhere in the State. There are 17 cities that now protect tenants with rent control laws, including San Francisco. All this would end if big landlords get their way. I hope the union will stand with tenants in this fight and honor the ILWU's creed: "An injury to one is an injury to all."

– Candice Stevenson
San Francisco

Send your letters to the editor.
The Dispatcher, 1188 Franklin St., San Francisco, CA 94109-6800
or email to editor@ilwu.org

A note on the new design... This issue of the *Dispatcher* has a new, updated look that we're hoping will be easier to read – while retaining the substance and feel of this classic ILWU publication. Please let us know what you think.



Senator Barack Obama came to Portland, Oregon on Friday, March 21 for a community rally that filled the Memorial Coliseum with nearly 10,000 supporters. He met there with Local 40 Vice President Dawn DesBrisay, Local 8 President Jeff Smith, along with Congressmember Earl Blumenauer of Oregon's 3rd District. "Obama talked about being an advocate for working families, and that made me hopeful," said DesBrisay. "I told him that the ILWU would help him if he continued to stand up for unions and working families, and he promised to keep fighting for us." Thirty ILWU members from locals 4,5,8,28,40 and 92, were invited to sit in the VIP section at the rally where New Mexico Governor Bill Richardson endorsed Obama, citing many qualities for his decision – including an exceptional ability to address racial issues in an honest and constructive way.

# Stop work meetings on May 1 will focus on Iraq War

Nearly one hundred Longshore Caucus delegates voted on February 8 to support a resolution calling for an eight-hour "stop-work" meeting during the day shift on Thursday, May 1 to protest the war by calling for the immediate, safe return of U.S. troops from Iraq.

"The Caucus has spoken on this important issue and I've notified the employers about our plans for 'stop work' meetings on May 1," said ILWU International President Bob McEllrath.

Members should check with their local unions for more information about plans in their area.

Caucus delegates, including several military veterans, spoke passionately about the importance of supporting the troops by bringing them home safely and ending the war in Iraq. Concerns were also raised about the growing cost of the war that has threatened funding for domestic needs, including education and healthcare. Nobel prize-winning economist Joseph Stiglitz and Harvard economist Linda J. Bilmes recently estimated that the true cost of the war in Iraq to American taxpayers

will exceed 3 trillion dollars – a figure they describe as "conservative."

The union's International Executive Board recently endorsed Barack Obama, citing his opposition to the Iraq war as one of the key factors in their decision-making process.

Caucus delegates are democratically elected representatives from every longshore local who set policy for the Longshore Division.

McEllrath has written letters to President John Sweeney of the AFL-CIO and President Andy Stern of the Change-to-Win Coalition, and to the presidents of the International

Transport Workers' Federation and the International Dockworkers Council to inform them of the ILWU's decision - and invite others to speak out against the war on May 1.



# DISPATCHER

Craig Merrilees, *Editor and Communications Director*
Tom Price, *Assistant Editor*

ILWU TITLED OFFICERS
Robert McEllrath, President
Joseph R. Radisich, Vice President
Wesley Furtado, Vice President
William E. Adams, Secretary-Treasurer

The Dispatcher (ISSN 0012-3765) is published monthly except for a combined July/August issue, for $5.00 a year and $10.00 a year for non-members by the ILWU, 1188 Franklin St., San Francisco, CA 94109. Periodical postage paid at San Francisco, CA. The Dispatcher welcomes letters, photos and other submissions to the above address. © ILWU, 2008

Exhibit D

IN ARBITRATION PROCEEDINGS PURSUANT TO THE
COLLECTIVE BARGAINING AGREEMENTS BETWEEN THE PARTIES


| | | |
|---|---|---|
| INTERNATIONAL LONGSHORE AND WAREHOUSE UNION, | ] ] ] | DECISION |
| Union, ] | ] | of |
| and | ] ] | JOHN KAGEL |
| PACIFIC MARITIME ASSOCIATION, ] | ] | Coast Arbitrator |
| | ] ] | |
| Employers. ] | ] | April 30, 2008 10:15 a.m. PDT |
| | ] ] | Palo Alto, California |
| Re: Employers motions re whether the ILWU and its officials are in violation of the PCLCD and PCCCD re 5/1/08 | ] ] ] | |

_____

APPEARANCES:

    For the Employers: Jim McKenna, Tom Edwards, Rich Marzano, Coast Steering Committee, PMA

    For the Union: Bob McEllrath, Joe Radisich, Leal Sundet, Ray Ortiz, ILWU

    All by telephone hearing.


BACKGROUND AND MOTIONS:

    On April 24, 2008 the Coast Arbitrator ordered the Union to inform its Locals and members that May 1, 2008 was a normal work day as required by Section 12.2 of both the PCLCD and PCCCD, requiring the Union to inform members of their collective and

individual responsibilities under the Agreement: To report for work as normal. That order is incorporated herein by reference.

By e-mail in the evening on April 29, 2008 the Employers notified the undersigned, as attested to to the best of their then knowledge and belief by telephone conference on April 30, 2008:

> "In Tacoma, APM Terminals has been informed that none of their steady clerks will be working on May 1st. At Washington United Terminals (WUT) management was told the steadies would be calling for replacements on May 1st. Sea Star, Husky and PCT have also provided similar reports. In Tacoma management has been told by certain steady employees that Randy Whitman and Doug Rollins, two members of the Local 23 Clerks LRC, have gone to the various terminals and instructed the steadies not to work on Thursday.
>
> In Seattle, APL's Terminal 5 reported that 11 out of 19 total steady clerks have said they were not working on Thursday (5 didn't respond when asked.) SSAT management is reporting their steady clerks have informed them they will not be working on Thursday. Same is true for the T-46 facility - no steadies reporting on Thursday.
>
> In Oakland, SSAT clerks at the Matson facility reported to management that they will not be working on Thursday, May 1st. They also advised that the direction not to work came from the Local 34 President. At another SSAT facility, the company is reporting 21 of 45 steady equipment operators and 8 of 18 steady clerks have stated they would not work on May 1st. Similar reports have come from the MTC facility in Oakland.
>
> In LA/LB certain employers have already been told steady employees will not be at work. A foreman at LBCT, where all of the steady foremen have stated they will not work on May 1st, told management that Local 94's President told him May 1st was an approved stop work meeting."

In addition the Employers assert that a Seattle newspaper and an Oakland theater marquee note that the ILWU will strike on May 1, in addition to the publicity cited by the Employers on April 24.

The Employers included the following motions in their e-mail:

"1.    The Union has failed to comply with the April 24, 2008 bench ruling, in violation of Section 17.57.

2.    The Union's deliberate and concerted action of directing longshoremen, clerks and foremen that they are not to work on May 1, 2008 is a violation of Section 11.1, 11.2, and 18.1.

3.    That there shall be no unilateral concerted job action or illegal work stoppage in violation of the Agreement during the , 2008  day shift.

4.    The Union shall take immediate and affirmative steps to notify its members of their contractual obligation and direct all members to report to work as they normally do during the day shift on May 1, 2008."

The Employers asked for a telephonic hearing on April 30, 2008 at 9 a.m. PDT. providing a call-in number and represented that calls had been placed to the International President and a Coast Committee Member advising them of their request. Because the e-mail from the Employers did not indicate it had been sent to the Union and the lateness of the hour as received by the Coast Arbitrator, 8 p.m. April 29, 2008, he forwarded copies to e-mail addresses of Union officials as he had them. As noted, Union officials participated in the telephone hearing in this matter at the appointed hour.


DISCUSSION:

According to the Union it complied with the Coast Arbitrator's April 24 order by informing its Negotiating Committee members of it and since such members represent all Locals they would communicate the order to the Locals. In addition the Union maintains that the information received by the Employers is hearsay and thus not to be credited; that if individual Union members or Local officers have violated the Agreements then it is the

requirement of the PMA to bring those issues to the Area Arbitrators and that for the Coast Arbitrator to rule that concerted activity to not work tomorrow would be an Agreement violation would be a prospective order that is both contrary to how the Parties' grievance machinery works and premature as there is no way to know if there will be such activity until it happens.

This decision is a supplement to the April 24, 2008 order. In that order the Coast Arbitrator continued jurisdiction so that evidence presented then is relevant. That evidence included that the Union caucus voted to have stop work meetings on the day shift on May 1 to protest the Iraq war. The Employers did not agree to vary the Agreement's stop work meeting provisions and the Union advised then that there might be reduced work forces available on day sift on May 1. The order of the Coast Arbitrator then was for the Union to advise its members and Locals that that day was, under the Agreements, a normal work day.

The evidence of the Employers is accepted here that since that order steady employees up and down the Coast have notified management in uncharacteristically large numbers that they would not be at work on May 1. Under all of the circumstances of this particular case where the issue was raised at the Coast level and at least four major ports are identified where this has occurred the Coast Arbitrator is required to recognize the realities of the situation and to grant the motions, as modified below. It is apparent that the Union's efforts to comply with the April 24, 2008 order fell short of the intent of the Agreements. Those realities show that concerted activity that would not treat May 1 as a normal work day would violate Sections 11.1 and 11.2 of the Agreements.

It is noted that there is a long standing practice of arbitrators not ruling on prospective possibilities of Agreement violations. That practice is not changed by this ruling which is based on the particular facts and circumstances of this case and is confined solely to it. In addition, this ruling is not based on the Coast Arbitrator's personally held views of the Iraq war. It is based solely on the provisions and requirements of the PCLCD and the PCCCD.

DECISIONS:

Given the evidence before the Coast Arbitrator Union efforts, to comply with the order of the Coast Arbitrator of April 24, 2008 appear, based on sufficient evidence, to have been ineffective, the following motions of the Employers are granted as modified below:

1.    The Union has not effectively complied with the April 24, 2008 ruling, in violation of Section 17.57.

2.    Any deliberate and/or concerted action of directing Longshoremen, Clerks and others that they are not to work, or that they are not working, on May 1, 2008 is a violation of Sections 11.1, and 11.2 of the PCLCD and PCCCD.

3.    There shall be no unilateral concerted job action or illegal work stoppage in violation of the Agreement during the May 1, 2008 day shift.

4.    The Union shall take immediate and affirmative steps to notify its Locals and members of their contractual obligation and direct all members to report to work as they normally do during the day shift on May 1, 2008.

The above orders are in effect at the date and time of this order and are effective by e-mail notice as if written, signed and served by the Coast Arbitrator.


s/_____John Kagel_____

Coast Arbitrator

Exhibit E

IN ARBITRATION PROCEEDINGS PURSUANT TO THE
COLLECTIVE BARGAINING AGREEMENTS BETWEEN THE PARTIES

| | | |
|---|---|---|
| INTERNATIONAL LONGSHORE AND WAREHOUSE UNION, | ] ] ] | C-05-2008 |
| Union, | ] ] | DECISION |
| and | ] ] | of |
| PACIFIC MARITIME ASSOCIATION, | ] ] ] ] | JOHN KAGEL Coast Arbitrator |
| Employers. | ] ] | April 30, 2008 3:15 p.m. PDT |
| Re: Employers motions re whether the ILWU and its officials are in violation of the PCLCD and PCCCD re decision C-4-08 | ] ] ] ] | Palo Alto, California |

APPEARANCES:

For the Employers: Jim McKenna, Tom Edwards, Rich Marzano, Coast Steering Committee, PMA

For the Union: Leal Sundet, Ray Ortiz, ILWU

All by telephone hearing.

DISCUSSION:

The Employers presented evidence in the form of tape transcripts and documents which confirm concerted activity to not work on May 1, 2008 day shift. That evidence

shows a violation of the award issued this morning, now called C-04-2008, and

Sections 11.1 and 11.2 of the PCCCD and PCLCD.


DECISION:

    The Union, its Officers and members are in violation of the orders of the Coast

Arbitrator set forth in C-04-2008 which is incorporated herein by reference.

    This decision is sent by e-mail to the same effect as if written and signed by the

Coast Arbitrator.


                                        s/_____John Kagel_____

                                          Coast Arbitrator

Exhibit F

 

**INTERNATIONAL
LONGSHORE &
WAREHOUSE UNION**
AFL-CIO

1188 FRANKLIN STREET
SAN FRANCISCO
CALIFORNIA 94109
(415) 775-0533
(415) 775-1302 FAX
WWW.ILWU.ORG

ROBERT McELLRATH
President

JOSEPH R. RADISICH
Vice President

WESLEY FURTADO
Vice President

WILLIAM E. ADAMS
Secretary-Treasurer

For immediate release: May 1, 2008

Contact: Craig Merrilees 510-774-5325
Jennifer Sargent: 503-703-2933
John Showalter: 415-775-0533, ext 139

# Longshore workers are standing down at West Coast ports:

## "We're standing up for America, we're supporting the troops, and we're telling politicians that it's time to end the Iraq war now!"

**(SAN FRANCISCO, CA)** More than 25,000 longshore workers at 29 west coast ports are exercising their First Amendment rights today by taking a day off work and calling for an end to the war in Iraq.

"Longshore workers are standing-down on the job and standing up for America," said ILWU International President Bob McEllrath. "We're supporting the troops and telling politicians in Washington that it's time to end the war in Iraq."

McEllrath says rank-and-file members made their own democratic decision in early February when Longshore Caucus delegates voted to take action on May 1. Employers were notified of the plan, but refused to accommodate the union's request despite plenty of advance notice. The employer group, represented by the Pacific Maritime Association (PMA) consists of large carriers and port operators, most of which are foreign-owned.

"Big foreign corporations that control global shipping aren't loyal or accountable to any country," said McEllrath. "For them it's all about making money. But longshore workers are different. We're loyal to America, and we won't stand by while our country, our troops, and our economy are destroyed by a war that's bankrupting us to the tune of 3 trillion dollars. It's time to stand up, and we're doing our part today."

**-30-**

*The International Longshore and Warehouse Union (ILWU) represents 60,000 working women and men in five states (California, Oregon, Washington, Alaska, Hawaii) and Canada. Through more than 60 locals ILWU unites longshore workers, warehouse workers, watchmen, clerks, ferry and tugboat workers, tourism industry workers and agricultural workers.*

1
2
3
4
5
6
7
8              UNITED STATES DISTRICT COURT

9             NORTHERN DISTRICT OF CALIFORNIA

10  PACIFIC MARITIME ASSOCIATION, a          Case No. CV-08-2244 CW
    California corporation,
11                                           Hon. Claudia Wilken
                         Plaintiff,
12                                           **[PROPOSED] ORDER GRANTING**
            v.                               **PLAINTIFF PMA'S MOTION FOR**
13                                           **CONFIRMATION OF LABOR**
    INTERNATIONAL LONGSHORE AND              **ARBITRATION AWARDS**
14  WAREHOUSE UNION, an
    unincorporated labor organization,
15
                         Defendant.
16

17

18          The motion by Plaintiff Pacific Maritime Association ("PMA") for an order confirming

19  two labor arbitration awards issued against Defendant International Longshore and Warehouse

20  Union ("ILWU") was heard by the Court on July 3, 2008.  Having considered the arguments and

21  evidence provided by the parties, the Court hereby CONFIRMS the awards issued by Coast

22  Arbitrator John Kagel on April 30, 2008, copies of which are attached to this Order as Exhibit A.

23

24  Dated: _____                    _____
                                                    Hon. Claudia Wilken
25                                                  U.S. District Judge

26

27

28

Exhibit A

IN ARBITRATION PROCEEDINGS PURSUANT TO THE
COLLECTIVE BARGAINING AGREEMENTS BETWEEN THE PARTIES

| | |
|---|---|
| INTERNATIONAL LONGSHORE AND ] | |
| WAREHOUSE UNION, ] | |
| ] | DECISION |
| Union, ] | |
| ] | of |
| and ] | |
| ] | JOHN KAGEL |
| ] | |
| PACIFIC MARITIME ASSOCIATION, ] | Coast Arbitrator |
| ] | |
| ] | |
| Employers. ] | April 30, 2008 10:15 a.m. PDT |
| ] | |
| ] | Palo Alto, California |
| Re: Employers motions re whether the ILWU ] | |
| and its officials are in violation of the PCLCD ] | |
| and PCCCD re 5/1/08 ] | |

_____

APPEARANCES:

For the Employers: Jim McKenna, Tom Edwards, Rich Marzano, Coast Steering

Committee, PMA

For the Union: Bob McEllrath, Joe Radisich, Leal Sundet, Ray Ortiz, ILWU

All by telephone hearing.


BACKGROUND AND MOTIONS:

On April 24, 2008 the Coast Arbitrator ordered the Union to inform its Locals and

members that May 1, 2008 was a normal work day as required by Section 12.2 of both

the PCLCD and PCCCD, requiring the Union to inform members of their collective and

individual responsibilities under the Agreement: To report for work as normal. That order is incorporated herein by reference.

By e-mail in the evening on April 29, 2008 the Employers notified the undersigned, as attested to to the best of their then knowledge and belief by telephone conference on April 30, 2008:

> "In Tacoma, APM Terminals has been informed that none of their steady clerks will be working on May 1st. At Washington United Terminals (WUT) management was told the steadies would be calling for replacements on May 1st. Sea Star, Husky and PCT have also provided similar reports. In Tacoma management has been told by certain steady employees that Randy Whitman and Doug Rollins, two members of the Local 23 Clerks LRC, have gone to the various terminals and instructed the steadies not to work on Thursday.
>
> In Seattle, APL's Terminal 5 reported that 11 out of 19 total steady clerks have said they were not working on Thursday (5 didn't respond when asked.) SSAT management is reporting their steady clerks have informed them they will not be working on Thursday. Same is true for the T-46 facility - no steadies reporting on Thursday.
>
> In Oakland, SSAT clerks at the Matson facility reported to management that they will not be working on Thursday, May 1st. They also advised that the direction not to work came from the Local 34 President. At another SSAT facility, the company is reporting 21 of 45 steady equipment operators and 8 of 18 steady clerks have stated they would not work on May 1st. Similar reports have come from the MTC facility in Oakland.
>
> In LA/LB certain employers have already been told steady employees will not be at work. A foreman at LBCT, where all of the steady foremen have stated they will not work on May 1st, told management that Local 94's President told him May 1st was an approved stop work meeting."

In addition the Employers assert that a Seattle newspaper and an Oakland theater marquee note that the ILWU will strike on May 1, in addition to the publicity cited by the Employers on April 24.

The Employers included the following motions in their e-mail:

"1.    The Union has failed to comply with the April 24, 2008 bench ruling, in violation of Section 17.57.

2.    The Union's deliberate and concerted action of directing longshoremen, clerks and foremen that they are not to work on May 1, 2008 is a violation of Section 11.1, 11.2, and 18.1.

3.    That there shall be no unilateral concerted job action or illegal work stoppage in violation of the Agreement during the , 2008 day shift.

4.    The Union shall take immediate and affirmative steps to notify its members of their contractual obligation and direct all members to report to work as they normally do during the day shift on May 1, 2008."

The Employers asked for a telephonic hearing on April 30, 2008 at 9 a.m. PDT. providing a call-in number and represented that calls had been placed to the International President and a Coast Committee Member advising them of their request. Because the e-mail from the Employers did not indicate it had been sent to the Union and the lateness of the hour as received by the Coast Arbitrator, 8 p.m. April 29, 2008, he forwarded copies to e-mail addresses of Union officials as he had them. As noted, Union officials participated in the telephone hearing in this matter at the appointed hour.


DISCUSSION:

According to the Union it complied with the Coast Arbitrator's April 24 order by informing its Negotiating Committee members of it and since such members represent all Locals they would communicate the order to the Locals. In addition the Union maintains that the information received by the Employers is hearsay and thus not to be credited; that if individual Union members or Local officers have violated the Agreements then it is the

requirement of the PMA to bring those issues to the Area Arbitrators and that for the
Coast Arbitrator to rule that concerted activity to not work tomorrow would be an
Agreement violation would be a prospective order that is both contrary to how the
Parties' grievance machinery works and premature as there is no way to know if there
will be such activity until it happens.

This decision is a supplement to the April 24, 2008 order. In that order the Coast
Arbitrator continued jurisdiction so that evidence presented then is relevant. That
evidence included that the Union caucus voted to have stop work meetings on the day
shift on May 1 to protest the Iraq war. The Employers did not agree to vary the
Agreement's stop work meeting provisions and the Union advised then that there might
be reduced work forces available on day sift on May 1. The order of the Coast Arbitrator
then was for the Union to advise its members and Locals that that day was, under the
Agreements, a normal work day.

The evidence of the Employers is accepted here that since that order steady
employees up and down the Coast have notified management in uncharacteristically large
numbers that they would not be at work on May 1. Under all of the circumstances of this
particular case where the issue was raised at the Coast level and at least four major ports
are identified where this has occurred the Coast Arbitrator is required to recognize the
realities of the situation and to grant the motions, as modified below. It is apparent that
the Union's efforts to comply with the April 24, 2008 order fell short of the intent of the
Agreements. Those realities show that concerted activity that would not treat May 1 as a
normal work day would violate Sections 11.1 and 11.2 of the Agreements.

It is noted that there is a long standing practice of arbitrators not ruling on prospective possibilities of Agreement violations. That practice is not changed by this ruling which is based on the particular facts and circumstances of this case and is confined solely to it. In addition, this ruling is not based on the Coast Arbitrator's personally held views of the Iraq war. It is based solely on the provisions and requirements of the PCLCD and the PCCCD.

DECISIONS:

Given the evidence before the Coast Arbitrator Union efforts, to comply with the order of the Coast Arbitrator of April 24, 2008 appear, based on sufficient evidence, to have been ineffective, the following motions of the Employers are granted as modified below:

1.     The Union has not effectively complied with the April 24, 2008 ruling, in violation of Section 17.57.

2.     Any deliberate and/or concerted action of directing Longshoremen, Clerks and others that they are not to work, or that they are not working, on May 1, 2008 is a violation of Sections 11.1, and 11.2 of the PCLCD and PCCCD.

3.     There shall be no unilateral concerted job action or illegal work stoppage in violation of the Agreement during the May 1, 2008 day shift.

4.     The Union shall take immediate and affirmative steps to notify its Locals and members of their contractual obligation and direct all members to report to work as they normally do during the day shift on May 1, 2008.

The above orders are in effect at the date and time of this order and are effective by e-mail notice as if written, signed and served by the Coast Arbitrator.


s/_____John Kagel_____

Coast Arbitrator

IN ARBITRATION PROCEEDINGS PURSUANT TO THE
COLLECTIVE BARGAINING AGREEMENTS BETWEEN THE PARTIES

| | | |
|---|---|---|
| INTERNATIONAL LONGSHORE AND WAREHOUSE UNION, | ] ] ] | C-05-2008 |
| | ] | DECISION |
| Union, | ] ] | of |
| and | ] ] | JOHN KAGEL |
| | ] | |
| PACIFIC MARITIME ASSOCIATION, | ] ] | Coast Arbitrator |
| | ] | |
| Employers. | ] ] | April 30, 2008 3:15 p.m. PDT |
| | ] ] | Palo Alto, California |
| Re: Employers motions re whether the ILWU and its officials are in violation of the PCLCD and PCCCD re decision C-4-08 | ] ] ] | |

APPEARANCES:

For the Employers: Jim McKenna, Tom Edwards, Rich Marzano, Coast Steering

Committee, PMA

For the Union: Leal Sundet, Ray Ortiz, ILWU

All by telephone hearing.

DISCUSSION:

The Employers presented evidence in the form of tape transcripts and documents

which confirm concerted activity to not work on May 1, 2008 day shift. That evidence

shows a violation of the award issued this morning, now called C-04-2008, and

Sections 11.1 and 11.2 of the PCCCD and PCLCD.


DECISION:

The Union, its Officers and members are in violation of the orders of the Coast

Arbitrator set forth in C-04-2008 which is incorporated herein by reference.

This decision is sent by e-mail to the same effect as if written and signed by the

Coast Arbitrator.


s/_____John Kagel_____

Coast Arbitrator