ROBERT S. REMAR (SBN 100124)
PHIL A THOMAS (SBN 248517)
LEONARD CARDER, LLP
1188 Franklin Street, Suite 201
San Francisco, California 94109
Telephone: 415-771-6400
Facsimile: 415-771-7010
rremar@leonardcarder.com
pthomas@leonardcarder.com

Attorneys for Defendants
INTERNATIONAL LONGSHORE AND WAREHOUSE UNION

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PACIFIC MARITIME ASSOCIATION, a California corporation;<br><br>Plaintiffs,<br><br>v.<br><br>INTERNATIONAL LONGSHORE AND WAREHOUSE UNION, an unincorporated labor organization.<br><br>Defendants. | Case No. CV 08 2244<br><br>**DECLARATION OF ROBERT MCELLRATH** |

I, Robert McEllrath, hereby declare as follows:

1.     I am the President of the Longshore Division of the International Longshore and Warehouse Union ("ILWU").  I have personal knowledge of each matter stated herein, and could testify competently thereto if called as a witness.

2.     Plaintiff Pacific Maritime Association ("PMA") is an association of shipping lines and stevedoring and marine terminal companies which operate in ports throughout California, Oregon and Washington.  PMA serves as the collective bargaining and payroll agent for its

member companies.

3.      Defendant ILWU is the collective bargaining representative of all longshore workers employed by PMA-member companies in the ports of California, Oregon and Washington.

4.      The wages, hours, and terms and conditions of employment for ILWU-represented longshore workers and marine clerks employed by PMA-member companies are governed by a coast-wide collective bargaining agreement known as the Pacific Coast Longshore and Clerks Agreement ("PCL&CA"), which is in effect through July 1, 2008.

5.      The PCL&CA is set forth in two documents, (1) the Pacific Coast Clerks Contract Document ("PCCCD"), which governs the terms and conditions of employment for marine clerks, and (2) the Pacific Coast Longshore Contract Document ("PCLCD"), which governs the terms and conditions of employment for longshore workers.  The sections of the PCLCD quoted herein are identical to the corresponding sections of the PCCCD.  A true and correct copy of the PCLCD is attached hereto as Exhibit A and incorporated by this reference.

6.      Section 9.3 of the PCLCD obligates the Union to supply "[c]ompetent men with adequate experience or training … for all tools and equipment to be operated by longshoremen."  Section 9.31 permits the Joint Port Labor Relations Committees to "provide for the availability of the necessary men when there are not sufficient such competent longshoremen available."  Section 8.51 requires each dispatching hall to "furnish on any day required up to at least the agreed to number of gangs and supporting men[.]"

7.      Nothing in the PCLCD requires any longshore worker to report for work on any particular day.

8.      Section 11.1 of the PCLCD provides that "there shall be no strike, lockout, or work stoppage for the life of this Agreement."  Under Section 12.31 of the PCLCD, each local union has the right to hold one "regularly scheduled a stop-work meeting each month during overtime

LEONARD CARDER, LLP
ATTORNEYS
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TELEPHONE: (415) 771-6400    FAX (415) 771-7010

hours on the second shift." Under Section 12.32, this meeting can be rescheduled on one week's notice by mutual agreement of the PMA and ILWU.

9.     Section 17 of the PCLCD sets forth the procedures to be used in resolving disputes. The contractual grievance procedure is the exclusive remedy for anyone claiming a violation of the PCLCD:

> **17.15** The grievance procedure of this Agreement shall be the exclusive remedy with respect to any disputes arising between the Union or any person working under this Agreement or both, on the one hand, and the association or any employer acting under this Agreement, or both, and no other remedies shall be utilized by any person with respect to any dispute involving this Agreement until the grievance procedure has been exhausted.

10.     The grievance procedure has several steps and attempts to resolve disputes at the lowest possible level. The final step in the procedure is a hearing before the Coast Arbitrator. Under Section 17.55, all decisions of the Coast Arbitrator are final and binding on all parties. Under Section 17.57, all decisions of the Coast Arbitrator must be observed and/or implemented.

11.     In the past, PMA has generally agreed to allow the ILWU to change its monthly one-shift, stop-work meeting when a timely request is made. For example, in 1999, the PMA agreed to allow ILWU to change the date of its April stop-work meeting so that the Union could participate in rallies opposing the expected execution of death row inmate Mumia Abu-Jamal, who is widely believed to have been wrongly convicted of killing a police officer. In agreeing to the change, Phil Resch, Senior Vice President of Operations for PMA, stated:

> The ILWU uses these meetings to conduct union business and to communicate with their members. ... How the ILWU chooses to use this meeting time is up to their discretion. When a request to change the date is made in advance and agreed upon by our members, there is little, if any, impact on the maritime industry.

A true and correct copy of PMA's April 20, 1999 press release is attached hereto as Exhibit B.

12.     At the ILWU Longshore Division Caucus, held from January 28 to February 8, 2008,

LEONARD CARDER, LLP
ATTORNEYS
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TELEPHONE: (415) 771-6400    FAX (415) 771-7010

the delegates adopted a resolution to move the May 2008 stop-work meeting to the day shift on May 1, 2008 in order to express their opposition to the war in Iraq.

13.    Various Longshore Division locals informed PMA that they would be moving the May stop-work meeting to the day shift of May 1. True and correct copies of notices from ILWU Locals 8, 32, 40, and 50 are attached hereto as Exhibit C.

14.    By letter dated March 17, 2008, PMA informed ILWU that it would not agree to the Union's proposed change of the time and date of the May, 2008 stop-work meeting. A true and correct copy of the March 17, 2008 letter is attached hereto as Exhibit D.

15.    By letter dated April 3, 2008, PMA reiterated its position that it would not agree to ILWU's proposed change of the time and date of the May, 2008 stop-work meeting. In this letter, PMA also demanded that ILWU "take the following steps by no later than April 9, 2008" and threatened to "commence appropriate legal proceedings if ILWU did not do so. Specifically, PMA demanded that ILWU:

    1.  Confirm to PMA in writing that the ILWU and its local unions will not engage in a stop-work meeting, work stoppage, or other job action on May 1;
    2.  Remove all postings from the ILWU's website that suggest a stop-work meeting, work stoppage, or other job action will occur on May 1;
    3.  Immediately notify ILWU members, via announcements at the joint dispatch, the joint dispatch tape, by special bulleting, and by publication on its website that the May 1, 2008 stop-work meeting is cancelled and that there will be no work stoppage or job action on that date; and
    4.  Instruct ILWU members to report for work as they normally would on the day shift of May 1, 2008 and fill all labor orders placed with the Joint Dispatch hall by the Employers as required by the PCL&CA.

A true and correct copy of the April 3, 2008 letter is attached hereto as Exhibit E.

16.    By letter dated April 8, 2008, ILWU informed PMA that "no local will move its regularly scheduled May stop-work meeting to the day side of May 1, 2008. By this letter, any written notification by any local to so move is retracted and the dictates of Section 12 of the PCL&CA will be adhered to." ILWU rejected PMA's demand that "the Union communicate

LEONARD CARDER, LLP
ATTORNEYS
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TELEPHONE: (415) 771-6400    FAX (415) 771-7010

such to its members by a specified structure and within artificial timelines unilaterally developed by the Pacific Maritime Association is rejected. The Employers have no contractual standing to dictate the manner or method that the Union communicates with its members."

ILWU also responded to PMA's threatened legal action by stating:

> Moreover, the Industry arbitrators lack authority to hear any non contractual based issue, much less one that is speculative. The PCL&CA grievance machinery is not designed to resolve speculative issues. Doing so would lead to endless arbitrations over issues involving rumors, perceptions, and posturing. Such is the case here. If any local fails to meet the contractual needs of the Employers on May 1 such would then and only then be a violation of the PCL&CA and appropriate contractual remedies could then be sought.

A true and correct copy of the April 8, 2008 letter is attached hereto as Exhibit F.

17. By letter dated April 15, 2008, recommended that PMA-member companies "take into consideration as they plan May 1 operations that manpower may be limited as members exercise their right to express themselves politically." A true and correct copy of the April 15, 2008 letter is attached hereto as Exhibit G.

18. On April 23, 2008, PMA raised the issue of a possible work stoppage on May 1, 2008 at a meeting of the Joint Coast LRC. The JCLRC did not reach agreement as to whether any work stoppage was likely or whether any action should be taken by either party.

19. On April 24, 2008, the PMA raised the issue of a possible work stoppage on May 1, 2008 before the Coast Arbitrator. The Coast Arbitrator's order reads in relevant part:

> BENCH DECISION AND ORDER OF THE COAST ARBITRATOR
>
> There is an obligation under Section 12.2 of the Agreement for the Union to inform members of their responsibility under the Agreement. When the Union took an action which might have led some members to believe that they had no obligation to report as normal, whether a reality or not, it seems to me the Union had to go one step further and tell the members, without affecting their political decisions, that the ports are open, the Agreement applies, and they are expected to do whatever it is they are required to do under the Agreement.
>
> I am not going to direct how the Union does that at this point, because it seems

LEONARD CARDER, LLP
ATTORNEYS
1188 FRANKLIN STREET, SUITE 201
SAN FRANCISCO, CALIFORNIA 94109
TELEPHONE: (415) 771-6400    FAX (415) 771-7010

DECLARATION OF ROBERT MCELLRATH

to me that is none of my business. And it is none of the Employers; business, unless they have some more.

A true and correct copy of the Coast Arbitrator's April 24, 2008 decision is attached hereto as Exhibit H.

20.      Immediately thereafter, ILWU officers notified the Longshore Division Negotiating Committee of the Coast Arbitrator's April 24, 2008 decision. ILWU officers instructed the Committee members to inform their local unions of the Coast Arbitrator's April 24, 2008 award and of the necessity of complying with it.

21.      On April 30, 2008, PMA returned to the Coast Arbitrator, claiming that ILWU was not in compliance with the April 24, 2008 award. The Coast Arbitrator found that "Union efforts, to comply with the order of April 24, 2008, based on sufficient evidence, [were] ineffective." The Coast Arbitrator then granted the following motions:

1.   The Union has not effectively complied with the April 24, 2008 ruling, in violation of Section 17.57.

2.   Any deliberate and/or concerted action of directing Longshoremen, Clerks and others that they are not to work, or that they are not working, on May 1, 2008 is a violation of Sections 11.1, and 11.2 of the PCLCD and PCCCD.

3.   There shall be no unilateral concerted job action or illegal work stoppage in violation of the Agreement during the May 1, 2008 day shift.

4.   The Union shall take immediate and affirmative steps to notify its Locals and members of their contractual obligation and direct all members to report to work as they normally do during the day shift on May 1, 2008.

A true and correct copy of the Coast Arbitrator's April 30, 2008 decision is attached hereto as Exhibit I.

22.      PMA returned to the Coast Arbitrator later that day and presented additional evidence. At 3:15 p.m., the Coast Arbitrator found that "the evidence showed the Union, its Officers and members to be in violation" of the award he issued at 10:15 that morning. A true and correct

DECLARATION OF ROBERT MCELLRATH

copy of the Coast Arbitrator's 3:15 p.m. decision is attached hereto as Exhibit J.

23.    On May 1, demonstrations against the war in Iraq were held in many cities; ILWU members participated in many of these demonstrations. Dispatch halls were open, and accepted orders for labor from PMA-member employers. Few, if any, longshore workers showed up at the dispatch halls during the day shift on May 1, and these orders could not be filled. Longshore workers returned to the dispatch halls on the second shift, and industry operations returned to normal.

24.    Since May 1, PMA has not returned to the Coast Arbitrator for a determination of whether any of the events of May 1 constituted a violation of the PCLCD and/or any of the Coast Arbitrator's decisions. PMA has taken no action to discipline any ILWU-represented longshore worker who did not report for work on May 1.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on July 2nd, 2008, at San Francisco, California.

Robert McEllrath.

DECLARATION OF ROBERT MCELLRATH

# EXHIBIT A

# PACIFIC COAST LONGSHORE CONTRACT DOCUMENT

July 1, 2002 – July 1, 2008

*Between*

INTERNATIONAL LONGSHORE AND WAREHOUSE UNION

*and*

PACIFIC MARITIME ASSOCIATION

Name _____

Port _____

Local No. _____ Reg. No. _____

# Pacific Coast Longshore Contract Document

## TABLE OF CONTENTS

                                                                    Page

## PREFACE

Preface . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    1

## CONTRACT SECTIONS

1 — Scope of This Contract Document and
      Assignment of Work to Longshoremen . . . . . .    2
2 — Hours and Shifts . . . . . . . . . . . . . . . . . . .   10
3 — Guarantees . . . . . . . . . . . . . . . . . . . . . .   16
4 — Wages . . . . . . . . . . . . . . . . . . . . . . . . .   26
5 — Holidays . . . . . . . . . . . . . . . . . . . . . . .   35
6 — Scheduled Day Off . . . . . . . . . . . . . . . . .   39
7 — Vacations . . . . . . . . . . . . . . . . . . . . . . .   39
8 — Dispatching, Registration, and Preference . . . .   46
9 — Promotions, Training,
      and Steady Skilled Men . . . . . . . . . . . . .   50
10 — Organization of Gangs, Gang Sizes and
       Manning, and Methods of Dispatching . . . . .   53
11 — No Strikes, Lockouts, and Work Stoppages . .   61
12 — Meetings for Registered Longshoremen . . . .   68
13 — No Discrimination . . . . . . . . . . . . . . . . .   69
14 — Cranes . . . . . . . . . . . . . . . . . . . . . . . .   70
15 — Efficient Operations . . . . . . . . . . . . . . . .   78
16 — Accident Prevention and Safety . . . . . . . . .   80
17 — Joint Labor Relations Committees,
       Administration of Agreement, and
       Grievance Procedures . . . . . . . . . . . . . .   81
18 — Good Faith Guarantee . . . . . . . . . . . . . . .   99

iii

19 — Union Security . . . . . . . . . . . . . . . . . . . . . . . 100
20 — Pay Guarantee Plan, Rules,
     and Administration . . . . . . . . . . . . . . . . . . 101
21 — Lash Barge Jurisdiction . . . . . . . . . . . . . . . 118
22 — Term of Agreement and Items Open to
     Review During Term of Agreement . . . . . . 121
23 — Welfare and Pension Plans . . . . . . . . . . . . 121
24 — Modification . . . . . . . . . . . . . . . . . . . . . . . 121

## PENALTY CARGO LIST

Penalty Cargo List . . . . . . . . . . . . . . . . . . . . . . . 123

## WAGE SCHEDULES

2002-2003 Wage Schedule *(Effective 8:00 a.m.,
     November 23, 2002 to 8:00 a.m., June 28, 2003)* . 130
2003-2004 Wage Schedule *(Effective 8:00 a.m.,
     June 28, 2003 to 8:00 a.m., July 3, 2004)* . . . . . . 134
2004-2005 Wage Schedule *(Effective 8:00 a.m.,
     July 3, 2004 to 8:00 a.m., July 2, 2005)* . . . . . . . 138
2005-2006 Wage Schedule *(Effective 8:00 a.m.,
     July 2, 2005 to 8:00 a.m., July 1, 2006)* . . . . . . . 142
2006-2007 Wage Schedule *(Effective 8:00 a.m.,
     July 1, 2006 to 8:00 a.m., June 30, 2007)* . . . . . . 146
2007-2008 Wage Schedule *(Effective 8:00 a.m.,
     June 30, 2007)* . . . . . . . . . . . . . . . . . . . . . . . . 150
Mechanics Wage Schedule . . . . . . . . . . . . . . . . 154

## CFS SUPPLEMENT

Container Freight Station Supplement . . . . . . . . . . 156
     CFS Wage Schedules . . . . . . . . . . . . . . . . . . 186
     CFS Program Fund . . . . . . . . . . . . . . . . . . . 189

## CONTRACT SUPPLEMENTS

I  — Coastwise Registration and Transfer . . . . . . . 191
IA — Registration/Transfer to Clerk . . . . . . . . . . . 197
II — Coast Provision for Transfer
     of Registration Between Longshore
     and Clerk Registered Lists . . . . . . . . . . . . . . . 201
III — Registration and Transfer of Men
     from Low Work Opportunity Ports . . . . . . . 204
IV — Industry Travel System . . . . . . . . . . . . . . . 209

## ADDENDA

Holdmen Capable of Driving Lifts . . . . . . . . . . . . . 215
In Lieu of Time . . . . . . . . . . . . . . . . . . . . . . . . . 217
Jobs of Short Duration . . . . . . . . . . . . . . . . . . . . 221
No Discrimination . . . . . . . . . . . . . . . . . . . . . . . 222
Policy Against Discrimination, Harassment,
     and Retaliation . . . . . . . . . . . . . . . . . . . . . . . 223
ADA Policy . . . . . . . . . . . . . . . . . . . . . . . . . . . . 238
Picket Line Language . . . . . . . . . . . . . . . . . . . . . 245
Scheduling of Meetings . . . . . . . . . . . . . . . . . . . 247
Guarantees, Skilled Rates for
     All Longshoremen and Clerks . . . . . . . . . . . . 247
Steady Skilled Men . . . . . . . . . . . . . . . . . . . . . . 248
San Francisco Steady Skilled Men . . . . . . . . . . . . 249
San Francisco Bay Area Crane Board . . . . . . . . . . 251
San Francisco Utility Man/Lift Drivers . . . . . . . . . 251
San Francisco Local 10 Day and Night
     Dock Preference . . . . . . . . . . . . . . . . . . . . . . 251
Seattle Equalization of Work Opportunity
     for Crane Operators . . . . . . . . . . . . . . . . . . . 254
Los Angeles/Long Beach Crane Operators . . . . . . 257

Los Angeles/Long Beach Container Yard (CY)
    Equipment Board . . . . . . . . . . . . . . . . . 262
Los Angeles/Long Beach UTR Drivers . . . . . . . . . . 263
Dispatch Hall Costs . . . . . . . . . . . . . . . . . . . . . . . 267
Employer Contribution to Longshore
    401(k) Fund . . . . . . . . . . . . . . . . . . . . . . . 268
PMA Letter to Members . . . . . . . . . . . . . . . . . . . . 269

**APPENDIX**

Memorandum of Understanding
    Between ILWU and IBT . . . . . . . . . . . . . . 270

**INDEX**

Subject Index . . . . . . . . . . . . . . . . . . . . . . . . . . . 273



viii

# PACIFIC COAST LONGSHORE CONTRACT DOCUMENT

THIS CONTRACT DOCUMENT, dated July 1, 2002, is by and between Pacific Maritime Association (hereinafter called "the Association"), on behalf of its members (hereinafter designated as "the Employers" or the "individual employer"), and the International Longshore and Warehouse Union (hereinafter designated as "the Union"), on behalf of itself and each and all of its longshore locals in California, Oregon and Washington (hereinafter designated as "longshore locals") and all employees performing work under the scope, terms and conditions of this Contract Document. This Contract Document is a part of the ILWU-PMA Pacific Coast Longshore and Clerks' Agreement.

The parties hereto are the International of the International Longshore and Warehouse Union and the coastwise Pacific Maritime Association. All property rights in and to the Agreement, including this Contract Document for longshoremen, are entirely and exclusively vested in the Pacific Maritime Association and the International Longshore and Warehouse Union respectively, and their respective members. In the case of the International Longshore and Warehouse Union, a majority of the members of both the individual and combined locals covered by the Agreement shall be necessary to designate any successor organization holding property rights and all benefits of the Agreement, and if an election is necessary to determine a majority of both individual and combined locals in order to establish the possessors of all rights and benefits under this Agreement, such election shall be conducted under the auspices

1

and the supervision of the Coast Arbitrator provided for in Section 17, provided that such designation or election is not in conflict with any paramount authority or lawful or statutory requirements.

## SECTION 1

## SCOPE OF THIS CONTRACT DOCUMENT AND ASSIGNMENT OF WORK TO LONGSHOREMEN

This Contract Document, as supplemented by agreements (Port Supplements and Working Rules) for the various port areas covered hereby, shall apply to all employees who are employed by the members of the Association to perform work covered herein. It is the intent of this Contract Document to preserve the existing work of such employees.

**1.1** Within the States of California, Oregon and Washington, all movement of cargo on vessels or loading to and discharging from vessels of any type and on docks or to and from railroad cars and barges at docks is covered by this Contract Document and all labor involved therein is assigned to longshoremen as set forth in this Section 1.

**1.11** This Contract Document covers the movement of outbound cargo only from the time it enters a dock and comes under the control of any terminal, stevedore, agent or vessel operator covered by this Contract Document and covers movement of inbound cargo only so long as it is at a dock and under the control of any vessel operator, agent, stevedore, or terminal covered by this Contract Document. In instances where an Employer asserts it had no control of the movement of the cargo in question, the responsibility of proving such lack of control shall be upon the employer.

**1.2** Dock work provisions.

2

**1.21** When an employer chooses to perform the following dock work, such work is covered by this Contract Document and all labor involved therein is assigned to longshoremen:

(a) High piling cargo and breaking down high piles of cargo,

(b) Sorting of cargo,

(c) Movement of cargo on the dock or to another dock,

(d) The removing of cargo from cargo boards,

(e) Building any loads of cargo on the dock,

(f) Multiple handling of cargo,

(g) Loading and unloading of containers at intermodal rail yards on dock (as defined in Section 1.92) and near dock, (i.e., not on dock, but adjacent to an employer's on-dock container yard) under the control of any employer covered by this Contract document shall be assigned to longshoremen — exception: unless such work at the intermodal yard has been assigned to other workers under terms of a collective bargaining agreement. An intermodal rail yard can only be designated as an on dock or a near dock but cannot be defined as both.

1. Uninterrupted movement of containers, 365 days a year, 24 hours per day (to non-work days). *(See July 1, 1996, Letter of Understanding.)*
2. Available shift starting times: day shift 0700, 0800 and 0900; night shift 1700, 1800, 1900, 0200 and 0300.
3. Side gate and expedited gate procedures.
4. Maximum of 10 hours for the purpose of finishing a train.

3

**1.211** Carriage of cargo between docks by barge or rail or by trucks on public roads may be assigned to longshoremen.

Exception: The intraport drayage of cargo, containers, chassis and cargo handling equipment shall be assigned, in either direction, to longshoremen whenever such drayage is between an on-dock container yard (as defined in Section 1.92) and a near-dock rail yard (i.e., not on-dock but adjacent to such container yard) which is covered by this Contract Document.

**1.212** When the following dock work is performed, such work is covered by this Contract Document and all labor involved therein is assigned to longshoremen:

Consolidating containers or chassis on the dock for storage or delivery purposes.

**1.22** Cargo received on pallet, lift, or cargo boards, or as unitized or packaged loads shall not be rehandled before moving to ships' tackle, unless so directed by the employer.

**1.23** Any load of cargo discharged from a vessel may be dock stored just as it left the hatch.

**1.24** Any load of cargo discharged from a vessel may, in whole or part, be rearranged if necessary for dock storage. Such cargo shall not be considered high piled unless stored more than 2 loads high.

**1.241** Newsprint in rolls shall not be considered high piled unless stored more than 2 high, except that half size rolls (36" or less in height) shall not be considered high piled unless stored more than 4 high.

**1.25** Cargo may be removed by the consignee or his agent, without additional handling by longshoremen except for breaking down high piles and any other work as the employer may choose to have done under Section 1.21.

**1.26** If jurisdictional difficulties arise in connection with the performance of dock work, whatever jurisdictional agreements are reached shall not result in multiple handling.

**1.27** Provisions relating to sorting or subsorting cargo to marks shall not prohibit a drayman from taking or rearranging such already sorted cargo for the purpose of properly loading his truck.

**1.28** Masonite, hardboard and similar commodities are not high piled if the commodity is dock stored for delivery to a truck in piles not to exceed approximately 6 feet in height.

**1.3** Any class of seamen in the employ of a vessel operator may do the work herein assigned to longshoremen that such seamen in their class now do, or may do, by practice arrived at by mutual consent of the parties or the Joint Coast Labor Relations Committee.

**1.4** The Union may at any time, in general or limited terms, waive in writing the right of longshoremen to do any portion of the work herein assigned to longshoremen or so accept an interpretation of such assignment, and to the extent and for the time that such waiver or interpretation is accepted by the Association in writing the employer may assign or permit assignment of excepted work to any other class of workers consistent with such waiver or interpretation. Among the waivers and interpretations that have been made and accepted are: (See Appendix I, Memorandum of Understanding between ILWU and IBT.)

**1.41** The Employers have the right to have trucks come under the hook to move heavy lifts, dunnage, lining material, long steel, booms, and ship-repair parts directly from truck to ship and/or ship to truck.

**1.42** Longshoremen will load or discharge trucks operating in direct transfer to or from the ship and otherwise will work on trucks when directed to do so by the employer.

**1.43** Teamsters may unload their trucks by unit lifts (excluding containers) or piece by piece, to the area designated by the employer at which point the trucking or drayage company or shipper releases control of the cargo. *(See Section 1.8.)*

**1.44** Teamsters may load their trucks piece by piece from cargo boards or with unit lifts (excluding containers) and build loads and otherwise handle cargo on their trucks or tailgates and on loading platforms and aprons. *(See Section 1.8.)*

**1.45** The movement of cargo to or from a vessel on an industrial dock shall be defined as work covered by this Contract Document and is assigned to longshoremen. Existing practices under which other workers perform such dock work at an existing facility may be continued. An industrial dock is a dock at a facility where materials are manufactured and/or processed and from which they are shipped or at which materials used in the manufacture or process are received, and the dock operator has a proprietary interest in such materials.

**1.5** All machinery, equipment and other tools now or hereafter used in moving cargo and/or used in performing other work described in Section 1.1 shall be operated by longshoremen when used in an operation or at a facility covered by this Contract Document and the operation thereof is assigned to longshoremen and is covered by this Contract Document.

    (a) Procedures provided for resolving disputes as set forth in Section 1.5 and subordinate subsections shall be construed in connection with the agreement of the Employers to provide skill training for longshoremen so as to minimize the grounds for exceptions listed in Section 1.54. When trained skilled long-

shoremen, certified as capable of performing work now assigned by the Pacific Maritime Association member company to nonlongshoremen, are available, such longshoremen will be assigned to such work, provided no union jurisdictional work stoppages are caused and provided that such trained skilled longshoremen may be assigned to any skilled work they are capable of performing without limitation by reason of claimed specialization.

    (b) Where Pacific Maritime Association or its member companies have existing bargaining relationships, have granted recognition to, and have assigned work to bona fide labor unions as a result of such relationships and recognition; or where status quo exceptions relating to other unions are now set forth in Section 1, International Longshore and Warehouse Union will not make any jurisdictional claim or cause any jurisdictional work stoppage dispute involving Pacific Maritime Association or such member companies with relation to such work assignments. However, if the Union obtains the right to represent and bargain for such workers and no jurisdictional work stoppage problems are created, the Association agrees that such exceptions regarding assignment of work to longshoremen will be eliminated.

**1.51** The individual employer shall not be deemed to be in violation of the terms of the Contract Document assigning work to longshoremen if he assigns work to a nonlongshoreman on the basis of a good-faith contention that this is permitted under an exception provided for herein.

**1.52** Should there be any dispute as to the existence or terms of any exception, or should there be no reasonable way to perform the work without the use of nonlongshoremen, work shall continue as directed by the employer while the dispute is resolved hereunder.

**1.53** Any such dispute shall be immediately placed before the Joint Coast Labor Relations Committee by the party attacking any claimed exception or proposing any change in an exception or any new exception. The Joint Coast Labor Relations Committee decision shall be promptly issued and shall be final unless and until changed by the parties or that Committee. The Committee may act on the grounds set forth in Section 1.54 or on any other grounds. Both parties agree that its position on such a dispute shall in no case be supported by, or give rise to threat, restraint or coercion.

**1.54** Any such dispute that is not so resolved by the Committee within 7 days after being placed before it, may be placed before the Coast Arbitrator on motion of either party. The Arbitrator shall decide whether an exception should be upheld and may do so on the following grounds only:

(a) Nonlongshoremen were assigned the skilled or unskilled labor in dispute under practices existing as of January–August 10, 1959, arrived at by mutual consent and as thereafter modified or defined by the parties or the Joint Coast Labor Relations Committee, or;

(b) Cranes are not available on a bare boat basis and reasonable bona fide efforts to obtain them have been made and there is no reasonable substitute crane available.

**1.6** This Contract Document shall apply to the cleaning of cargo holds, loading ship's stores, handling lines on all vessels

(including lines handling at industrial docks), marking off lumber and logs, hauling ship, lashing, etc. *(See Addenda, In Lieu Of Time.) (See Section 1.8.)*

**1.7** This Contract Document shall apply to the maintenance and repair of containers of any kind and of chassis, and the movement incidental to such maintenance and repair. *(See Section 1.8.)*

**1.71** This Contract Document shall apply to the maintenance and repair of all stevedore cargo handling equipment. *(See Section 1.8.)*

**1.8** Any type of work assigned herein in Sections 1.43, 1.44, 1.6, 1.7 and 1.71 to longshoremen that was done by nonlongshore employees of an employer or by subcontractor pursuant to a past practice that was followed as of July 1, 1978, may continue to be done by nonlongshore employees of that employer or by subcontractor at the option of said employer.

**1.81** This Contract Document shall apply to all movement of containers and chassis under one of the following conditions: (a) when containers or chassis are moved on a dock from a container yard or to or from a storage area adjacent to a maintenance and repair facility on the same dock, such movement will be made by ILWU personnel, and (b) when an employer does not use a storage area adjacent to a maintenance and repair facility and the movement is directly between a container yard and a maintenance and repair facility on the same dock, such movement will be made by ILWU personnel. If there is objection by the union having contractual rights at such facility, (a) above shall be applied and ILWU personnel shall move the containers or chassis to a storage area adjacent to a maintenance and repair facility.

This Section 1.81 does not apply to: (a) movements of containers or chassis to or from roadability check stations in the

container yard for repairs required for over the road haulage; or (b) movements for emergency repair and emergency maintenance of laden refrigerated containers.

**1.82** Section 1.8 provides that subcontracting of work covered by Sections 1.7 and 1.71 may be continued pursuant to a past practice that followed as of July 1, 1978. However, before a subcontractor change is made the employer shall first discuss the intended change with the ILWU.

**1.83** An employer in a port covered by this Contract Document who joins the Association subsequent to the execution hereof and who is not a party to any conflicting longshore agreement becomes subject to this Contract Document.

**1.9** Definitions.

**1.91** The term "longshoreman" as used herein shall mean any employee working under this Contract Document. (*See Addenda, No Discrimination.*)

**1.92** The term "dock" as used herein shall mean any moorage—anchorage, pier, wharf, berth, terminal, waterfront structure, dolphin, dock, etc.—at which cargo is loaded to or discharged from oceangoing vessels or received or delivered by an employer covered by this Agreement. The term "dock" does not include any facility at which vessels do not moor.

## SECTION 2

## HOURS AND SHIFTS

**2.1** The standard work shifts and work week consist of the first 8 hours on the first shift, the first 8 hours on the second shift and the first 5 hours on the third shift, Monday through Friday. Work outside the standard work shifts on Monday through Friday and all work on Saturdays, Sundays, and Agreement Holidays is overtime work.

**2.2** Meal time shall be 1 hour.

**2.21** The established noon meal period shall be the 2 hours between 11:00 a.m. and 1:00 p.m. and the meal hour shall be any 1 hour within such period beginning at 11:00, 11:30, or 12:00 noon.

**2.22** The midshift meal hour on the second shift shall be at either 10:00 p.m. or 11:00 p.m. in those ports whose normal starting time is 6:00 p.m. and at either 11:00 p.m. or 12:00 midnight in those ports whose normal starting time is 7:00 p.m. In either case the 2 meal hours constitute the established meal period.

**2.23** Men may be sent to the midshift meal an hour later than the established midshift meal period when there is a late start of a vessel and an extended shift is to be worked.

**2.231** When men are sent to the midshift meal an hour later than the established midshift meal period under Section 2.23 and an extended shift is not worked, the men shall be paid 1 hour extra at the overtime rate on either the first shift or the second shift.

**2.24** Except when released as provided in Section 2.25, employees shall go to midshift meals as directed by the employer under the provisions of Sections 2.21, 2.22 and 2.23.

**2.25** When so ordered, employees shall work 6 hours without a midshift meal on all vessels. The employees will then be released with payment for the full shift.

**2.26** The employers have the right to relieve hatches during meal periods.

**2.3** Longshoremen are entitled to a 15-minute relief period around the midpoint of each work period involved, having due regard for the continuity and nature of the work.

**2.31** Men shall take their relief as directed by the employer, and there shall be no abuse of such relief periods by the em-

ployees and they shall observe specified times for starting, resuming and finishing work as directed by the employer.

**2.32** The granting of relief in accordance with the foregoing sections shall not, during periods of such relief, be construed to amount to a reduction of manning on any operation so as to require replacement of the men on relief, provided such operation can continue to meet all protective health and safety and onerous work standards as set forth in the Agreement.

**2.4** The standard work shifts shall be as set forth in Section 2.41.

**2.41** The first shift shall start at 8:00 a.m. except that the initial start may be made later than 8:00 a.m. The second shift shall start at 6:00 p.m., provided that the Joint Port Labor Relations Committee in any port may by mutual agreement alter the second shift regular starting time for such port to 7:00 p.m. An employer who orders gangs for the third shift may start the second shift, at the option of the employer, at 5:30 p.m. or 6:00 p.m. or at the second shift regular starting time set by the Joint Port Labor Relations Committee. The initial start on the second shift may be made later than the regular starting time. The third shift shall start at 2:30 a.m. or 3:00 a.m. at the option of the employer.

**2.411** The term "initial start" refers to the man's start, not the job or ship's start.

**2.42** Agreed upon exceptions to the regular shift starting time because of special conditions shall continue in effect with such modifications as may be mutually agreed to by the Joint Port Labor Relations Committee.

**2.43** The first shift may not overlap the next shift for work purposes, but may overlap the next shift at a different berth for payroll purposes. The work of the second shift gangs that are sent to eat and return to work may overlap the work of

the third shift gangs but only for the purpose of completing the pay guarantee.

**2.431** However, for the purpose of implementing Section 2.4492 work on the third shift and first shift may overlap between 7:00 a.m. and 8:00 a.m., and

**2.432** For the purpose of implementing Section 2.5 any work shift may overlap the following work shift.

**2.44** The following are the extensions or exceptions to the standard shift:

**2.441** Travel time, whether paid or unpaid, shall not be included in the work shift, except where traveling from one job to another in order to complete a shift.

**2.442** A 2-hour leeway without going to a second meal or receiving meal money shall be allowed, thus extending the 8-hour shift to a maximum of 10 hours, when a vessel is required to finish in order to shift.

**2.443** On the shift immediately preceding the final work shift, men may be required to work a maximum of 9 hours in any hatch or hatches to finish such hatch or hatches. At the end of the ninth hour, such hatch or hatches shall not be worked further before sailing.

**2.4431** *Container Operations.* On the shift immediately preceding the final work shift, men may be required to work a maximum of 9 hours to perform any work related to the loading/discharging of containers to complete a hatch covered under deck container stowage area or that area directly above. At the end of the ninth hour, such areas shall not be worked further before sailing.

**2.4432** *Lash Operations.* On the shift immediately preceding the final work shift, men may be required to work a maximum of 9 hours to perform any work related to the load-

ing/discharging of LASH barges to complete a vertical tier (or tiers) either below and/or above deck. At the end of the ninth hour, such tier (or tiers) shall not be worked further before sailing.

2.4433 *Roll-On/Roll-Off Operations*. On the shift immediately preceding the final work shift, men may be required to work a maximum of 9 hours to perform any work to complete the cargo loading/discharging operation in any watertight compartment or on any deck. At the end of the ninth hour, such compartment or compartments, or deck or decks shall not be worked further before sailing.

2.444 On the final shift (day or night) the men may be required to work a maximum of 10 hours without a second meal or meal money to sail a vessel.

2.4441 Some gangs on a vessel may work the standard shift, some gangs work part of the extension and other gangs work the full extension.

2.445 A 1-hour leeway shall be allowed on the third shift, thus extending the 5-hour shift to a maximum of 6 hours. On a final third shift, gear priority is suspended at the end of 5 hours. Gangs may then be released and the remaining gang or gangs may be worked in all hatches in order to finish and shall receive the full hour at the rate provided in Section 4.153.

2.446 The standard shift shall be extended to work a vessel in case of real emergency, such as fire, or a leaking vessel in danger of sinking and men thus employed shall go to eat when ordered to do so.

2.447 When no replacements are available to the employer in the area, men and gangs in their home port shall work a maximum of 10 hours.

2.4471 Where men and gangs travel from home port to another port they shall not work longer than the maximum provided for in Sections 2.442, 2.443 and 2.444.

2.448 An extension of up to 2 hours on any shift shall be allowed when using a floating crane to finish any heavy lift operation but shall apply only to the gang and/or men involved.

2.449 Dock Operations.

2.4491 Any dock facility may operate from 7:00 a.m. to 6:00 p.m. and from 5:00 p.m. to 4:00 a.m. at the option of the employer.

2.4492 For flexibility on dock operations, individual longshoremen may (1) be ordered to perform any dock work for 1 full hour only prior to the start of any shift or (2) be directed to perform any dock work for 1 full hour only after any shift. Individual longshoremen shall be limited to a total of 9 hours on the first shift, 9 hours on the second shift, and 6 hours on the third shift. The 1 hour of work before or after the first and second shifts shall be paid at 1.5 times the straight time rate and on the third shift at 1.8 times the straight time rate.

2.4493 The local working rules may provide further or different exceptions for dock work.

2.5 For flexibility on ship operations, longshoremen may be ordered 1 full hour only prior to the start of any shift for work "other than actual handling or moving of cargo," such as lashing, unlashing, rigging of ramps, covering and uncovering, rigging or trimming of gear and preparing equipment. The phrase "other than actual handling or moving of cargo" is intended to permit the preparation of cargo for movement to or from the vessel so long as there is no actual movement of cargo directly to or from the vessel.

2.6 To meet extraordinary or emergency situations, Joint Port Labor Relations Committees may, by mutual agreement of the

parties, make limited exceptions to the rules in this Section other than 2.1.

**2.7** Men and gangs shall be available to the employers for 3 shifts. The employer shall determine the number of shifts to be worked and the number of gangs used on each shift. Gangs and men will report at the shift starting time designated by the employer in accord with the Contract Document.

## SECTION 3

# GUARANTEES

**3.1** Eight-hour guarantee.

**3.11** Applicability and method of payment.

**3.111** Fully registered and limited registered men who are ordered to a job and who report to work and are turned to shall receive a guarantee of 8 hours' pay, except on the third shift where a guarantee of 5 hours' work or 5 hours' pay is applicable.

**3.112** On the first shift, the 8-hour guarantee of work or pay shall be provided between the hours of 8:00 a.m. and 6:00 p.m.

**3.113** On the second shift, the 8-hour guarantee of work or pay shall be provided within a spread of 9 hours from the normal starting time, or in the San Francisco Bay Area from the beginning of a late subsequent start permitted under the present provisions in the San Francisco working rules. The spread is enlarged by 1 hour for a late initial start.

**3.114** In the event a full shift of work cannot be provided and dead time results, such dead time shall be payable at the regular hourly rate of the shift involved to which the employee is entitled under Section 4.13. No penalty cargo rates shall be paid for dead time hours.

---

**3.115** A man shall have only one 8-hour guarantee in any one day *(See Section 3.28)*.

**3.12** Exceptions to 8-hour guarantee.

**3.121** The 8-hour guarantee shall not apply in the following circumstances:

**3.1211** When men are neither turned to nor ordered to stand by *(See Section 3.22)*.

**3.1212** When men are turned to or ordered to stand by and work cannot commence, continue or resume because of bad weather (such determination to be made by the employer) and the men are not ordered back after a midshift meal *(See Section 3.23)*;

**3.1213** When extra longshoremen from the skilled classifications are ordered and turned to on an operation of short duration and are not shifted thereafter to comparable work on other docks or ships and are not ordered back after a midshift meal *(See Section 3.24)*.

**3.1214** When men employed at Selby, California, are not shifted to other operations to fill out the 8-hour guarantee *(See Section 3.27)*, and

**3.1215** As provided in Section 3.3.

**3.122** Where men have been ordered and fail to report to work at all or on time, thus delaying the start of an operation, the time lost thereby until replacements have been provided or until the man or gang has been turned to shall be deducted from the 8-hour guarantee.

**3.123** When gangs are traveled and, as a result, their starting time is later than 9:00 a.m. so that it is impossible to fill out the 8-hour guarantee between 8:00 a.m. and 6:00 p.m., the guarantee shall be pay or work from actual starting time until

6:00 p.m., except for the meal hour. The same principle shall apply to a night shift start.

**3.124** When hours are lost as a result of stop-work meetings, or mutual agreement of the ILWU and PMA, such hours shall be deducted from the 8-hour guarantee.

**3.125** When men are employed at Selby, California, the employer may shift the men to other operations to fill out an 8-hour guarantee, otherwise the guarantee is only 4 hours. If men are not shifted to other work but are ordered back after a mid-shift meal, a second 4-hour minimum shall apply.

**3.13** Accompanying the obligation placed upon the employers to furnish 8 hours of work each shift is the obligation on the part of the men to shift from one job to another when such move is ordered by the employers. Subject to the provisions hereunder the employers shall have the right to shift men and gangs, and men and gangs shall shift as ordered.

**3.131** A skill rated longshoreman may be shifted only to skill rated work suitable to his qualifications. *(Note: See Sections 4.32 and 10.32(e).)*

**3.132** Employers may shift men in ship gangs to any other work including all dock and car work.

**3.133** Longshoremen working on the dock may be shifted to work aboard ships and may be shifted from their original assignment on any shift to any work on docks, cars, or barges, except that longshoremen listed on port lists, as agreed by Joint Port Labor Relations Committees as men being limited to dock work, shall not be shifted to work aboard ships.

(a) This Section 3.133 as it relates to certain longshoremen being limited to dock work, is intended to implement reference in Coast Labor Relations Committee Meeting No. 28, December 27, 1961 concerning the preferential assignment of dock work

to "men either old or disabled." It is understood that the Joint Port Labor Relations Committees will prepare such lists of men who are "old or disabled," and who consequently will not be shifted away from dock work. The Joint Port Labor Relations Committees shall limit such lists to those in fact old or disabled and shall consider the normal volume of dock work in the port and the shifting of men from ship to dock, in order that the number of men on preferred dock assignment lists may have sufficient work opportunity to make reasonable hours of employment.

(b) Included in such lists shall be machine operators (hull drivers) in order that such men, not necessarily filling the classification "old or disabled," shall not be forced off machines and put to work hand handling cargo on dock or ship. The period of time such machine operators have been doing such work shall be the major factor to be used by Joint Port Labor Relations Committees in placing such men on preferential lists. This Section of the Contract Document shall not be construed to mean a guarantee of work or pay if insufficient work is provided.

**3.134** Employers may shift men from shovel, freezer, and calk shoe work to any other work including all dock and car work. When so shifted, the penalty cargo rate shall not prevail. The employer may not shift men dispatched for general cargo to shovel, freezer or calk shoe work.

**3.135** The employer shall have the right to peel off gangs at any time during a shift or at the end of a shift. The remaining gangs can work at all gears.

**3.1351** The employers have the right to order back after any shift only such gangs as are needed to finish the re-

maining work. Such gang or gangs ordered back must be the gang or gangs which the employer believes in good faith have the most work to do at their gear. They may be required to finish the work at the gear of the released gangs. Under such circumstances the gear priority of the gangs released is suspended. Any gang peeled off under this rule cannot be replaced at its gear by a new gang from the dispatching hall until the second subsequent comparable shift.

**3.1352** Gangs ordered to work under conditions which such gangs contend violate gear priority rules shall work as directed and claim(s) for such violation shall be presented by the union. If it is established that a gear priority violation did occur, then it will be automatic that the amount of time another gang worked in the hatch in which the gear priority violation was claimed will be paid the gang whose gear priority was violated on an hour for hour basis, unless the employer on whose ship the alleged gear priority violation occurred maintains that such incident happened for reasons beyond the employer's control. The employer may then take that position and process it through the grievance procedure to the Area Arbitrator for final decision.

**3.136** The shifting of registered and limited registered men shall be carried out without bumping.

**3.137** Any gear priority rule will not prevent the shifting of men and gangs for the purpose of fulfilling the 8-hour guarantee.

**3.138** No "center line" and "imaginary bulkhead" or similar practices which result in division of work among gangs shall be permitted.

**3.14** Rules and examples applicable to shifting men or gangs:

**3.141** Initial late start orders may be placed at the dispatching hall to work a ship and to shift to a second ship for a late start on the second ship. Men so ordered shall be dispatched for the second ship, with orders to work the first ship only as a fill-in.

**3.142** Men or gangs may be ordered to shift from a job or a ship that they have completed to a late start on another job or ship. Such men or gangs will be released at the end of the shift on the second job and may be required to work no longer than the extended hours as provided in Section 2.

**3.143** Men or gangs may be ordered to shift from a job or a ship where they have not completed their original assignment to permit a late start on another job or ship, or in order to finish the second ship for shifting or sailing. These men or gangs will be ordered back to their original job during that shift or for the start of the next day's shift. If extended hours are required to permit the second ship to shift or sail, the men or gangs will work up to but not beyond the end of the extension provided in Section 2.

**3.144** Men or gangs may be ordered to shift from a job or a ship which they have not completed but where they have run out of available work—e.g., a delay in arrival of cargo, a breakdown of equipment, or a ship that fails to arrive as scheduled to another job or ship, and they will be ordered to return to their original job to finish it.

**3.145** Shifting of men or gangs under Sections 3.13 or 3.14 may be accomplished without clearance through the dispatching hall.

**3.146** Gangs will have gear priority on only 1 ship during a shift and will be released to the dispatching hall at the end of any shift in which they have completed their work on the ship on which they had priority.

### 3.15 Possible adjustments in small ports:

**3.151** The full provisions of the 8-hour guarantee shall prevail in all ports. In ports of 6 gangs or less adjustments may be made in leeway for late starts because no alternative work is available to fill out the 8-hour guarantee by mutual agreement at the local level provided there is approval by the Joint Coast Labor Relations Committee.

### 3.2 Four-hour minimum.

**3.21** Longshoremen, other than fully registered or limited registered men, who are ordered to a job and are turned to shall receive a minimum of 4 hours' work or 4 hours' pay.

**3.22** Men and/or gangs who are ordered, report for work complete as ordered or in the agreed minimum numbers and ready to turn to but are not turned to shall receive the 4-hour minimum. Such men and/or gangs may be required to stand by for a maximum of one-half hour within the 4-hour minimum. Present port rules defining the number of men to start operations shall apply.

**3.221** When an operation cannot commence at the designated starting time because of failure of at least the minimum required and properly ordered number of men to appear, then pay shall be as follows:

**3.2211** Units not filled to minimum complement as provided in local working rules shall, if ordered by the employer, stand by awaiting additional men as needed to complete the minimum complement of men. Such standby shall be paid for and limited to 1 hour.

**3.2212** Other units or men not directly related to the operation who report for work as ordered shall be turned to. They may be released 1 hour later if the balance of the work does not commence or continue thereafter because of insufficient men being present. If they are so released they shall receive a 4-hour

minimum in addition to the time they may have worked prior to the commencement of the shift.

**3.2213** Where possible, units of less than the minimum requirements of men shall be consolidated to provide proper complements and the men shall so combine or shift as provided by this Contract Document.

**3.222** When the required minimum number of men report they are required to turn to as directed by the employer and work up to the midshift meal hour. If at that time there are men who have not as yet reported, then either the men or the employer can determine that work cannot proceed at any time thereafter. When work ceases under such circumstances or if the employer determines that the operation is not satisfactory prior to the meal hour then the minimum pay for all related men or units shall be time worked or 4 hours, whichever is the greater.

**3.223** When the required minimum complement reports and the operation commences and cannot be continued because of refusal of men to continue working with less than the required number of men, then pay shall be as follows:

**3.2231** Such men or units of men refusing to continue work shall be paid on the basis of time worked.

**3.2232** Related men or units of men shall be shifted to other work, or shall be released with a 4-hour minimum.

**3.2233** Such a refusal to continue work shall not be considered a violation of this Contract Document.

### 3.23 Inclement weather.

**3.231** When men are ordered to stand by and work cannot commence because of bad weather (such determination to be made by the employer), the 4-hour minimum shall apply. Any dead time resulting from bad weather shall be paid under Section 3.114.

**3.232** When are turned to and work cannot continue because of bad weather (such determination to be made by the employer), the 4-hour minimum shall apply unless the men are ordered back after a midshift meal. Any dead time resulting from bad weather shall be paid under Section 3.114.

**3.233** When men are turned to and commence work at the start of a shift in bad weather, they shall be entitled to pay for the full shift. Any dead time resulting from bad weather shall be paid under Section 3.114.

**3.24** When an operation of short duration requires extra longshoremen from the skilled classifications and such men are ordered and turned to, they shall have a 4-hour minimum, and can be transferred to comparable work on the original dock or ship to fill out the 4-hour minimum. (*See Addenda, Jobs Of Short Duration.*)

**3.25** When a gang quits during the course of the 8 hours of work or quits by refusal to work the extensions for shifting or sailing and a replacement gang is ordered from the dispatching hall then the replacement gang shall have a 4-hour minimum guarantee for that shift.

**3.26** Any replacement who is not refused employment for personal cause is to be paid for time worked on his initial shift, but he shall not receive less than the remainder of the original man's guarantee. Replacements caused by industrial injury or illness shall continue to receive time worked, or a minimum of 4 hours, whichever is greater.

**3.27** When men are employed at Selby, California, they have a 4-hour guarantee. If the employer shifts the men to other operations or orders them back after a midshift meal then the 8-hour guarantee shall apply.

**3.28** A man who has received an 8-hour guarantee and has been dispatched from the hall to a new job shall receive an ad-

ditional 4-hour guarantee for the second job. Overtime is payable only after 8 hours of straight time work on both jobs.

**3.29** Longshoremen and/or gangs who report to work as ordered and are turned to on fishing vessels 350 feet or less length over-all, shall receive a 4-hour minimum guarantee. Registered longshoremen ordered back after the mid-shift meal shall receive a guarantee of 8 hours. This provision does not apply to San Francisco or Los Angeles/Long Beach.

**3.3** General provisions as to guarantees.

**3.31** There shall be no guarantee for any man who is released for cause or who quits or who refuses to shift as provided under Section 3.13 or who loses hours as a result of ILWU unilateral action or who is not turned to where inability to turn to is a result of insufficient men to start the operation or who is turned to and works less than his guaranteed time by reason of illness or injury. Such men shall be paid only for their actual working time.

**3.32** When men are late in reporting at the designated shift starting time on an initial or subsequent start, if they are turned to, they shall then be turned to at and paid as of the next quarter-hour; that is, the quarter-hour, the half-hour, the three-quarter hour or the even hour and time lost between the designated starting time and time turned to shall be deducted from the guarantee.

**3.33** When men are not sent to eat before the beginning of the second hour of the 2-hour meal period, pay for the work in the second hour shall be one-half hour if worked less than one-half of such hour and 1 full hour if worked one-half or more than one-half of such hour.

**3.34** When men are knocked off work 6 minutes or more after the even hour, they shall be paid to the next one-half hour

and when knocked off 36 minutes or more past the even hour, they shall be paid to the end of the hour.

**3.35** The guarantees of this Section 3 do not apply to longshore baggagemen or linesmen or to gearmen called in on an emergency.

**3.351** Guarantees applicable to longshore baggagemen, linesmen and gearmen called in on an emergency may be adopted or modified by unanimous action of the Joint Coast Labor Relations Committee and, subject to the control of such Committee so exercised, existing and future local rules or mutually agreed practices shall be applicable.

**3.36** No rule is to be used as a subterfuge for firing gangs.

## SECTION 4

## WAGES

**4.1** Wage Rates.

The basic straight-time hourly rate of pay for longshoremen shall be as follows:

Effective 8:00 a.m., July 1, 2002     $27.68
Effective 8:00 a.m., June 28, 2003    $28.18
Effective 8:00 a.m., July 3, 2004     $28.68
Effective 8:00 a.m., July 2, 2005     $29.68
Effective 8:00 a.m., July 1, 2006     $30.18
Effective 8:00 a.m., June 30, 2007    $30.68

**4.12** All hourly rates of pay shall be as set forth in the Wage Schedule and shall be effective as set forth therein.

**4.13** Work Experience Straight Time Hourly Rates.

**4.131** Each employee, regardless of registration or non-registration status, unless exempted under Section 4.132, shall be paid for work under this Contract Document on the basis of total worked hours in the industry accumulated since the

beginning of the 1976 payroll year. The total accumulated worked hours credited to the employee at the end of the previous payroll week (7:59 a.m. Saturday) shall determine the employee's appropriate straight time hourly rate according to the following tables:

| Work Experience Hours | Straight Time Hourly Rate | | |
| --- | --- | --- | --- |
| | Eff. 7/1/02 | Eff. 6/28/03 | Eff. 7/3/04 |
| 4,001 or more hours | $27.68 | $28.18 | $28.68 |
| 2,001 through 4,000 hours | $22.94 | $23.30 | $23.66 |
| 1,001 through 2,000 hours | $20.94 | $21.30 | $21.66 |
| 0 through 1,000 hours | $19.94 | $20.30 | $20.66 |

| Work Experience Hours | Straight Time Hourly Rate | | |
| --- | --- | --- | --- |
| | Eff. 7/2/05 | Eff. 7/1/06 | Eff. 6/30/07 |
| 4,001 or more hours | $29.68 | $30.18 | $30.68 |
| 2,001 through 4,000 hours | $24.39 | $24.75 | $25.11 |
| 1,001 through 2,000 hours | $22.39 | $22.75 | $23.11 |
| 0 through 1,000 hours | $21.39 | $21.75 | $22.11 |

**4.1311** Qualifying hours for pay rate status as set forth in Section 4.131 above shall include all hours for which pay is received, excluding vacation hours, paid holiday hours, and Pay Guarantee Plan hours.

**4.1312** At the end of each succeeding payroll week, each employee, regardless of registration or non-registration status, will be credited with any hours worked. If the new total accumulated worked hours exceeds the upper limit of the work experience hours grouping in which the employee is classified, pay for hours worked the following payroll week and succeeding weeks shall be based on the hourly rate of the next work experience grouping.

**4.1313** All other derivative rates, such as the second and third shift rates and the overtime rates shall be calculated from the rates described in Section 4.131. All skill rates appro-

priate to the work being performed shall be applied to the rates so derived.

**4.132** All Class A and Class B employees registered on or before June 30, 1987 shall be exempted from the work experience requirements of Sections 4.131 through 4.1313 and shall be entitled to receive the basic straight time hourly rate or rates derived therefrom.

**4.14  Shift Rates and Overtime Rates.**

**4.141  Shift Rates:** The first shift hourly rate shall be the basic straight time hourly rate. The second shift hourly rate shall be 1.333333 times the basic straight time hourly rate. The third shift hourly rate shall be 1.6 times the basic straight time hourly rate.

**4.142  Overtime Rates:** The overtime hourly rate shall be 1.5 times the basic straight time hourly rate on the first shift, 1.5 times the basic straight time hourly rate on the second shift and 1.8 times the basic straight time hourly rate on the third shift.

**4.15  Payment of Rates.**

**4.151** *First Shift.* The basic straight time hourly rate shall be paid for the first 8 hours worked between the hours of 8:00 a.m. and 6:00 p.m. on the first shift Monday through Friday. The overtime rate (1.5 times the basic straight time hourly rate) shall be paid for work in excess of 8 hours, for work outside the hours of 8:00 a.m. to 6:00 p.m. on the first shift Monday through Friday and for all hours worked on the first shift on Saturday, Sunday, and Agreement Holidays.

**4.152** *Second Shift.* The second shift hourly rate (1.333333 times the basic straight time hourly rate) shall be paid for the first 8 hours worked on the standard second shift as set forth in Section 2.41, Monday through Friday. The overtime rate (1.5 times the basic straight time hourly rate) shall be

paid for work in excess of 8 hours, for work outside the standard 8-hour second shift Monday through Friday, and for all hours worked on the second shift on Saturday, Sunday, and Agreement Holidays.

**4.153** *Third Shift.* The third shift hourly rate (1.6 times the basic straight time hourly rate) shall be paid for the first 5 hours worked on the standard third shift, as set forth in Section 2.41, Monday through Friday. The third shift overtime rate (1.8 times the basic straight time hourly rate) shall be paid for work in excess of 5 hours, for work outside the standard 5-hour third shift, Monday through Friday, and for all hours worked on the third shift on Saturday, Sunday, and Agreement Holidays.

**4.2  Training Rates of Pay.**

**4.21** The hourly rate of pay for training shall be the employee's straight time rate as established under Sections 4.13 through 4.132.

**4.3  Skill Rates.**

**4.31** Wages to be called Skill Rates shall be paid for types of work specified in Section 4.32.

**4.32** The straight time Skill Rates are derived by adding a skill differential to the straight time hourly rate payable under Sections 4.13 through 4.132.

**Effective Date:**

|  | 11/23/02 | 6/28/03 | 7/3/04 | 7/2/05 | 7/1/06 | 6/30/07 |
|---|---|---|---|---|---|---|
| **Skill I:** | $30.08 | $30.58 | $31.08 | $32.08 | $32.58 | $33.08 |

WAGES                                                                    SECTION 4

Boom Man[1]
Bulldozer Operator[2]
Burton Man
Combination Lift Truck-Jitney Driver
Crane Chaser[3]
Gang Boss
Guy Man
Hatch Boss Tender[2]
Hatch Tender
Holdmen (Skilled)[3,4]

Lift Truck Operator (Up to 15 tons)[5]
Payloader Operator[2]
Stack Turner
Side Runner[1]
Tractor (semi-truck) Driver (On Dock)
Tractor (semi-truck) Driver (Aboard Ship)
Winch Driver

**Effective Date:**

|            | 11/23/02 | 6/28/03 | 7/3/04  | 7/2/05  | 7/1/06  | 6/30/07 |
|------------|----------|---------|---------|---------|---------|---------|
| Skill II:  | $32.35   | $32.85  | $33.35  | $34.35  | $34.85  | $35.35  |

Lift Truck Operator – Heavy (over 15 tons rated)
Locomotive Operator
Log Stacker Operator
Shipboard Munck Crane Operator

Shipboard Whirley
Shore-based Whirley & Mobile Crane Operators

**Effective Date:**

|            | 11/23/02 | 6/28/03 | 7/3/04  | 7/2/05  | 7/1/06  | 6/30/07 |
|------------|----------|---------|---------|---------|---------|---------|
| Skill III: | $33.48   | $33.98  | $34.48  | $35.48  | $35.98  | $36.48  |

Portainer/Hammerhead
Postpacker
Reachstacker
Sidepick Operator

Strad Driver
Tophandler Driver
Transtainer Operator
9.43 Equipment Operator

Skill I, Skill II, and Skill III rates based on Work Experience Straight Time Hourly Rates shall be paid as determined under Sections 4.13 through 4.132. These rates are provided in the Wage Schedules, pages 130–153.

Mechanics rates are provided in the Wage Schedules, pages 154–155.

[1] Section 3.131 does not apply and these men may be shifted to any longshore work retaining their skill differential.
[2] Two men shall be employed for each machine in continuous operation.
[3] Applies to Tacoma, Anacortes and Port Angeles only.
[4] See Section 10.2.
[5] See Section 10.32(e).

WAGES                                                                    SECTION 4

**4.33** The Skill Rate for the first shift shall be the straight time Skill Rate set forth in Section 4.32; the Skill Rate for the second shift shall be 1.333333 times the straight time Skill Rate; the Skill Rate for the third shift shall be 1.6 times the straight time Skill Rate.

**4.34** During overtime hours, the Skill Rates shall be 1.5 times the straight time Skill Rate on the first and second shifts and 1.8 times the straight time Skill Rate on the third shift.

**4.35** The rate of pay for Jitney Drivers shall be the employee's appropriate straight time hourly rate. When a Jitney Driver is dispatched to drive Jitney, he may be assigned to other work to fill out his minimum guarantee. Combination Lift Truck-Jitney Drivers may be required to work both as Jitney and Lift Truck Drivers. When a Combination Man, dispatched as such, is required to drive Jitney, he shall be paid the Skill Rate, and shall not be replaced during the shift by a man working at less than the combination rate.

**4.36** The parties or the Joint Coast Labor Relations Committee shall establish coastwise skill rates for operating other tools and, where appropriate, for operating machinery not presently in use.

**4.361** When new power equipment is introduced, the Employer at the Coast level shall submit to the Union a letter describing the equipment and the proposed skill rate prior to the anticipated use of such equipment. A copy of the letter shall be transmitted to the local(s) in the ports where the new equipment is to be introduced. After such notification, the following procedure shall be implemented:

(a) The Joint Port Labor Relations Committee in the port where the new power equipment is introduced shall meet promptly and reach agreement or disagreement on the Employers' proposed skill rate at least 48

hours prior to the anticipated use of the new equipment. If agreement is reached on the Employers' proposal, such skill rate shall be a rate in Section 4.32.

(b) If the Joint Port Labor Relations Committee under step (a) above does not reach agreement on the skill rate proposed by the Employers, the matter shall be immediately referred to the Area Arbitrator for resolution. The Area Arbitrator shall issue a prompt interim decision on the skill rate to be paid for the initial use of the equipment.

(c) On the initial working shift of the equipment, either party at the local level may request a Joint Port Labor Relations Committee meeting to observe the equipment in use as established by either step (a) or (b) above. If either party is dissatisfied with the skilled rate, the Area Arbitrator shall be promptly called to the job. The Area Arbitrator shall observe the operation with the local parties, hear their contentions, and then issue a prompt formal decision on the skilled rate that shall be final and binding, unless changed under step (d) below.

(d) Either party may appeal a decision by the Area Arbitrator under step (c) above to the Joint Coast Labor Relations Committee. Upon receipt of an appeal, the Joint Coast Labor Relations Committee shall meet within 5 days, or later, if the parties agree on a subsequent meeting date. If agreement is not reached by the Joint Coast Labor Relations Committee, the matter shall be placed before the Coast Arbitrator, whose decision on the skilled rate shall be final and binding.

### 4.4 Penalty cargo rates.

**4.41** In addition to the basic wages for longshore work, additional wages to be called penalties shall be paid for the types of cargoes, conditions of cargoes, or working conditions specified in the Wage Rate Schedule.

**4.42** Except where otherwise specified, the penalty cargo rates shall apply to all members of the longshore gang and dockmen working the penalty cargo.

**4.43** Where two penalty rates might apply, the higher penalty rate shall apply and in no case shall more than one penalty rate be paid.

**4.44** The penalty cargo rate for the first shift shall be the straight time penalty cargo rate as set forth in the Penalty Cargo List; the penalty cargo rate for the second shift shall be 1.333333 times the straight time penalty cargo rate; the penalty cargo rate for the third shift shall be 1.5 times the straight time penalty cargo rate.

**4.45** During overtime hours on the first, second and third shifts, the penalty cargo rate shall be 1.5 times the straight time penalty cargo rate.

**4.46** The straight time penalty cargo rate for working explosives shall at all times equal the employee's straight time rate as set forth in Section 4.13.

**4.47** Where a Skill Rate and a penalty both apply, the allowance for the penalty shall be applied to the Skill Rate and shall be augmented for shift differentials and overtime hours as provided in this Section 4.

### 4.5 Subsistence.

**4.51** Subsistence rates when payable shall be $80.00 per night for lodging and $20.00 per meal.

**4.6** Mileage Allowance.

**4.61** A mileage allowance for transportation shall be payable to each employed traveler. The amount shall be the maximum non-taxable mileage rate in accordance with IRS standards.

**4.62** Rate changes by the IRS will be implemented as soon as administratively possible but no later than 30 days from notification.

**4.63** When automobile mileage allowance is payable under local travel provisions then travel time shall be determined on the basis of actual automobile driving time, up to existing speed limits, in increments of no less than 15 minutes. Failure of the local parties to agree to a schedule on this basis shall be submitted to the Area Arbitrator for final determination in accordance with these guidelines.

**4.64** There shall be no other changes made in local travel provisions during the term of this Agreement, except for changes made at the local level by mutual agreement.

**4.7** Personal effects. Men shall be reimbursed for damage (other than usual wear and tear) to personal effects which are damaged on the job, provided satisfactory evidence is presented to the Joint Port Labor Relations Committee. The amount of the reimbursement shall be decided by the Committee, which shall adhere to the following rules:

**4.71** Personal effects are items which a man needs to take on the job to perform his work, and there must be proven need for the item on the job.

**4.72** Any damage must be a direct result of performing work and must be reported to company supervision on the job when it occurs.

**4.73** The damaged item must be exhibited to the Committee for determination of the depreciation and extent of damage.

**4.74** The claim must be accompanied by prima facie evidence that the item was damaged on the job, and negligence and carelessness are factors to be given consideration.

**4.75** If reimbursement is in order, the item will either be repaired or replaced in kind or reimbursed at its depreciated value.

**4.76** Any second approved claim by an individual for broken glasses may be reimbursed by replacement with safety-type glasses.

**4.77** Claims for lost or stolen items are not valid.

## SECTION 5

# HOLIDAYS

**5.1** The following holidays shall be recognized: New Year's Day, Martin Luther King's Birthday, Lincoln's Birthday, Washington's Birthday, Cesar Chavez' Birthday, Memorial Day, Independence Day, Bloody Thursday, Harry Bridges' Birthday, Labor Day, Veterans' Day, Thanksgiving Day, Christmas Eve Day, Christmas Day, and New Year's Eve Day.

**5.2** Holiday observance and work schedule. The observance of holidays and the work schedule on the holidays listed in Section 5.1 shall be as follows in all U.S. Pacific Coast ports:

*New Year's Eve Day, December 31* and

*New Year's Day, January 1*—No work shall be performed between 3:00 p.m., December 31 and 7:00 a.m., January 2.

*Exceptions:* (a) An extended shift will be worked from 3:00 p.m. to 5:00 p.m. on December 31 for the purpose of finishing a ship and (b) the provision for "no work" shall not apply to passenger ships, essential military cargo and emergencies as defined in Section 5.24.

*Martin Luther King's Birthday,* **3rd Monday in January**—Normal work day.

*Lincoln's Birthday,* **February 12**—Normal work day.

*Washington's Birthday,* **3rd Monday in February**—Normal work day.

*Cesar Chavez' Birthday,* **March 31**—Normal work day.

*Memorial Day,* **last Monday in May**—Normal work day.

*Independence Day,* **July 4**—Normal work day.

*Bloody Thursday,* **July 5**—No work shall be performed between 8:00 a.m., July 5 and 7:00 a.m., July 6.

*Harry Bridges' Birthday,* **July 28**—Normal work day.

*Labor Day,* **1st Monday in September**—No work shall be performed between 8:00 a.m. on Labor Day and 7:00 a.m. the day after Labor Day.

*Exception:* The provision for "no work" shall not apply to passenger ships, essential military cargo and emergencies as defined in Section 5.24.

*Veterans' Day,* **November 11**—Normal work day.

*Thanksgiving Day,* **4th Thursday in November**—No work shall be performed between 8:00 a.m. Thanksgiving Day and 7:00 a.m. the following day.

*Exception:* The provision for "no work" shall not apply to passenger ships, essential military cargo and emergencies as defined in Section 5.24.

*Christmas Eve Day,* **December 24** and

*Christmas Day,* **December 25**—No work shall be performed between 3:00 p.m., December 24 and 7:00 a.m., December 26.

*Exceptions:* (a) An extended shift will be worked from 3:00 p.m. to 5:00 p.m. on December 24 for the purpose of finishing a ship and (b) the provision for "no work" shall

not apply to passenger ships, essential military cargo and emergencies as defined in Section 5.24.

**5.21** When a holiday falls on Sunday, the work schedule provided in Section 5.2 shall apply on Sunday; however, the holiday shall be observed on Monday and payment as provided in Sections 5.32, 5.321 and 5.322 shall apply to Monday.

**5.22** On Election Day the work shall be arranged so as to enable the men to vote.

**5.23** Where work ceases at 3:00 p.m. (December 24 and December 31) the day shift guarantee shall be 6 hours on an 8:00 a.m. start and 5 hours on a 9:00 a.m. start.

**5.24** Any work schedule restriction provided in Section 5.2 shall not apply in the event of an emergency involving the safety of vessel, life or property.

**5.3** Paid Holidays. The following holidays shall be recognized as "paid holidays": New Year's Day, Martin Luther King's Birthday, Washington's Birthday, Cesar Chavez' Birthday, Memorial Day, Independence Day, Harry Bridges' Birthday, Labor Day, Veterans' Day, Thanksgiving Day, Christmas Eve Day, Christmas Day, and New Year's Eve Day.

**5.31** Eligibility for paid holidays. Only registered employees are entitled to receive a "paid holiday," provided:

**5.311** They have registration status on the date of the "paid holiday," and

**5.312** Have worked the required number of hours, in the most recent payroll year for which total payroll year hours are available, to qualify for a 1-week basic vacation as provided in Section 7.11.

**5.313** In addition to Sections 5.311 and 5.312, employees receiving their job assignments through the dispatch hall must be available for at least 2 of the 5 days, Monday through

Friday (exclusive of the holiday), during the payroll week in which the holiday falls.

**5.3131** Employees who work the required hours to have qualified for a 2-week basic vacation in the prior payroll year shall not be required to meet the provisions of Section 5.313 on paid holidays which are normal work days, i.e., Martin Luther King's Birthday, Washington's Birthday, Cesar Chavez Birthday, Memorial Day, Independence Day, Harry Bridges' Birthday, Veterans' Day.

**5.314** In addition to Sections 5.311 and 5.312, employees working on a steady basis must meet the availability requirement of their employer.

**5.315** The availability provision of Section 5.313 or Section 5.314 shall not apply to absence while on vacation or because of sickness or injury which is verified.

**5.32** Payment. A registered employee eligible for a "paid holiday" shall receive pay equivalent to 8 hours at the straight time rate to which the employee is entitled under Section 4.13 for the week in which the "paid holiday" occurs.

**5.321** Registered employees eligible for a "paid holiday" shall receive payment as provided in Section 5.32 above, whether they work or not. When registered employees who are eligible for a "paid holiday" perform work on such holiday, their additional payment for working shall be as prescribed in Section 4.

**5.322** Registered employees not eligible for a "paid holiday" and non-registered employees who perform work on any of the paid holidays listed in Section 5.3 above shall be paid for working as prescribed in Section 4.

**5.33** Disbursement. Payment for each "paid holiday" shall be made on the second payday following the payroll week in which the "paid holiday" falls. The Pacific Maritime Association shall be the disbursing agent for such payments. (PMA and

the Union will review the timely submission of availability to process payment of holiday pay. When this process is completed and availability is submitted in a timely manner, holiday pay will be paid the week following the holiday.)

**5.331** An employee who does not receive a "paid holiday" payment because of illness/injury, vacation, visiting, full-time union employment, full-time joint employment, jury duty or any other reason in which the employee claims all eligibility requirements were met, shall file a claim. To be valid, such claim for "paid holiday" payment must be submitted to PMA no later than 5 weeks after the normal pay day for the "paid holiday."

**5.34** Work force availability. The Union agrees that employees shall be available to meet the Employers' work requirements on all holidays in accordance with the work schedule contained in Section 5.2.

## SECTION 6                    SCHEDULED DAY OFF

**6.1** Each registered longshoreman shall be entitled to 2 full days (48 hours) off each payroll week.

**6.11** The Joint Port Labor Relations Committee shall fix, arrange, direct and schedule days off in advance in accordance with the above to the extent possible considering needs of the port and men available.

## SECTION 7                            VACATIONS

**7.1** Computation of vacations. In any payroll year each longshoreman who is registered and qualified on December 31 of the calendar year in which he earns his vacation shall receive a vacation with pay the following year at the straight time hourly

rate to which the employee was entitled under Section 4.13 on January 1 of the calendar year in which vacations are paid. The computation shall be as follows:

**7.11 Basic vacation.**

**7.111** Qualifying hours required for a basic 1-week or 2-week vacation with pay shall be as follows:

| Average Port Hours | Qualifying Hours | | | |
| --- | --- | --- | --- | --- |
| | Under Age 60 | | Age 60 and Over | |
| | 1 Week | 2 Weeks | 1 Week | 2 Weeks |
| 1,300 or more | 800 | 1,300 | 700 | 1,200 |
| 1,200 - 1,299 | 700 | 1,200 | 600 | 1,100 |
| 1,100 - 1,199 | 676 | 1,100 | 600 | 1,100 |
| 1,000 - 1,099 | 615 | 1,000 | 600 | 1,000 |
| 900 - 999 | 552 | 900 | 552 | 900 |
| 800 - 899 | 552 | 800 | 552 | 800 |
| less than 800 | 552 | 800 | 552 | 800 |

**7.1111** "Qualifying hours," as defined in Section 7.21, include hours worked in any port. In no event shall the qualifying hours for a basic 1-week vacation be less than 552 hours.

**7.1112** In calculating "average port hours," the following shall apply:

(a) Average port hours are the average hours worked in the port during the payroll year by those longshoremen registered in the port at the end of the payroll year, except that men who were paid for less than 100 hours shall be excluded.

(b) Hours worked shall include work performed by longshoremen in any registration classification (longshore, clerk or foreman).

(c) Hours worked by men outside of their port shall be excluded. "Port" shall be considered either the port,

port district or general area in which men are assigned and have employment priority.

**7.12 Additional vacation.**

**7.121** One additional week vacation with pay if he shall have qualified for at least 2 weeks of basic vacation under Section 7.111, and if in each of any 8 of his past years of service he shall have qualified for at least a 1-week basic vacation. (*See Sections 7.261 through 7.265.*)

**7.1211** Any active employee registered before July 1, 1990, in ports other than Seattle, Portland, San Francisco and Los Angeles who does not qualify for the additional week of vacation under Section 7.121 shall receive the additional week if he shall have qualified for 2 weeks of basic vacation under Section 7.111 and shall have been available for employment for 10 years or more under the Agreement or its predecessors for employees bound thereby, and if he shall have qualified for at least a 1-week basic vacation in 5 of the previous 10 payroll years. (*See Sections 7.261 through 7.265.*)

**7.122** One additional week's vacation with pay if he shall have qualified for at least 1 week of basic vacation under Section 7.111, and if in each of any 17 of his past years of service he shall have qualified for at least a 1-week basic vacation. (*See Sections 7.261 through 7.265.*)

**7.123** One additional week vacation with pay if he shall have qualified for at least 1 week of basic vacation under Section 7.111, and if in each of any 23 of his past years of service he shall have qualified for at least a 1-week basic vacation. (*See Sections 7.261 through 7.265.*)

**7.124** One additional week vacation with pay if he shall have qualified for at least 1 week of basic vacation under Section 7.111, and if in each of any 25 of his past years of service

he shall have qualified for at least a 1-week basic vacation. *(See Sections 7.261 through 7.265.)*

**7.13** Each week's vacation pay shall be 40 times the employee's straight time hourly rate as set forth in Sections 4.13 and 7.1, or the employee's appropriate skilled straight time rate.

**7.131** A skilled rate applies when at least half of the qualifying hours are at a skilled rate(s).

**7.1311** The skilled rate payable shall be the highest skilled rate at which accumulated skilled hours equal one-quarter of the qualifying hours for the basic 1-week or 2-week vacation.

**7.1312** When hours worked as a Walking Boss/ Foreman are insufficient to qualify for a vacation under the Walking Bosses & Foremen's Agreement, such hours shall be considered as hours worked at the highest longshore skill rate under this Contract Document.

**7.2** Qualifying hours and years.

**7.21** Qualifying hours for vacation purposes shall include all hours for which pay is received, except vacation hours, paid holiday hours and Pay Guarantee Plan hours.

**7.22** Qualifying hours shall be limited to hours paid for by individual employers or parties to this Contract Document and to other hours as to which employers participating in the vacation plan in the port area make the required payments to the Association. Hours paid to any longshoreman in any port area covered by the Agreement, other than that in which he is registered on December 31, shall be added to paid hours in his home port, provided, however, that such longshoreman either shall have been granted authorization in the customary manner to visit other port areas or shall have been transferred on the reg-

istered list in accordance with the rules and with the consent of the Joint Port Labor Relations Committee.

**7.23** Registered longshoremen shall be credited with hours paid for as longshoremen, clerks, or other employment under collective bargaining contracts to which the Union and the Association are parties, but no worker shall receive 2 vacations in the same year, one under this Agreement and another under any other agreement.

**7.24** Registered longshoremen shall be credited with hours at court as jurors, including waiting time under court order, as certified by the clerk of the court.

**7.25** Those employees who have worked during the payroll year but have insufficient qualifying hours for a vacation due to illness or injury, shall qualify for vacation based on hours worked during the 4 payroll quarters preceding the quarter in which the injury or illness occurred.

**7.26** In computing years of service under Section 7.12:

**7.261** Continuous absence from employment because of industrial illness or injury arising out of employment under this Contract Document compensated for under a State or Federal Compensation Act shall be considered qualifying time.

**7.2611** Temporary absence from employment due to compensable temporary partial disability because of industrial illness or injury shall be considered qualifying time.

**7.262** Service in the Armed Forces of the United States or employment by the United States as a civilian in longshore operations in World War II and the Korean War that occurs after registration shall be considered qualifying time.

**7.263** Service as a full-time Union official or of a registered longshoreman employed as a joint employee of a Labor Relations Committee, Welfare Fund, Pension Fund, or other joint entity of the parties shall be considered qualifying time.

**7.264**  When any longshoreman is absent less than the full calendar year, he shall receive only proportionate credit for qualifying time.

**7.265**  Any longshoreman whose combination of hours worked and hours of Pay Guarantee Plan payment total 800 hours or more in any payroll year shall have such counted as a qualifying year for years of service for vacation eligibility.

**7.27**  Any employee who has been registered in both a small port and a large port during the period in which he claims to have satisfied the requirements of Section 7.121 for a third week of vacation must satisfy the requirements of Section 7.1211, but for such purposes he shall be given double credit for any year in which he worked at least 800 hours in a small port, and for each such year of double credit the 15-year spread shall be reduced by 1 year.

**7.28**  Where a longshoreman has been paid for work in part of the year both by the Union or its longshore locals and by the Employers and the total amount thereof qualifies him for a vacation, his vacation shall be paid by the Employers and the Union on a pro rata basis.

**7.3**  Vacation procedure.

**7.31**  The method and procedure for scheduling vacations shall be those which have been in effect since 1951. Vacation periods may be scheduled during any month(s) of the calendar year by the Joint Labor Relations Committee of each port, who will also schedule vacations on a full week by week basis when so requested by the man.

**7.32**  Each registered longshoreman entitled to a vacation shall take his vacation at the time scheduled.

**7.33**  A registered longshoreman whose registration is cancelled after he shall have fulfilled all requirements for a vaca-

tion during the previous payroll year shall receive vacation pay at the time agreed to by the parties.

**7.34**  If a registered longshoreman dies after he has worked the required hours for a vacation, his vacation pay will be paid to his widow or beneficiary.

**7.35**  If a registered longshoreman retires under the ILWU-PMA Pension Plan after he has worked the required hours for a vacation, he shall receive his vacation pay at the time agreed to by the parties as set forth in Section 7.421.

**7.4**  Administration.

**7.41**  The Pacific Maritime Association shall be the disbursing agent under this Agreement and shall make vacation checks available in the same manner as regular pay checks are made available in each port area. Vacation checks will be available for distribution in the first full payroll week of March of the calendar year in which vacations are paid. PMA and the Union will review and analyze the Vacation Claims Process for vacations paid during the January/February 2000 vacation payment cycle. Based on this review, expedited claims processes will be developed so that, in the following year (2001), vacations will be paid in the first full payroll week of February. A second distribution of vacation checks based on timely claims will occur in the first full payroll week of June.

**7.411**  In addition to the regular distribution of vacation pay checks as set forth above in Section 7.41, there shall be 2 additional vacation pay distributions for vacation benefits earned in the current year for new retirees only. Such distributions shall occur in the first full payroll week in August and in the first full payroll week in December. These current year computations made in August and December shall be based on the prior year's average port hours.

SECTION 8

**7.42** Any public port or port commission may become a party to this vacation agreement by notifying the Union and the Association, prior to the first day of the calendar year in which the vacation is to be taken. Similarly, any or all of the Armed Services may become parties. In the event that one or more public ports or Armed Services becomes a party to the agreement, said port(s) or Service(s) shall be placed in the same status as an individual employer member of the Pacific Maritime Association for all the purposes of this Agreement.

**7.43** Nonmember employers may participate in the vacation plan in accordance with the conditions thereon fixed by the Association.

## SECTION 8

# DISPATCHING, REGISTRATION, AND PREFERENCE

**8.1** Dispatching Halls.

**8.11** The dispatching of all longshoremen shall be through halls maintained and operated jointly by the International Longshore and Warehouse Union and the Pacific Maritime Association in accordance with the provisions of Section 17. There shall be one central dispatching hall in each of the ports with such branch halls as shall be mutually agreed upon.

**8.111** The Association and the Union agree that continued study shall be made in mechanizing the dispatching halls and if a feasible plan is developed it shall be instituted in a major port on a trial basis. If no agreement is reached as to a feasible plan or its institution on a trial basis, such disagreement or disagreements may be submitted to the Area Arbitrator for resolution.

**8.12** Any longshoreman who is not a member of the Union shall be permitted to use the dispatching hall only if he pays his

46

pro rata share of the expenses related to the dispatching hall, the Labor Relations Committee, etc. The amount of these payments and the manner of paying them shall be fixed by the Joint Port Labor Relations Committees.

**8.13** Any non-Association employer shall be permitted to use the dispatching hall only if he pays to the Association for the support of the hall the equivalent of the dues and assessments paid by the Association's members. Such non-member employers shall have no preference in the allocation of men, and shall be allocated men on the same basis as Association members.

**8.14** Longshoremen not on the registered list shall not be dispatched from the dispatching hall or employed by any employer while there is any man on the registered list qualified, ready and willing to do the work.

**8.15** The local union shall bear one-half of all expenses of the dispatching hall less the amount received by the Joint Port Labor Relations Committee from nonmembers of the Union as pro rata shares payable under Section 8.12. *(See Addenda, Dispatch Hall Costs.)*

**8.2** Dispatching Hall Personnel.

**8.21** The personnel for each dispatching hall, with the exception of Dispatchers, shall be determined and appointed by the Joint Labor Relations Committee of the port. Dispatchers shall be selected by the Union through elections in which all candidates shall qualify according to standards prescribed and measured by the Joint Labor Relations Committee of the port. If it fails to agree on the appropriate standards or on whether a candidate is qualified under the standards, the dispute shall be decided in accord with provisions of Section 17.

**8.22** The term of office of any Dispatcher shall be at least 1 year.

47

**8.23** All personnel of the dispatching hall including Dispatchers, shall be governed by rules and regulations of the Joint Port Labor Relations Committee, and shall be removable for cause by the Joint Port Labor Relations Committee.

**8.24** The Association shall be permitted to maintain a representative in the dispatching hall. The Joint Port Labor Relations Committee shall permit any authorized representative of the Association or the Union to inspect dispatching hall records.

### 8.3 Registration.

**8.31** The Joint Port Labor Relations Committee in any port, subject to the ultimate control of the Joint Coast Labor Relations Committee, shall exercise control over registered lists in that port, including the power to make additions to or subtractions from the registered lists as may be necessary. In each port there shall be maintained a list of longshoremen showing their registration status under this Agreement. When objecting to the registration of any man, members of the Joint Port Labor Relations Committee shall be required to give reason therefor.

**8.32** Any longshoreman registered by a Joint Port Labor Relations Committee in accordance with this Contract Document shall thereby acquire joint coastwise registration under this Agreement. The rights and obligations of coastwise registration in regard to transfers between ports, visiting and leaves of absence are set forth in Supplement I to this Contract Document. The rights and obligations of coastwise registration in regard to transfer of registered longshoremen to registered clerk status and vice versa are set forth in Supplement II to this Contract Document.

**8.33** Either party may demand additions to or subtractions from the registered lists as may be necessary to meet the needs of the industry.

**8.34** Each registered longshoreman has the obligation to request a leave of absence if he intends to absent himself from work for a period of 30 days or longer and in other circumstances as may be covered by port rules under Supplement I. A registered longshoreman who fails to work for 30 days, except when on approved leave, and whose facts and reasons for such absence are not acceptable to the Joint Port Labor Relations Committee, may be deregistered.

**8.35** A registered individual holding a nonlongshore job is subject to discipline, including deregistration if the individual's outside employment detrimentally conflicts with the individual's duties as a registered longshoreman.

### 8.4 Preference of Employment.

**8.41** First preference of employment and dispatch shall be given to fully registered longshoremen who are available for employment covered by Section 1 of this Contract Document in accordance with the rules and regulations adopted by the Joint Port Labor Relations Committee. A similar second preference shall be so given to limited registered men. The Joint Coast Labor Relations Committee shall be authorized to effectuate such preferences in such manner and for such times and places as it determines in its discretion.

**8.42** Dispatching of men and gangs shall be under the principle of low-man, low-gang, first-to-be-dispatched, except where local dispatching rules provide otherwise for dispatching of special skilled men and gangs.

**8.43** There shall be no favoritism or discrimination in the hiring or dispatching or employment of any longshoremen qualified and eligible under the Agreement.

## SECTION 9

## PROMOTIONS, TRAINING, AND STEADY SKILLED MEN

**9.1** The principle of promotion from the ranks is hereby recognized and agreed to.

**9.2** There shall be established in each port a joint committee of registered longshoremen and of employers. It shall be the duty of such committee to establish qualifications for promotions to classifications covered by this Contract Document, including trainees, and to pass on all such promotions. The promotions committee shall determine the trainees under policies laid down by the Joint Port Labor Relations Committee. Such qualifications shall include length of service in the industry, competency and ability to perform skilled operations, or to direct work and skilled operations, ability to handle men and to secure conformance to the Agreement and to maintain and promote harmonious relations on the job and between the parties to this Agreement.

**9.3** Competent men with adequate experience or training shall be made available for all tools and equipment to be operated by longshoremen.

**9.31** Subject to the ultimate control of the Joint Coast Labor Relations Committee, the Joint Port Labor Relations Committee shall provide for the availability of the necessary men when there are not sufficient such competent longshoremen available.

**9.4** The Employers will train men and administer the necessary skill training programs. The Employers must be satisfied as to the qualifications of the men so trained and make the determination that they are skilled men. Such men shall be jointly certified. In turn, the men so trained, as well as the men already trained

**8.44** Any longshoreman or dispatching hall employee found guilty by the Joint Port Labor Relations Committee of favoritism or discrimination or bribery shall immediately be discharged and dropped from the registered list.

**8.5** Furnishing of gangs and supporting men.

**8.51** Each dispatching hall shall furnish on any day required up to at least the agreed to number of gangs and supporting men, as well as up to any number agreed to, or arrived at through Contract procedures, in the future.

**8.52** Where such gangs and men cannot be dispatched from the fully registered list, then limited registered men and casuals, if required, shall be dispatched.

**8.53** Qualified limited registered men and casuals shall be dispatched in skilled categories when required.

**8.54** Limited registered men and casuals shall be dispatched on any shift on any day, if required.

**8.55** Limited registered men and casuals shall be permitted to finish the job to which they were dispatched when so determined by the Chief Dispatcher. Replacements hereunder shall not occur before the end of a shift.

**8.56** Arrangements for employment of casuals shall be made by the Joint Labor Relations Committee of the port.

**8.57** A registered man who accepts a dispatch and who fails to report to the job to which dispatched and thereby makes it impossible for the work to proceed shall be guilty of causing a work stoppage and shall be subject to discipline as set forth in Section 17.

and/or qualified have the obligation to work in the skills in which they have been trained or are already qualified.

**9.41** Trained and/or qualified skilled men shall accept work in their skill when checked in for work or while working in other categories. Failure to do so shall result in removal from the qualification list of the skill in which they are failing to work, and such men shall not be eligible for future promotion or future skilled training programs.

**9.42** The Joint Port Labor Relations Committee shall provide as a part of the local Dispatching Rules an orderly procedure whereby skilled men who are on the skilled lists shall work as provided in Section 9.41. This procedure shall not preclude a skilled man working out of category when there is no work available for him in that category, but should the need subsequently arise for his skill(s), he will be replaced and will accept the skilled job.

**9.43** In addition to other steady employees provided for elsewhere in this Agreement, the Employers shall be entitled to employ steady, skilled mechanical or powered equipment operators without limit as to numbers or length of time in steady employment. They shall be entitled to the Contract guarantees as provided in Section 3. The employer shall be entitled to assign and shift such steady men to all equipment for which, in the opinion of the employer, they are qualified. *(See related subjects in Addenda.)*

**9.431** Steady skilled men cannot be assigned to operate winches.

**9.432** Steady skilled men cannot be assigned to operate basic forklifts* up to 5-ton capacity except under the following circumstances:

(a) To fill out the 8-hour guarantee.

(b) To move equipment around incidental to their other duties.

**9.44** Fully registered men holding union office or union or joint employment may apply and participate in training programs, provided such men will be re-entering the active work force within 60 days after the completion of the training program. Fully registered men holding union office or union or joint employment who will not be re-entering the active work force within the 60-day period, if qualified and selected for participation in a training program, may take the training immediately upon re-entering the active work force.

**9.45** A steady worker, after serving the Union as an elected official, has the right to be reinstated in his/her same steady job with the same seniority and at the same company, and that job shall be filled on a temporary basis.

**9.46** A training program shall be developed to ensure qualified registrants for relief, replacement, or expansion.

## SECTION 10

# ORGANIZATION OF GANGS, GANG SIZES AND MANNING, AND METHODS OF DISPATCHING

**10.1** The Joint Port Labor Relations Committee shall determine the methods of dispatching for the port. Gangs and men shall be dispatched only as ordered by the employer. The employers shall have the right to have dispatched to them, when available, the gangs in their opinion best qualified to do their

*A basic forklift is defined as a self-propelled machine (up to and including 10,000 pound capacity) for hoisting or moving objects by means of steel fingers (forks), chine hooks, barrel clamps, rotator, ram side-shifter or squeeze attachments affixed to a vertical mast.

work. Subject to the provisions of this Contract Document, gangs and men not assigned to gangs shall be so dispatched as to equalize their work opportunities as nearly as practicable, having regard to their qualifications for the work they are required to do. The employers shall be free to select their men within those eligible under the policies jointly determined and the men likewise shall be free to select their jobs.

10.11 Except as provided in Section 10.111, the employer shall have until 2:00 p.m. to file orders or cancel orders for gangs for the second and third shifts.

10.111 In the Columbia River District the Employers shall have until 12:00 Noon to firm or cancel orders for gangs and units on the second and third shifts.

10.2 The organized or make-up minimum basic ship gang for general break bulk cargo (hereinafter called the "basic gang") shall consist of men as follows:

A gang boss (in ports where such are used). *

Skilled deck man or front men.

2 sling or front men.

4 holdmen (2 of whom shall be skilled and shall receive the skilled rate of pay).** (See Addenda, Skilled Holdmen.)

*Employers will continue to employ gang bosses in ports where such are used provided such gang bosses will perform their duties in accordance with the following rules: The parties agree that gang bosses are in complete authority and will be held responsible for the functioning of their gangs. Gang bosses shall have the responsibility to discharge from their gangs any man or men for incompetence, insubordination, or failure to perform work as required, in conformance with the provisions of the Contract Document. Joint Port Labor Relations Committees may adopt additional rules to implement this authority and this responsibility, but may not nullify them.

**Where side runners are used they shall be included as part of the four, but shall not be deemed substitutes for the machine drivers.

54

10.21 In a general break bulk cargo operation when the cargo is to be hand handled piece by piece, then 2 longshoremen shall be added to the basic gang for all such discharge operations, and 4 longshoremen shall be added for all such loading operations. Exception: When space or safety are the factors that dictate that only 1 load can be handled at a time, prior to the handling of the second load, then the basic gang can perform such handling provided it is to last for 1 hour or more.

10.22 When machine(s) are introduced into the hatch for the purpose of moving the loads to or from the place of stow in the operation defined in Section 10.21, the skilled holdmen in the basic gang shall operate the machines as required. While such machines are in operation, the men operating them shall not be required to do manual work.

10.23 On loading operations: When the loads are being landed in the vessel at their place of rest, the basic gang can be used; when the loads are being stowed by mechanical equipment after landing, the basic gang shall be supplemented on the basis of 1 additional longshoreman for each skilled holdman operating a machine.

10.24 On discharge operations, the basic gang can be used when the loads are pre-slung or require the placement of slings or similar devices. When the loads are being removed from stow by machine to the point of removal from the vessel, the basic gang shall be supplemented on the basis of 1 additional longshoreman for each skilled holdman operating a machine.

10.25 When the cargo handling operation to be performed requires only a basic gang, that gang may be used to rig, uncover and cover hatches without additional men.

10.26 Such longshoremen as are called for herein may be used for any dock work and/or hold work in any hatch and may be shifted as provided in Section 3.132 and a second

55

SECTION 10

winch driver may be shifted as provided in Section 3.131. Longshoremen, skilled or unskilled and a second winch driver, shall not be added to the basic gang complement in order to have ship's time guaranteed. They shall have the 8-hour guarantee and the right to callbacks without favoritism. They may be released at the end of any shift when they are not needed to start the next shift.

**10.27** The minimums set forth can be supplemented in any numbers as ordered by the employer, while needed, without precedent.

**10.3** Manning for existing operations.

(a) Manning for operations existing on June 20, 1972, including existing T-Letters where a subsequent change in operation after the establishment of the original manning introduces a machine, or device, or new method of operation which results in the need for reduced or increased manning, shall be subject to review through the contract machinery at the Coast LRC level at the request of either party. Where such requests are made the review shall be based on a determination of necessary men as defined in Section 15.2 and the parties are not bound or limited by the basic gang structure provided in Section 10.2.

(b) Any review under (a) above shall not include a review of the minimum manning provided in Section 10.21.

**10.31** Packaged lumber shall be handled in the same manner as T-7. This excludes the reference to "topping off."

**10.32** Manning for robot operation as it now applies.

(a) Skilled deck man or men, as required.

(b) If lift trucks or similar machines are to be used, then skilled driver or drivers as required.

(c) Not less than 2 basic longshoremen to do all unskilled work as per Section 10.6 except for hand stowing or unstowing.

(d) Skilled driver or drivers working with 2 basic longshoremen under (c) above shall do no other work at any time except operate the machine.

(e) If the operation described above converts to a hand stowing or unstowing operation with no front men required, additional basic longshoremen will be added to the 2 basic longshoremen in (c) above to bring the complement up to the applicable required manning without front men, and the skilled driver or drivers shall function as in a regular gang of that type.

(f) If the operation starts as a hand handled break bulk operation and converts to a robot operation during the shift the gang boss (in ports where now used) will not lose his 8-hour guarantee. If the operation commences as a robot operation calling for less than the basic gang no gang boss (in ports where used) shall be hired. If such operation converts during a shift to use of a basic gang no gang boss (in ports where used) shall be added during that shift, but if the basic gang structure is called back for the next comparable shift a gang boss (in ports where used) will be ordered.

(g) Section 10.4 is applicable when operations change during a shift.

(h) The robot operation is subject to change under provisions of Section 10.5 provided, however, that the above manning continues unless changes are resolved through the grievance machinery.

**10.33** LASH manning. The manning for LASH ships and LASH barges shall remain as defined in T-150 with the following exceptions as to manning on LASH barges:

(a) On all LASH barge operations, except general break bulk cargo operations when the cargo is to be hand handled piece by piece, the manning shall be skilled men and/or basic longshoremen as determined by the employer.

(b) On all LASH barge operations, which are general break bulk cargo operations with the cargo to be hand handled piece by piece, the manning except for holdmen shall be as determined by the employer. The manning for holdmen shall be 4 holdmen, subject to the Union's right to claim that additional holdman manning is required because of onerousness. In such event the agreed-to procedure on "Onerousness" is to be followed to resolve such a dispute.

(c) When cranes are utilized to load cargo to or discharge cargo from LASH barges, the manning on the operation of the cranes shall conform with applicable Agreement provisions.

**10.4** In all of the preceding operations, if during the period of loading or discharging the operation changes from one category to another the employer shall be free to shift longshoremen in or out of the operation so that only the applicable number of men required are employed on the operation.

**10.5** New methods of operation.

**10.51** When new methods of operation are introduced after June 20, 1972, the Employers at the Coast level shall submit to the Union a letter describing the operation and the proposed ship manning prior to the anticipated start of the operation. A copy of the letter shall be transmitted to the local Union in the

port or ports where the new method of operation will take place. After such notification the following procedure shall be implemented:

(a) The Joint Port Labor Relations Committee in the port where the new operation is to first take place shall meet promptly and reach agreement or disagreement on the employers' proposed manning at least 48 hours prior to the anticipated initial starting time of the new operation. If agreement is reached on the employers' proposed manning, such manning shall be ordered for the initial working shift of the ship.

(b) If the Joint Port Labor Relations Committee under step (a) above does not reach agreement on the ship manning proposed by the employers, the matter shall be immediately referred to the Area Arbitrator for resolution. The Area Arbitrator shall issue a prompt interim decision on the manning to be ordered for the initial working shift of the ship.

(c) On the initial working shift of the ship, either party at the local level may request a Joint Port Labor Relations Committee meeting to observe the manning established by either step (a) or (b) above. If either party is dissatisfied with the manning, the Area Arbitrator shall be promptly called to the job. The Area Arbitrator shall observe the operation with the local parties, hear their contentions, and then issue a prompt formal decision on the manning that shall be binding on all subsequent shifts and on future operations in the port, unless changed under step (d) below.

(d) Either party may appeal a decision by the Area Arbitrator under step (c) above to the Joint Coast Labor

Relations Committee. Upon receipt of an appeal, the Joint Coast Labor Relations Committee shall meet within 5 days, or later, if the parties agree on a subsequent meeting date. If agreement is not reached by the Joint Coast Labor Relations Committee, the matter shall be placed before the Coast Arbitrator whose decision on the manning shall be final and binding.

**10.52** If a new method of operation is to occur in different areas, the steps defined in Sections 10.51(a) through (d) shall be applicable to the local parties in each area. "Areas" is defined to mean Washington, Columbia River and Oregon Coast Ports, Northern California and Southern California.

**10.53** If a new method of operation is to occur at more than one port within an area, the Joint Area Labor Relations Committee shall function under the steps defined in Sections 10.51(a) through (d) as a substitute for the Joint Port Labor Relations Committees in the area for the purpose of establishing uniform manning for the area.

**10.54** Any change in operation that introduces a machine, or device, or new method of operation that has as its purpose and effect the reduction of manning by eliminating unnecessary men below the manning specified in Section 10.2 and subordinate subsections, or previously approved letters, shall be presented by the Employers in a new letter, and shall be governed by the procedures provided in Section 10.51 and subordinate subsections.

**10.6** In addition to the descriptions of work that can be performed without additional men as hereinabove set forth, all other longshore work, without exception, in connection with loading or discharging will be performed as directed by the employer, subject to the provisions of the onerous workload procedure. However, when "topping off" piece by piece is

required such topping off shall be considered hand handling and the manning provided in Section 10.21 will be used.

**10.7** The use of dock gang units shall continue with flexibility in their usage. A dock gang need not be released as a unit.

**10.8** If, during a shift, a change is made from a discharge to a loading operation, and the change requires additional men under the provisions of this Section 10, if the employer is unable to swing in men from ship or dock from his own employees, the holdmen will work without additional men for a maximum of 15 loads but not more than 1 hour.

**10.9** The safeguards of Section 15.1 shall apply to gang size and manning.

**10.91** The parties agree that there shall be no 4-off and 4-on or variations thereof, and that the Union as well as the Employers will take the necessary steps to implement this understanding.

**10.92** Notwithstanding any past practice or conduct to the contrary, and with particular reference to Section 18 of this Agreement making it an explicit condition that the Union and Employers are committed to observe this Agreement in good faith, effective July 1, 1987, Section 10.91 shall be strictly enforced prospectively. To accomplish this, the International, the Locals and the Employers pledge total support and cooperation to each other to achieve full compliance by all individual longshoremen and individual employers to the elimination of all violations of Section 10.91. "Hard timing" or other similar conduct which inhibits or frustrates compliance shall be considered a violation of Section 11 of this Agreement. There shall be no selective implementation of this provision by the Employers in any port.

# SECTION 11

## NO STRIKES, LOCKOUTS, AND WORK STOPPAGES

**11.1** There shall be no strike, lockout or work stoppage for the life of this Agreement.

**11.2** The Union or the Employers, as the case may be, shall be required to secure observance of this Agreement.

**11.3** How work shall be carried on.

**11.31** In the event grievances or disputes arise on the job, all men and gangs shall continue to work as directed by the employer in accordance with the specific provisions of the Agreement or if the matter is not covered by the Agreement, work shall be continued as directed by the employer.

**11.4** Exceptions and Procedures for Health and Safety and Onerous Workload.

**11.41** Health and safety exception. Longshoremen shall not be required to work when in good faith they believe that to do so is to immediately endanger health and safety. Only in cases of bona fide health and safety issues may a standby be justified. The Union pledges in good faith that health and safety will not be used as a gimmick. The employer shall have the option of having the men who raise a question of health and safety stand by until a decision is reached or "working around" the situation until it can be resolved, and no further work shall be performed on that disputed operation until the health and safety issue is resolved.

**11.42** Onerous workload exception. Longshoremen on cargo handling operations shall not be required to work when in good faith they believe that to do so will result in an onerous workload. The Union pledges in good faith that the onerous workload claim will not be used as a gimmick. The employer

shall have the option of having the men claiming onerousness stand by until a decision is reached or "working around" the situation until it can be resolved.

**11.421** When a man is directed to take his own relief without a man being assigned to relieve him, this does not automatically present a question of onerousness of work or individual speedup for the men remaining on the job, regardless of the basic gang structure involved. A change in operations or manning to remove unnecessary men, or the handling of larger loads does not, in and of itself, automatically present any question of onerousness of work or individual speedup.

**11.422** The procedure provided in Section 11.42 shall not apply on operations where the Association and the Union have agreed to changed operations or reduced manning under Sections 10.3 and 10.5. If claims of onerousness are presented in such cases, they shall be referred to the Joint Coast Labor Relations Committee.

**11.4221** The foregoing Section 11.422 is intended to mean that agreements reached on changed operations or reduced manning in accordance with the Contract procedures shall not be challenged as being onerous operations if no further change has been made following such agreement. In other words, claims of onerousness shall not be used to challenge agreed manning if the operation is unchanged in all respects. Any such challenges shall be referred to the Joint Coast Labor Relations Committee.

**11.43** General Procedures for Health and Safety and Onerous Disputes.

**11.431** The men must ask their steward to bring the question of health, safety or onerousness to the attention of the foreman or walking boss in immediate charge of the operation. The steward and his immediate superior (gang boss, hatch

boss, etc.) are the only individuals who shall present the situation to the foreman or walking boss.

**11.432** If agreement cannot be reached in Section 11.431 the Business Agent shall be called. (The walking boss, gang boss or hatch boss and the Business Agent or steward, who are responsible and safety-minded individuals should be able to determine whether a condition is safe or unsafe.)

**11.433** If agreement cannot be reached in Section 11.432, an immediate Joint Port Labor Relations Committee meeting shall be called on the job.

**11.434** If agreement cannot be reached in Section 11.433, the Area Arbitrator shall be called to the job for an immediate ruling.

**11.44** Health and Safety Procedure.

**11.441** The Area Arbitrator shall make an immediate ruling as to how work shall proceed. After the work proceeds the Arbitrator shall make a further ruling that a bona fide health or safety issue did or did not exist.

**11.442** Where the Arbitrator decides or where agreement is reached in any one of the steps under Section 11.43 that the employers were correct, the men shall not be paid for standby time, if involved.

**11.443** Where the Arbitrator decides or where agreement is reached in any one of the steps under Section 11.43 that the men were correct, the men shall be paid for standby time, if involved.

**11.444** If the Arbitrator decides or it is agreed at any step under Section 11.43 that an unsafe condition exists which can be corrected, the men shall work as directed to correct such condition.

**11.445** If it is determined at any step under Section 11.43 that the condition claimed to be unsafe is in fact safe, the men shall resume work as directed and failure to resume work as directed shall be cause to remove the men from the payroll as of the time of standby.

**11.446** If during a period of standby on an issue of health and safety any man leaves his place of work except upon instructions of the walking boss, he shall be removed from the payroll as of the time of standby regardless of how the issue is settled. Any man who so leaves without obtaining his own replacement shall be automatically subject to appropriate penalties under the grievance machinery.

**11.45** Onerous Work Load Procedure.

**11.451** The Area Arbitrator shall make an immediate ruling as to whether the original direction of the employer did or did not impose an onerous workload.

**11.452** After the employer has directed the men as to how work shall proceed on the basis of the Arbitrator's ruling and the work proceeds in accordance with the direction of the employer, the Arbitrator shall make a further ruling that a bona fide question of onerousness of the workload did or did not exist.

**11.453** Where the Arbitrator decides or where agreement is reached in any one of the steps under Section 11.43 that to work in accordance with the employer's original direction did not impose an onerous workload and the employer exercised his option to have the men claiming onerousness stand by until a decision is reached, the men shall not be paid for standby time and may be required to work beyond the time the shift otherwise would end to make up the time the men stood by.

**11.4531** Such makeup time shall not exceed 2 hours, and the work will be performed at the rate applicable.

The first 8 hours of time paid for, including "makeup" time on the standard first and second shift and the first 5 hours of time paid for, including "makeup" time on the third shift shall be paid at the appropriate shift rates. If work goes beyond the standard shifts as set forth in Section 2.4 in order to complete as much as possible of a regular or extended shift, such work shall be paid at the appropriate shift overtime rate. When "makeup" time is worked, and the work goes beyond 5 hours without a meal period, the employees involved shall have the option of going to a meal on their own time and returning to complete the "makeup" time, or of finishing the "makeup" time without going to a meal.

**11.454**  Where the Arbitrator decides or where agreement is reached in any one of the steps under Section 11.43 that the original direction of the employer as to how work should proceed did impose an onerous workload and the employer exercised his option to have the men stand by until a decision is reached, the men shall be paid for standby time.

**11.455**  If the Arbitrator decides or it is agreed at any one of the steps under Section 11.43 that the original direction of the employer does not impose an onerous workload and if the men are directed to resume work as originally directed, any failure to resume work as directed shall be the cause to remove the men from the payroll as of the time the men were directed by the employer to stand by if the employer had not directed them to "work around" the situation, or as of the time the men fail to resume work as directed.

**11.456**  If during a period of standby on an onerous issue any man leaves his place of work except upon instructions of the walking boss, he shall be removed from the payroll as of the time of standby regardless of how the issue is settled. Any man who so leaves without obtaining his own replacement

shall be automatically subject to appropriate penalties under the grievance machinery.

**11.46**  Application of Contract Grievance Machinery.

**11.461**  The grievance machinery, pending investigation and adjudication of on the job disputes, requires that work shall be performed in accordance with specific provisions of the Agreement, or if the matter is not covered by the Agreement, work shall be continued as directed by the employer. Exceptions to this arise only where longshoremen in good faith believe that to do so is to immediately endanger health and safety or in good faith believe that to do so imposes an onerous workload.

**11.462**  The preceding procedures apply specifically to issues initially presented as being a dispute under health or safety or a dispute as to onerousness. On all other issues, the authority of the walking boss or foreman to remove men from the payroll for cause is not disturbed.

**11.463**  Should the Arbitrator rule that the issue of health or safety or onerousness was raised as a gimmick, the Employers may process the matter through the grievance procedure for appropriate penalties.

**11.464**  The contract machinery is the same in all disputes. The preceding procedures covering disputes on health and safety and onerousness are not intended to modify the basic grievance machinery structure.

**11.5**  Picket Lines.  *(See Addenda, Picket Line Language.)*

**11.51**  Refusal to cross a legitimate and bona fide picket line, as defined in this paragraph, shall not be deemed a violation of this Agreement. Such a picket line is one established and maintained by a union, acting independently of the ILWU longshore locals, about the premises of an employer with whom it is engaged in a bona fide dispute over wages, hours or

working conditions of employees, a majority of whom it represents as the collective bargaining agency. Collusive picket lines, jurisdictional picket lines, hot cargo picket lines, secondary boycott picket lines and demonstration picket lines are not legitimate and bona fide picket lines within the meaning of this Agreement.

**11.52** If an ILWU longshore local located within the confines of the United States whose members are not covered by this Agreement is engaged in a legitimate, bona fide, nonjurisdictional and noncollusive strike concerning wages, hours or working conditions of its members, no longshoreman under this Agreement shall be required to perform work hereunder respecting cargo that normally, without such strike, would be handled by members of such ILWU longshore local but which has been handled or is destined to be handled by other workers engaged in strikebreaking activities under established and legitimate trade union principles.

# SECTION 12

# MEETINGS FOR REGISTERED
# LONGSHOREMEN

**12.1** In addition to other qualifications specifically set forth in this Contract Document, all registered longshoremen in order to remain qualified and eligible for dispatch through the dispatching hall must be familiar with all the provisions of the Agreement, including all working, dispatching and safety rules and the requirements of conformance and performance under the Agreement.

**12.2** To this end it shall be the duty of the Union to inform all registered Union longshoremen of their collective and individual responsibilities under the Agreement. Similarly, it shall be the duty of the Joint Port Labor Relations Committee to inform

all registered nonunion longshoremen of such responsibilities. Meetings for such purposes shall be scheduled by mutual consent of the Joint Port Labor Relations Committee.

**12.3** Stop-Work Meetings.

**12.31** Each local shall have the right to hold 1 regularly scheduled stop-work meeting each month during overtime hours on the second shift. *(See Addenda, Scheduling of Meetings.)*

**12.311** In a port where such regularly scheduled stop-work meetings are held, the scheduled date during the month shall be the same for the longshore local and the clerks' local.

**12.32** Any other stop-work meetings must be mutually agreed to by PMA and the Union and PMA shall receive at least 1 week's notice of such nonscheduled meetings. They shall not occur more often than once a month.

**12.4** Any registered longshoreman refusing to attend such respective meetings or creating a disturbance which frustrates the purpose of the same shall be suspended or dropped from the registered list at the discretion of the Joint Port Labor Relations Committee.

# SECTION 13

# NO DISCRIMINATION

**13.1** There shall be no discrimination in connection with any action subject to the terms of this Agreement (including at work sites, joint dispatch halls, training sites, and other locations, when reasonably related to employment covered by this Agreement) either in favor of or against any person because of membership or nonmembership in the Union, activity for or against the Union or absence thereof, race, creed, color, sex (including gender, pregnancy, sexual orientation), age (forty or over), national origin, religious or political beliefs, disability,

protected family care or medical leave status, veteran status, political affiliation or marital status. Also prohibited by this policy is retaliation of any kind for filing or supporting a complaint of discrimination or harassment. *(See Addenda, Equal Employment Opportunity Policy).*

**13.2** All grievances and complaints alleging incidents of discrimination or harassment (including hostile work environment) in connection with any action subject to the terms of this Agreement based on race, creed, color, sex (including gender, pregnancy, sexual orientation), age (forty or over), national origin, or religious or political beliefs, or alleging retaliation of any kind for filing or supporting a complaint of such discrimination or harassment, shall be processed solely under the Special Grievance/Arbitration Procedures For The Resolution of Complaints Re Discrimination and Harassment Under The Pacific Coast Longshore & Clerk's Agreement *(See Addenda, Special Section 13.2 Grievance Procedures and Guidelines For Remedies)* with the exception of those types of grievances and complaints described in Section 13.3.

**13.3** Grievances and complaints alleging that a contractual provision or rule is discriminatory as written or as applied, as well as discrimination claims seeking elevation, registration or selection for casual status, and discrimination claims based on disability, protected family care or medical leave status, veteran status, political affiliation, marital status, membership or non-membership in the Union, or activity for or against the Union or absence thereof, are not to be filed under the Special Section 13.2 Grievance Procedures, but instead are to be filed and processed with the Joint Port Labor Relations Committee (JPLRC) under the grievance procedures in Section 17.4 of the PCLCA. Likewise, requests for "reasonable accommodation" for disabilities recognized under state or federal law will not be

processed under the Special Section 13.2 Grievance Procedures but instead must be brought to the local JPLRC pursuant to separate procedures established for such requests. (See Addenda, Policy on ADA Compliance and Reasonable Accommodation.)

# SECTION 14

# CRANES

**14.1** This section relates to the employment of longshoremen on the Pacific Coast waterfront in the driving of certain cranes and in the operation of certain other mechanical tools.

**14.2** Definitions.

**14.21** The term "longshore crane" refers to the following shore-based cranes: whirley cranes (whether or not self-luffing), crawler cranes, truck cranes, such cherry-picker cranes as the Joint Coast Labor Relations Committee determines to be longshore cranes subject hereto, gantry cranes, bulk unloading cranes (including bulk sugar unloading equipment at Crockett), bulk loaders, locomotive cranes, hammerhead cranes, overhead cranes, stiff-leg cranes, A-frame cranes, sheer-leg derricks, and such yard cranes as the Joint Coast Labor Relations Committee determines to be "longshore cranes" subject hereto.

**14.211** The term "longshore crane" excludes jitneys, lift trucks of all sizes (including such equipment with fixed or movable booms), pumps, generators, tractors, payloaders, skip loaders, bulldozers, straddle trucks, or any other equipment or tools not listed hereinabove as being within the definition of "longshore crane."

**14.212** The term "longshore crane" does not include any classes of tools or equipment not presently in use on the waterfront. The term "longshore crane" shall not include

cranes or other hoisting equipment mounted on any ship, float-ing-crane barge, or other vessel. The foregoing provisions may be modified, on motion of either party, by action of the Joint Coast Labor Relations Committee determining that any tools or equipment described in Section 14.212 shall be "longshore cranes" subject thereto.

**14.22** The term "crane driver" means a longshoreman who is dispatched, or who is steadily employed, to drive a long-shore crane.

**14.23** The term "crane work" means any work covered in this section when done by a longshoreman.

**14.3** The following clarifications, exceptions and limitations apply to the coverage of this section:

**14.31** Section 1 governs the assignment of work as be-tween longshoremen and nonlongshoremen and the assign-ment of maintenance work.

**14.32** The winch drivers' work includes driving of all hoisting equipment mounted on vessels, including such as is normally called cranes, and operating banana gantries. Com-petent winch drivers with adequate experience or training, regular or specialist, shall be made available for these tools and equipment.

**14.33** This section does not set the wages or conditions of employees operating heavy-lift cranes mounted on floating-crane barges.

**14.34** Any longshore crane being driven by nonlong-shoremen pursuant to an exception under Section 1.5 can be used for any longshore operation, new or old. Section 4 does not provide the rate of pay nor terms and conditions of em-ployment of such nonlongshoremen.

**14.4** Wages

**14.41** The crane driver rate shall be as defined in Section 4.33.

**14.411** It shall be paid to crane drivers for work in dri-ving longshore cranes and for other skilled work to fill out a daily guarantee.

**14.412** It shall be paid to crane drivers and other long-shoremen dispatched as crane drivers when doing mainte-nance work on longshore cranes.

**14.413** It shall be paid to winch drivers assigned by the employer to crane work for the period he drives a longshore crane and for the balance of the shift.

**14.42** Penalties for conditions and nature of cargo shall be payable only as provided in the penalty list or by decision of the Joint Coast Labor Relations Committee.

**14.43** The premiums for overtime work of crane drivers shall be in accordance with the schedule of overtime premiums for other longshoremen.

**14.44** No differential above the regular crane driver rate shall be paid when operating any special equipment.

**14.5** Shifts.

**14.51** Where applicable, the guarantee provisions of Sec-tion 3, as modified herein, shall apply to crane drivers.

**14.511** Jobs of short duration shall carry only the 4-hour guarantee; the definition of jobs of short duration shall ap-ply to crane drivers.

**14.52** Limitations on the length of shift shall be extended to permit the employer to order crane drivers in or to keep them on for the necessary preparation, new or old. Section 4 does work shall be done only as ordered by the employer.

**14.521** When ordered to do so by the employer, long-shore crane drivers (as defined in Section 14.2), tophandler dri-

vers, sidepick operators, strad, portpacker, and reachstacker drivers shall report and turn to at a specified time ahead of the regular time of the starting shift or shall continue to work after the shift or during half of the noon hour. The time before or after may be in one-hour increments. Skill III equipment operators who are ordered to a job and who report to work and are turned to shall receive a guarantee of 10 hours' pay at the prevailing rate.

**14.522** When ordered to do so by the employer, crane drivers shall report and turn to without preparation and greasing time.

**14.53** Crane drivers may be shifted to other skilled work to fill out a guarantee in accordance with the provisions of Section 3. A steady crane driver similarly may be shifted to complete his monthly guarantee. The principles with respect to what is "skill-rated work suitable to his qualifications" shall apply to crane drivers. Interpretations of what is "skill-rated work suitable to his qualifications" of a crane driver shall be determined by the Joint Coast Labor Relations Committee; it is agreed that the driving of any crane shall be such work; it is agreed that winch driving is such work for any longshoreman who has been jointly recognized as a qualified winch driver and such longshoreman shall shift to winch driving when ordered to do so; it is agreed that gear work is "skill-rated work suitable to his qualifications" of any crane driver.

**14.6** Steady Men.

**14.61** Any employer may employ 1 or more steady crane drivers.

**14.62** To have a steady crane driver, the employer must provide day crane drivers with a monthly monetary guarantee equivalent to 173 hours at the first shift crane driver rate and must provide night crane drivers with a monthly monetary

guarantee equivalent to 173 hours at the second shift crane driver rate.

**14.621** A crane driver may be put on a steady basis at the beginning of any payroll week and may be returned to the hall at the end of any payroll week. In either case his guarantee shall be prorated.

**14.6211** Men who are released by their steady employer for any reason, other than discharge for cause, shall be released on the basis of inverse job seniority unless the application of inverse seniority will not provide the employer with sufficient employees qualified to operate the employer's cranes. If a man believes he is being released improperly, he may make such claim and have it resolved through the grievance machinery.

**14.63** Steady crane drivers may be worked by the employer by orders given the crane drivers directly by the employer.

**14.64** A steady crane driver may be assigned to gear work at the crane driver's rate. The pay shall be charged against the monthly guarantee.

**14.65** A crane driver from the hall may be replaced at the end of any job by a steady crane driver.

**14.7** Competent longshoremen shall be provided for crane work in accordance with Section 9.3.

**14.71** Longshoremen who have appropriate skills as crane drivers will be declared eligible to check in on the certified crane drivers' board at the dispatching hall. A crane driver must be certified by the Joint Port Labor Relations Committee before he can check in on this board. The number of men allowed to check in as regular crane drivers shall be limited by the Joint Port Labor Relations Committee so that the crane drivers who have skills will maintain their skills through the regular performance of crane work.

**14.72** The Joint Port Labor Relations Committee shall place longshoremen on lists of specialist crane drivers for specialized longshore cranes requiring special skills. The number of men on any list of specialist crane drivers shall be limited by the Joint Port Labor Relations Committee so that the specialist crane drivers will have skills and will maintain the skills through the regular performance of the specialist crane work.

**14.73** Where a certified crane driver, other than a steady man, is on work not covered hereby, he will be replaced by the joint dispatcher whenever necessary so that certified crane drivers will be provided to do the work covered hereunder. When a specialist crane driver, other than a steady man, is on work not covered hereby or on general crane work, he will be replaced by the joint dispatcher whenever necessary so that specialist crane drivers will be provided to do specialist crane work.

**14.74** Any certified crane driver shall be decertified and denied check-in privileges as a crane driver, or restricted therein, by the Joint Port Labor Relations Committee for cause. Any specialist crane driver shall be removed from the list of specialists, or restricted therein, by the Joint Port Labor Relations Committee for cause.

**14.75** A certified crane driver who refuses to accept a dispatch when checked in at the hall or through replacement while on a job other than crane work shall be charged with hours worked for purposes of work equalization in dispatching as provided by the Joint Port Labor Relations Committee.

**14.76** When there is not available for regular dispatch to operate any particular longshore crane a competent registered longshoreman who has been previously certified as competent to operate such crane by the Joint Port Labor Relations Committee, a steady crane driver not being used by his steady employer and who is available shall be dispatched. If the job

cannot be so filled, nonlongshoremen may be employed for such job and may be used to complete 1 or more shifts until the job is finished or such a certified competent registered longshoreman is available.

**14.761** If a steady crane driver is dispatched by the hall to his steady employer pursuant to Section 14.76, this employer may use him to complete the job for which he is dispatched, or for only 1 or more shifts on such job.

**14.762** A steady crane driver dispatched under Section 14.76 shall be replaced by the joint dispatcher, or by his ordering his own replacement, so that he shall be available to his steady employer whenever such employer calls him back.

**14.77** Nonlongshoremen who have operated "old equipment" on the waterfront to do longshore work will be offered the equivalent of registered status for dispatch as a longshoreman to operate any tools covered hereby. Men accepting such status will have an obligation to make themselves available for all crane work, including any specialized longshore cranes on which they have special skills. Appropriate arrangements will be made to protect the pension rights of these individuals, such arrangements to be worked out on an individual basis.

**14.8** Manning.

**14.81** The employer has the following alternatives with respect to manning.

**14.811** One crane driver may be used where directed by the employer, the hatch tender not to be a crane driver, on jobs of short duration and on cranes not used in the direct movement of cargo in and out of the ship. This provision is subject to further review by the Joint Coast Labor Relations Committee.

**14.812** At his option the employer may employ 2 crane drivers for 1 piece of equipment, the 2 crane drivers to tend

hatch and to drive the equipment. In such cases they shall relieve each other.

**14.813** At his option the employer may order 1 crane driver per crane plus 1 relief crane driver for each 5 cranes, or fraction of 5; in such cases the hatch tenders shall not be crane drivers. This provision shall be subject to further review by the Joint Coast Labor Relations Committee.

**14.814** A combination crane driver-winch driver may be ordered. He may drive winch and drive crane, but shall receive the crane driver's rate for the entire job.

**14.815** A winch driver on the job may be temporarily assigned to drive crane; when ordered to do so by the employer, he shall receive the crane driver rate for the period he is driving crane and for the balance of the shift.

**14.82** Gangs without unnecessary men, as provided for in Section 15.2 shall be dispatched for longshore work involving the use of cranes. Such gangs may be make-up gangs. The Joint Port Labor Relations Committee may make provision for organized crane gangs.

**14.821** When 2 longshore crane drivers are employed under Section 14.812, the gang shall not include a hatch tender or a winch driver.

**14.822** When a longshore crane is driven by a nonlongshoreman pursuant to Section 14.34 or Section 14.76 hereof, the gang shall not include a winch driver or a crane driver. No "witnesses" or "standbys" or other unnecessary men shall be used in connection with the crane driving, and the use thereof shall be in violation of the Agreement.

**14.9** Local rules contrary to any provision of this section are hereby rescinded.

## SECTION 15

# EFFICIENT OPERATIONS

**15.1** There shall be no interference by the Union with the Employers' right to operate efficiently and to change methods of work and to utilize labor-saving devices and to direct the work through employer representatives while explicitly observing the provisions and conditions of this Contract Document protecting the safety and welfare of the employees and avoiding speedup: "Speedup" refers to an onerous workload on the individual worker; it shall not be construed to refer to increased production resulting from more efficient utilization and organization of the work, force, introduction of labor-saving devices, or removal of work restrictions.

**15.11** In order to avoid disputes, the employer shall make every effort to discuss with the Union in advance the introduction of any major change in operations.

**15.2** The employer shall not be required to hire unnecessary men. The number of men necessary shall be the number required to perform an operation in accordance with the provisions of Section 15.1, giving account to the contractual provisions for relief.

**15.3** The Employers shall have the right to propose changes in working and dispatching rules that they claim are in conflict with the intent of provisions incorporated in this Agreement. The Joint Coast Labor Relations Committee may refer proposed changes that are of only local significance to the local level for negotiation. Any such change agreed to at the local level must be approved at the Coast level before being put into operation. Any proposal referred to the local level and not resolved within 30 days thereafter shall automatically return to the Joint Coast Labor Relations Committee.

**15.31** Any provisions of the agreements (Port Supplements and Working Rules) for the various port areas covered hereby which are in conflict with this Contract Document shall be changed. Any other changes in the agreements can be made only by mutual agreement with the parties at the Coast level.

**15.4** The Employers agree that it is desirable from the standpoint of both parties to mechanize and/or improve methods of operation where such is economically feasible and practical. Therefore, the Employers agree that they will add machines or devices or institute improved methods regardless of the origin of such ideas provided the parties can agree to certain "ground rules" to implement the principles stated above.

**15.5** Any disputes concerning the interpretation or application of provisions of this Contract Document relating to the subject matter of this Section 15 may be submitted directly to the Joint Coast Labor Relations Committee.

## SECTION 16

## ACCIDENT PREVENTION AND SAFETY

**16.1** Recognizing that prevention of accidents is mutually beneficial, the responsibility of the parties in respect thereto shall be as follows:

**16.11** The Union and the Employers will abide by the rules set forth in the existing Pacific Coast Marine Safety Code which shall be applicable in all ports covered by the Agreement.

**16.12** The Employers will provide safe gear and safe working conditions and comply with all safety rules.

**16.13** Each individual employer will continue to furnish protective clothing or devices as he did on October 18, 1960, even though not specifically required by the Pacific Coast Marine Safety Code. At the local level the parties will from

time to time review the question of protective clothing and devices and arrive at and maintain an orderly procedure for the issuance, safeguarding and return of the items furnished by the employers.

**16.14** The Employers will maintain, direct and administer an adequate accident prevention program in keeping with changing conditions in the industry.

**16.15** The Union will cooperate in this program and develop and maintain procedures to influence all longshoremen to cooperate in every way that will help prevent industrial accidents and minimize injuries when accidents occur.

**16.16** The employees individually must comply with all safety rules and cooperate with management in the carrying out of the accident prevention program.

**16.17** An employee who is injured and claims two PMA employers are in dispute over who is responsible for his workmen's compensation claim, may request the Joint Coast Labor Relations Committee to assist the employee in securing a determination as to which employer is to make advance payments until the dispute is resolved. The JCLRC will not function to determine which employer, if any, is liable.

**16.2** To make effective the above statements and promote on the job accident prevention, employer-employee committees will be established in each port. These committees will consist of equal numbers of employer and employee representatives at the job level. Each category of employees should be represented. Employers' representatives should be from the supervisory level. The purpose of the committees will be to obtain the interest of the men in accident prevention by making them realize that they have a part in the program, to direct their attention to the real causes of accidents and provide a means for making practical use of the intimate knowledge of working

conditions and practices of the men on the job. It is further intended that this program will produce mutually practical and effective recommendations regarding corrections of accident-producing circumstances and conditions.

## SECTION 17

## JOINT LABOR RELATIONS COMMITTEES, ADMINISTRATION OF AGREEMENT, AND GRIEVANCE PROCEDURES

**17.1**  Joint Labor Relations Committees.

**17.11**  The parties shall establish and maintain, during the life of this Agreement, a Joint Port Labor Relations Committee for each port affected by this Contract Document, 4 Joint Area Labor Relations Committees, and a Joint Coast Labor Relations Committee. Each of said Labor Relations Committees shall be comprised of 3 or more representatives designated by the Union and 3 or more representatives designated by the Employers. Each side of the committee shall have equal vote.

**17.12**  The duties of the Joint Port Labor Relations Committee shall be:

**17.121**  To maintain and operate the dispatching hall.

**17.122**  To exercise control of the registered lists of the port, as specified in Section 8.3.

**17.123**  To decide questions regarding rotation of gangs and extra men.

**17.124**  To investigate and adjudicate all grievances and disputes according to the procedure outlined in this Section 17.

**17.125**  To investigate and adjudicate any complaint against any longshoreman whose conduct on the job, or in the dispatching hall, causes disruption of normal harmony in the relationship of the parties hereto or the frustration and/or vio-

lation of the provisions of the working or dispatching rules or of this Agreement. The application of this Section 17.125 shall not negate the procedure for penalties as provided for in Section 17.7.

**17.126**  To carry out such other functions as are assigned to it herein or by the parties, directly or through the Joint Coast Labor Relations Committee.

**17.13**  There shall be a Joint Area Labor Relations Committee for each of the 4 port areas (Southern California, Northern California, Columbia River and Oregon Coast Ports, and Washington). Such Committee shall investigate and adjudicate grievances not settled at the local level. The Area Joint Labor Relations Committee step may be eliminated by agreement at the area level or may be bypassed by agreement at the port level.

**17.14**  The Joint Coast Labor Relations Committee shall function in the administration of this Agreement as provided herein and shall investigate and adjudicate grievances as provided herein.

**17.141**  All meetings of the Joint Coast Labor Relations Committee and all arbitration proceedings before the Coast Arbitrator shall be held in the City and County of San Francisco, State of California, unless the parties shall otherwise stipulate in writing.

**17.15**  The grievance procedure of this Agreement shall be the exclusive remedy with respect to any disputes arising between the Union or any person working under this Agreement or both, on the one hand, and the Association or any employer acting under this Agreement or both, on the other hand, and no other remedies shall be utilized by any person with respect to any dispute involving this Agreement until the grievance procedure has been exhausted.

**17.151** Any dispute in which the Association or the Union asserts that any dispatching hall is dispatching employees who were not entitled to be dispatched or who were dispatched out of sequence as to other persons entitled to priority dispatch shall be subject to prompt resolution through the grievance procedure of the Agreement when a complaint is filed by either party with the Joint Port Labor Relations Committee. If such complaint is not resolved within 7 days from the date of filing, the matter shall be referred to the Area Arbitrator whose decision shall be final and binding. The grievance procedure shall then be deemed "exhausted."

**17.16** Pending investigation and adjudication of such disputes work shall continue and be performed as provided in Section 11.

**17.2** Grievances arising on the job shall be processed in accordance with the procedure hereof beginning with Section 17.21. Other grievances as to which there are no specific provisions herein shall be processed in accordance with the provisions hereof beginning with Section 17.23.

**17.21** The gang steward and his immediate supervisor, where the grievance is confined to 1 gang, or any 1 steward who is a working member of an affected gang where the grievance involves more than 1 gang or a dock operation, shall take the grievance to the walking boss, or ship or dock foreman in immediate charge of the operation.

**17.22** If the grievance is not settled as provided in Section 17.21, it shall be referred for determination to an official designated by the Union and to a representative designated by the Employers.

**17.23** If the grievance is not settled as provided in Section 17.21 or Section 17.22 or does not arise on the job, it shall be

referred to the Joint Port Labor Relations Committee which shall have the power and duty to investigate and adjudicate it.

**17.24** In the event that the Employer and Union members of any Joint Port Labor Relations Committee shall fail to agree upon any question before it, such question shall be immediately referred at the request of either party to the appropriate Joint Area Labor Relations Committee for decision.

**17.25** In the event that the Employer and Union members of any Joint Area Labor Relations Committee fail to agree on any question before it, such question shall be immediately referred at the request of either party to the Area Arbitrator for hearing and decision, and the decision of the Area Arbitrator shall be final and conclusive except as otherwise provided in Section 17.26.

**17.26** The Joint Coast Labor Relations Committee has jurisdiction to consider issues that are presented to it in accordance with this Agreement and shall exercise such jurisdiction where it is mandatory and may exercise it where such jurisdiction is discretionary as provided in Section 17.261, Section 17.262 and other provisions of this Agreement.

**17.261** Any decision of a Joint Port or Joint Area Labor Relations Committee or of an Area Arbitrator claimed by either party to conflict with this Agreement shall immediately be referred at the request of such party to the Joint Coast Labor Relations Committee (and, if the Joint Coast Labor Relations Committee cannot agree to the Coast Arbitrator, for review). The Joint Coast Labor Relations Committee, and if it cannot agree, the Coast Arbitrator, shall have the power and duty to set aside any such decision found to conflict with the Agreement and to finally and conclusively determine the dispute. It shall be the duty of the moving party in any case brought before the Coast Arbitrator under the provisions of this Section 17.261 to

make a prima facie showing that the decision in question conflicts with this Agreement, and the Coast Arbitrator shall pass upon any objection to the sufficiency of such showing before ruling on the merits.

**17.262** The Joint Coast Labor Relations Committee and the Coast Arbitrator shall have power to review decisions relative to the operation of dispatching halls, or the interpretation of port working and dispatching rules, or discharges, or pay (including travel pay and penalty rates), but shall exercise it in any case only if the Committee decides to review the specific case.

**17.263** When either the Union or the Association claims that there has been a violation of Section 13 by anyone bound by this Agreement, the grievance shall be submitted to the Joint Coast Labor Relations Committee and shall be resolved there or referred to the Coast Arbitrator for hearing and decision in accordance with the applicable contract provisions.

**17.27** In the event that the Employer and Union members of the Joint Coast Labor Relations Committee fail to agree on any question before it, including a question as to whether the issue was properly before the Coast Labor Relations Committee, such question shall be immediately referred at the request of either party to the Coast Arbitrator for hearing and decision, and the decision of the Coast Arbitrator shall be final and conclusive.

**17.271** Referrals to the Coast Arbitrator must be submitted and heard by the Coast Arbitrator within 6 months following the date of disagreement at the Coast Labor Relations Committee level. Referrals not submitted within 6 months shall be considered "dropped."

**17.28** Miscellaneous provisions.

**17.281** Should either party fail to participate in any of the steps of the grievance machinery, the matter shall automatically move to the next higher level.

**17.282** If the local grievance machinery becomes stalled or fails to work, the matter in dispute can be referred at once by either the Union or the Association to the Joint Coast Labor Relations Committee for disposition.

**17.283** The hearing and investigation of grievances relating to discipline by return to the dispatching hall (Section 17.7), penalties (Section 17.8) and dispatching hall personnel (Section 8.23) shall be given precedence over all other business before the Joint Port and Joint Area Labor Relations Committees and before the Area Arbitrator. Either party may request that:

(a) grievances arising under Section 17.7 or involving dispatch hall disputes (except those covered by Section 17.151) be processed initially and from step to step within 24 hours; and

(b) failures to observe Area Arbitrators' awards be processed to the next step within 24 hours.

**17.284** Nothing in this Section 17 shall prevent the parties from mutually agreeing upon other means of deciding matters upon which there has been disagreement.

**17.3** Business Agents.

**17.31** To aid in prompt settlement of grievances and to observe Agreement performance, it is agreed that Business Agents as Union representatives shall have access to ships and wharves of the employer to facilitate the work of the Business Agent, and in order that the employer may cooperate with the Business Agent in the settlement of disputes the Business Agent shall notify the representative designated by the employer before going on the job.

**17.4**  When any longshoreman (whether a registered long-shoreman or an applicant for registration or a casual long-shoreman) claims that he has been discriminated against in violation of Section 13 of this Agreement, he may at his option and expense, or either the Union or the Association may at its option and at their joint expense, have such complaint adjudicated hereunder, which procedure shall be the exclusive remedy for any such discrimination.

**17.41**  Such remedy shall be begun by the filing of a grievance with the Joint Port Labor Relations Committee setting forth the grievance and the facts as to the alleged discrimination. Such a grievance shall be timely if presented within 10 days of the occurrence of the alleged discrimination. Such grievance shall be investigated by the Joint Port Labor Relations Committee at a regular or special meeting of the Committee at which the individual involved shall be permitted to appear to state his case, at which time he may present oral and written evidence and argument.

**17.411**  With respect to any claim of violation of Section 13, the Joint Port Labor Relations Committee shall extend the time for filing of such claim beyond the time established in Section 17.41 whenever such extension is necessary because the period of limitation otherwise applicable is determined to be unlawful or because in the judgment of the Committee in the exercise of its sound discretion, such an extension is otherwise necessary to prevent inequity but in no event shall the time for filing of such claims be extended beyond 6 months from the date of the occurrence of the alleged discrimination.

**17.42**  Either the Employers, the Union or the man involved may appeal the decision of the Joint Port Labor Relations Committee. Such appeal shall be to the Joint Coast Labor Relations Committee by letter addressed to the Joint Coast La-

bor Relations Committee. To be timely, such appeal must be delivered or mailed within 7 days of the decision of the Joint Port Labor Relations Committee.

**17.421**  If such an appeal is taken within the time limits allowed, the Joint Coast Labor Relations Committee shall either confirm or reverse or modify the decision of the Joint Port Labor Relations Committee without any further hearing, or order a further hearing and thereupon issue its decision on the basis of the entire record including that at both hearings.

**17.43**  An appeal from the decision of the Joint Coast Labor Relations Committee can be presented to the Coast Arbitrator (or by agreement of the Joint Coast Labor Relations Committee to an Area Arbitrator) by the individual involved, the Employers or the Union. An appeal to the Coast Arbitrator filed by an applicant for registration or a casual longshoreman involving the subject of registration shall be permitted only for those grievances which the Joint Coast Labor Relations Committee, in its sole discretion, certifies to the Coast Arbitrator that the facts introduced in support of the grievance into the record of the prior proceedings, if unrebutted, may support a finding of a violation of the grievant's Section 13 rights under this Agreement. Appeal shall be by a written request for an arbitrator's hearing mailed or delivered to the Union and the Employer representatives of the Joint Coast Labor Relations Committee if by an individual, or to the individual and the other party's representative on the Joint Coast Labor Relations Committee if by either the Union or the Employers. Such an appeal shall be timely only if such request for an arbitrator's hearing is so filed in writing with the Joint Coast Labor Relations Committee no later than 7 days after issuance of the decision of the Joint Coast Labor Relations Committee from which an appeal to an arbitrator is taken.

**17.431** The arbitration procedure shall be carried on in accordance with the procedures generally applicable under this Agreement for arbitration before the Coast Arbitrator.

**17.5** Arbitrators and Awards.

**17.51** The parties shall have an arbitrator for each of the said 4 port areas and a Coast Arbitrator.

**17.511** The Area Arbitrator shall be appointed by the Joint Coast Labor Relations Committee and shall serve at its discretion. If any Area Arbitrator shall at any time be unable or refuse or fail to act, the Joint Coast Labor Relations Committee shall select a successor or substitute.

**17.512** The Coast Arbitrator shall be selected by the Joint Coast Labor Relations Committee to serve a term coextensive with the term of the Agreement. The Coast Arbitrator may be reappointed for the term of the next Agreement by mutual agreement of the Parties. The Coast Arbitrator shall be a highly qualified neutral arbitrator with maritime experience, located on the West Coast. If the Committee fails to agree on the selection of the Coast Arbitrator, the individual shall be selected by a 6-person panel of prominent industry representatives: 3 selected by the Union and 3 selected by the Employers.

**17.5121** If after thirty (30) days, the Panel is unable to select a Coast Arbitrator, the Panel shall submit to the Federal Mediation and Conciliation Service (FMCS) a request for a list of seven (7) highly qualified neutral arbitrators with maritime experience, located on the West Coast. If the Union and the Employer representatives agree that the list is unacceptable, they may jointly request that the FMCS provide a second list. In the event, the Parties cannot mutually select a Coast Arbitrator from the FMCS Panel, the selection shall be determined by a striking process. The first strike shall be determined

arising under the Agreement including cases dealing with the resumption or continuation of work.

**17.53** Arbitrators' decisions must be based upon the showing of facts and their application under the specific provisions of the written Agreement and be expressly confined to, and extend only to, the particular issue in dispute. The arbitrators shall have power to pass upon any and all objections to their jurisdiction. If an arbitrator holds that a particular dispute does not arise under the Agreement, then such dispute shall be subject to arbitration only by mutual consent.

**17.54** In the event the parties agree that an arbitrator has exceeded his authority and jurisdiction or that he is involved in the industry in any other position of interest which is in conflict with his authority and jurisdiction, he shall be disqualified for any further service.

**17.55** All decisions of the arbitrators, except as provided in Sections 17.261 and 17.6, shall be final and binding upon all parties. Decisions shall be in writing signed by the arbitrator and delivered to the respective parties.

**17.56** All expenses and salaries of the arbitrators shall be borne equally by the parties, except where specifically provided herein to the contrary.

**17.57** All decisions of arbitrators shall be observed and/or implemented. No decision of an Area Arbitrator, interim or formal, can be appealed unless it is observed and/or implemented.

**17.6** Informal hearings and interim rulings.

**17.61** When a grievance or dispute arises on the job and is not resolved through the steps of Sections 17.21 and 17.22, and it is claimed that work is not being continued as required by Section 11, a request by either party shall refer the matter to the Area Arbitrator (or by agreement of the Joint Coast Labor Relations Committee to the Coast Arbitrator) for his considera-

tion in an informal hearing; such referral may be prior to formal disagreement in any Joint Labor Relations Committee or upon failure to agree on the question in the Joint Area Labor Relations Committee. Such hearing may be ex parte if either party fails or refuses to participate, provided that the arbitrator may temporarily delay an ex parte hearing to permit immediate bona fide efforts to settle an issue without a hearing.

**17.62** The arbitrator shall act with his powers limited strictly to the application and interpretation of the Agreement as written. The parties shall have the right to present such views as they wish to the arbitrator, but it shall not be necessary to have a shorthand or stenotype reporter present to report the proceedings nor shall employment of counsel be necessary. The arbitrator, on this basis, shall promptly issue an oral interim ruling with respect to the grievance or dispute and thereafter confirm it in writing. An interim ruling shall be binding on the parties regarding the particular issue on the particular ship on the particular occasion but shall not be a precedent for other cases. Any interim ruling shall be binding unless reversed by a contrary decision after a formal hearing.

**17.63** If either party is dissatisfied with the interim ruling, the question shall be immediately referred at the request of such party to the arbitrator for hearing and decision in accordance with the normal procedure under Section 17.5 of this Agreement; the arbitrator shall then proceed as if there had been a failure to agree on the question by the Joint Port Labor Relations Committee, provided that the arbitrator may temporarily delay a hearing to permit prompt bona fide efforts to settle the question in the Port or Area Joint Labor Relations Committee.

**17.64** The use of the informal procedure leading to an interim ruling can be waived by consent of both parties with respect to any particular dispute or grievance. If at the begin-

ning of the informal procedure either party establishes a good faith claim that an issue, other than a dispute with respect to Section 11, is of general significance or that the formal procedure will be necessary to settle such issue, the arbitrator shall rule that the informal procedure be bypassed regarding such issue. In the absence of such waiver or decision to bypass, the arbitrator shall hold an informal hearing and issue an interim ruling regarding the dispute in accordance with the procedure set forth above.

**17.7** Discipline by return to the dispatching hall.

**17.71** The employer shall have the right to return to the dispatching hall any man (or to send home any nonregistered man) for incompetence, insubordination or failure to perform the work as required in conformance with the provisions of this Agreement.

**17.72** Such longshoreman shall not be dispatched to such employer until his case shall have been heard and disposed of before the Joint Port Labor Relations Committee, and no other employer shall refuse employment to such longshoreman on the basis of such return to the dispatch hall.

**17.73** If any man feels that he has been unjustly returned to the dispatching hall or dealt with, his grievance shall be taken up as provided in Section 17.2 beginning with Section 17.23.

**17.74** In case of return to the dispatching hall without sufficient cause, the Joint Port Labor Relations Committee may order payment for lost time or reinstatement with or without payment for lost time.

**17.75** When an employer returns a gang to the dispatching hall for cause, its gear priority terminates and such employer may carry on work at the hatch or gear involved without delay. The hatch or gear involved shall not stand idle because of any action or nonaction of the Union or longshoremen or the dis-

patching hall. A replacement gang shall be dispatched promptly upon order of the employer. Until the replacement gang turns to or if one is not ordered or cannot be dispatched, any other gang employed by the employer shall shift to the hatch or gear involved as directed by the employer. The returned gang shall not be redispatched to the job involved unless it is the only available gang and the Association requests that it be dispatched. The provisions of Sections 17.73 and 17.74 shall apply with respect to any gang returned to the dispatching hall for cause.

**17.8** Penalties for work stoppages, assault, pilferage, drunkenness, drug abuse and peddling, safety violations and other offenses.

**17.81** All longshoremen shall perform their work conscientiously and with sobriety and with due regard to their own interests shall not disregard the interests of the employer. Any employee who is guilty of deliberate bad conduct in connection with his work as a longshoreman or through illegal stoppage of work shall cause the delay of any vessel shall be fined, suspended, or for deliberate repeated offenses for which he has been found guilty under the Contract procedures, cancelled from registration. A determination that an onerous or health and safety claim made in good faith shall be disallowed is not a finding that a man is guilty of an offense within the meaning of this Section. Any employer may file with the Union a complaint against any member of the Union and the Union shall act thereon and notify the Joint Port Labor Relations Committee of its decision within 30 days from the date of receipt of the complaint. An employer shall not be required to appear nor need he participate in discipline by the Union of its members beyond the filing of complaints.

**17.811** If within 30 days thereafter the Employers are dissatisfied with the disciplinary action taken under Section 17.81,

then the following independent procedure of Section 17.82 may be followed, which procedure shall also be applicable in the case of longshoremen not members of the Union.

**17.82** The Joint Port Labor Relations Committee has the power and duty to impose penalties on longshoremen who are found guilty of stoppages of work, assault, refusal to work cargo in accordance with the provisions of this Agreement, or who leave the job before relief is provided, or who are found guilty of pilfering or broaching cargo or of drunkenness or who in any other manner violate the provisions of this Agreement or any award or decision of an arbitrator. In determining penalties neither the parties nor the arbitrators shall consider offenses that predate by 5 years or more the date of a current offense.

**17.821** Assault.

**17.8211** For first offense assault: Minimum penalty, 1 year suspension from work. Maximum penalty, discretionary.

**17.8212** For second offense assault: mandatory cancellation from registered list upon request of either party.

**17.8213** In either case such conviction shall not be dependent upon the existence of a prior court decision, nor shall the determination of guilt await a court decision.

**17.822** Pilferage.

**17.8221** For first offense pilferage: Minimum penalty, 60 days' suspension from work. Maximum penalty, discretionary.

**17.8222** For second offense pilferage: Mandatory cancellation from registered list upon request of the employer.

**17.823** Drunkenness or smoking in prohibited areas.

**17.8231** First offense: Suspension for 15 days.

**17.8232** Second offense: Suspension for 30 days.

**17.8233** Succeeding offenses: Minimum penalty, 60 days suspension. Maximum penalty, discretionary.

**17.824** Abuse of use of controlled substances and/or drugs on the job or in or around any employment premises or the dispatch hall.

**17.8241** First offense: Suspension for 15 days.

**17.8242** Second offense: Suspension for 30 days.

**17.8243** Succeeding offenses: Minimum penalty, 60 days suspension. Maximum penalty, discretionary.

**17.825** Sale and/or peddling of controlled substances and/or drugs on the job or in or around any employment premises or the dispatch hall.

**17.8251** For first offense: Minimum penalty, 1 year suspension from work. Maximum penalty, discretionary.

**17.8252** For second offense: Mandatory cancellation from registered list upon request of either party.

**17.8253** In either case such conviction shall not be dependent upon the existence of a prior court decision, nor shall the determination of guilt await a court decision.

**17.826** An employee found to be in violation of reasonable verbal instructions, posted employer safety rules, and/or the PCMSC shall attend a 1-day safety class approved by the Coast Labor Relations Committee without pay. Failure to attend and complete the class as scheduled without a valid excuse shall result in suspension from work until the class is completed. In addition, the employee shall be subject to the following minimum discipline, which shall be applied uniformly without favoritism or discrimination.

**17.8261** First Offense: Letter of warning.

**17.8262** Second Offense: Suspension from work for 15 days.

**17.8263** Third Offense: Suspension from work for 60 days. Maximum penalty, discretionary.

**17.8264** Fourth Offense: Subject to deregistration.

**17.827** An employee who, knowingly and flagrantly disregards reasonable verbal instructions, posted employer safety rules, and/or the PCMSC, and who intentionally causes significant damage to equipment or cargo, or who intentionally injures himself or others, shall be subject to the following minimum discipline, which shall be applied uniformly without favoritism or discrimination.

**17.8271** First Offense: Suspension from work for 90 days. Maximum penalty, discretionary.

**17.8272** Second Offense: Subject to deregistration.

**17.828** Grievances arising under Sections 17.826 and 17.827 shall be subject to the grievance procedure of Section 17, with the following exceptions.

**17.8281** Grievances arising under Sections 17.826 and 17.827 shall be heard by the local parties within 30 days of the employee being cited. In the event the parties fail to resolve the grievance within the 30-day time period, the grievance shall be referred to the Area Arbitrator, at the request of either party, for an immediate hearing and decision.

**17.8282** In determining whether a violation under Sections 17.826 and 17.827 is a first, second, third or fourth offense, Section 17.82 shall govern.

**17.829** An employee released from the job for being under the influence of alcohol or drugs may request that his/her union representative report to the job. If the union representative, having observed the employee, believes the employee was unjustly released, he will discuss the case immediately with the employer. If the employer and union representative are unable to

reach agreement, or if the union representative does not immediately respond to the request to come to the job, the case shall be immediately referred at the request of either party to the Joint Port Labor Relations Committee which shall have the power and duty to investigate and adjudicate it. If the Joint Port Labor Relations Committee members present are unable to reach agreement, and/or if no Union member of the Joint Port Labor Relations Committee responds to the request to come to the job within 1 hour, the Area Arbitrator shall be immediately called to the job to decide if the employee was properly released. If the released employee fails to contact his/her union representative, or if the employee leaves the job, the employee shall be guilty as charged. Where an employee is guilty of working under the influence of alcohol or drugs the employee shall be subject to the penalties found in Section 17, and shall be referred to the ILWU-PMA employee assistance program.

**17.83** Suspensions under the foregoing provisions shall follow convictions by either the Union grievance machinery or by the Joint Port Labor Relations Committee, either of whom shall accept a prior court decision. The court decision will be considered by the parties and they shall discount the penalties set forth above accordingly. Where a fine has been assessed then the days off on suspension shall be discounted at the rate of $5.00 per day. Any man suspended under these provisions shall not be dispatched for work in any port covered by this Agreement until the suspension penalty has been served.

**17.84** Any longshoremen having records of habitual drunkenness or whose conduct on the job or in the dispatching hall causes disruption of normal harmony in the relationship of the parties hereto, or who physically assault anyone in the dispatching hall or on the job, or who have records of working in a manner that is hazardous to themselves or that endangers oth-

er workers shall not be dispatched to operate or used to operate any hoisting or mechanical equipment or devices or to supervise the operation of such equipment; or they shall be subject to such other remedy as the Joint Port Labor Relations Committee shall mutually consider appropriate.

**17.85** In the event of disagreement at the Joint Port Labor Relations Committee level as to the imposition of penalties under this Section 17.8, the issue shall be processed immediately through the grievance procedure, and to the Area Arbitrator, if necessary.

**17.86** The rules and penalties provided hereinabove shall be applicable to fully registered longshoremen and, except where a more stringent rule or penalty is applicable pursuant to Section 17.861, to limited registered longshoremen and to nonregistered longshoremen.

**17.861** More stringent rules and penalties than those provided hereinabove that are applicable to limited registered longshoremen or to nonregistered longshoremen or to both such groups may be adopted or modified by unanimous action of the Joint Coast Labor Relations Committee and, subject to the control of such Committee so exercised, more stringent rules and penalties applicable to limited registered men or nonregistered men or to both groups that are provided in existing and future local joint working, dispatching, and registration rules and procedures or by mutually agreed practices shall be applicable.

## SECTION 18

# GOOD FAITH GUARANTEE

**18.1** As an explicit condition hereof, the parties are committed to observe this Agreement in good faith. The Union commits the locals and every longshoreman it represents to observe

this commitment without resort to gimmicks or subterfuge. The Employers give the same guarantee of good faith observance on their part.

## SECTION 19

# UNION SECURITY

**19.1** All present fully registered employees who are members of the Union on the date of execution of the Agreement, shall remain members of the Union in good standing as a condition of employment.

**19.2** All present fully registered employees who are not members of the Union on the date of execution of the Agreement shall become and remain members in good standing of the Union as a condition of employment.

**19.21** The Union hereby agrees to indemnify the Association and each member of the Association against any award, judgment, loss or expense arising out of a legal claim made against the Association or any company that is a member of the Association by a registered longshoreman or clerk, described in Section 19.2, because of deregistration or denial of full work opportunity at the request of the Union or any Union local pursuant to the provisions of Section 19.2.

**19.3** Any employee who becomes fully registered during the life of the Agreement shall, 30 days thereafter, become and remain a member of the Union in good standing as a condition of employment.

**19.4** A fully registered employee who, 30 days after said registration, has failed to acquire or thereafter maintain membership in the Union as here provided shall be removed from the registration list and deregistered 30 days after notice from the Union that he is not a member in good standing.

**19.5** A Union member shall be considered in good standing if he makes timely tender of the periodic dues, and initiation fees uniformly required as a condition of becoming and remaining a member in the Union.

## SECTION 20

# PAY GUARANTEE PLAN, RULES, AND ADMINISTRATION

This Pay Guarantee Plan continues and is an extension of the Pay Guarantee Plan provided in the Memorandum of Understanding of February 10, 1972, as amended through July 1, 1993.

## Preamble

The basic intention of the Pay Guarantee Plan (hereinafter PGP) is to provide a weekly income to eligible registered men.

**20.1** For each year of the Agreement the Employers will have a contingent liability for the Pay Guarantee Plan for the following amounts:

| | | |
|---|---|---|
| First year | (7/1/02 to 6/30/03) | $24,960,000 |
| Second year | (7/1/03 to 6/30/04) | $20,020,000 |
| Third year | (7/1/04 to 6/30/05) | $20,020,000 |
| Fourth year | (7/1/05 to 6/30/06) | $24,960,000 |
| Fifth Year | (7/1/06 to 6/30/07) | $20,020,000 |
| Sixth Year | (7/1/07 to 6/30/08) | $20,020,000 |

**20.11** In the first year $6,240,000 will be made available each quarter; in the second year $5,005,000 will be made available in each quarter; in the third year $5,005,000 will be made available each quarter; in the fourth year $6,240,000 will be made available each quarter; in the fifth year $5,005,000 will be made available in each quarter; in the sixth year $5,005,000 will be made available in each quarter.

**20.12** One-thirteenth of each quarter's amount will be contingent liabilities and will be available at the end of each payroll week to meet the Plan's payout requirements for that week.

**20.13** At the end of the first payroll week if the benefits that have been paid are less than the amount available for that week, the unused amount will be made available for the next payroll week(s) as provided in Section 20.3. Thereafter, the unused amount of the total available in any payroll week shall be made available for the following payroll week(s). This accumulating procedure shall continue over the full 156-week contract period.

**20.14** The Employers will determine the method by which contributions for the contingent liability will be collected and made available.

**20.2** Benefits. Effective with the beginning of the third payroll quarter of 1987, PGP benefits for Class A employees shall be a maximum of 38 hours pay each week; PGP benefits for Class B employees who have 5 or more vacation qualifying years as of the preceding April 1 shall be a maximum of 38 hours pay each week; PGP benefits for Class B employees with less than 5 vacation qualifying years as of the preceding April 1 shall be a maximum of 28 hours pay each week. The hourly rate of PGP pay shall be the employee's appropriate straight time rate of pay as provided under Section 4.13. (PGP will reflect any increases in the basic longshore rates, Memorandum of Understanding dated November 23, 2002.)

**20.21** An exception to the benefits provided in Section 20.2 above shall be that new registrants after July 1, 1984 shall not be entitled to PGP benefits until completion of 1 year of registration.

**20.22** The benefits payable each week shall be the difference between a man's earnings for the 4-week period ending with the current week and PGP benefits for those 4 weeks.

**20.221** Earnings are defined as all earnings and/or compensation received during the payroll week or period including such payments as straight time, overtime, skill pay, penalty cargo pay, travel time pay, pay for vacations and paid holidays, jury duty pay, State unemployment benefits and PGP payments.

**20.2211** Compensation shall include all payroll adjustments including monetary claims paid as a result of LRC or arbitration decisions. Payroll adjustments shall be included as part of the individual's earnings for the payroll week in which such payments are made.

**20.2212** Compensation shall also include the amount of ILWU-PMA Pension Plan benefits and any other retirement benefits to which a man is entitled on the first day of the month if coincident with a man's 65th birthday, or on the first day of the month subsequent to a man's 65th birthday, whichever is applicable, and the amount of Social Security benefits regardless of age. (See CLRC Meeting no. 2-98, item 5, January 29, 1998.)

**20.222** If an individual's earnings in any week of the 4-week period were less than the benefit amount and he was ineligible for an appropriate PGP benefit that week, the calculation for the 4-week period will be made as if his earnings for that week were equal to the appropriate PGP weekly benefit.

**20.223** If an individual's earnings as a longshoreman are less than the State unemployment compensation benefit for a given week and evidence is not submitted showing that the individual has applied for unemployment compensation together with the amount of entitlement, the earnings record for

that week will be increased by the difference between actual earnings in the given week and the weekly guarantee maximum limit.

**20.2231** An employee shall not be eligible for PGP in any week for which:

(a) he has non-longshore work-related earnings from an outside source not covered by this Agreement, which requires his attendance during any part of the day shift or night shift on any day of the week from Monday through Friday; or

(b) he has received any weekly indemnity benefits for an off-the-job disability from either the State of California or the ILWU-PMA Benefit Funds; temporary total or temporary partial State workers' compensation, or temporary total or temporary partial Longshore & Harbor Workers' Compensation; or

(c) he has failed to establish entitlement for a State Unemployment Compensation benefit, if such failure is due to employment not covered by this Agreement.

**20.22311** Employees must give full Social Security authorization and appropriate State authorization to PMA as Trustee of the PGP Fund for the purpose of verifying eligibility in accordance with the standards established by Section 20.2231. All documents necessary to obtain full Social Security and other State and Federal benefit program information to establish eligibility for PGP must be executed by the employee when requested by either party at the local level with immediate notice of such request to be given to the other party. When requested, evidence of all outside earnings shall be submitted to the Joint LRC. When a charge is made that any employee has violated Sections 20.2231 or 20.22311, such charge shall be subject to resolution under the grievance machinery.

**20.22312** Any employee who receives PGP in violation of Section 20.2231 shall be disqualified from receiving PGP for the life of this contract, or 12 months, whichever is longer.

**20.22313** Any claim that denial of PGP eligibility under these provisions is improper, shall be heard by the Joint LRC immediately and they shall have the authority to effect reinstatement and/or reimbursement.

**20.2232** Evidence of application for unemployment compensation benefits to be considered timely must be in the hands of PMA no later than the second Tuesday following the Friday payday on which PMA issues notification of eligibility for unemployment compensation so that the unemployment compensation benefit can be applied to the correct payroll week. If the evidence of application is not in the hands of PMA by the second Tuesday then the difference between the man's actual earnings and the guarantee maximum benefit will be added to the man's earnings for the applicable payroll week.

**20.3** Payment Procedures.

**20.31** PGP payments will be made to eligible men weekly on the payday of the second week following the week for which a benefit is payable. Men will be eligible for benefits if they are on the PGP eligibility list, meet the weekly availability requirement and have 4-week earnings less than the appropriate 4-week benefit amount.

**20.311** At the close of each payroll week the dispatch hall shall furnish PMA the joint records of all men available but not dispatched, and those who flopped, for each day of the payroll week. A combination of days of "work" and "availability" in the joint dispatch hall shall be used to calculate PGP eligibility.

**20.32** Total PGP payments for any week may not exceed the weekly contingent liability for that week plus the unused amount from the prior week(s) as provided in Section 20.13.

**20.321** If in any payroll week the total payments due do not exceed the current weekly contingent liability plus any unused amount from prior weeks, payment in full will be made.

**20.322** If in any payroll week the total payments due are in excess of the current weekly contingent liability plus any unused amount from prior weeks, an across-the-board percentage reduction will be made to reduce the week's payments to an amount equal to the current weekly contingent liability plus any unused amount from prior weeks.

**20.323** Twelve successive 13-week periods shall be determined commencing July 3, 1999. If, at the end of each 13-week period, there is an unused amount resulting from the accumulating procedure of Section 20.13 and if weekly PGP payments were reduced during such period as provided in Section 20.322, the following PGP benefit adjustment procedure shall then apply:

**20.3231** A lump sum "make whole" payment shall be made to any registered man who, during the 13-week period, had his weekly PGP benefit reduced under the provisions of Section 20.322 above. Such lump sum payments in the aggregate shall not exceed the unused amount resulting from the accumulating procedure of Section 20.13.

**20.3231 1** Except as provided in Section 20.32312 below, the lump sum "make whole" payment to a man shall be the difference between his PGP payments for the 13-week period and the amount he would have been entitled to had there been no reduction under Section 20.322 above.

**20.32312** If the total "make whole" payments exceeds the total unused amount available, the "make whole"

payments will be reduced by an across-the-board percentage reduction so that the total PGP payments will not exceed the unused amount available.

**20.324** If, at the end of each 52-week period (week numbers 52, 104 and 156), there is an unused amount resulting from the accumulating procedure of Section 20.13 and if weekly PGP payments were reduced during such 52-week period and have not been previously "made whole" under the benefit adjustment procedure of Section 20.323, then the benefit adjustment procedure of Section 20.323 shall apply to such 52-week period.

**20.325** If, at the end of the third 52-week period (week number 156) and after the benefit adjustment procedure of Section 20.324, there is an unused amount resulting from the accumulating procedure of 20.13 and if weekly PGP payments were reduced during the first 52-week period and/or the second 52-week period and have not been previously "made whole" under the benefit adjustment procedure of Section 20.323, then the benefit adjustment procedure of Section 20.323 shall apply to the first 52-week period and/or the second 52-week period.

**20.33** PMA shall furnish to the local union a list of men showing their hours worked, their earnings, their availability and the amount of PGP payments for which a man is eligible before the adjustment, if any, the amount of the adjustment, and the net payment after the adjustment.

**20.331** A claim of incorrect payment of PGP is to be submitted to a designated person in each local. To be considered timely, such claim must be in the hands of PMA no later than 28 days after the payday on which the payment was made.

**20.4** Eligibility. Only registered Class A and Class B men are eligible to participate in the PGP.

SECTION 20

**20.41** Men on the PGP eligibility list will be eligible for PGP benefits for any payroll week (8:00 a.m. Saturday to 8:00 a.m. Saturday) by establishing "availability" as defined in Section 20.531 for the 5 days Monday through Friday inclusive, except that in any week in which a paid holiday as defined in Section 5 is observed on Monday through Friday men shall be eligible for PGP benefits for that week by being available Monday through Friday less the day on which the paid holiday is observed.

**20.411** For each full day of work by a man on a Saturday and/or Sunday the individual's weekly availability requirement as defined in Section 20.41 shall be reduced by 1 day.

**20.42** The PGP eligibility list shall include only those registered men (1) who meet the requirements of the 50% test provided below in Sections 20.421 through 20.4212, or (2) who in the preceding payroll year were paid at least a basic 1 week vacation (on the basis of required, qualifying hours under the terms of the 1981-1984 Agreement).

**20.421** Eligibility shall include only those Class A or Class B registered men who work 50% or more of the average work hours available to Class A or Class B men, respectively, in their home port for the most recent available 4 payroll quarters preceding the current quarter. "Work hours" shall not include travel hours, outport hours, vacation hours, holiday hours, or PGP hours. Men with less than 100 work hours for the 4-quarter period and steady men will be excluded in the calculation of the average.

**20.4211** The PGP eligibility list will be prepared quarterly and will be effective for the period beginning with the second week of the current payroll quarter to the second week of the following payroll quarter.

**20.4212** Men who have insufficient hours to meet the 50% test due to vacation, jury duty, illness, injury, full-time Union employment, full-time joint employment, military service, leave of absence, etc. shall be entitled to a pro rata adjustment on the basis of hours worked while not absent during the test period.

**20.43** Men will be deleted from the PGP eligibility list while working on a steady basis for an employer under a weekly or monthly guarantee for which their employer is responsible. The individual employers of steady men shall notify the PMA area offices immediately when men are employed or released as steady men.

**20.431** Men employed or released as steady men during a payroll week are not eligible for benefits under the PGP for such week.

**20.44** Men dropped from the registration list for any reason shall be deleted from the PGP eligibility list.

**20.45** Authorized visitors, granted clearance by the home port LRC and approved by the visited JPLRC to work as a visitor shall be included on the PGP eligibility list in the port they are visiting.

**20.46** Unauthorized visitors, visiting and working in other than their home port without having obtained the clearance and approval of the LRC of both ports shall not be included on the PGP eligibility list of the port visited, but shall remain on the PGP eligibility list of the home port.

**20.47** Men who are transferred to another port under the provisions of the Agreement will be placed on the PGP eligibility list in the port to which they are transferred effective at the beginning of the payroll week immediately following the effective date of the transfer.

**20.5** Availability. It is recognized that the industry works 7 days per week and the Union agrees that employees will be available to fill the needs of the employers on all working shifts during the week, including Saturdays, Sundays and holidays in accordance with the Agreement. It is also recognized that some employees only make themselves available to work days, that some employees only make themselves available to work nights, and that some employees make themselves available to work either days or nights.

**20.51** Port rules shall determine shift availability of gangs and men. Availability shall be any combination of day or night.

**20.52** A failure by a local to provide the required registered work force on Saturday and/or Sunday shall be referred for correction to the Joint Port LRC. This matter shall take precedence over any other matter before the JPLRC. If the matter is not settled within 5 days from its introduction to the JPLRC the Area Arbitrator shall adjudicate the dispute by mediation/arbitration within 10 days. Arbitrators' decisions shall be corrective and restricted to the local involved.

**20.53** Failure to meet the weekly availability requirement shall disqualify the employee for PGP benefits for the week in which the failure occurs.

**20.531** "Availability" is defined to mean working or being available for work without employment offered.

**20.532** "Working" is defined to mean working a full shift, unless injured on the job or released earlier by the employer.

**20.5321** A man replacing himself prior to the completion of a full shift will not be considered as having been available that day for PGP purposes. Each such replacement shall be reported by the employer to PMA in the payroll week in which such replacement occurs.

**20.533** Men checked in for work who refuse any work opportunity offered in their category (skilled, unskilled) will not be given availability credit. *Exception:* Dock preference men shall be exempt from work on ship.

**20.5331** In addition to Section 20.533 above, a Class A registered man will be deemed unavailable if he did not accept work when work was available to him and a Class B man or a casual was employed in his category (skilled or unskilled) on his assigned shift during the Monday-Friday period. A Class B registered man will be deemed unavailable if he did not accept work when work was available to him and a casual was employed on his assigned shift during the Monday-Friday period.

**20.5332** The reference to "category (skilled or unskilled)" in Sections 20.533 and 20.5331 means that a skilled man is required to accept only skilled work for which he is qualified unless Section 20.7241 is applicable. Unskilled men are required to accept any unskilled work.

**20.534** Men who do not meet the weekly availability requirement because of absence due to illness, injury, full-time union employment, full-time joint employment, military service, leave of absence, disciplinary time off, incarceration or for any other reason other than jury duty whether it be authorized or unauthorized shall not be entitled to a PGP payment for the payroll week in which such absence occurs.

**20.535** Men who are absent Monday through Friday because of part-time union employment or part-time joint employment shall have their hours, earnings and availability for such employment integrated with their hours, earnings and availability under the Agreement to determine eligibility for PGP benefits.

**20.536**  Individuals who are absent because of jury duty shall have their jury duty days Monday through Friday counted toward availability and shall not be subject to four-week averaging (Section 20.22) to determine PGP for the week or weeks while serving. Verification of jury duty service and pay shall be presented to PMA in order to receive this benefit.

**20.537**  Men working as unauthorized visitors in another port must meet the 5 days Monday through Friday availability requirement in the home port in order to qualify for PGP payments. Earnings paid to unauthorized visitors in the port visited shall be included in determining PGP payments in the home port.

**20.54**  Each dispatch hall shall record availability for its local in the manner and form determined by the JPLRC. The JPLRC form for this purpose is to be transmitted to PMA for each weekly payroll period.

**20.541**  Any dispute as to an individual's availability shall be promptly processed through the contract grievance machinery.

**20.55**  Availability credit during a payroll week will be given for each day on the following basis provided that no more than a single day's credit shall accrue in a 24-hour period 8:00 a.m. to 8:00 a.m.:

**20.551**  For each day or night Saturday to Saturday that a man has worked.

**20.552**  For each day or night Monday through Friday that a man makes himself available for work in accordance with JPLRC check-in procedures.

**20.6**  Work Stoppages.

**20.61**  A work stoppage by any local(s) in violation of Section 11.1 as defined herein shall disqualify all registered men

in the port(s) affected from payment under the PGP in the payroll week(s) that the violation occurs.

**20.611**  A work stoppage is here defined as one which occurs by reason of Union policy, local or International, or by failure to work as directed by an Arbitrator.

**20.612**  An unauthorized stop-work meeting in violation of Section 12.3 is considered to be a work stoppage by any local in violation of Section 11.1.

**20.613**  Unauthorized non-work days or non-work shifts are considered to be a work stoppage by any local in violation of Section 11.1.

**20.614**  Action to disqualify registered men in the port from payment of PGP under Section 20.61 can be taken by the Employers only upon written notification to the local(s) involved within 48 hours following the work stoppage. If the Union grieves such action, it has the right to have the grievance heard by the Area Arbitrator within 48 hours of receipt of notification. The Arbitrator's decision shall be rendered within 24 hours of the hearing.

**20.62**  In each week a coastwise work stoppage occurs, the Employers' obligation will be reduced by the amount of the weekly contingent liability.

**20.63**  In the event that unions other than those signatory to this Agreement have work stoppages or there occurs an Act of God (described herein as a "force majeure") that creates a need to provide PGP payments in a port, area or on a coastwise basis for a period extending beyond 1 payroll week, PGP payments will be suspended in the port, area or coastwise as applicable until work can be resumed. There shall be no reduction in the Employers' liability for the PGP as a result of such incident.

**20.691** The 1 payroll week, for which PGP payments may be made as provided herein, shall stand alone and therefore shall not be included in any 4-week period as provided in Section 20.22.

**20.692** Upon the occurrence of an event that creates a need to make PGP payments as provided herein, the Joint Coast Labor Relations Committee shall promptly meet to review conditions in the port(s) affected to discuss what relief the parties may agree can be provided for the longshoremen in those ports.

**20.7** Abuses.

**20.71** The parties agree it is to their mutual best interest to prevent abuses of the intent and purpose of the Pay Guarantee Plan. Recognizing this as their objective, the parties agree that the Rules contained herein are subject to change, modification, deletion or addition for such purpose.

**20.72** To correct abuses in a local, the registered work force may be dispatched under one or more of the following rules, or other rules agreed to by the JPLRC. Such rules must be observed after implementation to avoid unwarranted PGP payments.

**20.721** Obsolete boards are to be discontinued.

**20.722** The number of men in a local to be assigned to the day shift versus the night shift shall be jointly decided.

**20.723** The number of identified regular gangs in a local (day/night) shall be jointly decided, not to exceed presently agreed numbers.

**20.724** Available men must accept any work for which they are qualified and gang members, when their gang(s) are not working, shall be required to accept work for which they are qualified in accordance with Sections 20.533, 20.5331 and 20.5332 in order to meet the availability requirements for PGP.

**20.7241** Skilled men will not be required to accept a dispatch to unskilled work except in those locals where it is an accepted dispatching practice.

**20.7242** All orders placed by the Employer after dispatch has begun shall not disqualify an employee for PGP availability.

**20.73** Disagreement over implementation of any rule to correct abuses or failure by a JPLRC to agree on any other alleged abuses within 10 days shall be subject to prompt and final determination by the Area Arbitrator. An Area Arbitrator's decision shall be restricted to the local involved.

**20.8** General Provisions.

**20.81** Travel. Historically, travel between ports has been an accepted and essential part of the Agreement. It is the workers' obligation to travel to work where such travel is customary or feasible.

**20.811** Travel between ports shall continue in accordance with customary dispatch procedures and travel practices.

**20.8111** Each JPLRC shall develop a list of "travel exempt" men who are not required to accept a dispatch to travel. Such list shall include only those men who have valid or legitimate reasons for refusing to travel, such as but not limited to physical or medical limitations.

**20.8112** Men not on the "travel exempt" list who refuse to accept travel orders on any day upon which they are available shall not be entitled to a guarantee payment for the payroll week of such occurrence.

**20.8113** The availability record maintained by the dispatch hall shall indicate such refusal to travel.

**20.812** Travel time and earnings paid for work in the port to which traveled shall be included in an individual's earnings record.

**20.82** Dispatch Procedures.

**20.821** Dispatch of Longshoremen as Clerks. If the registered work force of clerks in any local is exhausted on any dispatch, available registered longshoremen, Class A or Class B, shall be offered the work before casual clerks are employed. Failure of a registered longshoreman to accept such dispatch during the Monday through Friday availability period shall make him ineligible for PGP benefits for that payroll week.

**20.8211** Whenever a registered longshoreman refuses to accept a dispatch to clerks' work during dispatch periods, a report of such incident must be made by the dispatcher on the JPLRC availability form.

**20.8212** Registered longshoremen dispatched to clerks' work who are determined by an employer to be unqualified shall be placed on a list of longshoremen unqualified for clerks' work by the longshore JPLRC. Such men are not required to accept dispatch as a clerk but shall, however, be entitled to use the grievance machinery under the Clerks' Contract Document to claim reinstatement of eligibility for clerks' work.

**20.82121** The Employer shall have the right to have any grievance against a longshoreman working as a clerk processed by the Joint Clerks' LRC with that Committee having the authority to invoke disciplinary action consistent with the Agreement. The decision of the Joint Clerks' LRC is to be recognized and enforced by all Joint Labor Relations Committees.

**20.822** Dispatch in "Low Work Opportunity Port" Situation. When a "Low Work Opportunity Port" situation occurs

for Class B men they shall be dispatched by rotation on a 1-day basis. In a similar situation the same rule shall apply to hall Class A men in the port. (*See Supplement III*.)

**20.83** Registered Men Employed by Nonmembers of PMA.

**20.831** Hours and earnings of registered men employed on a steady or casual basis by an employer who is signatory to a Nonmember Participation Agreement shall be included in the calculation of a man's eligibility and earnings.

**20.84** Payroll Processing. All payrolls for registered men including any former direct payments made by member companies and payrolls of nonmember companies participating in the PGP shall be processed through the PMA Management Information Services.

**20.85** Vacations. No employee shall be eligible for PGP payments for more than 52 payroll weeks per payroll year minus the number of weeks of vacation for which he is paid in that year.

**20.851** Vacation weeks to which a man is entitled for PGP purposes shall be taken in 5-day units of Monday through Friday.

**20.852** The JPLRC availability record maintained in the dispatch hall shall indicate when a man is on vacation.

**20.853** Men shall not be entitled to a PGP payment for any payroll week while on vacation.

**20.8531** When a man is on vacation, the appropriate maximum weekly PGP benefit shall be charged to his weekly guarantee record for each week of paid vacation taken.

**20.8532** If at the end of the payroll year the payroll records indicate that a man has not taken the number of weeks of vacation for which he was paid, the appropriate maximum

weekly PGP benefits shall be charged to his guarantee record for the number of weeks of vacation not taken, beginning with the first payroll week following the end of the payroll year.

**20.86** Fringe Benefit Eligibility.

**20.861** PGP payments for which a man is eligible, prior to any reduction or offset for unemployment insurance or jury duty pay, shall be credited when required to establish eligibility for Welfare Plan coverage, a qualifying year under the Pension Plan and a qualifying year of past service for additional vacation under Section 7.12.

**20.8611** The number of hours to be credited under Section 20.861 will be calculated by dividing the amount of the PGP by the appropriate longshore straight time rate.

**20.862** PGP payments shall not be credited for the purpose of establishing eligibility for the basic vacation under Section 7.11.

**20.87** Survey Team. A 4-man PGP Survey Team with 2 representatives each from the Employers and the Union shall be established. The Team shall visit each area and review the administration of the PGP. The Team shall make recommendations to the parties in the various ports and to the Coast Committee. The principal purpose of the Team shall be to promote efficient and uniform administration of the PGP and its rules.

**20.88** Grievances. Disputes arising over interpretation or application of PGP provisions and rules shall be subject to the contract grievance procedure.

## SECTION 21

# LASH BARGE JURISDICTION

**21.1** Section 1.1 of the PCLCD, Section 1.2 of the PCCCD and Section 1 of the Pacific Coast Walking Bosses/Foremen's Agreement shall apply to loading cargo to and discharging car-

118

go from LASH barges at all docks accommodating vessels and/or barges within the existing geographical jurisdiction of any longshore, clerk or walking bosses/foremen local, and the labor involved therein is hereby assigned to longshoremen, clerks and walking bosses/foremen.

**21.2** At docks where there are jurisdictional claims made by other Unions which may prevent LASH barge work from commencing or continuing with the use of longshoremen, clerks and walking bosses/foremen, then non-longshoremen, non-clerks and non-walking bosses/foremen may do such work provided the following procedures are followed:

**21.21** The LASH barge owner and/or agent shall be required to expend a good faith effort to secure assigned work for longshoremen, clerks and walking bosses/foremen and shall notify the local unions 10 days before the start of the operation.

**21.22** At those industrial docks or private docks where established practices for PMA vessels are in effect, such practices shall apply to LASH barges (use of front men, operation of hoisting equipment for cargo-handling from/to LASH barges, and that dock work, clerks' work and walking bosses/foremen work which longshoremen, clerks and walking bosses/foremen do at each such dock).

**21.23** At docks other than those described in Section 21.22 where none of the assigned work is performed by longshoremen, clerks or walking bosses/foremen, an assessment of $1.50 per revenue ton shall be transmitted promptly upon completion of the loading or discharging operation to the Treasurer, Pacific Maritime Association, San Francisco. Such monies shall be accompanied by a transmittal letter showing the port and area location where the operation took place, the date or dates on which the operation occurred and the revenue tons handled.

119

**21.24** The labor involved in loading and discharging of LASH barges outside the geographical jurisdiction on the United States Pacific Coast of any longshore, clerk or walking bosses/foremen local may be performed by non-longshoremen, non-clerks and non-walking bosses/foremen and such work shall not be claimed by longshoremen, clerks or walking bosses/foremen by virtue of the existence of this Memorandum of Understanding. Similarly, nothing in this Memorandum of Understanding shall prevent longshoremen, clerks and walking bosses/foremen from exercising their legal rights to obtain representation of such workers by organizational or procedural efforts. At such docks as described in Section 21.24 above where none of the assigned work is performed by longshoremen, clerks and walking bosses/foremen, an assessment of 65¢ per revenue ton shall be paid and handled on the same basis as the $1.50 assessment provided for in Section 21.23 above.

**21.25** The monies transmitted to PMA under this Agreement as described in Sections 21.23 and 21.24 shall be held by the Pacific Maritime Association and disbursed on a quarterly basis by sending the total amount accumulated in the quarter to the ILWU Coast Pro Rata Committee. Accompanying the check shall be an itemization of the amounts collected in accord with the breakdown in the transmittal letter described in Section 21.23 above. The ILWU Coast Pro Rata Committee will make appropriate distribution of these monies to the various longshore, clerk and walking bosses/foremen locals, and such monies will be used as an offset by each local receiving such monies against the respective local's share of the joint dispatch hall expenses. When such distribution is made, the ILWU Coast Pro Rata Committee will advise each PMA Area Manager of the breakdown and amounts of the distribution, with a carbon copy of such information to the PMA Treasurer in San Francisco.

SECTION 22

SECTION 23
SECTION 24

TERM OF AGREEMENT AND ITEMS OPEN
TO REVIEW DURING TERM OF AGREEMENT
WELFARE AND PENSION PLANS
MODIFICATION

## SECTION 22

### TERM OF AGREEMENT AND ITEMS OPEN TO REVIEW DURING TERM OF AGREEMENT

**22.1** This Agreement shall remain in effect—unless terminated in accordance with other provisions in the Agreement or unless the termination date is extended by mutual agreement—until 5:00 p.m., July 1, 2008, and shall be deemed renewed thereafter from year to year unless either party gives written notice to the other of a desire to modify or terminate the same, said notice to be given at least 60 days prior to the expiration date. Negotiations shall commence within 10 days after the giving of such notice.

## SECTION 23

### WELFARE AND PENSION PLANS

**23.1** The parties hereto have agreements on the subjects of Welfare and Pensions for longshoremen covered by this Agreement as set forth in the ILWU-PMA Welfare Agreement, as amended, and the ILWU-PMA Welfare Fund—Declaration of Trust as amended, the ILWU-PMA Pension Agreement, as amended, and the ILWU-PMA Pension Fund—Declaration of Trust, as amended.

## SECTION 24

### MODIFICATION

**24.1** No provision or term of this Agreement may be amended, modified, changed, altered or waived except by a written document executed by the parties hereto.

**24.2** All joint working and dispatching rules shall remain in effect unless changed pursuant to Section 15. All other restrictions on the employer or longshoremen that are in conflict with

MODIFICATION                                                    SECTION 24

the provisions of this Agreement are null and void. There will be no unilateral "hip pocket" working or dispatching rules.

**24.3** The parties agree that all arbitration decisions and rulings of the Labor Relations Committees with respect to provisions of the Contract that are not changed or modified in this Agreement, remain in effect; the foregoing is subject to the right of either party, by motion in the Joint Coast Labor Relations Committee, to seek a review or reopening of any such decision or ruling during the term of this Agreement. If there is disagreement on any proposal to change or modify such decision or ruling, the issue of whether the decision or ruling is in accordance with this Agreement may be submitted to the Coast Arbitrator for decision.

IN WITNESS WHEREOF, the parties hereto have signed this Contract Document effective as of July 1, 2002.

*Pacific Maritime Association*
on behalf of its members

*International Longshore and Warehouse Union*
on behalf of itself and each and all of its longshore locals in California, Oregon, and Washington and all employees performing work under the scope, terms, and conditions of this Agreement.

/s/ Joseph N. Miniace          /s/ James Spinosa

/s/ Craig T. Johnson          /s/ Robert McEllrath

/s/ Craig E. Epperson

122

## PENALTY CARGO LIST

### PENALTY CARGO – OTHER THAN BULK COMMODITIES

**15¢ Penalty - Automatic**
For hand handling the following commodities in lots of 15 short tons or more.

The penalty shall be paid in accordance with Section 4.43.
The penalty payments are to be in accordance with Section 3.34.

Alfalfa meal or pellets in sacks.
Carborundum grits in sacks.
Cement in sacks.
Coal in sacks.
Cottonseed meal in sacks.
Creosoted wood products, unless boxed or crated.
Fertilizers in sacks, namely, tankage, animal, fish, fish meal, guano, blood meal and bone meal. (Bone meal odor freed, non-offensive and treated to prevent weeping is not included.)
Herring in boxes and barrels.
Lumber, logs and lumber products loaded out of water.
Lumber, freshly painted and paint is wet.
Lumber, chemically treated, uncrated, where treatment results in irritation and offensiveness.
Nitrate, crude, untreated, in sacks.
Ore in sacks (excludes commodities such as rutile sand, zircon sand).
Phosphates, crude, untreated in sacks (not considered treated by mere process of grinding).
Pig iron, rough piled, when hand handled.
Refrigerated Cargo; handling and stowing in refrigerator space; meats, fowl and other cargoes in lots of 15 short tons or more or if job lasts 1 hour or more, to be transported at temperatures of freezing or below; and when men are required to work in hatch areas where the temperature is 32 degrees Fahrenheit or below.

123

Rubber, Baled, Covered with Loose Talc: to be paid to the gang actually handling this commodity including the deckmen, front men, jitney driver and the dockmen working as part of the gang. If another gang is working in the same hatch on a nonpenalty commodity, the ship gang members of said gang shall likewise be paid the penalty provided the holdmen of such gang are working the same deck or compartment as the gang handling the baled rubber covered with loose talc.

Sacks or Bags: loading only and to apply to the entire loading operation where table or chutes are used and the men are handling sacks weighing 120 pounds or over on the basis of 1 man per sack.

## 25¢ Penalty – Automatic

Green Hides: When the above commodities in unit loads or in palletized loads are machine stowed or unstowed, should an obnoxious condition develop, a conditional penalty may be paid to those individuals subjected to that obnoxious condition.

## 15¢ Penalty – Conditional

For the following commodities when packages are leaking or sifting due to damaged or faulty containers.

Penalty payable only to those men subjected to an offensive condition.

Alfalfa meal or pellets in bags.
Aniline dyes in bags.
Aqua gel (oilwell drilling clay) in bags.
Asbestos in bags or sacks.
Barium oxide in bags or drums.
Bichromate of soda in bags.
Borate in bags.
Borate in bags when not leaking or sifting but when temperature is 130 degrees Fahrenheit or more.
Calcium nitrate in bags.
Carborundum grits in bags.
Caustic soda in drums.
Celite and Decalite in bags.
Cement in bags.

---

Coal in bags.
Copra meal in bags.
Corn starch in bags.
Cottonseed meal in bags.
Creosote in pails, kits, etc., when not crated.
Cryolite in bags.
DDT in bags or fibre drums.
Feather meal in bags.
Fertilizers in bags, namely, tankage, animal, fish, fish meal, guano, blood meal and bone meal.
Fish, brined, in tierces or barrels.
Fish oil, whale oil and Oriental oils in drums, barrels or cases.
Gilsonite in bags.
Iron oxide in bags.
Lampblack, soot and carbon in bags.
Lime in fibre drums.
Lime, dehydrated, in bags.
Nitrate, crude, untreated in bags.
Ore in bags (excludes commodities such as rutile sand, zircon sand).
Paint pigment in bags.
Phosphates, crude, untreated in bags (not considered treated by mere process of grinding).
Plaster in bags.
Soda ash in bags.
Soy sauce in drums, barrels, etc.
Talc in bags.
Tapioca flour in bags.
Tallow in drums.
Urea in bags.
Vermiculite in bags.
Whiting in bags.
Working in Cramped Space:
    Holdmen only—All paper and pulp in packages weighing 300 pounds or over per package only when winging up and when stowing in fore peaks, after peaks and special compartments other than regular cargo spaces. (This does not apply to rolls.) When

there is less than 6 feet of headroom (a)loading cargo in hold on top of bulk grain (b)covering logs or piling with lumber products, paid to side-runners when used.

NOTE: Because the terms "sack" and "bag" are confusing, when these words are used, they are intended to mean the following:

*Sack:* Refers to burlap, cotton or cloth sacks with no inner lining.

*Bag:* Refers to plastic, multiwall paper bags or innerlined cloth sacks.

**25¢ Penalty**

Creosoted products out of water —Holdmen and boom men only.

Shoveling —The physical act of shoveling any commodity.

## NEW AND UNLISTED COMMODITIES

Automatic penalties are not payable for any unlisted commodity. The parties at the local level may jointly refer any commodity and the packaging method used to the parties at the Coast level who will finally determine whether or not the item is to be added to the penalty cargo list.

Where a penalty based on offensiveness is claimed due to abnormal condition, the local parties may agree or local arbitrators may rule that a conditional penalty not to exceed the 15¢ conditional penalty rate is or is not to be paid to those subjected to the condition in the instant case.

## BULK COMMODITIES (EXCLUDING BULK LIQUIDS)

(Payments to be in accordance with Section 3.34)

**25¢ Penalty**

Bulk commodities not otherwise specified mechanically loaded or discharged (includes incidental shoveling).

**50¢ Penalty**

Bulk grain—Board men only, when actually using board or operating trimming machine.

126

### 50¢ Maximum Dust Penalty

*Exceptions*

(1) The Understanding reached regarding the San Francisco working rule covering bulk ore or concentrate continues the 35¢ straight time and 52½¢ overtime penalties for unusually dusty, and 85¢ straight time and $1.275 overtime penalties for extremely dusty, fine, dry concentrates, but limits the application of these rates specifically to bulk ore or concentrate handled at Selby only.

(2) A similar understanding applies to Quirivelca ore handled at Tacoma, namely, the existing rate of 20¢ on sacks and 30¢ on bulk is limited to this specific commodity handled at Tacoma only.

The Employers shall have the right to protest the applicability of any penalty based on the characteristics of the commodity or the methods of operation, whether on a local basis or coastwise. The Union has the right to request the maximum penalty on any bulk commodity. The Joint Coast Labor Relations Committee shall finally decide whether the commodity is to be on the no penalty list, the bulk penalty list or the maximum penalty list.

The bulk penalty rate of 25¢ is based on the basic offensive characteristics of the commodity to which the employees are subjected. The local parties or the local arbitrators shall be limited in determining whether the normal bulk penalty or the maximum dust penalty is to be applied on any particular operation.

Where the method of operation removes the offensiveness for which a penalty is paid, the Employers may process a request through the grievance machinery to eliminate the penalty for that method of operation.

127

All local working rules are to be amended so as to conform to the new penalty cargo list as required under Section 24 and in accordance with Section 15.3.

## BULK LIQUID CARGO

*No penalty is payable on bulk liquid cargoes.*

A conditional penalty of 25¢ an hour may be paid to specific men for the time they are subjected to an offensive condition when employed in the following situations:

1. When longshoremen are required to work in bulk liquid tanks in order to strip the tanks of residual liquid cargo of an offensive nature.

2. Should there be a rupture of a pipe or hose used in the ship or on the dock for the loading or discharging of liquid cargo which creates an offensive condition for the men employed in the specific operation.

3. Should a spill occur on the ship or dock which creates an offensive condition for the men employed in the specific operation.

## DAMAGED CARGO

### 85¢ Penalty

Cargo damaged by fire, collision, springing a leak or stranding, for that part of cargo only which is in a damaged condition.

Cargo damaged from causes other than those enumerated above shall, if inspection warrants, pay the damaged cargo rate or such other rate determined by the Port Labor Relations Committee for handling that part of the cargo only which is in a damaged condition. This provision shall apply to individual consignments which are damaged and shall not empower any

committee to add to or detract from penalty cargo rates herein specified.

Cargo damaged from causes other than those enumerated above is understood to mean cargo damaged by reason of a casualty to the vessel or an occurrence aboard the vessel, such as a rupture in the sanitary pipes or a fuel oil leak, which produces the damaged cargo condition.

## FIRE PENALTY

### $1.20 Penalty

Working hatch when fire is burning or cargo is smoldering in hatch—payable to all employees working the cargo, ship or dock.

## EXPLOSIVES

When working Class A explosives as defined by Interstate Commerce Commission regulations, all men working in connection with a ship which is loading explosives are to receive the penalty during such time as explosives are actually being worked. *(Refer to Section 4.46.)*

## 2002-2003 WAGE SCHEDULE

*Effective 8:00 a.m., November 23, 2002 to 8:00 a.m. June 28, 2003*

| "Experience" Level (Hours) | Skill Category | 1st Shift | 2nd Shift | 3rd Shift | 1st & 2nd Shift Overtime | 3rd Shift Overtime |
|---|---|---|---|---|---|---|
| **No Cargo Penalty** | | | | | | |
| 4,000 or more | Basic | $27.68 | $36.91 | $41.52 | $44.29 | $49.82 |
| | Skill I | 30.08 | 40.11 | 45.12 | 48.13 | 54.14 |
| | Skill II | 32.35 | 43.13 | 48.53 | 51.76 | 58.23 |
| | Skill III | 33.48 | 44.64 | 50.22 | 53.57 | 60.26 |
| 2,001 - 4,000 | Basic | $22.94 | $30.59 | $34.41 | $36.70 | $41.29 |
| | Skill I | 25.34 | 33.79 | 38.01 | 40.54 | 45.61 |
| | Skill II | 27.61 | 36.81 | 41.42 | 44.18 | 49.70 |
| | Skill III | 28.74 | 38.32 | 43.11 | 45.98 | 51.73 |
| 1,001 - 2,000 | Basic | $20.94 | $27.92 | $31.41 | $33.50 | $37.69 |
| | Skill I | 23.34 | 31.12 | 35.01 | 37.34 | 42.01 |
| | Skill II | 25.61 | 34.15 | 38.42 | 40.98 | 46.10 |
| | Skill III | 26.74 | 35.65 | 40.11 | 42.78 | 48.13 |
| 0 - 1,000 | Basic | $19.94 | $26.59 | $29.91 | $31.90 | $35.89 |
| | Skill I | 22.34 | 29.79 | 33.51 | 35.74 | 40.21 |
| | Skill II | 24.61 | 32.81 | 36.92 | 39.38 | 44.30 |
| | Skill III | 25.74 | 34.32 | 38.61 | 41.18 | 46.33 |
| **15¢ Cargo Penalty** | | | | | | |
| 4,000 or more | Basic | $27.83 | $37.11 | $41.75 | $44.51 | $50.05 |
| | Skill I | 30.23 | 40.31 | 45.35 | 48.35 | 54.37 |
| | Skill II | 32.50 | 43.33 | 48.75 | 51.99 | 58.46 |
| | Skill III | 33.63 | 44.84 | 50.45 | 53.79 | 60.49 |
| 2,001 - 4,000 | Basic | $23.09 | $30.79 | $34.64 | $36.93 | $41.52 |
| | Skill I | 25.49 | 33.99 | 38.24 | 40.77 | 45.84 |
| | Skill II | 27.76 | 37.01 | 41.64 | 44.40 | 49.92 |
| | Skill III | 28.89 | 38.52 | 43.34 | 46.21 | 51.96 |
| 1,001 - 2,000 | Basic | $21.09 | $28.12 | $31.64 | $33.73 | $37.92 |
| | Skill I | 23.49 | 31.32 | 35.24 | 37.57 | 42.24 |
| | Skill II | 25.76 | 34.34 | 38.64 | 41.20 | 46.32 |
| | Skill III | 26.89 | 35.85 | 40.34 | 43.01 | 48.36 |
| 0 - 1,000 | Basic | $20.09 | $26.79 | $30.14 | $32.13 | $36.12 |
| | Skill I | 22.49 | 29.99 | 33.74 | 35.97 | 40.44 |
| | Skill II | 24.76 | 33.01 | 37.14 | 39.60 | 44.52 |
| | Skill III | 25.89 | 34.52 | 38.84 | 41.41 | 46.56 |

130

## 2002-2003 WAGE SCHEDULE

*Effective 8:00 a.m., November 23, 2002 to 8:00 a.m. June 28, 2003*

| "Experience" Level (Hours) | Skill Category | 1st Shift | 2nd Shift | 3rd Shift | 1st & 2nd Shift Overtime | 3rd Shift Overtime |
|---|---|---|---|---|---|---|
| **25¢ Cargo Penalty** | | | | | | |
| 4,000 or more | Basic | $27.93 | $37.24 | $41.90 | $44.66 | $50.20 |
| | Skill I | 30.33 | 40.44 | 45.50 | 48.50 | 54.52 |
| | Skill II | 32.60 | 43.47 | 48.90 | 52.14 | 58.61 |
| | Skill III | 33.73 | 44.97 | 50.60 | 53.94 | 60.64 |
| 2,001 - 4,000 | Basic | $23.19 | $30.92 | $34.79 | $37.08 | $41.67 |
| | Skill I | 25.59 | 34.12 | 38.39 | 40.92 | 45.99 |
| | Skill II | 27.86 | 37.15 | 41.79 | 44.55 | 50.07 |
| | Skill III | 28.99 | 38.65 | 43.49 | 46.36 | 52.11 |
| 1,001 - 2,000 | Basic | $21.19 | $28.25 | $31.79 | $33.88 | $38.07 |
| | Skill I | 23.59 | 31.45 | 35.39 | 37.72 | 42.39 |
| | Skill II | 25.86 | 34.48 | 38.79 | 41.35 | 46.47 |
| | Skill III | 26.99 | 35.99 | 40.49 | 43.16 | 48.51 |
| 0 - 1,000 | Basic | $20.19 | $26.92 | $30.29 | $32.28 | $36.27 |
| | Skill I | 22.59 | 30.12 | 33.89 | 36.12 | 40.59 |
| | Skill II | 24.86 | 33.15 | 37.29 | 39.75 | 44.67 |
| | Skill III | 25.99 | 34.65 | 38.99 | 41.56 | 46.71 |
| **35¢ Cargo Penalty** | | | | | | |
| 4,000 or more | Basic | $28.03 | $37.37 | $42.05 | $44.81 | $50.35 |
| | Skill I | 30.43 | 40.57 | 45.65 | 48.65 | 54.67 |
| | Skill II | 32.70 | 43.60 | 49.05 | 52.29 | 58.76 |
| | Skill III | 33.83 | 45.11 | 50.75 | 54.09 | 60.79 |
| 2,001 - 4,000 | Basic | $23.29 | $31.05 | $34.94 | $37.23 | $41.82 |
| | Skill I | 25.69 | 34.25 | 38.54 | 41.07 | 46.14 |
| | Skill II | 27.96 | 37.28 | 41.94 | 44.70 | 50.22 |
| | Skill III | 29.09 | 38.79 | 43.64 | 46.51 | 52.26 |
| 1,001 - 2,000 | Basic | $21.29 | $28.39 | $31.94 | $34.03 | $38.22 |
| | Skill I | 23.69 | 31.59 | 35.54 | 37.87 | 42.54 |
| | Skill II | 25.96 | 34.61 | 38.94 | 41.50 | 46.62 |
| | Skill III | 27.09 | 36.12 | 40.64 | 43.31 | 48.66 |
| 0 - 1,000 | Basic | $20.29 | $27.05 | $30.44 | $32.43 | $36.42 |
| | Skill I | 22.69 | 30.25 | 34.04 | 36.27 | 40.74 |
| | Skill II | 24.96 | 33.28 | 37.44 | 39.90 | 44.82 |
| | Skill III | 26.09 | 34.79 | 39.14 | 41.71 | 46.86 |

131

## 2002-2003 WAGE SCHEDULE

*Effective 8:00 a.m., November 23, 2002 to June 28, 2003*

### 50¢ Cargo Penalty

| "Experience" Level (Hours) | Skill Category | 1st Shift | 2nd Shift | 1st & 2nd Shift Overtime | 3rd Shift | 3rd Shift Overtime |
|---|---|---|---|---|---|---|
| 4,000 or more | Basic | $28.18 | $37.57 | $42.27 | $45.04 | $50.57 |
| | Skill I | 30.58 | 40.77 | 45.87 | 48.88 | 54.89 |
| | Skill II | 32.85 | 43.80 | 49.28 | 52.51 | 58.98 |
| | Skill III | 33.98 | 45.31 | 50.97 | 54.32 | 61.01 |
| 2,001 - 4,000 | Basic | $23.44 | $31.25 | $35.16 | $37.45 | $42.04 |
| | Skill I | 25.84 | 34.45 | 38.76 | 41.29 | 46.36 |
| | Skill II | 28.11 | 37.48 | 42.17 | 44.93 | 50.45 |
| | Skill III | 29.24 | 38.99 | 43.86 | 46.73 | 52.48 |
| 1,001 - 2,000 | Basic | $21.44 | $28.59 | $32.16 | $34.25 | $38.44 |
| | Skill I | 23.84 | 31.79 | 35.76 | 38.09 | 42.76 |
| | Skill II | 26.11 | 34.81 | 39.17 | 41.73 | 46.85 |
| | Skill III | 27.24 | 36.32 | 40.86 | 43.53 | 48.88 |
| 0 - 1,000 | Basic | $20.44 | $27.25 | $30.66 | $32.65 | $36.64 |
| | Skill I | 22.84 | 30.45 | 34.26 | 36.49 | 40.96 |
| | Skill II | 25.11 | 33.48 | 37.67 | 40.13 | 45.05 |
| | Skill III | 26.24 | 34.99 | 39.36 | 41.93 | 47.08 |

### 85¢ Cargo Penalty

| "Experience" Level (Hours) | Skill Category | 1st Shift | 2nd Shift | 1st & 2nd Shift Overtime | 3rd Shift | 3rd Shift Overtime |
|---|---|---|---|---|---|---|
| 4,000 or more | Basic | $28.53 | $38.04 | $42.80 | $45.56 | $51.10 |
| | Skill I | 30.93 | 41.24 | 46.40 | 49.40 | 55.42 |
| | Skill II | 33.20 | 44.27 | 49.80 | 53.04 | 59.51 |
| | Skill III | 34.33 | 45.77 | 51.50 | 54.84 | 61.54 |
| 2,001 - 4,000 | Basic | $23.79 | $31.72 | $35.69 | $37.98 | $42.57 |
| | Skill I | 26.19 | 34.92 | 39.29 | 41.82 | 46.89 |
| | Skill II | 28.46 | 37.95 | 42.70 | 45.45 | 50.97 |
| | Skill III | 29.59 | 39.45 | 44.39 | 47.26 | 53.01 |
| 1,001 - 2,000 | Basic | $21.79 | $29.05 | $32.69 | $34.78 | $38.97 |
| | Skill I | 24.19 | 32.25 | 36.29 | 38.62 | 43.29 |
| | Skill II | 26.46 | 35.28 | 39.69 | 42.25 | 47.37 |
| | Skill III | 27.59 | 36.79 | 41.39 | 44.06 | 49.41 |
| 0 - 1,000 | Basic | $20.79 | $27.72 | $31.19 | $33.18 | $37.17 |
| | Skill I | 23.19 | 30.92 | 34.79 | 37.02 | 41.49 |
| | Skill II | 25.46 | 33.95 | 38.19 | 40.65 | 45.57 |
| | Skill III | 26.59 | 35.45 | 39.89 | 42.46 | 47.61 |

132

## 2002-2003 WAGE SCHEDULE

*Effective 8:00 a.m., November 23, 2002 to 8:00 a.m. June 28, 2003*

### $1.20 Cargo Penalty

| "Experience" Level (Hours) | Skill Category | 1st Shift | 2nd Shift | 1st & 2nd Shift Overtime | 3rd Shift | 3rd Shift Overtime |
|---|---|---|---|---|---|---|
| 4,000 or more | Basic | $28.88 | $38.51 | $43.32 | $46.09 | $51.62 |
| | Skill I | 31.28 | 41.71 | 46.92 | 49.93 | 55.94 |
| | Skill II | 33.55 | 44.73 | 50.33 | 53.56 | 60.03 |
| | Skill III | 34.68 | 46.24 | 52.02 | 55.37 | 62.06 |
| 2,001 - 4,000 | Basic | $24.14 | $32.19 | $36.21 | $38.50 | $43.09 |
| | Skill I | 26.54 | 35.39 | 39.81 | 42.34 | 47.41 |
| | Skill II | 28.81 | 38.41 | 43.22 | 45.98 | 51.50 |
| | Skill III | 29.94 | 39.92 | 44.91 | 47.78 | 53.53 |
| 1,001 - 2,000 | Basic | $22.14 | $29.52 | $33.21 | $35.30 | $39.49 |
| | Skill I | 24.54 | 32.72 | 36.81 | 39.14 | 43.81 |
| | Skill II | 26.81 | 35.75 | 40.22 | 42.78 | 47.90 |
| | Skill III | 27.94 | 37.25 | 41.91 | 44.58 | 49.93 |
| 0 - 1,000 | Basic | $21.14 | $28.19 | $31.71 | $33.70 | $37.69 |
| | Skill I | 23.54 | 31.39 | 35.31 | 37.54 | 42.01 |
| | Skill II | 25.81 | 34.41 | 38.72 | 41.18 | 46.10 |
| | Skill III | 26.94 | 35.92 | 40.41 | 42.98 | 48.13 |

### Explosives Cargo Penalty

| "Experience" Level (Hours) | Skill Category | 1st Shift | 2nd Shift | 1st & 2nd Shift Overtime | 3rd Shift | 3rd Shift Overtime |
|---|---|---|---|---|---|---|
| 4,000 or more | Basic | $55.36 | $73.81 | $83.04 | $85.81 | $91.34 |
| | Skill I | 57.76 | 77.01 | 86.64 | 89.65 | 95.66 |
| | Skill II | 60.03 | 80.04 | 90.05 | 93.28 | 99.75 |
| | Skill III | 61.16 | 81.55 | 91.74 | 95.09 | 101.78 |
| 2,001 - 4,000 | Basic | $45.88 | $61.17 | $68.82 | $71.11 | $75.70 |
| | Skill I | 48.28 | 64.37 | 72.42 | 74.95 | 80.02 |
| | Skill II | 50.55 | 67.40 | 75.83 | 78.59 | 84.11 |
| | Skill III | 51.68 | 68.91 | 77.52 | 80.39 | 86.14 |
| 1,001 - 2,000 | Basic | $41.88 | $55.84 | $62.82 | $64.91 | $69.10 |
| | Skill I | 44.28 | 59.04 | 66.42 | 68.75 | 73.42 |
| | Skill II | 46.55 | 62.07 | 69.83 | 72.39 | 77.51 |
| | Skill III | 47.68 | 63.57 | 71.52 | 74.19 | 79.54 |
| 0 - 1,000 | Basic | $39.88 | $53.17 | $59.82 | $61.81 | $65.80 |
| | Skill I | 42.28 | 56.37 | 63.42 | 65.65 | 70.12 |
| | Skill II | 44.55 | 59.40 | 66.83 | 69.29 | 74.21 |
| | Skill III | 45.68 | 60.91 | 68.52 | 71.09 | 76.24 |

133

## 2003-2004 WAGE SCHEDULE
*Effective 8:00 a.m., June 28, 2003 to 8:00 a.m. July 3, 2004*

| "Experience" Level (Hours) | Skill Category | 1st Shift | 2nd Shift | 1st & 2nd Shift Overtime | 3rd Shift | 3rd Shift Overtime |
|---|---|---|---|---|---|---|
| **No Cargo Penalty** | | | | | | |
| 4,000 or more | Basic | $28.18 | $37.57 | $42.27 | $45.09 | $50.72 |
| | Skill I | 30.58 | 40.77 | 45.87 | 48.93 | 55.04 |
| | Skill II | 32.85 | 43.80 | 49.28 | 52.56 | 59.13 |
| | Skill III | 33.98 | 45.31 | 50.97 | 54.37 | 61.16 |
| 2,001 - 4,000 | Basic | $23.30 | $31.07 | $34.95 | $37.28 | $41.94 |
| | Skill I | 25.70 | 34.27 | 38.55 | 41.12 | 46.26 |
| | Skill II | 27.97 | 37.29 | 41.96 | 44.76 | 50.35 |
| | Skill III | 29.10 | 38.80 | 43.65 | 46.56 | 52.38 |
| 1,001 - 2,000 | Basic | $21.30 | $28.40 | $31.95 | $34.08 | $38.34 |
| | Skill I | 23.70 | 31.60 | 35.55 | 37.92 | 42.66 |
| | Skill II | 25.97 | 34.63 | 38.96 | 41.55 | 46.75 |
| | Skill III | 27.10 | 36.13 | 40.65 | 43.36 | 48.78 |
| 0 - 1,000 | Basic | $20.30 | $27.07 | $30.45 | $32.48 | $36.54 |
| | Skill I | 22.70 | 30.27 | 34.05 | 36.32 | 40.86 |
| | Skill II | 24.97 | 33.29 | 37.46 | 39.95 | 44.95 |
| | Skill III | 26.10 | 34.80 | 39.15 | 41.76 | 46.98 |
| **15¢ Cargo Penalty** | | | | | | |
| 4,000 or more | Basic | $28.33 | $37.77 | $42.50 | $45.31 | $50.95 |
| | Skill I | 30.73 | 40.97 | 46.10 | 49.15 | 55.27 |
| | Skill II | 33.00 | 44.00 | 49.50 | 52.79 | 59.36 |
| | Skill III | 34.13 | 45.51 | 51.20 | 54.59 | 61.39 |
| 2,001 - 4,000 | Basic | $23.45 | $31.27 | $35.18 | $37.51 | $42.17 |
| | Skill I | 25.85 | 34.47 | 38.78 | 41.35 | 46.49 |
| | Skill II | 28.12 | 37.49 | 42.18 | 44.98 | 50.57 |
| | Skill III | 29.25 | 39.00 | 43.88 | 46.79 | 52.61 |
| 1,001 - 2,000 | Basic | $21.45 | $28.60 | $32.18 | $34.31 | $38.57 |
| | Skill I | 23.85 | 31.80 | 35.78 | 38.15 | 42.89 |
| | Skill II | 26.12 | 34.83 | 39.18 | 41.78 | 46.97 |
| | Skill III | 27.25 | 36.33 | 40.88 | 43.59 | 49.01 |
| 0 - 1,000 | Basic | $20.45 | $27.27 | $30.68 | $32.71 | $36.77 |
| | Skill I | 22.85 | 30.47 | 34.28 | 36.55 | 41.09 |
| | Skill II | 25.12 | 33.49 | 37.68 | 40.18 | 45.17 |
| | Skill III | 26.25 | 35.00 | 39.38 | 41.99 | 47.21 |

134

## 2003-2004 WAGE SCHEDULE
*Effective 8:00 a.m., June 28, 2003 to 8:00 a.m. July 3, 2004*

| "Experience" Level (Hours) | Skill Category | 1st Shift | 2nd Shift | 1st & 2nd Shift Overtime | 3rd Shift | 3rd Shift Overtime |
|---|---|---|---|---|---|---|
| **25¢ Cargo Penalty** | | | | | | |
| 4,000 or more | Basic | $28.43 | $37.91 | $42.65 | $45.46 | $51.10 |
| | Skill I | 30.83 | 41.11 | 46.25 | 49.30 | 55.42 |
| | Skill II | 33.10 | 44.13 | 49.65 | 52.94 | 59.51 |
| | Skill III | 34.23 | 45.64 | 51.35 | 54.74 | 61.54 |
| 2,001 - 4,000 | Basic | $23.55 | $31.40 | $35.33 | $37.66 | $42.32 |
| | Skill I | 25.95 | 34.60 | 38.83 | 41.50 | 46.64 |
| | Skill II | 28.22 | 37.63 | 42.33 | 45.13 | 50.72 |
| | Skill III | 29.35 | 39.13 | 44.03 | 46.94 | 52.76 |
| 1,001 - 2,000 | Basic | $21.55 | $28.73 | $32.33 | $34.46 | $38.72 |
| | Skill I | 23.95 | 31.93 | 35.93 | 38.30 | 43.04 |
| | Skill II | 26.22 | 34.96 | 39.33 | 41.93 | 47.12 |
| | Skill III | 27.35 | 36.47 | 41.03 | 43.74 | 48.16 |
| 0 - 1,000 | Basic | $20.55 | $27.40 | $30.83 | $32.86 | $36.92 |
| | Skill I | 22.95 | 30.60 | 34.43 | 36.70 | 41.24 |
| | Skill II | 25.22 | 33.63 | 37.83 | 40.33 | 45.32 |
| | Skill III | 26.35 | 35.13 | 39.53 | 42.14 | 47.36 |
| **35¢ Cargo Penalty** | | | | | | |
| 4,000 or more | Basic | $28.53 | $38.04 | $42.80 | $45.61 | $51.25 |
| | Skill I | 30.93 | 41.24 | 46.40 | 49.45 | 55.57 |
| | Skill II | 33.20 | 44.27 | 49.80 | 53.09 | 59.66 |
| | Skill III | 34.33 | 45.77 | 51.50 | 54.89 | 61.69 |
| 2,001 - 4,000 | Basic | $23.65 | $31.53 | $35.48 | $37.81 | $42.47 |
| | Skill I | 26.05 | 34.73 | 39.08 | 41.65 | 46.79 |
| | Skill II | 28.32 | 37.76 | 42.48 | 45.28 | 50.87 |
| | Skill III | 29.45 | 39.27 | 44.18 | 47.09 | 52.91 |
| 1,001 - 2,000 | Basic | $21.65 | $28.87 | $32.48 | $34.61 | $38.87 |
| | Skill I | 24.05 | 32.07 | 36.08 | 38.45 | 43.19 |
| | Skill II | 26.32 | 35.09 | 39.48 | 42.08 | 47.27 |
| | Skill III | 27.45 | 36.60 | 41.18 | 43.89 | 49.31 |
| 0 - 1,000 | Basic | $20.65 | $27.53 | $30.98 | $33.01 | $37.07 |
| | Skill I | 23.05 | 30.73 | 34.58 | 36.85 | 41.39 |
| | Skill II | 25.32 | 33.76 | 37.88 | 40.48 | 45.47 |
| | Skill III | 26.45 | 35.27 | 39.68 | 42.29 | 47.51 |

135

## 2003-2004 WAGE SCHEDULE
*Effective 8:00 a.m., June 28, 2003 to 8:00 a.m. July 3, 2004*

### 50¢ Cargo Penalty

| "Experience" Level (Hours) | Skill Category | 1st Shift | 2nd Shift | 1st & 2nd Shift Overtime | 3rd Shift | 3rd Shift Overtime |
|---|---|---|---|---|---|---|
| 4,000 or more | Basic | $28.68 | $38.24 | $43.02 | $45.84 | $51.47 |
| | Skill I | 31.08 | 41.44 | 46.62 | 49.68 | 55.79 |
| | Skill II | 33.35 | 44.47 | 50.03 | 53.31 | 59.88 |
| | Skill III | 34.48 | 45.97 | 51.72 | 55.12 | 61.91 |
| 2,001 - 4,000 | Basic | $23.80 | $31.73 | $35.70 | $38.03 | $42.69 |
| | Skill I | 26.20 | 34.93 | 39.30 | 41.87 | 47.01 |
| | Skill II | 28.47 | 37.96 | 42.71 | 45.50 | 51.10 |
| | Skill III | 29.60 | 39.47 | 44.40 | 47.31 | 53.13 |
| 1,001 - 2,000 | Basic | $21.80 | $29.07 | $32.70 | $34.83 | $39.09 |
| | Skill I | 24.20 | 32.27 | 36.30 | 38.67 | 43.41 |
| | Skill II | 26.47 | 35.29 | 39.71 | 42.30 | 47.50 |
| | Skill III | 27.60 | 36.80 | 41.40 | 44.11 | 49.53 |
| 0 - 1,000 | Basic | $20.80 | $27.73 | $31.20 | $33.23 | $37.29 |
| | Skill I | 23.20 | 30.93 | 34.80 | 37.07 | 41.61 |
| | Skill II | 25.47 | 33.96 | 38.21 | 40.70 | 45.70 |
| | Skill III | 26.60 | 35.47 | 39.90 | 42.51 | 47.73 |

### 85¢ Cargo Penalty

| "Experience" Level (Hours) | Skill Category | 1st Shift | 2nd Shift | 1st & 2nd Shift Overtime | 3rd Shift | 3rd Shift Overtime |
|---|---|---|---|---|---|---|
| 4,000 or more | Basic | $29.03 | $38.71 | $43.55 | $46.36 | $52.00 |
| | Skill I | 31.43 | 41.91 | 47.15 | 50.20 | 56.32 |
| | Skill II | 33.70 | 44.93 | 50.55 | 53.84 | 60.41 |
| | Skill III | 34.83 | 46.44 | 52.25 | 55.64 | 62.44 |
| 2,001 - 4,000 | Basic | $24.15 | $32.20 | $36.23 | $38.56 | $43.22 |
| | Skill I | 26.55 | 35.40 | 39.83 | 42.40 | 47.54 |
| | Skill II | 28.82 | 38.43 | 43.23 | 46.03 | 51.62 |
| | Skill III | 29.95 | 39.93 | 44.93 | 47.84 | 53.66 |
| 1,001 - 2,000 | Basic | $22.15 | $29.53 | $33.23 | $35.36 | $39.62 |
| | Skill I | 24.55 | 32.73 | 36.83 | 39.20 | 43.94 |
| | Skill II | 26.82 | 35.76 | 40.23 | 42.83 | 48.02 |
| | Skill III | 27.95 | 37.27 | 41.93 | 44.64 | 50.06 |
| 0 - 1,000 | Basic | $21.15 | $28.20 | $31.73 | $33.76 | $37.82 |
| | Skill I | 23.55 | 31.40 | 35.33 | 37.60 | 42.14 |
| | Skill II | 25.82 | 34.43 | 38.73 | 41.23 | 46.22 |
| | Skill III | 26.95 | 35.93 | 40.43 | 43.04 | 48.26 |

---

## 2003-2004 WAGE SCHEDULE
*Effective 8:00 a.m., June 28, 2003 to 8:00 a.m. July 3, 2004*

### $1.20 Cargo Penalty

| "Experience" Level (Hours) | Skill Category | 1st Shift | 2nd Shift | 1st & 2nd Shift Overtime | 3rd Shift | 3rd Shift Overtime |
|---|---|---|---|---|---|---|
| 4,000 or more | Basic | $29.38 | $39.17 | $44.07 | $46.89 | $52.52 |
| | Skill I | 31.78 | 42.37 | 47.67 | 50.73 | 56.84 |
| | Skill II | 34.05 | 45.40 | 51.08 | 54.36 | 60.93 |
| | Skill III | 35.18 | 46.91 | 52.77 | 56.17 | 62.96 |
| 2,001 - 4,000 | Basic | $24.50 | $32.67 | $36.75 | $39.08 | $43.74 |
| | Skill I | 26.90 | 35.87 | 40.35 | 42.92 | 48.06 |
| | Skill II | 29.17 | 38.89 | 43.76 | 46.55 | 52.15 |
| | Skill III | 30.30 | 40.40 | 45.45 | 48.36 | 54.18 |
| 1,001 - 2,000 | Basic | $22.50 | $30.00 | $33.75 | $35.88 | $40.14 |
| | Skill I | 24.90 | 33.20 | 37.35 | 39.72 | 44.46 |
| | Skill II | 27.17 | 36.23 | 40.76 | 43.35 | 48.55 |
| | Skill III | 28.30 | 37.73 | 42.45 | 45.16 | 50.58 |
| 0 - 1,000 | Basic | $21.50 | $28.67 | $32.25 | $34.28 | $38.34 |
| | Skill I | 23.90 | 31.87 | 35.85 | 38.12 | 42.66 |
| | Skill II | 26.17 | 34.89 | 39.26 | 41.75 | 46.75 |
| | Skill III | 27.30 | 36.40 | 40.95 | 43.56 | 48.78 |

### Explosives Cargo Penalty

| "Experience" Level (Hours) | Skill Category | 1st Shift | 2nd Shift | 1st & 2nd Shift Overtime | 3rd Shift | 3rd Shift Overtime |
|---|---|---|---|---|---|---|
| 4,000 or more | Basic | $56.36 | $75.15 | $84.54 | $87.36 | $92.99 |
| | Skill I | 58.76 | 78.35 | 88.14 | 91.20 | 97.31 |
| | Skill II | 61.03 | 81.37 | 91.55 | 94.83 | 101.40 |
| | Skill III | 62.16 | 82.88 | 93.24 | 96.64 | 103.43 |
| 2,001 - 4,000 | Basic | $46.60 | $62.13 | $69.90 | $72.23 | $76.89 |
| | Skill I | 49.00 | 65.33 | 73.50 | 76.07 | 81.21 |
| | Skill II | 51.27 | 68.36 | 76.91 | 79.70 | 85.30 |
| | Skill III | 52.40 | 69.87 | 78.60 | 81.51 | 87.33 |
| 1,001 - 2,000 | Basic | $42.60 | $56.80 | $63.90 | $66.03 | $70.29 |
| | Skill I | 45.00 | 60.00 | 67.50 | 69.87 | 74.61 |
| | Skill II | 47.27 | 63.03 | 70.91 | 73.50 | 78.70 |
| | Skill III | 48.40 | 64.53 | 72.60 | 75.31 | 80.73 |
| 0 - 1,000 | Basic | $40.60 | $54.13 | $60.90 | $62.93 | $66.99 |
| | Skill I | 43.00 | 57.33 | 64.50 | 66.77 | 71.31 |
| | Skill II | 45.27 | 60.36 | 67.91 | 70.40 | 75.40 |
| | Skill III | 46.40 | 61.87 | 69.60 | 72.21 | 77.43 |

## 2004-2005 WAGE SCHEDULE
*Effective 8:00 a.m., July 3, 2004 to 8:00 a.m. July 2, 2005*

| "Experience" Level (Hours) | Category | 1st Shift | 2nd Shift | 1st & 2nd Shift Overtime | 3rd Shift | 3rd Shift Overtime |
|---|---|---|---|---|---|---|
| **No Cargo Penalty** | | | | | | |
| 4,000 or more | Basic | $28.68 | $38.24 | $43.02 | $45.89 | $51.62 |
| | Skill I | 31.08 | 41.44 | 46.62 | 49.73 | 55.94 |
| | Skill II | 33.35 | 44.47 | 50.03 | 53.36 | 60.03 |
| | Skill III | 34.48 | 45.97 | 51.72 | 55.17 | 62.06 |
| 2,001 - 4,000 | Basic | $23.66 | $31.55 | $35.49 | $37.86 | $42.59 |
| | Skill I | 26.06 | 34.75 | 39.09 | 41.70 | 46.91 |
| | Skill II | 28.33 | 37.77 | 42.50 | 45.33 | 50.99 |
| | Skill III | 29.46 | 39.28 | 44.19 | 47.14 | 53.03 |
| 1,001 - 2,000 | Basic | $21.66 | $28.88 | $32.49 | $34.66 | $38.99 |
| | Skill I | 24.06 | 32.08 | 36.09 | 38.50 | 43.31 |
| | Skill II | 26.33 | 35.11 | 39.50 | 42.13 | 47.39 |
| | Skill III | 27.46 | 36.61 | 41.19 | 43.94 | 49.43 |
| 0 - 1,000 | Basic | $20.66 | $27.55 | $30.99 | $33.06 | $37.19 |
| | Skill I | 23.06 | 30.75 | 34.59 | 36.90 | 41.51 |
| | Skill II | 25.33 | 33.77 | 38.00 | 40.53 | 45.59 |
| | Skill III | 26.46 | 35.28 | 39.69 | 42.34 | 47.63 |
| **15¢ Cargo Penalty** | | | | | | |
| 4,000 or more | Basic | $28.83 | $38.44 | $43.25 | $46.11 | $51.85 |
| | Skill I | 31.23 | 41.64 | 46.85 | 49.95 | 56.17 |
| | Skill II | 33.50 | 44.67 | 50.25 | 53.59 | 60.26 |
| | Skill III | 34.63 | 46.17 | 51.95 | 55.39 | 62.29 |
| 2,001 - 4,000 | Basic | $23.81 | $31.75 | $35.72 | $38.08 | $42.81 |
| | Skill I | 26.21 | 34.95 | 39.32 | 41.92 | 47.13 |
| | Skill II | 28.48 | 37.97 | 42.72 | 45.55 | 51.22 |
| | Skill III | 29.61 | 39.48 | 44.42 | 47.36 | 53.25 |
| 1,001 - 2,000 | Basic | $21.81 | $29.08 | $32.72 | $34.88 | $39.21 |
| | Skill I | 24.21 | 32.28 | 36.32 | 38.72 | 43.53 |
| | Skill II | 26.48 | 35.31 | 39.72 | 42.35 | 47.62 |
| | Skill III | 27.61 | 36.81 | 41.42 | 44.16 | 49.65 |
| 0 - 1,000 Hours | Basic | $20.81 | $27.75 | $31.22 | $33.28 | $37.41 |
| | Skill I | 23.21 | 30.95 | 34.82 | 37.12 | 41.73 |
| | Skill II | 25.48 | 33.97 | 38.22 | 40.75 | 45.82 |
| | Skill III | 26.61 | 35.48 | 39.92 | 42.56 | 47.85 |

## 2004-2005 WAGE SCHEDULE
*Effective 8:00 a.m., July 3, 2004 to 8:00 a.m. July 2, 2005*

| "Experience" Level (Hours) | Category | 1st Shift | 2nd Shift | 1st & 2nd Shift Overtime | 3rd Shift | 3rd Shift Overtime |
|---|---|---|---|---|---|---|
| **25¢ Cargo Penalty** | | | | | | |
| 4,000 or more | Basic | $28.93 | $38.57 | $43.40 | $46.26 | $52.00 |
| | Skill I | 31.33 | 41.77 | 47.00 | 50.10 | 56.32 |
| | Skill II | 33.60 | 44.80 | 50.40 | 53.74 | 60.41 |
| | Skill III | 34.73 | 46.31 | 52.10 | 55.54 | 62.44 |
| 2,001 - 4,000 | Basic | $23.91 | $31.88 | $35.87 | $38.23 | $42.96 |
| | Skill I | 26.31 | 35.08 | 39.47 | 42.07 | 47.28 |
| | Skill II | 28.58 | 38.11 | 42.87 | 45.70 | 51.37 |
| | Skill III | 29.71 | 39.61 | 44.57 | 47.51 | 53.40 |
| 1,001 - 2,000 | Basic | $21.91 | $29.21 | $32.87 | $35.03 | $39.36 |
| | Skill I | 24.31 | 32.41 | 36.47 | 38.87 | 43.68 |
| | Skill II | 26.58 | 35.44 | 39.87 | 42.50 | 47.77 |
| | Skill III | 27.71 | 36.95 | 41.57 | 44.31 | 49.80 |
| 0 - 1,000 | Basic | $20.91 | $27.88 | $31.31 | $33.43 | $37.56 |
| | Skill I | 23.31 | 31.08 | 34.97 | 37.27 | 41.88 |
| | Skill II | 25.58 | 34.11 | 38.37 | 40.90 | 45.97 |
| | Skill III | 26.71 | 35.61 | 40.07 | 42.71 | 48.00 |
| **35¢ Cargo Penalty** | | | | | | |
| 4,000 or more | Basic | $29.03 | $38.71 | $43.55 | $46.41 | $52.15 |
| | Skill I | 31.43 | 41.91 | 47.15 | 50.25 | 56.47 |
| | Skill II | 33.70 | 44.93 | 50.55 | 53.89 | 60.56 |
| | Skill III | 34.83 | 46.44 | 52.25 | 55.69 | 62.59 |
| 2,001 - 4,000 | Basic | $24.01 | $32.01 | $36.02 | $38.38 | $43.11 |
| | Skill I | 26.41 | 35.21 | 39.62 | 42.22 | 47.43 |
| | Skill II | 28.68 | 38.24 | 43.02 | 45.85 | 51.52 |
| | Skill III | 29.81 | 39.75 | 44.72 | 47.66 | 53.55 |
| 1,001 - 2,000 | Basic | $22.01 | $29.35 | $33.02 | $35.18 | $39.51 |
| | Skill I | 24.41 | 32.55 | 36.62 | 39.02 | 43.83 |
| | Skill II | 26.68 | 35.57 | 40.02 | 42.65 | 47.82 |
| | Skill III | 27.81 | 37.08 | 41.72 | 44.46 | 49.95 |
| 0 - 1,000 | Basic | $21.01 | $28.01 | $31.52 | $33.58 | $37.71 |
| | Skill I | 23.41 | 31.21 | 35.12 | 37.42 | 42.03 |
| | Skill II | 25.68 | 34.24 | 38.52 | 41.05 | 46.12 |
| | Skill III | 26.81 | 35.75 | 40.22 | 42.86 | 48.15 |

## 2004-2005 WAGE SCHEDULE
*Effective 8:00 a.m., July 3, 2004 to 8:00 a.m. July 2, 2005*

| "Experience" Level (Hours) | Skill Category | 1st Shift | 2nd Shift | 1st & 2nd Shift Overtime | 3rd Shift | 3rd Shift Overtime |
|---|---|---|---|---|---|---|
| **50¢ Cargo Penalty** | | | | | | |
| 4,000 or more | Basic | $29.18 | $38.91 | $43.77 | $46.64 | $52.37 |
| | Skill I | 31.58 | 42.11 | 47.37 | 50.48 | 56.69 |
| | Skill II | 33.85 | 45.13 | 50.78 | 54.11 | 61.83 |
| | Skill III | 34.98 | 46.64 | 52.47 | 55.92 | 62.81 |
| 2,001 - 4,000 | Basic | $24.16 | $32.21 | $36.24 | $38.61 | $43.34 |
| | Skill I | 26.56 | 35.41 | 39.84 | 42.45 | 47.66 |
| | Skill II | 28.83 | 38.44 | 43.25 | 46.06 | 51.74 |
| | Skill III | 29.96 | 39.95 | 44.94 | 47.89 | 53.78 |
| 1,001 - 2,000 | Basic | $22.16 | $29.55 | $33.24 | $35.41 | $39.74 |
| | Skill I | 24.56 | 32.75 | 36.84 | 39.25 | 44.06 |
| | Skill II | 26.83 | 35.77 | 40.25 | 42.88 | 48.14 |
| | Skill III | 27.96 | 37.28 | 41.94 | 44.69 | 50.18 |
| 0 - 1,000 | Basic | $21.16 | $28.21 | $31.74 | $33.81 | $37.94 |
| | Skill I | 23.56 | 31.41 | 35.34 | 37.65 | 42.26 |
| | Skill II | 25.83 | 34.44 | 38.75 | 41.28 | 46.34 |
| | Skill III | 26.96 | 35.95 | 40.44 | 43.09 | 48.38 |
| **85¢ Cargo Penalty** | | | | | | |
| 4,000 or more | Basic | $29.53 | $39.37 | $44.30 | $47.16 | $52.90 |
| | Skill I | 31.93 | 42.57 | 47.90 | 51.00 | 57.22 |
| | Skill II | 34.20 | 45.60 | 51.30 | 54.64 | 61.31 |
| | Skill III | 35.33 | 47.11 | 53.00 | 56.44 | 63.34 |
| 2,001 - 4,000 | Basic | $24.51 | $32.68 | $36.77 | $39.13 | $43.86 |
| | Skill I | 26.91 | 35.88 | 40.37 | 42.97 | 48.18 |
| | Skill II | 29.18 | 38.91 | 43.77 | 46.60 | 52.27 |
| | Skill III | 30.31 | 40.41 | 45.47 | 48.41 | 54.30 |
| 1,001 - 2,000 | Basic | $22.51 | $30.01 | $33.77 | $35.93 | $40.26 |
| | Skill I | 24.91 | 33.21 | 37.37 | 39.77 | 44.58 |
| | Skill II | 27.18 | 36.24 | 40.77 | 43.40 | 48.67 |
| | Skill III | 28.31 | 37.75 | 42.47 | 45.21 | 50.70 |
| 0 - 1,000 | Basic | $21.51 | $28.68 | $32.27 | $34.33 | $38.46 |
| | Skill I | 23.91 | 31.88 | 35.87 | 38.17 | 42.78 |
| | Skill II | 26.18 | 34.91 | 39.27 | 41.80 | 46.87 |
| | Skill III | 27.31 | 36.41 | 40.97 | 43.61 | 48.90 |

## 2004-2005 WAGE SCHEDULE
*Effective 8:00 a.m., July 3, 2004 to 8:00 a.m. July 2, 2005*

| "Experience" Level (Hours) | Skill Category | 1st Shift | 2nd Shift | 1st & 2nd Shift Overtime | 3rd Shift | 3rd Shift Overtime |
|---|---|---|---|---|---|---|
| **$1.20 Cargo Penalty** | | | | | | |
| 4,000 or more | Basic | $29.88 | $39.84 | $44.82 | $47.69 | $53.42 |
| | Skill I | 32.28 | 43.04 | 48.42 | 51.53 | 57.74 |
| | Skill II | 34.55 | 46.07 | 51.83 | 55.16 | 61.83 |
| | Skill III | 35.68 | 47.57 | 53.52 | 56.97 | 63.86 |
| 2,001 - 4,000 | Basic | $24.86 | $33.15 | $37.29 | $39.66 | $44.39 |
| | Skill I | 27.26 | 36.35 | 40.89 | 43.50 | 48.71 |
| | Skill II | 29.53 | 39.37 | 44.30 | 47.13 | 52.79 |
| | Skill III | 30.66 | 40.88 | 45.99 | 48.94 | 54.83 |
| 1,001 - 2,000 | Basic | $22.86 | $30.48 | $34.29 | $36.46 | $40.79 |
| | Skill I | 25.26 | 33.68 | 37.89 | 40.30 | 45.11 |
| | Skill II | 27.53 | 36.71 | 41.30 | 43.93 | 49.19 |
| | Skill III | 28.66 | 38.21 | 42.99 | 45.74 | 51.23 |
| 0 - 1,000 | Basic | $21.86 | $29.15 | $32.79 | $34.86 | $38.99 |
| | Skill I | 24.26 | 32.35 | 36.39 | 38.70 | 43.31 |
| | Skill II | 26.53 | 35.37 | 39.80 | 42.33 | 47.39 |
| | Skill III | 27.66 | 36.88 | 41.49 | 44.14 | 48.43 |
| **Explosives Cargo Penalty** | | | | | | |
| 4,000 or more | Basic | $57.53 | $76.48 | $86.04 | $88.91 | $94.64 |
| | Skill I | 59.76 | 79.68 | 89.64 | 92.75 | 98.96 |
| | Skill II | 62.03 | 82.71 | 93.05 | 96.38 | 103.05 |
| | Skill III | 63.16 | 84.21 | 94.74 | 98.19 | 105.08 |
| 2,001 - 4,000 | Basic | $47.32 | $63.09 | $70.98 | $73.35 | $78.06 |
| | Skill I | 49.72 | 66.29 | 74.58 | 77.19 | 82.40 |
| | Skill II | 51.99 | 69.32 | 77.99 | 80.82 | 86.48 |
| | Skill III | 53.12 | 70.83 | 79.68 | 82.63 | 88.52 |
| 1,001 - 2,000 | Basic | $43.32 | $57.76 | $64.98 | $67.15 | $71.48 |
| | Skill I | 45.72 | 60.96 | 68.58 | 70.99 | 75.80 |
| | Skill II | 47.99 | 63.99 | 71.99 | 74.62 | 79.88 |
| | Skill III | 49.12 | 65.49 | 73.68 | 76.43 | 81.92 |
| 0 - 1,000 | Basic | $41.32 | $55.09 | $61.98 | $64.05 | $68.18 |
| | Skill I | 43.72 | 58.29 | 65.58 | 67.89 | 72.50 |
| | Skill II | 45.99 | 61.32 | 69.99 | 71.52 | 76.58 |
| | Skill III | 47.12 | 62.83 | 70.68 | 73.33 | 78.62 |

## 2005-2006 WAGE SCHEDULE
*Effective 8:00 a.m., July 2, 2005 to 8:00 a.m. July 1, 2006*

**No Cargo Penalty**

| "Experience" Level (Hours) | Skill Category | 1st Shift | 2nd Shift | 1st & 2nd Shift Overtime | 3rd Shift | 3rd Shift Overtime |
|---|---|---|---|---|---|---|
| 4,000 or more | Basic | 29.68 | 39.57 | $44.52 | $47.49 | $53.42 |
| | Skill I | 32.08 | 42.77 | 48.12 | 51.33 | 57.74 |
| | Skill II | 34.35 | 45.80 | 51.53 | 54.96 | 61.83 |
| | Skill III | 35.48 | 47.31 | 53.22 | 56.77 | 63.86 |
| 2,001 - 4,000 | Basic | 24.39 | 32.52 | $36.59 | $39.02 | $43.90 |
| | Skill I | 26.79 | 35.72 | 40.19 | 42.86 | 48.22 |
| | Skill II | 29.06 | 38.75 | 43.59 | 46.50 | 52.31 |
| | Skill III | 30.19 | 40.25 | 45.29 | 48.30 | 54.34 |
| 1,001 - 2,000 | Basic | 22.39 | 29.85 | $33.59 | $35.82 | $40.30 |
| | Skill I | 24.79 | 33.05 | 37.19 | 39.66 | 44.62 |
| | Skill II | 27.06 | 36.08 | 40.59 | 43.30 | 48.71 |
| | Skill III | 28.19 | 37.59 | 42.29 | 45.10 | 50.74 |
| 0 - 1,000 | Basic | 21.39 | 28.52 | $32.09 | $34.22 | $38.50 |
| | Skill I | 23.79 | 31.72 | 35.69 | 38.06 | 42.82 |
| | Skill II | 26.06 | 34.75 | 39.09 | 41.70 | 46.91 |
| | Skill III | 27.19 | 36.25 | 40.79 | 43.50 | 48.94 |

**15¢ Cargo Penalty**

| "Experience" Level (Hours) | Skill Category | 1st Shift | 2nd Shift | 1st & 2nd Shift Overtime | 3rd Shift | 3rd Shift Overtime |
|---|---|---|---|---|---|---|
| 4,000 or more | Basic | 29.83 | 39.77 | $44.75 | $47.71 | $53.65 |
| | Skill I | 32.23 | 42.97 | 48.35 | 51.55 | 57.97 |
| | Skill II | 34.50 | 46.00 | 51.75 | 55.19 | 62.06 |
| | Skill III | 35.63 | 47.51 | 53.45 | 56.99 | 64.09 |
| 2,001 - 4,000 | Basic | 24.54 | 32.72 | $36.81 | $39.25 | $44.13 |
| | Skill I | 26.94 | 35.92 | 40.41 | 43.09 | 48.45 |
| | Skill II | 29.21 | 38.95 | 43.82 | 46.72 | 52.53 |
| | Skill III | 30.34 | 40.45 | 45.51 | 48.53 | 54.57 |
| 1,001 - 2,000 | Basic | 22.54 | 30.05 | $33.81 | $36.05 | $40.53 |
| | Skill I | 24.94 | 33.25 | 37.41 | 39.89 | 44.85 |
| | Skill II | 27.21 | 36.28 | 40.82 | 43.52 | 48.93 |
| | Skill III | 28.34 | 37.79 | 42.51 | 45.33 | 50.97 |
| 0 - 1,000 | Basic | 21.54 | 28.72 | $32.31 | $34.45 | $38.73 |
| | Skill I | 23.94 | 31.92 | 35.91 | 38.29 | 43.05 |
| | Skill II | 26.21 | 34.95 | 39.32 | 41.92 | 47.13 |
| | Skill III | 27.34 | 36.45 | 41.01 | 43.73 | 49.17 |

142

## 2005-2006 WAGE SCHEDULE
*Effective 8:00 a.m., July 2, 2005 to 8:00 a.m. July 1, 2006*

**25¢ Cargo Penalty**

| "Experience" Level (Hours) | Skill Category | 1st Shift | 2nd Shift | 1st & 2nd Shift Overtime | 3rd Shift | 3rd Shift Overtime |
|---|---|---|---|---|---|---|
| 4,000 or more | Basic | 29.93 | 39.91 | $44.90 | $47.86 | $53.80 |
| | Skill I | 32.33 | 43.11 | 48.50 | 51.70 | 58.12 |
| | Skill II | 34.60 | 46.13 | 51.90 | 55.34 | 62.21 |
| | Skill III | 35.73 | 47.64 | 53.60 | 57.14 | 64.24 |
| 2,001 - 4,000 | Basic | 24.64 | 32.85 | $36.96 | $39.40 | $44.28 |
| | Skill I | 27.04 | 36.05 | 40.56 | 43.24 | 48.60 |
| | Skill II | 29.31 | 39.08 | 43.97 | 46.87 | 52.68 |
| | Skill III | 30.44 | 40.59 | 45.66 | 48.66 | 54.72 |
| 1,001 - 2,000 | Basic | 22.64 | 30.19 | $33.96 | $36.20 | $40.68 |
| | Skill I | 25.04 | 33.39 | 37.56 | 40.04 | 45.00 |
| | Skill II | 27.31 | 36.41 | 40.97 | 43.67 | 49.08 |
| | Skill III | 28.44 | 37.92 | 42.66 | 45.48 | 51.12 |
| 0 - 1,000 | Basic | 21.64 | 28.85 | $32.46 | $34.60 | $38.88 |
| | Skill I | 24.04 | 32.05 | 36.06 | 38.44 | 43.20 |
| | Skill II | 26.31 | 35.08 | 39.47 | 42.07 | 47.28 |
| | Skill III | 27.44 | 36.59 | 41.16 | 43.88 | 49.32 |

**35¢ Cargo Penalty**

| "Experience" Level (Hours) | Skill Category | 1st Shift | 2nd Shift | 1st & 2nd Shift Overtime | 3rd Shift | 3rd Shift Overtime |
|---|---|---|---|---|---|---|
| 4,000 or more | Basic | 30.03 | 40.04 | $45.05 | $48.01 | $53.95 |
| | Skill I | 32.43 | 43.24 | 48.65 | 51.85 | 58.27 |
| | Skill II | 34.70 | 46.27 | 52.05 | 55.49 | 62.36 |
| | Skill III | 35.83 | 47.77 | 53.75 | 57.29 | 64.39 |
| 2,001 - 4,000 | Basic | 24.74 | 32.99 | $37.11 | $39.55 | $44.43 |
| | Skill I | 27.14 | 36.19 | 40.71 | 43.39 | 48.75 |
| | Skill II | 29.41 | 39.21 | 44.12 | 47.02 | 52.83 |
| | Skill III | 30.54 | 40.72 | 45.81 | 48.83 | 54.87 |
| 1,001 - 2,000 | Basic | 22.74 | 30.32 | $34.11 | $36.35 | $40.83 |
| | Skill I | 25.14 | 33.52 | 37.71 | 40.19 | 45.15 |
| | Skill II | 27.41 | 36.55 | 41.12 | 43.82 | 49.23 |
| | Skill III | 28.54 | 38.05 | 42.81 | 45.63 | 51.27 |
| 0 - 1,000 | Basic | 21.74 | 28.99 | $32.61 | $34.75 | $39.03 |
| | Skill I | 24.14 | 32.19 | 36.21 | 38.59 | 43.35 |
| | Skill II | 26.41 | 35.21 | 39.62 | 42.22 | 47.43 |
| | Skill III | 27.54 | 36.72 | 41.31 | 44.03 | 49.47 |

143

## 2005-2006 WAGE SCHEDULE
*Effective 8:00 a.m., July 2, 2005 to 8:00 a.m. July 1, 2006*

| "Experience" Level (Hours) | Skill Category | 1st Shift | 2nd Shift | 1st & 2nd Shift Overtime | 3rd Shift | 3rd Shift Overtime |
|---|---|---|---|---|---|---|
| **50¢ Cargo Penalty** | | | | | | |
| 4,000 or more | Basic | $30.18 | $40.24 | $45.27 | $48.24 | $54.17 |
| | Skill I | 32.58 | 43.44 | 48.87 | 52.08 | 58.49 |
| | Skill II | 34.85 | 46.47 | 52.28 | 55.71 | 62.58 |
| | Skill III | 35.88 | 47.97 | 53.97 | 57.52 | 64.61 |
| 2,001 - 4,000 | Basic | $24.89 | $33.19 | $37.34 | $39.77 | $44.65 |
| | Skill I | 27.29 | 36.39 | 40.94 | 43.61 | 48.97 |
| | Skill II | 29.56 | 39.41 | 44.34 | 47.25 | 53.06 |
| | Skill III | 30.69 | 40.92 | 46.04 | 49.05 | 55.09 |
| 1,001 - 2,000 | Basic | $22.89 | $30.52 | $34.34 | $36.57 | $41.05 |
| | Skill I | 25.29 | 33.72 | 37.94 | 40.41 | 45.37 |
| | Skill II | 27.56 | 36.75 | 41.34 | 44.05 | 49.46 |
| | Skill III | 28.69 | 38.25 | 43.04 | 45.85 | 51.49 |
| 0 - 1,000 | Basic | $21.89 | $29.19 | $32.84 | $34.97 | $39.25 |
| | Skill I | 24.29 | 32.39 | 36.44 | 38.81 | 43.57 |
| | Skill II | 26.56 | 35.41 | 39.84 | 42.45 | 47.66 |
| | Skill III | 27.69 | 36.92 | 41.54 | 44.25 | 49.69 |
| **85¢ Cargo Penalty** | | | | | | |
| 4,000 or more | Basic | $30.53 | $40.71 | $45.80 | $48.76 | $54.70 |
| | Skill I | 32.93 | 43.91 | 49.40 | 52.60 | 59.02 |
| | Skill II | 35.20 | 46.93 | 52.80 | 56.24 | 63.11 |
| | Skill III | 36.33 | 48.44 | 54.50 | 58.04 | 65.14 |
| 2,001 - 4,000 | Basic | $25.24 | $33.65 | $37.86 | $40.30 | $45.18 |
| | Skill I | 27.64 | 36.85 | 41.46 | 44.14 | 49.50 |
| | Skill II | 29.91 | 39.88 | 44.87 | 47.77 | 53.58 |
| | Skill III | 31.04 | 41.39 | 46.56 | 49.58 | 55.62 |
| 1,001 - 2,000 | Basic | $23.24 | $30.99 | $34.88 | $37.10 | $41.58 |
| | Skill I | 25.64 | 34.19 | 38.46 | 40.94 | 45.90 |
| | Skill II | 27.91 | 37.21 | 41.87 | 44.57 | 49.98 |
| | Skill III | 29.04 | 38.72 | 43.56 | 46.38 | 52.02 |
| 0 - 1,000 | Basic | $22.24 | $29.65 | $33.38 | $35.50 | $39.78 |
| | Skill I | 24.64 | 32.85 | 36.96 | 39.34 | 44.10 |
| | Skill II | 26.91 | 35.88 | 40.37 | 42.97 | 48.18 |
| | Skill III | 28.04 | 37.39 | 42.06 | 44.78 | 50.22 |

## 2005-2006 WAGE SCHEDULE
*Effective 8:00 a.m., July 2, 2005 to 8:00 a.m. July 1, 2006*

| "Experience" Level (Hours) | Skill Category | 1st Shift | 2nd Shift | 1st & 2nd Shift Overtime | 3rd Shift | 3rd Shift Overtime |
|---|---|---|---|---|---|---|
| **$1.20 Cargo Penalty** | | | | | | |
| 4,000 or more | Basic | $30.88 | $41.17 | $46.32 | $49.29 | $55.22 |
| | Skill I | 33.28 | 44.37 | 49.92 | 53.13 | 59.54 |
| | Skill II | 35.55 | 47.40 | 53.33 | 56.76 | 63.63 |
| | Skill III | 36.68 | 48.91 | 55.02 | 58.57 | 66.66 |
| 2,001 - 4,000 | Basic | $25.59 | $34.12 | $38.39 | $40.82 | $45.70 |
| | Skill I | 27.99 | 37.32 | 41.99 | 44.66 | 50.02 |
| | Skill II | 30.26 | 40.35 | 45.39 | 48.30 | 54.11 |
| | Skill III | 31.39 | 41.85 | 47.09 | 50.10 | 56.14 |
| 1,001 - 2,000 | Basic | $23.59 | $31.45 | $35.39 | $37.62 | $42.10 |
| | Skill I | 25.99 | 34.65 | 38.99 | 41.46 | 46.42 |
| | Skill II | 28.26 | 37.68 | 42.39 | 45.10 | 50.51 |
| | Skill III | 29.39 | 39.19 | 44.09 | 46.90 | 52.54 |
| 0 - 1,000 | Basic | $22.59 | $30.12 | $33.89 | $36.02 | $40.30 |
| | Skill I | 24.99 | 33.32 | 37.49 | 39.86 | 44.62 |
| | Skill II | 27.26 | 36.35 | 40.89 | 43.50 | 48.71 |
| | Skill III | 28.39 | 37.85 | 42.59 | 45.30 | 50.74 |
| **Explosives Cargo Penalty** | | | | | | |
| 4,000 or more | Basic | $59.36 | $79.15 | $89.04 | $92.01 | $97.94 |
| | Skill I | 61.76 | 82.35 | 92.64 | 95.85 | 102.26 |
| | Skill II | 64.03 | 85.37 | 96.05 | 99.48 | 106.35 |
| | Skill III | 65.16 | 86.88 | 97.74 | 101.29 | 108.38 |
| 2,001 - 4,000 | Basic | $48.78 | $65.04 | $73.17 | $75.61 | $80.49 |
| | Skill I | 51.18 | 68.24 | 76.77 | 79.45 | 84.81 |
| | Skill II | 53.45 | 71.27 | 80.18 | 83.08 | 88.89 |
| | Skill III | 54.58 | 72.77 | 81.87 | 84.89 | 90.93 |
| 1,001 - 2,000 | Basic | $44.78 | $59.71 | $67.17 | $69.41 | $73.89 |
| | Skill I | 47.18 | 62.91 | 70.77 | 73.25 | 78.21 |
| | Skill II | 49.45 | 65.93 | 74.18 | 76.88 | 82.29 |
| | Skill III | 50.58 | 67.44 | 75.87 | 78.69 | 84.33 |
| 0 - 1,000 | Basic | $42.78 | $57.04 | $64.17 | $66.31 | $70.59 |
| | Skill I | 45.18 | 60.24 | 67.77 | 70.15 | 74.91 |
| | Skill II | 47.45 | 63.27 | 71.18 | 73.78 | 78.99 |
| | Skill III | 48.58 | 64.77 | 72.87 | 75.59 | 81.03 |

## 2006-2007 WAGE SCHEDULE

*Effective 8:00 a.m., July 1, 2006 to 8:00 a.m. June 30, 2007*

| "Experience" Level (hours) | Skill Category | 1st Shift | 2nd Shift | 1st & 2nd Shift Overtime | 3rd Shift | 3rd Shift Overtime |
|---|---|---|---|---|---|---|
| **No Cargo Penalty** | | | | | | |
| 4,000 or more | Basic | $30.18 | $40.24 | $45.27 | $48.29 | $54.32 |
| | Skill I | 32.58 | 43.44 | 48.87 | 52.13 | 58.64 |
| | Skill II | 34.85 | 46.47 | 52.28 | 55.76 | 62.73 |
| | Skill III | 35.98 | 47.97 | 53.97 | 57.57 | 64.76 |
| 2,001 - 4,000 | Basic | $24.75 | $33.00 | $37.13 | $39.60 | $44.55 |
| | Skill I | 27.15 | 36.20 | 40.73 | 43.44 | 48.87 |
| | Skill II | 29.42 | 39.23 | 44.13 | 47.07 | 52.96 |
| | Skill III | 30.55 | 40.73 | 45.83 | 48.88 | 54.99 |
| 1,001 - 2,000 | Basic | $22.75 | $30.33 | $34.13 | $36.40 | $40.95 |
| | Skill I | 25.15 | 33.53 | 37.73 | 40.24 | 45.27 |
| | Skill II | 27.42 | 36.56 | 41.13 | 43.87 | 49.36 |
| | Skill III | 28.55 | 38.07 | 42.83 | 45.68 | 51.39 |
| 0 - 1,000 | Basic | $21.75 | $29.00 | $32.63 | $34.80 | $39.15 |
| | Skill I | 24.15 | 32.20 | 36.23 | 38.64 | 43.47 |
| | Skill II | 26.42 | 35.23 | 39.63 | 42.27 | 47.56 |
| | Skill III | 27.55 | 36.73 | 41.33 | 44.08 | 49.59 |
| **15¢ Cargo Penalty** | | | | | | |
| 4,000 or more | Basic | $30.33 | $40.44 | $45.50 | $48.51 | $54.55 |
| | Skill I | 32.73 | 43.64 | 49.10 | 52.35 | 58.87 |
| | Skill II | 35.00 | 46.67 | 52.50 | 55.99 | 62.96 |
| | Skill III | 36.13 | 48.17 | 54.20 | 57.79 | 64.99 |
| 2,001 - 4,000 | Basic | $24.90 | $33.20 | $37.35 | $39.83 | $44.78 |
| | Skill I | 27.30 | 36.40 | 40.95 | 43.67 | 49.10 |
| | Skill II | 29.57 | 39.43 | 44.36 | 47.30 | 53.18 |
| | Skill III | 30.70 | 40.93 | 46.05 | 49.11 | 55.22 |
| 1,001 - 2,000 | Basic | $22.90 | $30.53 | $34.35 | $36.63 | $41.18 |
| | Skill I | 25.30 | 33.73 | 37.95 | 40.47 | 45.50 |
| | Skill II | 27.57 | 36.76 | 41.36 | 44.10 | 49.58 |
| | Skill III | 28.70 | 38.27 | 43.05 | 45.91 | 51.62 |
| 0 - 1,000 | Basic | $21.90 | $29.20 | $32.85 | $35.03 | $39.38 |
| | Skill I | 24.30 | 32.40 | 36.45 | 38.87 | 43.70 |
| | Skill II | 26.57 | 35.43 | 39.86 | 42.50 | 47.78 |
| | Skill III | 27.70 | 36.93 | 41.55 | 44.31 | 49.82 |

146

## 2006-2007 WAGE SCHEDULE

*Effective 8:00 a.m., July 1, 2006 to 8:00 a.m. June 30, 2007*

| "Experience" Level (hours) | Skill Category | 1st Shift | 2nd Shift | 1st & 2nd Shift Overtime | 3rd Shift | 3rd Shift Overtime |
|---|---|---|---|---|---|---|
| **25¢ Cargo Penalty** | | | | | | |
| 4,000 or more | Basic | $30.43 | $40.57 | $45.65 | $48.66 | $54.70 |
| | Skill I | 32.83 | 43.77 | 49.25 | 52.50 | 59.02 |
| | Skill II | 35.10 | 46.80 | 52.65 | 56.14 | 63.11 |
| | Skill III | 36.23 | 48.31 | 54.35 | 57.94 | 65.14 |
| 2,001 - 4,000 | Basic | $25.00 | $33.33 | $37.50 | $39.98 | $44.93 |
| | Skill I | 27.40 | 36.53 | 41.10 | 43.82 | 49.25 |
| | Skill II | 29.67 | 39.56 | 44.51 | 47.45 | 53.33 |
| | Skill III | 30.80 | 41.07 | 46.20 | 49.26 | 55.37 |
| 1,001 - 2,000 | Basic | $23.00 | $30.67 | $34.50 | $36.78 | $41.33 |
| | Skill I | 25.40 | 33.87 | 38.10 | 40.62 | 45.65 |
| | Skill II | 27.67 | 36.89 | 41.51 | 44.25 | 49.73 |
| | Skill III | 28.80 | 38.40 | 43.20 | 46.06 | 51.77 |
| 0 - 1,000 | Basic | $22.00 | $29.33 | $33.00 | $35.18 | $39.53 |
| | Skill I | 24.40 | 32.53 | 36.60 | 39.02 | 43.85 |
| | Skill II | 26.67 | 35.56 | 40.01 | 42.65 | 47.93 |
| | Skill III | 27.80 | 37.07 | 41.70 | 44.46 | 49.97 |
| **35¢ Cargo Penalty** | | | | | | |
| 4,000 or more | Basic | $30.53 | $40.71 | $45.80 | $48.81 | $54.85 |
| | Skill I | 32.93 | 43.91 | 49.40 | 52.65 | 59.17 |
| | Skill II | 35.20 | 46.93 | 52.80 | 56.29 | 63.26 |
| | Skill III | 36.33 | 48.44 | 54.50 | 58.09 | 65.29 |
| 2,001 - 4,000 | Basic | $25.10 | $33.47 | $37.65 | $40.13 | $45.08 |
| | Skill I | 27.50 | 36.67 | 41.25 | 43.97 | 49.40 |
| | Skill II | 29.77 | 39.69 | 44.66 | 47.60 | 53.48 |
| | Skill III | 30.90 | 41.20 | 46.35 | 49.41 | 55.52 |
| 1,001 - 2,000 | Basic | $23.10 | $30.80 | $34.65 | $36.93 | $41.48 |
| | Skill I | 25.50 | 34.00 | 38.25 | 40.77 | 45.80 |
| | Skill II | 27.77 | 37.03 | 41.66 | 44.40 | 49.88 |
| | Skill III | 28.90 | 38.53 | 43.35 | 46.21 | 51.92 |
| 0 - 1,000 | Basic | $22.10 | $29.47 | $33.15 | $35.33 | $39.68 |
| | Skill I | 24.50 | 32.67 | 36.75 | 39.17 | 44.00 |
| | Skill II | 26.77 | 35.69 | 40.16 | 42.80 | 48.08 |
| | Skill III | 27.90 | 37.20 | 41.85 | 44.61 | 50.12 |

147

## 2006-2007 WAGE SCHEDULE
Effective 8:00 a.m., July 1, 2006 to 8:00 a.m. June 30, 2007

| "Experience" Level (hours) | Skill Category | 1st Shift | 2nd Shift | 1st & 2nd Shift Overtime | 3rd Shift | 3rd Shift Overtime |
|---|---|---|---|---|---|---|
| **50¢ Cargo Penalty** | | | | | | |
| 4,000 or more | Basic | $30.68 | $40.91 | $46.02 | $49.04 | $55.07 |
| | Skill I | 33.08 | 44.11 | 49.62 | 52.88 | 59.39 |
| | Skill II | 35.35 | 47.13 | 53.03 | 56.51 | 63.48 |
| | Skill III | 36.48 | 48.64 | 54.72 | 58.32 | 65.51 |
| 2,001 - 4,000 | Basic | $25.25 | $33.67 | $37.88 | $40.35 | $45.30 |
| | Skill I | 27.65 | 36.87 | 41.48 | 44.19 | 49.62 |
| | Skill II | 29.92 | 39.89 | 44.88 | 47.82 | 53.71 |
| | Skill III | 31.05 | 41.40 | 46.58 | 49.63 | 55.74 |
| 1,001 - 2,000 | Basic | $23.25 | $31.00 | $34.88 | $37.15 | $41.70 |
| | Skill I | 25.65 | 34.20 | 38.48 | 40.99 | 46.02 |
| | Skill II | 27.92 | 37.23 | 41.88 | 44.62 | 50.11 |
| | Skill III | 29.05 | 38.73 | 43.58 | 46.43 | 52.14 |
| 0 - 1,000 | Basic | $22.25 | $29.67 | $33.38 | $35.55 | $39.90 |
| | Skill I | 24.65 | 32.87 | 36.98 | 39.39 | 44.22 |
| | Skill II | 26.92 | 35.89 | 40.38 | 43.02 | 48.31 |
| | Skill III | 28.05 | 37.40 | 42.08 | 44.83 | 50.34 |
| **85¢ Cargo Penalty** | | | | | | |
| 4,000 or more | Basic | $31.03 | $41.37 | $46.55 | $49.56 | $55.60 |
| | Skill I | 33.43 | 44.57 | 50.15 | 53.40 | 59.92 |
| | Skill II | 35.70 | 47.60 | 53.55 | 57.04 | 64.01 |
| | Skill III | 36.83 | 49.11 | 55.25 | 58.84 | 66.04 |
| 2,001 - 4,000 | Basic | $25.60 | $34.13 | $38.40 | $40.88 | $45.83 |
| | Skill I | 28.00 | 37.33 | 42.00 | 44.72 | 50.15 |
| | Skill II | 30.27 | 40.36 | 45.41 | 48.35 | 54.23 |
| | Skill III | 31.40 | 41.87 | 47.10 | 50.16 | 56.27 |
| 1,001 - 2,000 | Basic | $23.60 | $31.47 | $35.40 | $37.68 | $42.23 |
| | Skill I | 26.00 | 34.67 | 39.00 | 41.52 | 46.55 |
| | Skill II | 28.27 | 37.69 | 42.41 | 45.15 | 50.63 |
| | Skill III | 29.40 | 39.20 | 44.10 | 46.96 | 52.67 |
| 0 - 1,000 | Basic | $22.60 | $30.13 | $33.90 | $36.08 | $40.43 |
| | Skill I | 25.00 | 33.33 | 37.50 | 39.92 | 44.75 |
| | Skill II | 27.27 | 36.36 | 40.91 | 43.55 | 48.83 |
| | Skill III | 28.40 | 37.87 | 42.60 | 45.36 | 50.87 |

## 2006-2007 WAGE SCHEDULE
Effective 8:00 a.m., July 1, 2006 to 8:00 a.m. June 30, 2007

| "Experience" Level (hours) | Skill Category | 1st Shift | 2nd Shift | 1st & 2nd Shift Overtime | 3rd Shift | 3rd Shift Overtime |
|---|---|---|---|---|---|---|
| **$1.20 Cargo Penalty** | | | | | | |
| 4,000 or more | Basic | $31.38 | $41.84 | $47.07 | $50.09 | $56.12 |
| | Skill I | 33.78 | 45.04 | 50.67 | 53.93 | 60.44 |
| | Skill II | 36.05 | 48.07 | 54.08 | 57.56 | 64.53 |
| | Skill III | 37.18 | 49.57 | 55.77 | 59.37 | 66.56 |
| 2,001 - 4,000 | Basic | $25.95 | $34.60 | $38.93 | $41.40 | $46.35 |
| | Skill I | 28.35 | 37.80 | 42.53 | 45.24 | 50.67 |
| | Skill II | 30.62 | 40.83 | 45.93 | 48.81 | 54.76 |
| | Skill III | 31.75 | 42.33 | 47.63 | 50.68 | 56.79 |
| 1,001 - 2,000 | Basic | $23.95 | $31.93 | $35.93 | $38.20 | $42.75 |
| | Skill I | 26.35 | 35.13 | 39.53 | 42.04 | 47.07 |
| | Skill II | 28.62 | 38.16 | 42.93 | 45.67 | 51.16 |
| | Skill III | 29.75 | 39.67 | 44.63 | 47.48 | 53.19 |
| 0 - 1,000 | Basic | $22.95 | $30.60 | $34.43 | $36.60 | $40.95 |
| | Skill I | 25.35 | 33.80 | 38.03 | 40.44 | 45.27 |
| | Skill II | 27.62 | 36.83 | 41.43 | 44.07 | 49.36 |
| | Skill III | 28.75 | 38.33 | 43.13 | 45.88 | 51.39 |
| **Explosives Cargo Penalty** | | | | | | |
| 4,000 or more | Basic | $60.54 | $80.48 | $90.54 | $93.56 | $99.59 |
| | Skill I | 62.76 | 83.66 | 94.14 | 97.40 | 103.91 |
| | Skill II | 65.03 | 86.71 | 97.55 | 101.03 | 108.00 |
| | Skill III | 66.16 | 88.21 | 99.24 | 102.84 | 110.03 |
| 2,001 - 4,000 | Basic | $49.50 | $66.00 | $74.25 | $76.73 | $81.68 |
| | Skill I | 51.90 | 69.20 | 77.85 | 80.57 | 86.00 |
| | Skill II | 54.17 | 72.23 | 81.26 | 84.20 | 90.08 |
| | Skill III | 55.30 | 73.73 | 82.95 | 86.01 | 92.12 |
| 1,001 - 2,000 | Basic | $45.50 | $60.67 | $68.25 | $70.53 | $75.08 |
| | Skill I | 47.90 | 63.87 | 71.85 | 74.37 | 79.40 |
| | Skill II | 50.17 | 66.89 | 75.28 | 78.00 | 83.48 |
| | Skill III | 51.30 | 68.40 | 76.96 | 79.81 | 85.52 |
| 0 - 1,000 | Basic | $43.50 | $58.00 | $65.25 | $67.43 | $71.78 |
| | Skill I | 45.90 | 61.20 | 68.85 | 71.27 | 76.10 |
| | Skill II | 48.17 | 64.23 | 72.26 | 74.90 | 80.18 |
| | Skill III | 49.30 | 65.73 | 73.95 | 76.71 | 82.22 |

## 2007-2008 WAGE SCHEDULE
*Effective 8:00 a.m. June 30, 2007*

**No Cargo Penalty**

| "Experience" Level (Hours) | Skill Category | 1st Shift | 2nd Shift | 1st & 2nd Shift Overtime | 3rd Shift | 3rd Shift Overtime |
|---|---|---|---|---|---|---|
| 4,000 or more | Basic | $30.68 | $40.91 | $46.02 | $49.09 | $55.22 |
| | Skill I | 33.08 | 44.11 | 49.62 | 52.93 | 59.54 |
| | Skill II | 35.35 | 47.13 | 53.03 | 56.56 | 63.63 |
| | Skill III | 36.48 | 48.64 | 54.72 | 58.37 | 65.66 |
| 2,001 - 4,000 | Basic | $25.11 | $33.48 | $37.67 | $40.18 | $45.20 |
| | Skill I | 27.51 | 36.68 | 41.27 | 44.02 | 49.52 |
| | Skill II | 29.78 | 39.71 | 44.67 | 47.65 | 53.60 |
| | Skill III | 30.91 | 41.21 | 46.37 | 49.46 | 55.64 |
| 1,001 - 2,000 | Basic | $23.11 | $30.81 | $34.67 | $36.98 | $41.60 |
| | Skill I | 25.51 | 34.01 | 38.27 | 40.82 | 45.92 |
| | Skill II | 27.78 | 37.04 | 41.67 | 44.45 | 50.00 |
| | Skill III | 28.91 | 38.55 | 43.37 | 46.26 | 52.04 |
| 0 - 1,000 | Basic | $22.11 | $29.48 | $33.17 | $35.38 | $39.80 |
| | Skill I | 24.51 | 32.68 | 36.77 | 39.28 | 44.12 |
| | Skill II | 26.78 | 35.71 | 40.17 | 42.85 | 48.20 |
| | Skill III | 27.91 | 37.21 | 41.87 | 44.66 | 50.24 |

**15¢ Cargo Penalty**

| "Experience" Level (Hours) | Skill Category | 1st Shift | 2nd Shift | 1st & 2nd Shift Overtime | 3rd Shift | 3rd Shift Overtime |
|---|---|---|---|---|---|---|
| 4,000 or more | Basic | $30.83 | $41.11 | $46.25 | $49.31 | $55.45 |
| | Skill I | 33.23 | 44.31 | 49.85 | 53.15 | 59.77 |
| | Skill II | 35.50 | 47.33 | 53.25 | 56.79 | 63.86 |
| | Skill III | 36.63 | 48.84 | 54.95 | 58.59 | 65.89 |
| 2,001 - 4,000 | Basic | $25.26 | $33.68 | $37.89 | $40.40 | $45.42 |
| | Skill I | 27.66 | 36.88 | 41.49 | 44.24 | 49.74 |
| | Skill II | 29.93 | 39.91 | 44.90 | 47.87 | 53.83 |
| | Skill III | 31.06 | 41.41 | 46.59 | 49.68 | 55.86 |
| 1,001 - 2,000 | Basic | $23.26 | $31.01 | $34.89 | $37.20 | $41.82 |
| | Skill I | 25.66 | 34.21 | 38.49 | 41.04 | 46.14 |
| | Skill II | 27.93 | 37.24 | 41.89 | 44.67 | 50.23 |
| | Skill III | 29.06 | 38.75 | 43.59 | 46.48 | 52.26 |
| 0 - 1,000 | Basic | $22.26 | $29.68 | $33.39 | $35.60 | $40.02 |
| | Skill I | 24.66 | 32.88 | 36.99 | 39.44 | 44.34 |
| | Skill II | 26.93 | 35.91 | 40.40 | 43.07 | 48.43 |
| | Skill III | 28.06 | 37.41 | 42.09 | 44.88 | 50.46 |

## 2007-2008 WAGE SCHEDULE
*Effective 8:00 a.m. June 30, 2007*

**25¢ Cargo Penalty**

| "Experience" Level (Hours) | Skill Category | 1st Shift | 2nd Shift | 1st & 2nd Shift Overtime | 3rd Shift | 3rd Shift Overtime |
|---|---|---|---|---|---|---|
| 4,000 or more | Basic | $30.93 | $41.24 | $46.40 | $49.46 | $55.60 |
| | Skill I | 33.33 | 44.44 | 50.00 | 53.30 | 59.92 |
| | Skill II | 35.60 | 47.47 | 53.03 | 56.94 | 64.01 |
| | Skill III | 36.73 | 48.97 | 55.10 | 58.74 | 66.04 |
| 2,001 - 4,000 | Basic | $25.36 | $33.81 | $38.04 | $40.55 | $45.57 |
| | Skill I | 27.76 | 37.01 | 41.64 | 44.39 | 49.89 |
| | Skill II | 30.03 | 40.04 | 45.05 | 48.02 | 53.98 |
| | Skill III | 31.16 | 41.55 | 46.74 | 49.83 | 56.01 |
| 1,001 - 2,000 | Basic | $23.36 | $31.15 | $35.04 | $37.35 | $41.97 |
| | Skill I | 25.76 | 34.35 | 38.64 | 41.19 | 46.29 |
| | Skill II | 28.03 | 37.37 | 42.05 | 44.82 | 50.38 |
| | Skill III | 29.16 | 38.88 | 43.74 | 46.63 | 52.41 |
| 0 - 1,000 | Basic | $22.36 | $29.81 | $33.54 | $35.75 | $40.17 |
| | Skill I | 24.76 | 33.01 | 37.14 | 39.59 | 44.49 |
| | Skill II | 27.03 | 36.04 | 40.55 | 43.22 | 48.58 |
| | Skill III | 28.16 | 37.55 | 42.24 | 45.03 | 50.61 |

**35¢ Cargo Penalty**

| "Experience" Level (Hours) | Skill Category | 1st Shift | 2nd Shift | 1st & 2nd Shift Overtime | 3rd Shift | 3rd Shift Overtime |
|---|---|---|---|---|---|---|
| 4,000 or more | Basic | $31.03 | $41.37 | $46.55 | $49.61 | $55.75 |
| | Skill I | 33.43 | 44.57 | 50.15 | 53.45 | 60.07 |
| | Skill II | 35.70 | 47.60 | 53.55 | 57.09 | 64.16 |
| | Skill III | 36.83 | 49.11 | 55.25 | 58.89 | 66.19 |
| 2,001 - 4,000 | Basic | $25.46 | $33.95 | $38.19 | $40.70 | $45.72 |
| | Skill I | 27.86 | 37.15 | 41.79 | 44.54 | 50.04 |
| | Skill II | 30.13 | 40.17 | 45.20 | 48.17 | 54.13 |
| | Skill III | 31.26 | 41.68 | 46.89 | 49.98 | 56.16 |
| 1,001 - 2,000 | Basic | $23.46 | $31.28 | $35.19 | $37.50 | $42.12 |
| | Skill I | 25.86 | 34.48 | 38.79 | 41.34 | 46.44 |
| | Skill II | 28.13 | 37.51 | 42.20 | 44.97 | 50.53 |
| | Skill III | 29.26 | 39.01 | 43.89 | 46.78 | 52.56 |
| 0 - 1,000 | Basic | $22.46 | $29.95 | $33.69 | $35.90 | $40.32 |
| | Skill I | 24.86 | 33.15 | 37.29 | 39.74 | 44.64 |
| | Skill II | 27.13 | 36.17 | 40.70 | 43.37 | 48.73 |
| | Skill III | 28.26 | 37.68 | 42.39 | 45.18 | 50.76 |

## 2007-2008 WAGE SCHEDULE
*Effective 8:00 a.m. June 30, 2007*

### 50¢ Cargo Penalty

| "Experience" Level (Hours) | Skill Category | 1st Shift | 2nd Shift | 1st & 2nd Shift Overtime | 3rd Shift | 3rd Shift Overtime |
|---|---|---|---|---|---|---|
| 4,000 or more | Basic | $31.18 | $41.57 | $46.77 | $49.84 | $55.97 |
|  | Skill I | 33.58 | 44.77 | 50.37 | 53.68 | 60.29 |
|  | Skill II | 35.85 | 47.80 | 53.78 | 57.31 | 64.38 |
|  | Skill III | 36.98 | 49.31 | 55.47 | 59.12 | 66.41 |
| 2,001 - 4,000 | Basic | $25.61 | $34.15 | $38.42 | $40.93 | $45.95 |
|  | Skill I | 28.01 | 37.35 | 42.02 | 44.77 | 50.27 |
|  | Skill II | 30.28 | 40.37 | 45.42 | 48.40 | 54.35 |
|  | Skill III | 31.41 | 41.88 | 47.12 | 50.21 | 56.39 |
| 1,001 - 2,000 | Basic | $23.61 | $31.48 | $35.42 | $37.73 | $42.35 |
|  | Skill I | 26.01 | 34.68 | 39.02 | 41.57 | 46.67 |
|  | Skill II | 28.28 | 37.71 | 42.42 | 45.20 | 50.75 |
|  | Skill III | 29.41 | 39.21 | 44.12 | 47.01 | 52.79 |
| 0 - 1,000 | Basic | $22.61 | $30.15 | $33.92 | $36.13 | $40.55 |
|  | Skill I | 25.01 | 33.35 | 37.52 | 39.97 | 44.87 |
|  | Skill II | 27.28 | 36.37 | 40.92 | 43.60 | 48.95 |
|  | Skill III | 28.41 | 37.88 | 42.62 | 45.41 | 50.99 |

### 85¢ Cargo Penalty

| "Experience" Level (Hours) | Skill Category | 1st Shift | 2nd Shift | 1st & 2nd Shift Overtime | 3rd Shift | 3rd Shift Overtime |
|---|---|---|---|---|---|---|
| 4,000 or more | Basic | $31.53 | $42.04 | $47.30 | $50.36 | $56.50 |
|  | Skill I | 33.93 | 45.24 | 50.90 | 54.20 | 60.82 |
|  | Skill II | 36.20 | 48.27 | 54.30 | 57.84 | 64.91 |
|  | Skill III | 37.33 | 49.77 | 56.00 | 59.64 | 66.94 |
| 2,001 - 4,000 | Basic | $25.96 | $34.61 | $38.94 | $41.45 | $46.47 |
|  | Skill I | 28.36 | 37.81 | 42.54 | 45.29 | 50.79 |
|  | Skill II | 30.63 | 40.84 | 45.95 | 48.92 | 54.88 |
|  | Skill III | 31.76 | 42.35 | 47.64 | 50.73 | 56.91 |
| 1,001 - 2,000 | Basic | $23.96 | $31.95 | $35.95 | $38.25 | $42.87 |
|  | Skill I | 26.36 | 35.15 | 39.54 | 42.09 | 47.19 |
|  | Skill II | 28.63 | 38.17 | 42.95 | 45.72 | 51.28 |
|  | Skill III | 29.76 | 39.68 | 44.64 | 47.53 | 53.31 |
| 0 - 1,000 | Basic | $22.96 | $30.61 | $34.44 | $36.65 | $41.07 |
|  | Skill I | 25.36 | 33.81 | 38.04 | 40.49 | 45.39 |
|  | Skill II | 27.63 | 36.84 | 41.45 | 44.12 | 49.48 |
|  | Skill III | 28.76 | 38.35 | 43.14 | 45.93 | 51.51 |

## 2007-2008 WAGE SCHEDULE
*Effective 8:00 a.m. June 30, 2007*

### $1.20 Cargo Penalty

| "Experience" Level (Hours) | Skill Category | 1st Shift | 2nd Shift | 1st & 2nd Shift Overtime | 3rd Shift | 3rd Shift Overtime |
|---|---|---|---|---|---|---|
| 4,000 or more | Basic | $31.88 | $42.51 | $47.82 | $50.89 | $57.02 |
|  | Skill I | 34.28 | 45.71 | 51.42 | 54.73 | 61.34 |
|  | Skill II | 36.55 | 48.73 | 54.83 | 58.36 | 65.43 |
|  | Skill III | 37.68 | 50.24 | 56.52 | 60.17 | 67.46 |
| 2,001 - 4,000 | Basic | $26.31 | $35.08 | $39.47 | $41.98 | $47.00 |
|  | Skill I | 28.71 | 38.28 | 43.07 | 45.82 | 51.32 |
|  | Skill II | 30.98 | 41.31 | 46.47 | 49.45 | 55.40 |
|  | Skill III | 32.11 | 42.81 | 48.17 | 51.26 | 57.44 |
| 1,001 - 2,000 | Basic | $24.31 | $32.41 | $36.47 | $38.78 | $43.40 |
|  | Skill I | 26.71 | 35.61 | 40.07 | 42.62 | 47.72 |
|  | Skill II | 28.98 | 38.64 | 43.47 | 46.25 | 51.80 |
|  | Skill III | 30.11 | 40.15 | 45.17 | 48.06 | 53.84 |
| 0 - 1,000 | Basic | $23.31 | $31.08 | $34.97 | $37.18 | $41.60 |
|  | Skill I | 25.71 | 34.28 | 38.57 | 41.02 | 45.92 |
|  | Skill II | 27.98 | 37.31 | 41.97 | 44.65 | 50.00 |
|  | Skill III | 29.11 | 38.81 | 43.67 | 46.46 | 52.04 |

### Explosives Cargo Penalty

| "Experience" Level (Hours) | Skill Category | 1st Shift | 2nd Shift | 1st & 2nd Shift Overtime | 3rd Shift | 3rd Shift Overtime |
|---|---|---|---|---|---|---|
| 4,000 or more | Basic | $61.81 | $81.81 | $92.04 | $95.11 | $101.24 |
|  | Skill I | 63.76 | 85.01 | 95.64 | 98.95 | 105.56 |
|  | Skill II | 66.03 | 88.04 | 99.05 | 102.58 | 109.65 |
|  | Skill III | 67.16 | 89.55 | 100.74 | 104.39 | 111.68 |
| 2,001 - 4,000 | Basic | $50.22 | $66.96 | $75.33 | $77.84 | $82.86 |
|  | Skill I | 52.62 | 70.16 | 78.89 | 81.68 | 87.18 |
|  | Skill II | 54.89 | 73.19 | 82.34 | 85.31 | 91.27 |
|  | Skill III | 56.02 | 74.69 | 84.00 | 87.12 | 93.30 |
| 1,001 - 2,000 | Basic | $46.22 | $61.63 | $69.33 | $71.64 | $76.26 |
|  | Skill I | 48.62 | 64.83 | 72.93 | 75.48 | 80.58 |
|  | Skill II | 50.89 | 67.85 | 76.34 | 79.11 | 84.67 |
|  | Skill III | 52.02 | 69.36 | 78.00 | 80.92 | 86.70 |
| 0 - 1,000 | Basic | $44.22 | $58.96 | $66.33 | $68.54 | $72.96 |
|  | Skill I | 46.62 | 62.16 | 69.93 | 72.38 | 77.28 |
|  | Skill II | 48.89 | 65.19 | 73.34 | 76.01 | 81.37 |
|  | Skill III | 50.02 | 66.69 | 75.03 | 77.82 | 83.40 |

## MECHANICS

### 2002-2003 Wage Schedule

*Effective 8:00 a.m., November 23, 2002 to 8:00 a.m. June 28, 2003*

|  | 1st Shift | 2nd Shift | 1st & 2nd Shift Overtime | 3rd Shift | 3rd Shift Overtime |
|---|---|---|---|---|---|
| Journeyman | $33.22 | $44.29 | $49.83 | $53.15 | $59.80 |
| Leadman | $35.98 | $47.97 | $53.97 | $57.57 | $64.76 |
| Trainee |  |  |  |  |  |
| 4,001 or more | $33.22 | $44.29 | $49.83 | $53.15 | $59.80 |
| 2,001 - 4,000 | $31.83 | $42.44 | $47.75 | $50.93 | $57.29 |
| 1,001 - 2,000 | $30.45 | $40.60 | $45.68 | $48.72 | $54.81 |
| 0 - 1,000 | $29.06 | $38.75 | $43.59 | $46.50 | $52.31 |

### 2003-2004 Wage Schedule

*Effective 8:00 a.m., June 28, 2003 to 8:00 a.m. July 3, 2004*

|  | 1st Shift | 2nd Shift | 1st & 2nd Shift Overtime | 3rd Shift | 3rd Shift Overtime |
|---|---|---|---|---|---|
| Journeyman | $33.82 | $45.09 | $50.73 | $54.11 | $60.88 |
| Leadman | $36.63 | $48.84 | $54.95 | $58.61 | $65.93 |
| Trainee |  |  |  |  |  |
| 4,001 or more | $33.82 | $45.09 | $50.73 | $54.11 | $60.88 |
| 2,001 - 4,000 | $32.41 | $43.21 | $48.62 | $51.86 | $58.34 |
| 1,001 - 2,000 | $31.00 | $41.33 | $46.50 | $49.60 | $55.80 |
| 0 - 1,000 | $29.59 | $39.45 | $44.39 | $47.34 | $53.26 |

### 2004-2005 Wage Schedule

*Effective 8:00 a.m., July 3, 2004 to 8:00 a.m. July 2, 2005*

|  | 1st Shift | 2nd Shift | 1st & 2nd Shift Overtime | 3rd Shift | 3rd Shift Overtime |
|---|---|---|---|---|---|
| Journeyman | $34.42 | $45.89 | $51.63 | $55.07 | $61.96 |
| Leadman | $37.28 | $49.71 | $55.92 | $59.65 | $67.10 |
| Trainee |  |  |  |  |  |
| 4,001 or more | $34.42 | $45.89 | $51.63 | $55.07 | $61.96 |
| 2,001 - 4,000 | $32.98 | $43.97 | $49.47 | $52.77 | $59.36 |
| 1,001 - 2,000 | $31.55 | $42.07 | $47.33 | $50.48 | $55.79 |
| 0 - 1,000 | $30.11 | $40.15 | $45.17 | $48.18 | $54.20 |

## MECHANICS

### 2005-2006 Wage Schedule

*Effective 8:00 a.m., July 2, 2005 to 8:00 a.m. July 1, 2006*

|  | 1st Shift | 2nd Shift | 1st & 2nd Shift Overtime | 3rd Shift | 3rd Shift Overtime |
|---|---|---|---|---|---|
| Journeyman | $35.62 | $47.49 | $53.43 | $56.99 | $64.12 |
| Leadman | $38.58 | $51.44 | $57.87 | $61.73 | $69.44 |
| Trainee |  |  |  |  |  |
| 4,001 or more | $35.62 | $47.49 | $53.43 | $56.99 | $64.12 |
| 2,001 - 4,000 | $34.13 | $45.51 | $51.20 | $54.61 | $61.43 |
| 1,001 - 2,000 | $32.65 | $43.53 | $48.98 | $52.24 | $58.77 |
| 0 - 1,000 | $31.16 | $41.55 | $46.74 | $49.86 | $56.09 |

### 2006-2007 Wage Schedule

*Effective 8:00 a.m., July 1, 2006 to 8:00 a.m. June 30, 2007*

|  | 1st Shift | 2nd Shift | 1st & 2nd Shift Overtime | 3rd Shift | 3rd Shift Overtime |
|---|---|---|---|---|---|
| Journeyman | $36.22 | $48.29 | $54.33 | $57.95 | $65.20 |
| Leadman | $39.23 | $52.31 | $58.85 | $62.77 | $70.61 |
| Trainee |  |  |  |  |  |
| 4,001 or more | $36.22 | $48.29 | $54.33 | $57.95 | $65.20 |
| 2,001 - 4,000 | $34.71 | $46.28 | $52.07 | $55.54 | $62.48 |
| 1,001 - 2,000 | $33.20 | $44.27 | $49.80 | $53.12 | $59.76 |
| 0 - 1,000 | $31.69 | $42.25 | $47.54 | $50.70 | $57.04 |

### 2007-2008 Wage Schedule

*Effective 8:00 a.m. June 30, 2007*

|  | 1st Shift | 2nd Shift | 1st & 2nd Shift Overtime | 3rd Shift | 3rd Shift Overtime |
|---|---|---|---|---|---|
| Journeyman | $36.82 | $49.09 | $55.23 | $58.91 | $66.28 |
| Leadman | $39.88 | $53.17 | $59.82 | $63.81 | $71.78 |
| Trainee |  |  |  |  |  |
| 4,001 or more | $36.82 | $49.09 | $55.23 | $58.91 | $66.28 |
| 2,001 - 4,000 | $35.28 | $47.04 | $52.92 | $56.45 | $63.50 |
| 1,001 - 2,000 | $33.75 | $45.00 | $50.63 | $54.00 | $60.75 |
| 0 - 1,000 | $32.21 | $42.95 | $48.32 | $51.54 | $57.98 |

# CONTAINER FREIGHT STATION SUPPLEMENT

Following are the terms and conditions of the Container Freight Station Supplement dated December 16, 1969 in its current status as amended and/or modified through July 12, 1986:

## CFS SECTION 1

### SCOPE OF WORK

**1.1** The stuffing and unstuffing of containers by Container Freight Station Longshore/Clerk Utilitymen in a Container Freight Station (hereinafter referred to as a CFS) is work covered by this Supplement.

**1.11** Any member of PMA may carry on work covered by this Contract Supplement by doing it at any CFS operated hereunder or by otherwise doing it under the Agreement.

**1.12** A CFS covered by this Contract Supplement is a permanent facility that either is especially built only for stuffing and unstuffing and storing containers, or is an especially constructed shed or a place set aside to stuff and unstuff and store containers that is distinct from the dock itself and from a container yard.

**1.121** A container yard is an area where containers are warehoused or are held awaiting loading aboard ships, or are held after being unloaded from ships, or are held ready to be hauled away to a factory or a warehouse or other place not a CFS, or are held on the way to or from a CFS.

**1.13** A CFS must be a permanent installation.

**1.2** CFS employees and CFS work are described in this CFS Section 1.2.

156

**1.21** A CFS must employ a basic complement of steady men (a minimum of 3 steady employees, 1 from each of the ILWU longshore division categories, i.e., Longshore, Clerk and Walking Boss) which shall be obtained as provided in CFS Sections 6.1 through 6.112. There shall be no manning scales for any CFS operation. The number of men for any operation can be 1 or more as determined by the employer subject to the requirement that a CFS must employ a basic complement. All employees shall perform all necessary work in the CFS without regard to their category unless otherwise restricted herein.

**1.22** CFS Longshore/Clerk Utilitymen. Combination longshore/clerk employees covered by this Contract Supplement shall perform all types of work at the CFS as directed by the employer, which shall include but not be limited to handling cargo, driving forklift and other mechanical handling and lifting equipment, stockpiling, palletizing and depalletizing, loading and unloading railcars, stuffing and unstuffing containers, moving containers in the CFS, shifting and assembling cargo, bagging, all other cargo-handling activities, cleaning up in and around the CFS and the physical checking of cargo received at, delivered from, or within the CFS area, including the customary spotting, sorting, tallying and tagging of cargo in the CFS area.

**1.221** Ratios of longshoremen and clerks in existing CFS's as of July 1, 1984 shall govern hiring ratios. Local JPLRC's shall provide the rules necessary to maintain port by port hiring ratios and/or establish a ratio where none now exists. Any failure to agree shall be subject to final and binding Area Arbitration.

**1.222** Registered clerks steadily employed in a CFS as of July 1, 1984 will not be required to physically handle cargo when such work is beyond their capabilities. Any clerks hired

157

subsequent to July 1, 1984 shall not be entitled to this exception.

**1.223** Whenever possible, registered clerks will perform any and all CFS clerks' work. When no such work is required, they will perform any basic CFS utility work. "Bumping" to achieve this end is not required. "Bumping" is defined as the interruption of an operation already under way in order to substitute another category of worker.

**1.224** If only 1 CFS longshore/clerk utilityman from the Clerks category is employed, he shall be a "working supervisory clerk" who shall perform the work described in CFS Section 1.223 above.

**1.225** If 2 or more CFS longshore/clerk utilitymen from the Clerks category are employed, 1 shall be the "working supervisory clerk." In this case, the "working supervisory clerk" shall direct the clerical activities of other CFS longshore/clerk utilitymen, and may also be required to perform CFS clerk's work if such work does not prohibit supervision of the clerical activities of other CFS longshore/clerk utilitymen.

**1.226** CFS longshore/clerk utilitymen shall shift assignments as directed within the CFS area. An employer shall not place an excessive or unreasonable amount of work on any employee. Employees have the right to claim onerousness under the grievance machinery.

**1.23** It is understood and agreed that this CFS Supplement does not cover work in a CFS office. The local supplements to the Pacific Coast Clerks' Contract Document shall not apply to CFS operations. Direction of clerk supervisors will be by management personnel.

**1.24** CFS employees—steady or extra labor—shall be utilized only in the CFS as designated. They shall not at any time be transferred to longshore or clerks' work outside the CFS un-

der the terms of any of the Agreements except as provided for in CFS Section 1.3 and subsections.

**1.25** If an employer operates more than 1 CFS in an area he may use the steady and extra labor employees of 1 CFS to temporarily supplement the steady work force of another CFS, in which case he shall arrange suitable transportation for such employees.

**1.26** No CFS employer shall hire or use extra CFS labor for any reason other than to supplement the basic work force.

**1.3** Longshoremen employed under the Pacific Coast Longshore Contract Document may be directed to place cargo or containers coming from a vessel at any point on the CFS premises, and to pick up cargo or containers from any place on the CFS premises for delivery to a dock.

**1.31** At any CFS facility on or adjacent to the container yard, the employer may designate a CFS longshore/clerk utilityman who may move containers to and from the container yard. Such employee shall whenever possible be a longshore utilityman. The appropriate skill rate shall be paid for the time involved, except that utilitymen shall not operate portainers, transtainers or mobile cranes. At any CFS facility not on or adjacent to a container yard, present practices may continue in the movement of containers. In instances where PCL&CA or CFS personnel are utilized, the drivers may be required to perform any work necessary related to the delivery or pick-up of containers, such as placing/removing pallet boards or blocks under the fifth wheel, opening doors, releasing twist-locks, etc.

**1.32** If containers are placed upon or taken off of trucks, trailers, chassis or railcars at a CFS, the work shall be done by longshoremen or CFS employees. Longshoremen and CFS employees shall perform this work as directed by the employer.

**1.33** Incoming and outgoing railcars at or adjacent to a CFS, containing mixed CFS and general cargo, may be completely loaded or discharged by either CFS utilitymen or PCLCD longshoremen at the employer's option.

**1.34** When cargo is directly transferred to a container from a truck, or from a container to a truck, utilizing a conveyor or gravities, the employment of a "pusher" is at the discretion of the employer.

**1.35** Where devanned cargo has come to rest on the CFS facility, individuals other than those employed at the CFS under this supplemental agreement may load such cargo without sorting to their equipment for shipment from the CFS.

**1.36** When cargo arrives at the CFS and is under the control of the trucking company, forwarders or drayage firms, the handling of such cargo from their equipment to the point of rest on the CFS may be done by the non-CFS employees.

**1.361** A truck driver who arrives at a CFS with loose cargo may place such cargo on a pallet board, slipsheet, bin or similar device on his truck or tailgate. When this occurs, the pallet board, slipsheet, bin or similar device shall be placed on and removed from the truck or tailgate by a CFS employee.

**1.4** All machinery, equipment and other tools now or hereafter used in a CFS shall be operated by CFS longshore/clerk utilitymen when used in an operation covered by the Contract Supplement and the operation thereof is assigned to CFS longshore/clerk utilitymen and is covered by this Contract Supplement, provided that exceptions thereto—as to individual classes of workers who are not CFS longshore/clerk utilitymen and as to tools or classes of tools may be continued and any exceptions may be set up, modified or eliminated by joint agreement of the Association and the Union.

(a) Exceptions described and procedures provided for resolving disputes as set forth in Section 1.5 of the PCLCD and subordinate subsections shall be construed in connection with the agreement of the employers to provide skill training for CFS utilitymen so as to minimize the grounds for exceptions listed in Section 1.54 of the PCLCD. When trained, skilled CFS longshore/clerk utilitymen certified as capable of performing work now assigned by the Pacific Maritime Association member company to non-CFS utilitymen are available, such CFS longshore/clerk utilitymen will be assigned to such work, provided no union jurisdictional work stoppages are caused, and provided that such trained, skilled CFS longshore/clerk utilitymen may be assigned to any skilled work they are capable of performing without limitation by reason of claimed specialization.

(b) Where Pacific Maritime Association or its member companies have existing bargaining relationships, have granted recognition to and have assigned work to bona fide labor unions as a result of such relationships and recognition, or where status quo exceptions relating to other unions are now set forth in Section 1 of the PCLCD, International Longshore and Warehouse Union will not make any jurisdictional claim or cause any jurisdictional work stoppage dispute involving Pacific Maritime Association or such member companies with relation to such work assignments. However, if the Union obtains the right to represent and bargain for such workers and no jurisdictional work stoppage problems are created, the Association agrees that such exceptions re-

garding assignment of work to CFS longshore/clerk utilitymen will be eliminated.

**1.5** It is the intent and purpose of this Contract Supplement to protect and preserve the work jurisdiction of employees covered by the ILWU-PMA Pacific Coast Longshore and Clerks' Agreement or this CFS Supplement to stuff or unstuff cargo in containers to be loaded aboard or discharged from vessels as provided for herein. Within any Port Area CFS Zone all containers owned or leased by vessel operating carriers shall be stuffed or unstuffed by such employees at docks, or at ILWU-PMA CFS facilities within the Port Area CFS Zone.

(a) Containers of convenience. Where the vessel operating carrier requires cargo to be transferred from one container to another, or where containers are utilized by the vessel operating carrier for its own convenience, the stuffing or unstuffing of such cargo shall be performed by employees covered by the ILWU-PMA Pacific Coast Longshore and Clerks' Agreement or this CFS Supplement.

**1.51** *Exceptions.* Exceptions shall apply to (1) where there is mutual agreement to perform such work elsewhere, (2) where some other employer or the federal government has a legally enforceable right to require that it be done elsewhere, or (3) where exceptions contained in CFS Section 1.541 are applicable.

**1.52** *Transition Period.* It is intended that the work provided for herein shall be performed by employees covered by the ILWU-PMA Pacific Coast Longshore and Clerks' Agreement or this CFS Supplement as soon as possible. Recognizing the need to make and publish tariff changes, eliminate subcontracting practices, etc., it is agreed that whatever changes are necessary shall be accomplished no later than 35 days follow-

ing the implementation date set forth in the March 16, 1986 Memorandum of Understanding.

**1.521** *Existing Contracts.* Where there are existing contracts between ILWU locals and vessel operating carriers and/or CFS employers, a transition period will end no later than the expiration dates of such contracts. Where there is a jurisdictional problem between two segments of the ILWU having to do with stuffing and unstuffing of containers, containers will be discharged or loaded without penalty and as directed by the employer without interference by the ILWU, and the ILWU will be responsible for solving its own jurisdictional problems.

**1.522** *Subcontracting.* All vessel operating carriers, or other employers covered by the ILWU-PMA Pacific Coast Longshore and Clerks' Agreement or this CFS Supplement thereto, shall discontinue their past practice of subcontracting of stuffing or unstuffing of containers and to refrain from future subcontracting work as defined in CFS Sections 1.5 and 1.5(a) to employers not parties to this Agreement, except that such subcontracting practices may continue during the period legally required by the subcontract plus any additional time required to build, expand, lease, equip, or provide facilities to be operated within the Port Area CFS Zone under the PCL&CA or this CFS Supplement. During such period containers may be received from or delivered to such subcontractors without penalty, but such penalty-free period shall not extend beyond 35 days following the implementation date set forth in this document. Each company having subcontracts will promptly notify PMA of the date it will be operating under this Agreement and such information shall be furnished to the Union.

**1.5221** All vessel operating carriers shall be required to have all LCL (less-than-container load) cargo which is booked and/or controlled by them stuffed or unstuffed by

employees under the terms of the Pacific Coast Longshore and Clerks' Agreement or this CFS Supplement thereto, unless any of the exceptions stated in CFS Section 1.5 are applicable. All published LCL tariffs and/or advertisements shall delete all references to off-dock Container Freight Stations where such work on behalf of vessel operating carriers has been performed in the past by other employees.

**1.52211** The language in CFS Section 1.5221 above which reads "all LCL cargo which is booked and/or controlled by them" includes such cargo which is stuffed or unstuffed by a non-vessel operating carrier (NVOCC), freight forwarder, or consolidator within the Port Area CFS Zone, if such company is owned by a vessel operating carrier or the vessel operating carrier has a proprietary financial interest in the company.

**1.52212** CFS Sections 1.533 and 1.534 shall not be used as a subterfuge by any vessel operating carrier to avoid their obligation set forth in CFS Section 1.5221 above. Any violation found to be a subterfuge or deliberate evasion of responsibility on the part of the vessel operating carrier shall result in the penalty set forth in CFS Section 1.54 doubled to a total of $2,000 per container.

**1.53** *Definitions.* For the purposes of this section the following definitions shall be applicable:

**1.531** *Container*—means a single rigid, nondisposable dry cargo, insulated, refrigerated, flatrack, vehicle, rack, portable liquid tank, or open-top container, etc. All types of containers will have constructions, fittings, and fastenings able to withstand, without permanent distortion, all the stresses that may be applied in normal service use of continuous transportation, and shall have a minimum outside width of 8' and minimum outside length of 20'.

**1.532** *Port Area CFS Zone*—means geographic area of 50 miles radius from each ILWU-PMA joint longshore dispatch hall. Where 2 or more zones overlap, the combined area within the outer limits of such zones shall be treated as a single zone.

**1.533** *Inbound Shipper's Load*—means one that is handled as a unit, without the contents being checked for delivery purposes, for movement straight through to any facility designated by the consignee or shipper. (*Warning:* Note penalty for violation of this Section as set forth in CFS Section 1.52212.)

(*Note:* If and when it is legally found that the provisions of NLRB Decision and Order D-3426 can be applied to containers owned or leased by *all* vessel operating carriers, within 30 days thereafter, the above CFS Section 1.533 shall be replaced by the following:

**1.533** *Inbound Shipper's Load*—means one that is handled as a unit, without the contents being checked for delivery purposes, for movement straight through to the consignee who is the purchaser or who otherwise has a proprietary financial interest in the import cargo in the container which is being transported, as distinct from a financial interest in the transportation or consolidation or deconsolidation of such cargo.)

**1.534** *Outbound Shipper's Load*—means one that is tendered as a unit, without the contents being checked for receiving purposes, for movement straight through to the vessel. (*Warning:* Note penalty for violation of this CFS Section as set forth in CFS Section 1.52212.)

(*Note:* If and when it is legally found that the provisions of NLRB Decision and Order D-3426 can be applied to containers owned or leased by *all* vessel operating carriers, within 30 days thereafter, the above CFS Section 1.534 shall be replaced by the following:

SCOPE OF WORK

**1.534** *Outbound Shipper's Load* — means one that is tendered as a unit, without the contents being checked for receiving purposes, for movement straight through to the vessel and which comes from a manufacturer or seller having a proprietary financial interest in the export cargo in the container which is being transported, as distinct from a financial interest in the transportation or consolidation or deconsolidation of such cargo.)

**1.535** *Stuffing and Unstuffing* — stuffing means the act of placing cargo into a container and unstuffing means the act of removing cargo from a container.

**1.536** *"Store door" method of pick-up or delivery* — means the stuffing or unstuffing of cargo into or out of containers at 1 or more wholesale or retail warehouses, factories, or processing plants when pickup or delivery service is the responsibility of the vessel operating carrier.

**1.537** *Coastwise and Intercoastal* — Coastwise means the West Coast of the North American Continent. Intercoastal means between the East Coast and West Coast of the United States.

**1.538** *Domestic Trade* — means intercoastal, West Coast of the continental United States including Alaska, Hawaii, Guam, Puerto Rico and any other U.S. insular possession.

**1.54** *Container Penalty.* Containers of cargo owned or leased by vessel operating carriers which are loaded aboard or discharged from vessels will be assessed a penalty of $1,000 per container, except as provided below in CFS Section 1.541. The payment of such penalty shall be the responsibility of the carrier operating the vessel. Such penalty payments shall be collected by PMA and shall be used to reduce the unfunded past service liability of the ILWU-PMA Pension Plan.

166

SCOPE OF WORK

**1.541** The penalty described in CFS Section 1.54 shall not apply to:

**1.5411** Outbound containers originating outside of the Port Area CFS Zone as defined in CFS Section 1.532 or inbound containers destined for delivery outside of the Port Area CFS Zone as defined in CFS Section 1.532.

**1.5412** Containers stuffed or unstuffed by employees under the terms and conditions of the Pacific Coast Longshore and Clerks' Agreement or this CFS Supplement.

**1.5413** Outbound containers defined as a "shipper's load" originating within the Port Area CFS Zone.

**1.5414** Inbound containers defined as a "shipper's load" destined for delivery within the Port Area CFS Zone.

**1.5415** Containers of household goods which are stuffed or unstuffed by a moving company.

**1.5416** Containers of cargo moving coastwise or intercoastal.

**1.5417** Containers stuffed or unstuffed in the "store door" method of pick-up or delivery in the "domestic trade."

**1.5418** Containers where the penalty has been paid once on the cargo contents.

**1.542** *Container Penalty Payment Procedure.* The following payment procedure shall apply when a grievance machinery decision is rendered which provides that a container penalty as set forth in CFS Section 1.54 or CFS Section 1.52212 is payable:

**1.5421** Within 5 days of the date of the decision, payment of the penalty shall be made by the vessel operating carrier. Payment shall be made to Pacific Maritime Association and PMA shall immediately place the monies in a special CFS bank account.

167

**1.5422** Within 15 days of the date of the decision, PMA shall notify the ILWU International of its intention to appeal, or not to appeal, the decision.

**1.54221** If PMA elects not to appeal the decision, the monies in the special CFS bank account, plus any accrued interest, shall be immediately forwarded to the Administrator of the ILWU-PMA Pension Plan to be applied against the unfunded past service liability of the ILWU-PMA Pension Plan.

**1.54222** If PMA elects to appeal the decision, the monies shall be retained in the special CFS account until a final resolution is reached through the contract grievance machinery. Processing of an appeal shall be completed within 3 months following PMA's notice to appeal.

**1.542221** If the final resolution sustains the decision, the monies in the special CFS penalty account, plus any accrued interest, shall be immediately forwarded to the Administrator of the ILWU-PMA Pension Plan to be applied against the unfunded past service liability of the ILWU-PMA Pension Plan.

**1.542222** If the final resolution reverses the decision, the monies in the special CFS penalty account, plus any accrued interest, shall be immediately returned to the vessel operating carrier.

**1.5423** Evidence of deposits to or withdrawals from the special CFS bank account shall be transmitted to the ILWU International.

**1.55** Grievances

**1.551** *Local.* It is intended by the Parties that grievances as to whether a container is subject to the container penalty set forth in CFS Section 1.52212 or CFS Section 1.54 shall be subject to resolution through the grievance machinery promptly and reasonably. In determining the facts as to whether a con-

tainer of cargo is subject to a container penalty, the carrier operating the vessel shall, upon request, make available to the Union as expeditiously as possible the records and/or documentation that may be necessary to verify the facts as to the stuffing or unstuffing of the container. Any delay by the vessel operating carrier to immediately provide such records and/or documentation must be justified. In an effort to avoid disputes, the records and/or documentation referred to herein shall be made available to the Union, upon request, prior to the filing of a grievance.

**1.5511** For purpose of implementing the intent of the Parties as expressed in CFS Section 1.551 above it is agreed that the special local grievance procedure, as set forth in CFS Section 1.5512 below, which involves initiating a grievance at the Section 17.61 level of the grievance machinery is temporary, shall not be used as a precedent, and shall expire on July 1, 1987.

**1.5512** The following special grievance procedures shall be followed:

**1.5513** An alleged violation shall be called to the attention of the Union representative who shall review the claim with the terminal operator and/or vessel operating carrier. If the claim is unresolved at that level on the job site, the Union may invoke Section 17.61 of the Agreement and request an informal hearing and interim ruling by the Area Arbitrator. Work shall proceed at all times as directed by the Employer and the alleged violation shall not interfere with, delay, nor prevent the container(s) from being received and loaded aboard a vessel or from being discharged and delivered.

**1.5514** When called to the job under Section 17.61, the Area Arbitrator may issue an interim ruling, or may delay an interim ruling pending a bona fide delay in the documenta-

tion and/or records necessary to reach a decision being available, or may rule under Section 17.64 that a formal hearing under Section 17.5 should be held to resolve the matter.

**1.5515** An interim ruling rendered by the Area Arbitrator under Section 17.61 may be appealed as provided in Section 17.63.

**1.5516** Subject to Section 17.57 of the Agreement any decision of the Area Arbitrator may be appealed to the Joint Coast Labor Relations Committee as provided in Section 17.261 of the Agreement. In the event the Joint Coast Labor Relations Committee reaches disagreement, the matter may be appealed to the Coast Arbitrator as provided in Section 17.27 of the Agreement for final resolution.

**1.552** *Coast.* Grievances, other than those set forth in CFS Section 1.551 above, involving implementation disputes or problems, clarifications or interpretations shall be referred to the Joint Coast Labor Relations Committee and at the request of either party shall be referred, in the event of disagreement, to the Coast Arbitrator for final resolution.

*Note:* The provisions of CFS Section 1.5 shall be subject to reopening at any time during the term of the PCL&CA if the National Labor Relations Board issues a ruling extending its determination that Decision and Order D-3426 can be applied to containers owned or leased by all vessel operating carriers whether they be members or nonmembers of PMA.

**1.6** It is further understood that a non-PMA company operating a CFS facility may join PMA and become covered by this Contract Supplement upon meeting the usual terms and conditions established by PMA as being applicable to obtaining such membership.

**1.7** Any questions arising as to the application or interpretation of Section 1.92 of the PCL&CA or CFS Section 1.12 of this Supplement as they apply to covered work in the dock areas shall be subject to review by the Joint Coast Labor Relations Committee and shall be referred, if necessary, to the Coast Arbitrator for final resolution.

**1.8** If the ILWU (Longshore/Clerks Division—the International or local) has negotiated or negotiates a CFS contract with a PMA member or nonmember with terms and conditions dealing with the handling of containerized cargo that are more favorable to said member or nonmember than the terms and conditions of this CFS Supplement or the PCL&CA, such contract shall be available to PMA members operating under this CFS Supplement or the PCL&CA.

## CFS SECTION 2

# HOURS AND SHIFTS

**2.1** The standard work shifts of CFS employees shall be 8 hours on the first shift, 8 hours on the second shift and 7 hours on the third shift Monday through Friday. Work outside the standard work shifts on Monday through Friday and all work on Saturdays, Sundays, and Agreement Holidays is overtime work.

**2.11** The regular work week for CFS employees shall be 40 hours within any 5 consecutive 8-hour days' spread during a week. Staggered shifts may be utilized at the option of the employer, i.e., Monday through Friday, Tuesday through Saturday, Wednesday through Sunday, etc. Overtime shall be payable when work on any spread includes Saturday and/or Sunday. Overtime work shall be offered equitably to members of the steady work force.

**2.2** Meal time shall be 1 hour.

**2.21** The established noon meal period shall be 2 hours between 11:00 a.m. and 1:00 p.m. and the meal hour shall be 1 hour within such period beginning at 11:00 a.m. or 12:00 noon. Working straight through the meal period shall be permitted by sending some employees to their meal the first hour (11:00 a.m.) and others to their meal the second hour (12:00 noon) of the 2 hour spread.

**2.22** The midshift meal hour on the second shift shall be either the fourth or fifth hour after the starting time. The 2 meal hours constitute the established meal period.

**2.23** CFS employees shall go to meals as directed by the employer and shall return to complete their shift.

**2.231** CFS employees are not required to work over 6 hours without an opportunity to eat on any of the shifts herein provided.

**2.3** CFS employees are entitled to a 15-minute relief period around the midpoint of each work period involved, having due regard for the continuity and nature of the work.

**2.31** CFS employees shall take their relief as directed by the employer, and there shall be no abuse of such relief periods by the employees and they shall observe specified times for starting, resuming and finishing work as directed by the employer.

**2.4** Extended time may be worked to finish cars, trucks and containers, either inbound or outbound, which have been started, as well as all necessary work for the purpose of meeting receiving or delivery deadlines, when such work is required to meet more efficient operational needs. There shall be no gimmicking of this provision.

**2.41** When working extended time, CFS employees shall be paid at the overtime rate. In no case shall a CFS employee be allowed to work more than 2 hours under this provision.

**2.42** At the option of the employer, 1 or more CFS longshore/clerk utilitymen may be ordered to report for work either one-half hour or 1 hour in advance of the start of a work shift for the purpose of performing preparatory work such as gassing equipment, opening doors, etc. Such additional work prior to the standard work shift shall be paid for at the overtime rate. (Such preparatory work shall not include physical cargo handling of any type, but cargo may be received and/or delivered.)

**2.5** CFS employees shall be available to the employers for 3 shifts. The employer shall determine the number of shifts to be worked and the number of CFS employees used on each shift. CFS employees will report at the shift starting time designated by the employer in accord with this Contract Supplement. Steady employees may, at their option only, accept a change of shifts.

**2.51** The first shift is 8 hours between 8:00 a.m. and 5:00 p.m.

**2.52** The second shift is the first 8 hours starting between 5:00 p.m. and 7:00 p.m. and one that is set up and operates for a period of no less than 1 full week. A second shift may be put into operation at any time and may overlap the third shift.

**2.53** The third shift is the first 7 hours starting at 1:00 a.m. and ending at 8:00 a.m. and that is set up and operates for a period of no less than 1 full week. A third shift may be put into operation at any time. The 7-hour third shift shall be considered as a single work period for relief purposes (CFS Section 2.3). The third shift has no designated meal period. Employees shall be allowed time to eat in accordance with CFS Section 2.231 if an extended shift is worked on the third shift.

**2.54** The employer may operate on the second or third shift.

## CFS SECTION 3

## GUARANTEES

**3.1** Steady Men.

**3.11** During the probationary period, any steady CFS employee called and reporting for duty and turned to is guaranteed a minimum of 8 hours' pay at the regular hourly rate. If no work is available the guarantee shall be 4 hours' pay at the regular rate.

**3.12** Any steady employee who has completed the probationary period and is called and reports for work at the designated starting time on the first day of that employee's regular work week shall be guaranteed 40 hours' work or pay at the regular rate, subject to CFS Sections 3.13 and 3.14.

**3.13** A steady employee absent due to illness or injury or with permission of the employer shall be paid for hours worked during that payroll period. A steady employee who is absent without bona fide reason shall be paid for hours worked during that payroll period and shall be subject to disciplinary action.

**3.14** During any week in which a holiday falls on Monday through Friday, the weekly guarantee of 40 hours is reduced to 32 hours.

**3.2** Extra Labor.

**3.21** Any Class A or Class B registered employee dispatched and reporting for CFS extra labor duty and turned to is guaranteed a minimum of 8 hours' pay at the regular hourly rate. If no work is available, they shall receive 4 hours' pay at the regular hourly rate.

**3.22** All nonregistered employees dispatched and reporting for extra CFS labor duty shall receive a minimum of 4 hours' pay and/or time worked. If such an employee is called back for the following day, the guarantee shall be 8 hours for

the initial day and for every day turned to from that day on until released.

**3.3** Acts of God: The provisions of this Section shall not apply in the event work is not available or possible due to fire, flood, earthquake, power failure or other acts of God, or as a result of ILWU unilateral actions or because of work stoppages by other unions.

**3.31** There shall be no guarantee for any CFS employee who is released for cause or who quits or who refuses to shift as provided under CFS Section 1.25, or who is turned to and works less than the guaranteed time by reason of illness or injury. Such CFS employees shall be paid only for their actual working time.

**3.32** When men are knocked off work 6 minutes or more after the even hour, they shall be paid to the next one-half hour, and when knocked off 36 minutes or more past the even hour, they shall be paid to the end of the hour.

## CFS SECTION 4

## WAGES

**4.1** Wage Rates.

**4.11** The basic straight time hourly rate of pay for longshore/clerk utilitymen and working supervisory clerks shall be as follows:

|  | Longshore/Clerk Utilitymen | Working Sup. Clerks |
|---|---|---|
| Effective 8:00 a.m. November 23, 2002 | $27.68 | $30.08 |
| Effective 8:00 a.m. June 28, 2003 | $28.18 | $30.58 |
| Effective 8:00 a.m. July 3, 2004 | $28.68 | $31.08 |
| Effective 8:00 a.m. July 2, 2005 | $29.68 | $32.08 |
| Effective 8:00 a.m. July 1, 2006 | $30.18 | $32.58 |
| Effective 8:00 a.m. June 30, 2007 | $30.68 | $33.08 |

**4.12** All hourly rates of pay shall be as set forth in the Wage Schedule and shall be effective as set forth therein.

**4.13** Work Experience Straight Time Hourly Rates.

**4.131** Each employee, regardless of registration or non-registration status, unless exempted under CFS Section 4.132, shall be paid for work under this CFS Supplement on the basis of total worked hours in the industry accumulated since the beginning of the 1976 payroll year. The total accumulated worked hours credited to the employee at the end of the previous payroll week (7:59 a.m. Saturday) shall determine the employee's appropriate straight time hourly rate according to the following table:

| Work Experience Hours | Straight Time Hourly Rate | | |
|---|---|---|---|
| | Eff. 11/23/02 | Eff. 6/28/03 | Eff. 7/3/04 |
| 0 through 1,000 hours | $19.94 | $20.30 | $20.66 |
| 1,001 through 2,000 hours | $20.94 | $21.30 | $21.66 |
| 2,001 through 4,000 hours | $22.94 | $23.30 | $23.66 |
| 4,001 or more hours | Basic S.T. | Basic S.T. | Basic S.T. |

| Work Experience Hours | Straight Time Hourly Rate | | |
|---|---|---|---|
| | Eff. 7/2/05 | Eff. 7/1/06 | Eff. 6/3/07 |
| 0 through 1,000 hours | $21.39 | $21.75 | $22.11 |
| 1,001 through 2,000 hours | $22.39 | $22.75 | $23.11 |
| 2,001 through 4,000 hours | $24.39 | $24.75 | $25.11 |
| 4,001 or more hours | Basic S.T. | Basic S.T. | Basic S.T. |

**4.1311** Qualifying hours for pay rate status as set forth in CFS Section 4.131 above shall include all hours for which pay is received, excluding vacation hours, paid holiday hours, and Pay Guarantee Plan hours.

**4.1312** At the end of each succeeding payroll week, each employee, regardless of registration or non-registration status, will be credited with any hours worked. If the new total accumulated worked hours exceeds the upper limit of the work

experience hours grouping in which the employee is classified, pay for hours worked the following payroll week and succeeding weeks shall be based on the hourly rate of the next work experience grouping.

**4.1313** All other derivative rates, such as the second and third shift rates and the overtime rates shall be calculated from the rates described in CFS Section 4.131.

**4.132** All Class A and Class B employees registered on or before June 30, 1987 shall be exempted from the work experience requirements of CFS Sections 4.131 through 4.1313 and shall be entitled to receive the basic straight time hourly rate or rates derived therefrom.

**4.14** Shift Rates and Overtime Rates.

**4.141** Shift Rates: The first shift hourly rate shall be the basic straight time hourly rate. The second shift hourly rate shall be 1.333333 times the basic straight time hourly rate. The third shift hourly rate shall be 1.6 times the basic straight time hourly rate for the first 5 hours of the 7-hour shift and 1.8 times the basic straight time hourly rate for the last 2 hours of the 7-hour shift.

**4.142** Overtime Rates: The overtime hourly rate shall be 1.5 times the basic straight time hourly rate on the first shift, 1.5 times the basic straight time hourly rate on the second shift and 1.8 times the basic straight time hourly rate on the third shift.

**4.15** Payment of Rates.

**4.151** First Shift.

**4.1511** The basic straight time rate shall be paid for the first 8 hours worked between the hours of 8:00 a.m. and 5:00 p.m. on the first shift Monday through Friday.

**4.1512** The overtime rate (1.5 times the basic straight time hourly rate) shall be paid for work in excess of 8

hours, for work outside the hours of 8:00 a.m. to 5:00 p.m. on the first shift Monday through Friday and shall be paid for all hours worked on the first shift on Saturday, Sunday, and Agreement Holidays.

**4.152** *Second Shift.*

**4.1521** The second shift rate (1.333333 times the basic straight time hourly rate) shall be paid for the first 8 hours worked on the second shift Monday through Friday.

**4.1522** The overtime rate (1.5 times the basic straight time hourly rate) shall be paid for work in excess of 8 hours, for work outside the regular 8-hour second shift Monday through Friday and shall be paid for all hours worked on the second shift on Saturday, Sunday, and Agreement Holidays.

**4.153** *Third Shift.*

**4.1531** The first 5 hours worked during the 7 hour standard third shift Monday through Friday shall be paid at 1.6 times the basic straight time hourly rate and the last 2 hours worked shall be paid at 1.8 times the basic straight time hourly rate.

**4.1532** The overtime rate (1.8 times the basic straight time hourly rate) shall be paid for all hours worked in excess of the 7 hour standard work shift Monday through Friday and shall be paid for all hours worked on the third shift on Saturday, Sunday, and Agreement Holidays.

**4.154** There shall be no pyramiding of overtime.

**4.155** No travel time or travel allowances shall be paid.

**4.2** Penalty Cargoes.

**4.21** CFS Longshore/Clerk Utilitymen.

**4.211** In addition to the basic wage for CFS work, additional wages to be called penalties shall be paid as specified in Section 4.4 and related subsections of the PCLCD and PCCCD

for the types of cargoes, conditions of cargoes, or working conditions specified in the Wage Rate Schedule (Penalty Cargo List) of the PCLCD and PCCCD.

**4.212** Penalty cargo rates where applicable shall be limited to those CFS utilitymen specifically assigned to the operation for which a penalty rate is paid.

## CFS Section 5                           VACATIONS

**5.1** Steady CFS employees shall be paid vacations in accordance with the terms and conditions of the PCL&CA except that in all circumstances each week's vacation pay shall be 40 times the applicable CFS straight time rate.

**5.2** In conformity with Section 7.23 of the PCL&CA, hours worked by registered men in CFS's shall be interchangeable with hours worked under the PCL&CA. Vacation pay shall be in accordance with the terms of that Contract Document or Supplement under which more than half of the total hours for the year were worked.

## CFS Section 6
### DISPATCHING, REGISTRATION, AND PREFERENCE

**6.1** Steady Employees.

**6.11** Each CFS under the Contract Supplement shall be furnished a basic complement of employees to work on a steady basis, in the number determined by the employer to meet the anticipated regular employment needs.

**6.111** Orders placed at the joint ILWU-PMA dispatching halls for employees to work on a steady basis as part of the basic complement of employees for a CFS shall be placed at the hall at least 5 calendar days before dispatch and these or-

ders shall be posted immediately. Registered employees desiring dispatch to such jobs may notify the dispatcher of such desire during the time the jobs are posted. Registered employees shall be dispatched from the ILWU-PMA dispatching halls to such jobs, subject to first preference to Class A registered employees and second preference to Class B registered employees.

**6.112** If the local dispatching hall fails to provide the number of registered employees requested by the employer on a steady basis, then such individual employer shall be free to employ other workers of his own choosing. Workers so hired shall be entitled to steady employment under the terms and conditions of the Contract Supplement.

**6.2** Extra CFS labor to supplement the steady work force: It is recognized by the parties that the workload in a CFS may vary, calling for the employment of employees over and above the basic steady complement. When such additional employees are required they shall be identified as extra CFS labor.

**6.21** Orders for extra CFS labor shall be placed by the employer at the ILWU-PMA dispatching hall no later than the day before such employees are required. Extra labor shall be dispatched as per local joint dispatching rules except that such employees can be given their dispatch prior to the day they are to report.

**6.22** If sufficient employees are not available through the dispatching hall, the employer shall be free to employ extra CFS labor from other sources of his own choosing.

**6.23** Extra CFS labor may be continued on the payroll at a CFS but not after the end of the weekly payroll period.

**6.3** Union Security. Membership in the Union on or after the thirtieth (30th) day following the beginning of steady employment under this Contract Supplement shall be required as a

condition of employment of steady CFS employees who have completed their probationary period, provided that membership in the Union shall be subject to the approval of the Union, and provided further that membership shall not be terminated for reasons other than failure to tender periodic dues and initiation fees uniformly required as a condition of retaining membership, and provided further that no steady employee can be denied a job because of Union membership.

## CFS SECTION 7

# EMPLOYEE STATUS, SENIORITY, AND DISCHARGE

**7.1** Probationary Period.

**7.11** Individuals employed on a steady basis shall be considered as on probation during the first 30 calendar days of their employment. Any such individual who came from the registered work force, and who does not prove satisfactory to the employer at any time during the probationary period may be returned to the dispatching hall at the employer's discretion.

**7.12** Individuals hired on a steady basis from a source other than the ILWU-PMA dispatching halls shall also serve a 30-day probationary period during which time they may be terminated at the employer's discretion.

**7.2** Seniority.

**7.21** When employees hired for the basic steady complement in a CFS have passed the probationary period they become permanent employees. Seniority shall date from the date of original hire. Employees may be terminated from such status only under the seniority or discharge provisions of this Contract Supplement and the Agreement.

**7.22** Seniority shall be lost by an employee who fails to return to work within 72 hours after having been notified that the

job is again available unless the employee is prevented from returning to work by a bona fide illness or injury, or because of a scheduled vacation or approved leave of absence under the PCL&CA or is working in a job under the Agreement and cannot be replaced.

**7.23** Seniority shall also be lost if an employee is laid off for a continuous period of 60 days.

**7.24** Seniority shall also be lost by discharge of the employee from the CFS for cause or by an employee's failure to report to work when directed to do so by the employer without obtaining leave of absence approval by the company and the Union.

**7.241** A registered Class A or B longshoreman or clerk who loses seniority under the preceding paragraph shall be returned to the dispatching hall and shall be subject to discipline under the PCL&CA for the incidents giving rise to the employee's return to the hall. The employment records of the registered longshoremen and clerks under this Supplement shall be part of their records under the Agreement.

**7.25** Nothing in this Supplement shall prevent the discharge of a steady or an extra employee who is not a registered Class A or Class B longshoreman or clerk. If there is disagreement between the parties as to the propriety of the discharge, the employee shall have access to the grievance procedure, provided such complaint is filed promptly with the employer within 2 working days after the employee has been notified of the discharge.

## CFS SECTION 8

### LAYOFF

**8.1** Should the work opportunity at a CFS be reduced to such a degree as to necessitate a reduction in the basic complement

of employees, the last steady employee hired shall be the first laid off. An employee who was a registered Class A or B longshoreman or clerk shall be returned to the joint dispatching hall.

**8.2** Should steady work opportunity increase, laid-off employees with seniority shall be offered the first opportunity to return to the CFS as steady employees in the reverse order of layoff. Those employees returning who had previously gained seniority shall not have to serve an additional probationary period, and their previous seniority shall count in regard to future layoffs.

**8.21** Notice of return to work shall be given to the laid off employee by certified mail, return receipt requested, directed to the last address on record with the company who laid him off. A carbon copy of such notice shall be sent to the ILWU-PMA dispatching hall.

## CFS SECTION 9

### GRIEVANCE PROCEDURE

**9.1** Section 17 of the Agreement applies to this Contract Supplement and is supplemented by the following:

**9.11** Any disagreements as to the facts involved in the application of the rules set out in CFS Sections 1.13, 1.24, 1.25, 1.26, 6.21 and 6.23 shall be carried on through the grievance-arbitration procedure of Section 17 of the Agreement, except that decisions reached at the local level by joint agreement or by the Area Arbitrator shall be final and binding.

## CFS SECTION 10

### GENERAL

The provisions of Sections 5, 11, 12, 13, 15, 16 and 18 of the Pacific Coast Longshore & Clerks' Agreement are applicable

parts of this Contract Supplement. Other provisions can be reviewed, and their application or effect specified by mutual agreement.

## CFS SECTION 11
## TERM OF CONTRACT SUPPLEMENT

**11.1** The term of this Contract Supplement shall be the same as the PCL&CA.

## CFS SECTION 12
## HEALTH, WELFARE, AND PENSIONS

**12.1** Employers shall contribute to the welfare and the pension funds as provided under the PCL&CA.

**12.2** Any CFS employee eligible for ILWU-PMA welfare benefits because of longshore or clerk registration and work on the day before the first day of employment under the terms and conditions of this Contract Supplement shall continue to be eligible for benefits.

**12.21** Registered employees working as CFS employees shall enter, remain in, and be removed from the group of registered longshoremen and clerks eligible for welfare benefits under the terms generally applicable, except that hours of work as a CFS employee shall be considered as hours of work as a longshoreman or clerk in determining eligibility questions.

**12.3** Any CFS employee, including any such employee not already having such eligibility under the PCL&CA shall be eligible for welfare benefits on the first day of the month after first completing 3 months of continuous service, without layoff, under the terms and conditions of this Contract Supplement.

**12.31** Eligibility of a steady CFS employee for welfare benefits on the basis of CFS Section 12.3 shall terminate at the

end of the month in which the employee is laid off as a steady CFS employee.

**12.32** A steady CFS employee who has become eligible under CFS Section 12.3 and lost eligibility under CFS Section 12.31 shall, within the period during which seniority is retained under CFS Section 7.2 again become eligible for welfare benefits on the first day of the month following return from layoff unless the employee has again been laid off during the month in which called back.

**12.4** Time worked under this Contract Supplement by any CFS employee shall count as time worked as a longshoreman or clerk under the ILWU-PMA Pension Plan, and the Pay Guarantee Plan for Class A and Class B registered longshoremen and clerks.

2002-2003 WAGE RATES
2002-2004 WAGE SCHEDULE

CFS SUPPLEMENT
CFS WAGE SCHEDULE

## 2002-2003 WAGE SCHEDULE

*Effective 8:00 a.m., November 23, 2002 to 8:00 a.m. June 28, 2003*

| "Experience" Level (Hours) | 1st Shift | 2nd Shift | 3rd Shift | 1st & 2nd Shift Overtime | 3rd Shift Overtime |
|---|---|---|---|---|---|
| **Longshore/Clerk Utilityman** | | | | | |
| 4,000 or more | $27.68 | $36.91 | $41.52 | $44.29 | $49.82 |
| 2,001 - 4,000 | $22.94 | $30.59 | $34.41 | $36.70 | $41.29 |
| 1,001 - 2,000 | $20.94 | $27.92 | $31.41 | $33.50 | $37.69 |
| 0 - 1,000 | $19.94 | $26.59 | $29.91 | $31.90 | $35.89 |
| **Clerk Supervisor** | | | | | |
| 4,000 or more | 30.08 | 40.11 | 45.12 | 48.13 | 54.14 |
| 2,001 - 4,000 | 25.34 | 33.79 | 38.01 | 40.54 | 45.61 |
| 1,001 - 2,000 | 23.34 | 31.12 | 35.01 | 37.34 | 42.01 |
| 0 - 1,000 | 22.34 | 29.79 | 33.51 | 35.74 | 40.21 |

## 2003-2004 WAGE SCHEDULE

*Effective 8:00 a.m., June 28, 2003 to 8:00 a.m. July 3, 2004*

| "Experience" Level (Hours) | 1st Shift | 2nd Shift | 3rd Shift | 1st & 2nd Shift Overtime | 3rd Shift Overtime |
|---|---|---|---|---|---|
| **Longshore/Clerk Utilityman** | | | | | |
| 4,000 or more | $28.18 | $37.57 | $42.27 | $45.09 | $50.72 |
| 2,001 - 4,000 | $23.30 | $31.07 | $34.95 | $37.28 | $41.94 |
| 1,001 - 2,000 | $21.30 | $28.40 | $31.95 | $34.08 | $38.34 |
| 0 - 1,000 | $20.30 | $27.07 | $30.45 | $32.48 | $36.54 |
| **Clerk Supervisor** | | | | | |
| 4,000 or more | 30.58 | 40.77 | 45.87 | 48.93 | 55.04 |
| 2,001 - 4,000 | 25.70 | 34.27 | 38.55 | 41.12 | 46.26 |
| 1,001 - 2,000 | 23.70 | 31.60 | 35.55 | 37.92 | 42.66 |
| 0 - 1,000 | 22.70 | 30.27 | 34.05 | 36.32 | 40.86 |

2004-2005 WAGE RATES
2005-2006 WAGE RATES

CFS SUPPLEMENT
CFS WAGE SCHEDULE

## 2004-2005 WAGE SCHEDULE

*Effective 8:00 a.m., July 3, 2004 to 8:00 a.m. July 2, 2005*

| "Experience" Level (Hours) | 1st Shift | 2nd Shift | 3rd Shift | 1st & 2nd Shift Overtime | 3rd Shift Overtime |
|---|---|---|---|---|---|
| **Longshore/Clerk Utilityman** | | | | | |
| 4,000 or more | $28.68 | $38.24 | $43.02 | $45.89 | $51.62 |
| 2,001 - 4,000 | $23.66 | $31.55 | $35.49 | $37.86 | $42.59 |
| 1,001 - 2,000 | $21.66 | $28.88 | $32.49 | $34.66 | $38.99 |
| 0 - 1,000 | $20.66 | $27.55 | $30.99 | $33.06 | $37.19 |
| **Clerk Supervisor** | | | | | |
| 4,000 or more | 31.08 | 41.44 | 46.62 | 49.73 | 55.94 |
| 2,001 - 4,000 | 26.06 | 34.75 | 39.09 | 41.70 | 46.91 |
| 1,001 - 2,000 | 24.06 | 32.08 | 36.09 | 38.50 | 43.31 |
| 0 - 1,000 | 23.06 | 30.75 | 34.59 | 36.90 | 41.51 |

## 2005-2006 WAGE SCHEDULE

*Effective 8:00 a.m., July 2, 2005 to 8:00 a.m. July 1, 2006*

| "Experience" Level (Hours) | 1st Shift | 2nd Shift | 3rd Shift | 1st & 2nd Shift Overtime | 3rd Shift Overtime |
|---|---|---|---|---|---|
| **Longshore/Clerk Utilityman** | | | | | |
| 4,000 or more | $29.68 | $39.57 | $44.52 | $47.49 | $53.42 |
| 2,001 - 4,000 | $24.39 | $32.52 | $36.59 | $39.02 | $43.90 |
| 1,001 - 2,000 | $22.39 | $29.85 | $33.59 | $35.82 | $40.30 |
| 0 - 1,000 | $21.39 | $28.52 | $32.09 | $34.22 | $38.50 |
| **Clerk Supervisor** | | | | | |
| 4,000 or more | 32.08 | 42.77 | 48.12 | 51.33 | 57.74 |
| 2,001 - 4,000 | 26.79 | 35.72 | 40.19 | 42.86 | 48.22 |
| 1,001 - 2,000 | 24.79 | 33.05 | 37.19 | 39.86 | 44.62 |
| 0 - 1,000 | 23.79 | 31.72 | 35.69 | 38.06 | 42.82 |

## 2006-2007 WAGE SCHEDULE

*Effective 8:00 a.m., July 1, 2006 to 8:00 a.m. June 30, 2007*

| "Experience" Level (Hours) | 1st Shift | 2nd Shift | 1st & 2nd Shift Overtime | 3rd Shift | 3rd Shift Overtime |
|---|---|---|---|---|---|
| **Longshore/Clerk Utilityman** | | | | | |
| 4,000 or more | $30.18 | $40.24 | $45.27 | $48.29 | $54.32 |
| 2,001 - 4,000 | $24.75 | $33.00 | $37.13 | $39.60 | $44.55 |
| 1,001 - 2,000 | $22.75 | $30.33 | $34.13 | $36.40 | $40.95 |
| 0 - 1,000 | $21.75 | $29.00 | $32.63 | $34.80 | $39.15 |
| **Clerk Supervisor** | | | | | |
| 4,000 or more | 32.58 | 43.44 | 48.87 | 52.13 | 58.64 |
| 2,001 - 4,000 | 27.15 | 36.20 | 40.73 | 43.44 | 48.87 |
| 1,001 - 2,000 | 25.15 | 33.53 | 37.73 | 40.24 | 45.27 |
| 0 - 1,000 | 24.15 | 32.20 | 36.23 | 38.64 | 43.47 |

## 2007-2008 WAGE SCHEDULE

*Effective 8:00 a.m. June 30, 2007*

| "Experience" Level (Hours) | 1st Shift | 2nd Shift | 1st & 2nd Shift Overtime | 3rd Shift | 3rd Shift Overtime |
|---|---|---|---|---|---|
| **Longshore/Clerk Utilityman** | | | | | |
| 4,000 or more | $30.68 | $40.91 | $46.02 | $49.09 | $55.22 |
| 2,001 - 4,000 | $25.11 | $33.48 | $37.67 | $40.18 | $45.20 |
| 1,001 - 2,000 | $23.11 | $30.81 | $34.67 | $36.98 | $41.60 |
| 0 - 1,000 | $22.11 | $29.48 | $33.17 | $35.38 | $39.80 |
| **Clerk Supervisor** | | | | | |
| 4,000 or more | 33.08 | 44.11 | 49.62 | 52.93 | 59.54 |
| 2,001 - 4,000 | 27.51 | 36.68 | 41.27 | 44.02 | 49.52 |
| 1,001 - 2,000 | 25.51 | 34.01 | 38.27 | 40.82 | 45.92 |
| 0 - 1,000 | 24.51 | 32.68 | 36.77 | 39.22 | 44.12 |

# CFS PROGRAM FUND

The parties acknowledge their mutual interests in developing productive work opportunities that preserve for dockworkers their work and living standards. Such a program will retain and attract to the industry responsible, reliable and skilled persons whose availability will assure a stable work force and will minimize the costs of those industry programs that are now required when work is unavailable.

The parties recognize that the continued movement of container work from the docks jeopardizes their aforesaid mutual interests. They desire to reverse that movement and encourage the establishment, development and growth of efficient and productive container freight stations on the docks to preserve the work which has historically been performed by the longshore work force.

To achieve these ends they have agreed as follows:

(1) The employers will expend annually during the term of this contract approximately $3 million to be raised upon containerized cargo tonnage. (The reference to a dollar expenditure is not a cap upon the sum the employers may be required to expend annually to achieve the objectives of this program.) The funds shall be managed by PMA and distributed by it to those of its members who operate CFS facilities, such distribution to be on a basis which will encourage the preservation, growth and increase of such container stuffing and unstuffing facilities. PMA will report periodically to the Union on the receipts and disbursements of the Fund.

(2) The provisions of the Container Freight Station Supplement shall not be burdened by arbitration decisions or past practices prior to July 1, 1984 whether

oral or written. Any restrictions on the employer that are in conflict with the provisions of the Container Freight Station Supplement will be considered null and void.

(3) The parties will henceforth commit themselves to increasing CFS productivity and the elimination of wasteful work practices.

(4) The parties agree to set up a joint committee to report periodically to the Joint Coast Labor Relations Committee on the progress of this program and to make recommendations as to further implementation.

(5) Disputes which arise with respect to this program shall be first referred to the Joint Port Labor Relations Committee for the port where the dispute may arise and, if necessary, may be referred by either party to the Joint Coast Labor Relations Committee and then by either party to the Coast Arbitrator.

(6) This program may be terminated with the mutual written consent of the parties upon 60 days' written notice to all employers receiving distributions under this program and, in all events, this program shall immediately terminate if the provisions of CFS Sections 1.5 through 1.543 of the 1970-71 Container Freight Station Supplement and CFS Sections 1.53, 1.54, 1.55 and 1.57 of the amended Container Freight Station Supplement that were entered into February 10, 1972 are determined to be legally enforceable.

## SUPPLEMENT I
# COASTWISE REGISTRATION AND TRANSFER

The Joint Port Labor Relations Committee in any port, subject to the ultimate control of the Joint Coast Labor Relations Committee, shall exercise control over registration lists in that port, including the power to make additions to or subtractions from the registered lists as may be necessary. Any longshoreman or clerk who is properly registered by a Joint Port Labor Relations Committee acting under their agreement and this Supplement I has coastwise registration under the Pacific Coast Longshore and Clerks' Agreement. The rights and obligations of coastwise registration shall be under the control of the Joint Coast Labor Relations Committee and subject to the provisions set forth herein below.

## 1. TRANSFERS OF LONGSHOREMEN BETWEEN PORTS

1.1 A longshoreman having fully registered status as a Class A longshoreman may transfer to another port, and as a fully registered Class A longshoreman at such other port, provided;

1.11 The Joint Port Labor Relations Committee at the former home port determines that a transfer is warranted on the basis of work opportunity or that there are compelling reasons for letting him transfer despite the need for him at that port and that there is an opening available for him at the port to which he seeks to be transferred.

1.12 Transfers shall not be permitted if contrary to policies established by the Joint Coast Labor Relations Committee; and

1.13 The Joint Port Labor Relations Committee to which transfer is made, by applying the usual rules finds there is an

opening available for him on the list of such port and approves him for transfer of registration.

**1.2** A request for transfer may be denied by the Joint Port Labor Relations Committee of the port from which transfer is sought if the longshoreman is needed at that port or if he has not had a satisfactory record at that port.

**1.3** No longshoreman shall be eligible for transfer who within a year of the application has been the subject of major discipline.

**1.4** A request for transfer may be denied by the Joint Port Labor Relations Committee of the port to which the man seeks to transfer. Any denial of transfer, except because there is no opening available on its list, shall be subject to review in accordance with the procedure and rules that are applicable.

**1.5** No fully registered man shall be entitled to transfer under these provisions until he has held such status for at least 1 year.

**1.6** Hereunder, a fully registered longshoreman may transfer only to fully registered status as a longshoreman in another port. The place of the transferred man on the Class A list of the port to which he transfers shall be determined by his total Class A and Class B registered time as compared to such time of those on the Class A list of the port to which he transfers.

**1.7** Fully registered men having less than 1 year of such status and limited registered men may apply for inclusion on the limited registered list of another port and consideration shall be given to the work and availability record under the Pacific Coast Longshore Agreement in taking action on such applications.

An application of such a longshoreman for limited registration in the second port shall be considered without discrimination based upon his failure to be a resident of the port to which application is made is provided the Joint Port Labor Relations

Committee of the port where he has limited registration certifies to the Joint Port Labor Relations Committee of the port where application is made that the applicant has a fully satisfactory record as a longshoreman in the port where registered and that there is no reason to interfere with his transfer that is deemed sufficient by the Joint Port Labor Relations Committee. In considering the application of a limited registered longshoreman from another port, consideration may be given to his employment provided the favorable certification referred to above is submitted by the Joint Port Labor Relations Committee where he has been registered.

## 2. VISITING REGULATIONS FOR THE HOME PORT

**2.1** Fully registered men shall be freely accorded visiting privileges subject to the manpower needs of their home port and the port to be visited as more specifically set forth below.

**2.2** Permission to leave a home port can be granted only by action of the appropriate Joint Port Labor Relations Committee acting under the Pacific Coast Longshore Agreement. One who leaves his home port without Joint Port Labor Relations Committee approval shall be subject to being called back when needed and to deregistration if he then fails to make himself available at his home port.

**2.3** Permission to leave to visit need not be granted if there is so much work in the home port that nonregistered longshoremen must regularly be used.

**2.4** Permission to leave to visit shall be conditioned on the obligation to return to the home port at any time after 30 days when it appears that nonregistered longshoremen are being regularly used in the home port.

**2.5** The period of time away from the home port, and other conditions on being away on visit, shall be determined by the Joint Port Labor Relations Committee of the home port.

**2.6** No longshoreman shall be granted leave to visit while there is a trade dispute affecting the work of longshoremen in the home port unless the Joint Coast Labor Relations Committee is in unanimous agreement on the leave. Representatives of either party may refuse to agree to such leaves except on such conditions as they deem are appropriate.

**2.7** A registered man away from his home port shall have his eligibility for benefits determined on the basis of the number of hours actually worked under the Pacific Coast Longshore Agreement.

## 3. VISITING REGULATIONS FOR THE PORT BEING VISITED

**3.1** A man who has fully registered longshoreman status under the Pacific Coast Longshore Agreement may, if he has been granted leave by his home port to visit, be permitted to visit at another port covered by the Pacific Coast Longshore Agreement upon receiving the approval of the Joint Port Labor Relations Committee of the port he wishes to visit; provided that the Joint Port Labor Relations Committee of the port visited shall determine (a) whether or not visiting longshoremen will be accepted from other ports under the Pacific Coast Longshore Agreement, (b) the conditions under which they shall be accepted provided that there shall be at all times a condition imposed by the basic Agreement that any visitor-longshoreman may lose his visitor rights at any time upon proper notice, (c) the length of time any visitor shall be permitted to remain in the port, (d) in what category or categories of work the visitor may be dispatched and work, and (e) whether or not a visitor-longshoreman may work in a gang.

**3.2** Any fully registered longshoreman having visitor status hereunder shall be given work opportunity equal to that of fully registered men at the port visited.

**3.3** A visitor shall not be dispatched until his application for visitor status, to which there is attached a copy of his leave from his home port to go on the visit, has been submitted to the Pacific Maritime Association and the local union in the port being visited and preliminary approval of the visit has been given by a local Joint Port Labor Relations Committee subcommittee that is representative of both parties.

**3.4** Preliminary approval of the visit shall be given automatically and immediately if (a) a certificate of leave to visit issued by the Joint Port Labor Relations Committee of the home port is presented, (b) the Joint Port Labor Relations Committee of the port being visited has agreed that visitors may be accepted at the time the application is submitted and (c) the applicant has sufficient time as a registered longshoreman as may be required.

**3.5** Final action on a visitor application shall be taken no later than the second regular Joint Port Labor Relations Committee meeting after the application has been submitted. Thereafter the visitor shall have rights to work in the visited port only if the application is approved by both parties or by action of the Area Arbitrator. An application may be denied if the man has a poor work or availability record at any one or more ports under the Pacific Coast Longshore Agreement, or if he does not satisfy the requirements therefor.

**3.6** No visiting privileges need be accorded limited registered men, but if there is a shortage of registered longshoremen in any port, temporary visiting privileges may be accorded to limited registered men from other ports where the Joint Port Labor

Relations Committee of the port of registration agrees to permit such visiting by its limited registered longshoremen.

## 4. LEAVES OF ABSENCE

**4.1** A leave of absence for a registered longshoreman can be granted only by action of the Joint Port Labor Relations Committee ("JPLRC"). The JPLRC may grant registered longshoremen up to one (1) year leave of absence. A leave of absence in excess of one (1) year may be granted by action of the JPLRC.

**4.2** The Joint Port Labor Relations Committee shall give a leave of absence on request for the period of any employment by the Union, or a longshore local, or for the period of any joint employment.

**4.3** Port rules may be established with respect to the period of leaves of absence, reasons for which they may be granted, procedures for obtaining leaves, etc.

## 5. M & R REGISTRATION

Supplement I is applicable to registered longshore mechanics subject to the requirements of the M&R Herman/Flynn Letters of Understanding dated January 17, 1980 and March 24, 1980 and approved by their steady employer.

## SUPPLEMENT I-A

## REGISTRATION/TRANSFER TO CLERK

### (DATED JULY 1, 1990)

**1.** The parties shall retain joint control of the number of registered workers and Identified Casuals in the industry.

**2.** The parties shall retain all Contract provisions on preference of employment, Coastwise registration and transfer, industry travel, and no layoffs.

**3.** Each Joint Port Labor Relations Committee, subject to JCLRC control, shall establish the number of Class A and Class B registered longshoremen and clerks and Identified Casuals required in each port to effectively cover the work available in each port, with due regard for the Coastwise transfer provisions and the industry travel system.

**4.** Each Joint Port Labor Relations Committee shall review the size of the registration list and the available work in its port on a quarterly basis. Based on the available work in the port as determined by this review and subject to JCLRC approval, the Joint Port Labor Relations Committee shall make additions to the Class A, Class B, and Identified Casual List. Such additions shall be accomplished prior to the next quarterly review. In the event the local parties reach disagreement on additions to the Class A, Class B, or Identified Casual List, such disagreement shall be referred to the JCLRC and shall be arbitrable. The objective of this provision is to add workers in small numbers to each List on a more regular basis and to avoid large additions.

**4.1** In ports where the registration lists fall below ten, there shall be additions to those registration lists in order to maintain no less than ten registrants.

**4.2** Newly-registered longshoremen in these ports shall be obligated to travel as individuals when ordered by the

Employer for up to three days during any payroll week and shall receive their orders to travel in conformance with applicable local/area working, dispatching and travel provisions. When such individuals are ordered, they shall be entitled to travel pay and reporting guarantees. PGP_ shall be paid as per the PCLCD. And such travel obligation for newly registered longshoremen in these ports that fall below ten shall extend for no more than seven years. Longshoremen having registration dates in these ports prior to July 1, 1999 shall not be obligated to these travel provisions.

5. The selection of individuals for the Identified Casual List shall be made by the JPLRC or a Tripartite Joint Port Labor Relations Committee in a port where such Committee exists. All Casuals shall be required to pass the industry Strength and Agility Test, physical examination, and Drug and Alcohol Screening Test. All Identified Casuals dispatched to perform Marine Clerks' work must pass the Marine Clerks' Cognitive Test. One Identified Casual List shall cover all Casual work, longshore and clerk, to be dispatched in rotation from a longshore or clerk dispatch hall.

6. Additions to the Class B Longshore Registration List shall be made from the list of Identified Casuals in that port based upon work experience (hours) and work record in the industry. Class B registrants shall move to Class A status in no more than 5 years, except if there is a decline in work opportunity for the Class A work force in the port.

7. A simplified application procedure shall be developed by the JCLRC.

8. Under the direct control of the Joint Coast Labor Relations Committee, the selection of individuals for the initial establishing of the Identified Casual Lists shall be made by the JPLRC or a Tripartite Port Labor Relations Committee in ports

where such Committee exists on the basis of a random-draw concept. Where possible, existing lists of unidentified Casuals may be "grandfathered." Additionally, each JPLRC shall establish a procedure for dispatching unidentified Casuals when the Identified Casual System is insufficient to fill the Employers' manpower requirement.

9. Future clerk registration positions shall be filled first by transferring Class A longshoremen. If transferring longshoremen in sufficient numbers do not meet the following requirements, remaining positions shall be filled with Class B clerk registration.

9.1 The following criteria must be met in order for longshoremen to qualify for a transfer to clerk registration:

9.11 Transfer applicants, except longshoremen who are registered in Low-Work Opportunity Ports as determined by Supplement III, must have worked the required hours to have qualified for a 2-week basic vacation in each of the previous 2 years. This requirement may be waived for up to a maximum of 1 year for individuals off work due to industrial illness or injury. Any transfer applicant who fails to meet this requirement during one or both of the two years previous to a Clerk transfer decision because of their disability may apply to the Joint Port Labor Relations Committee for a waiver of the requirement. Applications should include an explanation of how the disability prevented the longshore worker from meeting the minimum hours requirement, all attempts by the longshore worker to meet the minimum hours requirement (such as seeking work off a dock preference board), and medical documents that substantiate the disability. The application should be submitted to the Joint Port Labor Relations Committee for the port in question, and will be processed under the CLRC Policy on ADA Compliance and Reasonable Accommodation. (See CLRC Meeting no. 20-01, item1, December 5, 2001.)

**9.12** Transfer applicants must pass the ARRO Cognitive Test.

**9.13** Transfer applicants must successfully pass a CRT Keyboard Skill Test, which includes a typing test for speed and accuracy.

**9.14** Transfer applicants successfully meeting the requirements of Sections 9.11, 9.12 and 9.13 above, shall be placed in a pool of applicants for selection. Selection shall be from applicants by seniority for 50% of the total number of transfers, and the remaining 50% shall be selected by the employers.

**10.** Transfer applicants who are transferred to Marine Clerks' registration shall be required to successfully complete the Basic Clerks' Training Course and Clerks' Computer Training Course. Transferred clerks will be considered probationary for a period of 1 year. During such year, the work record and capabilities of the probationary clerk shall be subject to evaluation by the Employers. The Employers shall have the right at any time within the 1 year probationary period to have removed from the registration list of clerks and returned to longshore registration any probationary clerk who, in the opinion of the Employers, is considered to be unqualified. This right to return a probationary clerk to longshore registration shall not require joint agreement. Such probationary clerk will receive a written explanation from the employer.

**11.** If, as the result of a quarterly review, the Joint Port Clerks' Labor Relations Committee determines that there is an excess of registered clerks and the Joint Port Longshore Labor Relations Committee determines that there is an insufficient number of registered longshoremen, the JPLRC shall transfer clerks who have come from the longshore ranks back to longshore registration. These transfer returns shall be first offered to volunteers and, second, shall be required on the basis of inverse seniority as a clerk.

## SUPPLEMENT II

## COAST PROVISIONS FOR TRANSFER OF REGISTRATION BETWEEN LONGSHORE AND CLERK REGISTERED LISTS

**1.** Any request for transfer must be considered and any transfer must be approved by both the longshore Joint Port Labor Relations Committee and the Clerks' Joint Port Labor Relations Committee.

**2.** Each Joint Port Labor Relations Committee shall determine the requirements and qualifications of applicants for registration within its jurisdiction. In determining whether an applicant for transfer is or is not qualified, the Committee having jurisdiction over the list to which transfer is requested shall recognize the special qualifications of men who have worked in the longshore industry. A longshoreman, by reason of his knowledge and experience in the industry, is better qualified to be a clerk than an outsider; and a clerk, for the same reason, is better qualified to be a longshoreman than an outsider.

**3.1** No transfer shall take place to the registered list of clerks in any port unless it is determined by the Clerks' Joint Port Labor Relations Committee in that port that men are needed in addition to the existing combined pool of men on the Class A and Class B lists.

**3.2** No transfer shall take place to the longshore registered list in any port unless it is determined by the Longshore Joint Labor Relations Committee in that port that men are needed in addition to the existing combined pool of men on the Class A and Class B longshore registered lists.

**4.1** When the Clerks' Joint Port Labor Relations Committee determines that additional personnel is needed on the list of registered clerks, fully registered longshoremen seeking

transfer and found to be qualified shall be transferred directly to the Class A registered clerks' list. A longshoreman who has not had 5 years of full registration (Class A) shall not be accorded transfer.

**4.2** When the Longshore Joint Port Labor Relations Committee determines that additional personnel is needed on the list of registered longshoremen, fully registered clerks seeking transfer and found to be qualified shall be transferred directly to Class A registered longshoremen's list. A clerk who has not had 5 years of full registration (Class A) shall not be accorded transfer.

**5.1** Fully registered longshoremen may be transferred to the fully registered clerks' list not more frequently than quarterly.

**5.2** Fully registered clerks may be transferred to the fully registered longshoremen's list not more frequently than quarterly.

**6.1** Prior to any application being considered for registration as limited registered (Class B) clerk, fully registered longshoremen found to be qualified may be transferred to the fully registered clerks' list — up to the number fixed by the Clerks' Joint Port Labor Relations Committee.

**6.2** Prior to any applications being considered for registration as limited registered (Class B) longshoremen, fully registered clerks found to be qualified may be transferred to the fully registered longshoremen's list — up to the number fixed by the Longshore Joint Port Labor Relations Committee.

**7.** Any additions to or reduction from any registered list of longshoremen or clerks, either Class A or Class B, will be made at the port level, but only after clearance by the Joint Coast Labor Relations Committee.

**8.1** Clerks on the clerks' Class B list may be advanced to the status of fully registered clerks even if qualified longshoremen are awaiting transfer, but only after clearance by the Joint Coast Labor Relations Committee.

**8.2** Longshoremen on the longshoremen's Class B list may be advanced to the status of fully registered longshoremen even if qualified clerks are awaiting transfer, but only after clearance by the Joint Coast Labor Relations Committee.

**9.** A clerk accepted for transfer on the longshore registered list or a longshoreman accepted for transfer on the clerks' registered list shall carry with him all his pension, welfare, Pay Guarantee Plan, and vacation rights. His place on the Class A list to which his is transferred shall be determined by his total Class A registered time.

**10.** A fully registered man seeking transfer shall be transferred only if he is qualified for the vacancy. Each of the labor relations committees involved in such transfer shall act in a nondiscriminatory manner and no clearance for transfer, registration, or refusal of transfer shall be based on, or in any way affected by rules, regulations, constitutional provisions, by-laws or any other aspect or obligation of union policies or requirements.

## SUPPLEMENT III

### REGISTRATION AND TRANSFER OF MEN FROM LOW WORK OPPORTUNITY PORTS

#### A. No Lay Offs

There shall be no reduction in registered longshoremen or clerks' work force during the term of the Agreement except for normal attrition due to quits, deaths and retirements, and deregistration for cause. This does not preclude the parties from agreeing upon a reduction in force should unusual circumstances develop.

#### B. Promotion of Class B Men

Subject to the ultimate control of the parties at the Coast level, local Joint Port Labor Relations Committees may submit requests for promotions from Class B to Class A on an orderly basis.

### TRANSFER OF MEN FROM LOW WORK OPPORTUNITY PORTS

A "Low Work Opportunity Port" (LWOP) situation may include Class B men in a port, or Class A and Class B men in a port, and is described as follows:

**1.** When the average Class B hours worked in a port are reduced to one-half or less of the 28-hour PGP guarantee for Class B men for a continuous 6-week period, such situation shall constitute a LWOP for Class B men in that port.

**2.** When the average Class A hours worked in a port are reduced to one-half of the 38-hour PGP guarantee for Class A men for a continuous 6-week period, such situation shall constitute a LWOP for Class A men in that port. No Class A man LWOP shall exist without a Class B man LWOP in any port where Class B men are registered.

204

**3.** LWOP status shall be determined by averaging the hours worked during any 6 consecutive payroll weeks. Once a port has obtained LWOP status it shall automatically remain in that status for 26 payroll weeks. At the end of the 26th payroll week, a review shall be made of the last 6 payroll weeks of that period (the 21st payroll week through the 26th payroll week). If the average weekly work hours for those 6 weeks is 14 hours or less per week for Class B men or 19 hours or less for Class A men in the port, the LWOP status shall continue for a succeeding 26 payroll-week period. If not, the LWOP status shall be discontinued. Whenever LWOP status is discontinued, re-entry into, subsequent continuance or discontinuance of such status shall occur as provided herein.

**4.** The determination of whether men in Low Work Opportunity Ports are to be offered the opportunity to transfer (including the number) to other ports requiring additional manpower shall rest with the Joint Coast Labor Relations Committee.

**5.** Men in Low-Work Opportunity Ports may transfer to other ports where greater work opportunity exists, under the following conditions:

(a) The selection of men volunteering to transfer shall be on a seniority basis. Class A men shall have first preference and Class B men shall have second preference. Seniority within each classification shall also prevail.

(b) Transferees cannot be denied transfer by the Joint Port Labor Relations Committee of the port requiring additional manpower without just cause. Any dispute under this provision shall be arbitrable.

**6.** Those who transfer to another port under Section 4 shall be given the following considerations by PMA:

205

(a) Round trip transportation, subsistence and lodging for one advance trip only to look for housing in the port to which transferred. This trip shall be limited to the man to be transferred, his wife, or both and transportation reimbursement shall be made on the basis of airline coach-class transportation or the lowest airline fare available at that time, or the current mileage rate agreed to in Section 4.6, PCLCD if personal car is used. Subsistence reimbursement shall be as set forth in Section 4.51, PCLCD, and lodging reimbursement shall be on the basis of actual cost, with receipts to be furnished. This advance trip shall not exceed 5 days.

(b) Moving expenses for family and for the family's personal belongings and household goods as indicated below:

(1) Moving of personal belongings, i.e., household goods by a licensed moving company selected by the parties. Pacific Maritime Association payments for shipment of household goods will be limited to a maximum of 6,500 pounds of shipment for a married man and his family; single longshoremen with no dependents involved shall be limited to 2,500 pounds. Insurance shall not exceed $2.00 per pound.

(2) Transportation to the port to which transferred and subsistence and lodging for the longshoreman and his family. Reimbursement for transportation shall be made on the basis of cost of airline coach-class transportation or the lowest airline fare available at that time, or the current mileage rate agreed to in Section 4.6, PCLCD if

a personal car is used. Subsistence reimbursement shall be as set forth in Section 4.51, PCLCD, and lodging reimbursement shall be on the basis of actual cost, with receipts to be furnished. The maximum payment for subsistence and lodging while traveling and while in the port to which transferred shall not exceed normal time, for mode of travel used, plus 3 days.

(3) Minimum cost required to disconnect and hook up appliances.

(4) Storage of household effects caused by unusual circumstances, when approved by the parties.

(5) All transfers must be completed and transfer relocation expenses, as described in Supplement III, PCLCD, must be submitted no later than 2 years after acceptance for transfer; claims filed thereafter shall be disallowed.

7. Men transferring shall sign an "Agreement to Transfer" under the conditions set forth herein. Their registration shall become effective in the port to which transferred at the beginning of the payroll week (8:00 a.m. Saturday) following the move to the port to which transferred and check-in to dispatch hall after approval of the JPLRC.

8. Once transferred, men shall not be eligible for transfer back to their original port or to any other port for 3 years (unless the port to which transferred should become a Low Work Opportunity Port). After 3 years, eligibility to transfer to other ports shall be as provided in the PCLCD and PCCCD.

9. The conditions of transfer are limited to those contained herein and it is intended that these conditions will be applied on a "reasonable" basis. Any dispute as to an underpayment or

overcharge may be submitted to the Area Arbitrator for final and binding resolution.

10. Men who transfer from Low Work Opportunity Ports but do not move their residence may elect to retain the welfare coverage in effect at the port from which they transferred.

## SUPPLEMENT IV

# INDUSTRY TRAVEL SYSTEM

1. Area Agreements with respect to traveling of men and gangs shall continue in full force and effect. Individuals who voluntarily travel or individuals and/or gangs who are ordered to travel by the employer within a defined area shall, when they work, be paid for such travel under the provisions set forth herein.

2. The defined areas are:

   *Southern California*

   Individuals who voluntarily travel from Port Hueneme to San Diego or vice versa shall, when they work, be paid full travel time and subsistence from port to port, regardless of the number of casuals dispatched in Los Angeles/Long Beach.

   *Northern California*

   *Columbia River/Oregon Coast*

   *Puget Sound Area/Washington Coast*

   2.1 Individual Voluntary Travelers.

   2.11 In the Southern California, Columbia River/Oregon Coast, and Puget Sound areas, the sequence of dispatch for registered Class A and Class B individuals who voluntarily travel shall be in sequence of ports on low-to-high "average hours" basis. In the Northern California area, the Joint Area Labor Relations Committee shall determine the method of equalizing dispatch opportunity between ports in Northern California.

   2.111 In determining a port's average hours, home port hours, out port hours and travel hours shall be included. Steady men hours shall be excluded.

INDUSTRY TRAVEL SYSTEM                                    SUPPLEMENT IV

**2.112** The average hours shall be calculated quarterly. The most recently available payroll quarter calculation shall be used in determining the dispatch sequence of ports within an area.

**2.12** The sequence of dispatch for registered Class A and Class B individuals set forth in Sections 2.11, 2.111 and 2.112 above may be modified by mutual agreement of the Joint Longshore Area Labor Relations Committee.

**2.2** Gang Travel.

**2.21** Within each of the defined areas set forth in Section2, above, the sequence of dispatch of longshore gangs (any gang or unit) ordered to travel by the employer from ports within the defined area to jobs in an employment port shall be on the basis of priority orders established by the Employers. In the Columbia River/Oregon Coast Area the sequence of dispatch of longshore gangs (any gang or unit) shall be from the closest port. The mileage figures used to calculate travel time and transportation allowances for both individual and gang travel in the Oregon Area shall conform to existing travel schedules.

**3.** Dispatch halls within a defined area shall communicate with ports in their area as to the number and type of job opportunities which may be available. Unless there already exist local written agreements between the parties, a practical method of dispatching men, who voluntarily travel to jobs either from the employment port dispatch hall or from their home port dispatch hall, shall be determined by the parties at the local and/or area level subject to grievance procedures. In the Southern California area it is understood that individuals shall accept work opportunity in the nearest port when it is available to them. The method must provide timely dispatch so as to avoid late starts, must provide the Employers with available information as to dispatch, and shall be within the following guidelines:

210

**3.1** The sequence of employment in the employment port shall be:

**3.11** Home Port Class A and Class B registered men and jointly authorized visitors.

**3.12** Gangs/Units or men ordered to travel by the employer.

**3.13** Class A and Class B registered individuals voluntarily traveling.

**3.14** Unauthorized visitors

**3.15** Casuals

**3.2** Where local written agreements between the parties are not in existence, voluntary travelers shall be required to be in the employment port dispatch hall at the time of dispatch.

**3.3** Volunteer men dispatched to a job from their port are not entitled to wages under any circumstance in which payment would be denied had they been dispatched from the port of employment dispatch hall

**3.4** No "job rights" wage claims related to the dispatch or employment of registered men from other ports shall be payable to men registered in the employment port.

**3.5** No "job rights" wage claims related to the dispatch or employment of casuals shall be payable to men either from other ports or from the employment port.

**3.51** Any claim related to the dispatch or employment of casuals in violation of the sequence of dispatch as outlined in this section shall be heard by the Joint Area Labor Relations Committee. The Joint Area Labor Relations Committee shall establish rules to correct such violations, if confirmed.

**3.6** Each port shall be required to fill the Employers' orders as provided in Section 8.5 of the PCLCD.

211

**4.** Class A and Class B registered men shall be prohibited from voluntarily traveling to or working in other ports when (1) there is work for them in their home port, or (2) they are ordered to travel in gangs or as individuals.

**5.** Uniform Coastwise Travel Allowances.

**5.1** Uniform "travel time" and "transportation allowances" shall be paid as set forth below.

**5.11** The travel time between any 2 ports shall be determined by dividing the round-trip mileage between ports by 35 M.P.H. for the first 70 miles. Travel time beyond 70 miles shall be determined by dividing the additional mileage by 55 M.P.H. Such travel time shall be calculated to the nearest one-quarter hour. Mileage figures to be supplied by the American Automobile Association (AAA), except as provided for in Section 2.21 for the Oregon Area. Travel time shall be payable at one-half the basic straight time hourly rate of pay.

**5.12** A mileage allowance for transportation shall be payable to each employed traveler. The amount shall be the maximum non-taxable mileage rate in accordance with IRS standards.

**5.121** Rate changes by IRS will be implemented as soon as administratively possible, but no later than 30 days from notification.

**5.13** Travelers employed on successive days shall be paid the "travel time" and "transportation allowances" set forth in Sections 5.11 and 5.12 above for the first day and last day, and the lesser of travel time and transportation or subsistence and lodging for all other days.

**5.131** Gangs/units and individuals dispatched to travel, arrive on time and work a shift in a port at least 75 miles one way from their home port shall be paid for 1 night's

lodging and 3 meals in addition to entitlements due under Section 5.

**5.14** Payment of "travel time" and "transportation allowances" shall be paid by the Employers with Pacific Maritime Association acting as the distributing agent on behalf of those Employers for whom PMA does the payrolling.

**5.15** The payment of travel time and transportation allowances provided for herein will be made on the payday of the second week following the week during which such entitlements occurred.

**5.16** The uniform coastwise travel allowances provided in this Section 5 shall supersede all existing local interport travel allowances and schedules. (Intraport travel allowances and schedules paid for travel within a port or within a local's jurisdiction are not included herein.)

**6.** Voluntary travelers who are entitled to travel allowances shall forfeit payment under the following circumstances:

**6.1** There are unfilled jobs in their home port.

**6.2** There are other voluntary travelers employed in their home port, or

**6.3** There are casuals employed in their home port.

**6.4** Forfeiture of payment under Sections 6.1, 6.2 and 6.3 above shall be applied on a shift basis when the voluntary travelers are recognized by the Joint Labor Relations Committee as "day men" or "night men." For example, voluntary travelers who are day men will not forfeit payment when the cause for denial occurred on the night shift, or vice versa.

**6.5** It is the intent of this Section 6 to prevent abuses of the industry travel system by providing proper utilization of men available for work in any port. It is intended to require the dispatch system of the home port to fulfill its responsibility by fill-

ing the manpower needs of the home port in the sequence provided in Section 3.1.

**6.51** Having an awareness and recognizing the priority obligation to their home port, it is intended that dispatchers are not to dispatch men to other ports and men are not to voluntarily travel to other ports when there is work available to them in their home port.

**6.52** On the other hand, it is also intended that the provisions of this Section 6 are not to apply when situations occur beyond the control of the dispatchers or the men. For example, such could occur in a late order/late dispatch situation, an unavoidable situation on the part of the dispatch hall, improper orders, and emergencies. Such situations shall be called to the attention of the PMA Area Office as soon as possible.

**6.53** Failure by the JPLRC to reach agreement on any grievance arising under this Section 6 within 10 days shall be subject to prompt and final determination by the Area Arbitrator.

**7.** Visitors unauthorized by the Joint Labor Relations Committee shall not be entitled to travel pay.

**8.** The requirement to travel men and the rights of men to travel, as set forth herein, shall not preclude or hinder establishing or maintaining an adequate registered work force in any port related to the port's need.

214

## ADDENDA

*For the convenience of the longshoremen, the employers and the parties, there are printed herein a number of the rulings of the Joint Coast Labor Relations Committee that are currently in effect. The printing herein of any ruling of the Joint Coast Labor Relations Committee does not in any way change its effect or mean that it is entitled to greater weight than other rulings of the Joint Coast Labor Relations Committee. Nor does the printing of any ruling in any way limit the power of the Joint Coast Labor Relations Committee to modify or change it.*

## SKILLED HOLDMEN — HOLDMEN CAPABLE OF DRIVING LIFTS

### CLRC No. 11, August 5, 1966 (Item 2(e))

The Employers stated they will not pay the skill differential to men until they are capable of driving lifts.

The Union suggested the approach that where it is recognized at the local level that a gang does not have qualified machine operators therein, then prior to the 2 men receiving the differential, holdmen capable of driving lifts will replace them in the gang.

It is the dispatchers' obligation to make up gangs properly, and this now includes providing 2 holdmen capable of driving lifts.

It was further agreed as follows:

1. In gang boss ports, it is the gang bosses' obligation to see to it the basic gang is properly constituted, and the holdmen capable of driving lifts are to be designated by him, where there

215

are steady men in his gang. In making up gangs, it is the dispatchers' responsibility to see that the basic gang is properly constituted on dispatch;

2. In all other ports the dispatchers shall dispatch the proper holdmen;

3. Should the employer find there are no holdmen capable of driving lifts he may—

    (a) Swing in skilled men from the dock who are not on the old or disabled preferential list and swing out the holdmen who were dispatched as the men capable of driving lifts, or

    (b) Discharge the gang, or

    (c) Call for replacements, or

    (d) Suspend the skill differential, and

    (e) Process the complaint through the grievance machinery.

4. The local LRC's have the discretion of filling these skilled hold jobs with either Class A or Class B longshoremen, and such men are to be regularly attached to the gang.

## CLRC No. 21, November 3, 1967 (Item 2)

The Committee again discussed the issues in this case and agreed that if there are no lift drivers available, meaning if no lift drivers are employed by the employer in the dock or terminal area, skilled holdmen may operate the lift on the dock for the purpose of bringing or removing gear or other necessary equipment to or from the hatch when no productive work is being performed.

# IN LIEU OF TIME

## CLRC No. 7, May 4, 1961 (Item 3)

### In Lieu of Time

The parties have discussed and have reached agreement on a general rule covering the assignment of work set forth in Section 1.6 of the Pacific Coast Longshore Agreement. It was further agreed that the adoption of this general rule for assignment of work under Section 1.6 will not be interpreted to support claims for in lieu of pay for work performed by American crews under the status quo understanding.

Subject to the foregoing understanding the parties agree:

(1) Longshoremen shall be assigned to work covered by Section 1.6 commencing when the ship is tied up on arrival and ending when lines are let go for the ship to leave the dock, except for the purpose of shifting within a port. (Shifts between ports shall not be included in longshore work assignment.)

(2) Exceptions to (1) above are as follows:

    (a) The crew may be used for the complete rigging of the jumbo gear.

    (b) The crew may secure gear, lower booms, and swing in booms alongside the dock.

    (c) Handling ship's stores. If loads are to be built on the dock and ship's gear is to be used, longshoremen shall build the loads and handle gear to land such loads on deck. During a shift when no longshoremen are employed the crew may use ship's gear to bring stores aboard.

The agreement to assign the above described work to longshoremen shall not result in the payment of in lieu of time to longshoremen if such work is performed by crew members under the status quo for American ships.

The Committee agreed that the subject of cargo carpentry work done in connection with the cargo is still under discussion.

## CLRC No. 25, October 30, 1961 (Item 4) In Lieu of Time—Interpretation of Paragraph 2(c)

*(Reference is made to CLRC Meeting No. 7, May 4, 1961, Item 3.)*

The agreement reached on "In Lieu of Time" in the meeting of the Joint Coast Labor Relations Committee noted above is not to be interpreted so as to support claims for in lieu of pay for work normally and properly performed by American crews under the status quo understanding or to alter such understanding. Thus, the agreement to assign work as described to longshoremen does not result in payment of in lieu of time to longshoremen if such work is performed by crew members under the status quo for American ships.

*Reference is made to the following paragraph as contained in the above noted minutes:*

(c) Handling Ship's Stores. If loads are to be built on the dock and ship's gear is to be used, longshoremen shall build the loads and handle gear to land such loads on deck. During a shift when no longshoremen are employed the crew may use ship's gear to bring stores aboard.

The Committee agrees that the crew under the above language would not be used during meal hours or between shifts. Ship's stores may be hand-carried aboard by the crew. If no longshore gangs are on the ship during a shift, the crew can use the gear (includes conveyor or sideport operation) and load ship's stores, including the building of loads.

It was further agreed that:

1. Ship's stores that have been pre-palletized may be hoisted aboard ship (to be thereafter de-palletized and stowed by ship's crew) by any longshore gang already employed on the

ship providing such a gang has in its complement winch drivers and hatch tender, front men or swingmen to hook on the loads, and sufficient holdmen or swingmen as part of the gang on board to unhook said loads. A gang may be supplemented to reach this complement.

2. Ship's stores delivered to ship's side that are to be built into loads on the dock and then hoisted aboard ship to be thereafter de-palletized and stowed by ship's crew can be so built and hoisted aboard with a basic gang that is already employed. Two of the 4 holdmen will assist the front men in building the loads on the dock, and the other 2 holdmen will unhook the loads on the deck.

3. If longshoremen are directed by an employer to stow the stores in the various appropriate lockers or compartments, the basic 4 holdmen gang must be supplemented by not fewer than 4 swingmen; however, the contractual exception in paragraph 23 of the October 18, 1960 Memorandum of Agreement shall apply, and the gang may or may not be further supplemented on the ship or dock, based on the needs of the operation at the employer's option.

4. Where standing gear is not being used to load stores, longshoremen when employed to load stores under these circumstances shall be employed in such numbers, skilled and unskilled, as required for the particular operation.

The parties agreed that in connection with the above understanding, the matter shall be reviewed by the Joint Coast Labor Relations Committee in 90 days or during a subsequent wage review.

## CLRC No. 6, February 27, 1963 (Item 3) In Lieu of Time

*(Reference is made to CLRC Meeting No. 7, May 4, 1961, Item 3.)*

The Employer members of the Committee raised the question of a timely notice being served on the employer when the Union feels that an "in lieu of" violation has occurred.

The Committee, after discussion, agreed that when the Union alleges that the crew is or has been performing longshore work on which an "in lieu of" claim will be filed, such notification must be given to the stevedoring company involved and/or the Association within 24 hours. On Sundays and holidays the notice must be given on the following business day.

If such notification is not given in such timely fashion the claims are to be denied.

**Memorandum of Understanding**
**July 2, 1981**

With respect to "in lieu of time" payments made as a result of work performed by crew members, the present method of payment shall continue except that a 4-hour minimum payment shall be applicable, as set forth in Section 1.6 of the PCLCD.

**Memorandum of Understanding**
**July 2, 1987**

All prior clarifications on ship's stores are amended as necessary to allow foreign ships' crews to use noncargo handling gear to load stores for 1 hour or less per shift.

**Memorandum of Understanding**
**July 1, 1990**

The Employers shall answer a properly submitted "in lieu of time" claim within 30 days of the receipt of the claim.

# JOBS OF SHORT DURATION
**CLRC No. 25, October 30, 1961 (Item 1)**
*Amended in CLRC No. 12, June 23, 1962 (Item 1)*

The Coast Committee is aware that it has ruled on many disputes on this subject, but desired to define a job of short duration so that it would be clearly understood. The Committee agreed upon the following definition:

An operation of short duration is one which is comprised of the following elements and only when the order is placed for a man of short duration:

1. It must be 6 hours or less with no meal.
2. It pertains to the man and not the gang.
3. It pertains to a man in a skilled classification (i.e., winch drivers, lift truck operators, bull drivers, etc.).
4. It pertains to a specific shift.
5. It requires a 4-hour minimum guarantee.
6. It allows a skilled man to be shifted to comparable work on the original ship or dock.
7. A skilled man may be shifted to comparable work on another ship or dock but if this is done, such a man receives an 8-hour guarantee rather than the 4-hour guarantee.
8. A skilled man of short duration shall be ordered at regular dispatch to start the job at any time. This does not preclude orders for jobs of short duration during the course of the shift where the need could not be foreseen at regular ordering time.
9. A skilled man of short duration must be one supplementing a skilled man of the same skill already on the job on the shift in which the requirement for the extra skill man occurs. Each shift stands on its own insofar as employment of short duration is concerned.

**Example 1.** A job of short duration beginning after the midshift meal but not completed by the end of that shift may be continued on the next immediate shift as day follows night or night follows day, with another man employed for a job of short duration.

**Example 2.** A job of short duration during a given shift and completed before the end of such shift and with cargo operations not requiring the man of short duration occurring after his release, may be repeated on the next comparable shift and both such jobs shall be considered as jobs of short duration.

**Example 3.** A job of short duration during a given shift and completed at the end of such shift and with cargo operations not requiring a man of short duration at the beginning of the next comparable shift will permit the employment of a man of short duration on that next comparable shift.

**Example 4.** It is not permissible under the Agreement to consider as jobs of short duration work which takes a man of short duration to the end of one shift and the start of the next comparable shift. Employment on such a basis will require payment of 8-hour guarantees on both shifts.

# NO DISCRIMINATION

## Item XXII, June 22, 1962 — Memorandum of Agreement

The parties hereby state that during the negotiations resulting in this Memorandum of Agreement they discussed the provisions of Section 13, No Discrimination, of the basic Agreement and agreed that the parties are jointly responsible for the total implementation of the provisions therein and the Union agrees that it will administer its internal affairs so as to fulfill its share of this joint responsibility.

## Item XI, July 1, 1975 — Memorandum of Agreement

To formalize the agreement that has been reached and placed in effect between the International Longshoremen's and Warehousemen's Union and the Pacific Maritime Association that there be no discrimination on the basis of "sex" in the terms, meaning, application, implementation and administration of their collective bargaining contracts, and in the exercise of control over the registered lists, the terms of each of the collective bargaining contracts between the International Longshoremen's and Warehousemen's Union and Pacific Maritime Association are amended to provide as follows:

(a) All collective bargaining contracts shall provide that there shall be no discrimination in connection with "sex."

(b) All words, terms or definitions of employees used in the collective bargaining contracts are used as being words of common gender, and not as being words of either male or female gender, and hence have equal applicability to female and male persons wherever such words are used.

# LETTER OF UNDERSTANDING RE ILWU-PMA EQUAL EMPLOYMENT OPPORTUNITY POLICY & PROCEDURES

## 1. Policy Against Discrimination, Harassment & Retaliation

All workers in the longshore industry shall be treated with dignity, respect and courtesy. It has been for decades and continues to be the policy of the Pacific Maritime Association (PMA), its member companies and the

International Longshore and Warehouse Union and its Locals (ILWU) that discrimination, harassment, and retaliation of any kind for filing or supporting a complaint of discrimination or harassment, committed by anyone, will not be tolerated in connection with any action subject to the terms of the Pacific Coast Longshore & Clerk's Agreement (the PCLCA or Agreement) (including at work sites, joint dispatch halls, training sites, and other locations, when reasonably related to employment covered by this Agreement).

The policy against discrimination and harassment stated in Section 13 of the Pacific Coast Longshore & Clerk's Agreement shall be administered as described in this document.

## 2. Responsibility for Following Section 13.2

All longshore workers, clerks, walking bosses/foremen, superintendents or managers, outside truck drivers, vendors, contractors and others are required to follow this Policy and shall not engage in any Prohibited Conduct in connection with any action subject to the terms of the PCLCA (including at work sites, joint dispatch halls, training sites, and other locations, when reasonably related to employment covered by this Agreement). It is important not to assume that the Employers, PMA or the ILWU know of particular incidents of discrimination or harassment. Discrimination and harassment can be eliminated from the workplace only if everyone working under the PCLCA who experiences or sees such problems files a grievance using the Special Section 13.2 Grievance Procedures for discrimination and harassment. It is also important if you believe you are a victim of discrimination, harassment or retaliation that you immediately inform the offending party that you find his or her conduct offensive and ask that it be stopped.

## 3. Examples of Prohibited Conduct Under 13.2

Discrimination and harassment can take many forms. Certain actions or even words can constitute discrimination and harassment. As a general matter, it is a violation of this Policy for anyone to treat another in a way that is threatening, intimidating, embarrassing or offensive, or that denies a person equal treatment and opportunities because of his or her sex, race or other unique characteristics. So-called "good intentions" or "joking around" (as determined by the Arbitrator) does not excuse Prohibited Conduct.

To assist you in recognizing and avoiding behavior which may be considered harassing, discriminatory, or retaliatory, the following examples of Prohibited Conduct are listed:

**Physical Harassment:** Unwelcome touching or grabbing or sexual assault, blocking someone's movement, standing unnecessarily close.

**Verbal Harassment :** Racial or sexual jokes, name-calling, using slurs, derogatory terms, belittling remarks, or abusive language related to a person's gender, race or other defining characteristics.

**Visual Harassment:** Displaying objects, messages, pictures, pornography, graffiti, or drawings of a sexual or racial nature; engaging in offensive and unwelcome personal conduct such as offensive gestures, staring (especially at particular body parts), mooning, leering; showing a lack of respect for privacy in toilet facilities and locker rooms.

**Unwelcome Romantic or Sexual Attention:** Unwelcome flirting, pressuring another for a date and unwelcome sexual advances; also demanding sexual favors or romantic attention as a condition of any type of employment benefit.

**Discriminatory Dispatch, Job Assignments and Discipline** : Assigning work based on sex or race, segregating workers by sex or ethnic group on work assignments, disciplining or evaluating women more harshly than men (or vice versa), setting someone up to fail, hard-timing (such as failing to help co-workers of one sex or ethnic group to the same degree as you help co-workers of another sex or ethnic group), filing false reports because of the person's sex or race.

### 4. Special Section 13.2 Grievance Procedures for Complaints of Discrimination, Harassment & Retaliation

All registered and casual longshore workers and clerks have the right and responsibility to promptly report any Prohibited Conduct of which they are aware to their Local (through the ILWU business agent or a Union official) and on-the-job supervision (such as the walking boss/foreman or clerk supervisor or management). To correct any incidents of discrimination, harassment (including hostile work environment) or retaliation which violate this Policy, the longshore worker or clerk experiencing the problem must promptly file, within ten (10) calendar days of the incident, a grievance under the ILWU-PMA Special Section 13.2 Grievance Procedures For The Resolution of Complaints Re Discrimination and Harassment Under the Pacific Coast Longshore and Clerks Agreement (referred to as the "Special Grievance Procedures"), a copy of which is attached. Grievances may be filed only by longshore workers, clerks, union locals, PMA and its member companies.

In your grievance, please provide as much detail as you can, including identifying the names of witnesses and of

those you believe to be responsible, describing what happened as well as when and where the Prohibited Conduct occurred. Grievances will be addressed and resolved as quickly, fairly and confidentially as reasonably possible.

Upon being notified of any complaint of Prohibited Conduct, the union Business Agent shall, as needed, identify for the grievant the grievance procedure available. Once a walking boss/foreman or clerk supervisor learns of a complaint of Prohibited Conduct, he or she shall immediately report it to management and take other appropriate action.

### 5. Grievance Procedures for Challenges to Contractual Provisions or Rules, Including Claims for Registration or Selection for Casual Status, or Other Section 13.3 Claims; and Procedures for Requests for Reasonable Accommodation of Disabilities

Grievances and complaints alleging that a contractual provision or rule is discriminatory as written or as applied, as well as discrimination claims seeking elevation, registration or selection for casual status, and discrimination claims based on disability, protected family care or medical leave status, veteran status, political affiliation, marital status, membership or non-membership in the Union, or activity for or against the Union or absence thereof, are not to be filed under the Special Section 13.2 Grievance Procedures, but instead are to be filed and processed with the Joint Port Labor Relations Committee (JPLRC) under the grievance procedures in Section 17.4 of the PCLCA.

Likewise, requests for "reasonable accommodation" for disabilities recognized under state or federal law will not be processed under the Special Section 13.2 Grievance

Procedures but instead must be brought to the local JPLRC pursuant to separate procedures established for such requests, a copy of which is attached.

## 6. Special Section 13.2 Remedies & Penalties

Longshore workers, clerks, walking bosses/foremen, superintendents or managers, outside truck drivers, vendors, contractors, or others who violate Section 13.2 of the Agreement, as described in this Policy, by engaging in Prohibited Conduct in connection with any action subject to the terms of the PCLCA (including at work sites, joint dispatch halls, training sites, and other locations, when reasonably related to employment covered by this Agreement) will be subject to discipline or penalties up to and including termination, deregistration or permanent loss of dispatch privileges or loss of access to employer sites. Likewise, PMA Employers, PMA offices and ILWU Locals are subject to all appropriate remedies for directly violating this Policy, including mandatory training, distribution of notices to employees, and changes in policies and practices found to violate this Policy. Violations of this Policy are subject to the attached Guidelines for Remedies & Penalties in Cases of Discrimination, Harassment & Retaliation Under the Special Section 13.2 Grievance Procedures.

# LETTER OF UNDERSTANDING RE ILWA-PMA Special Grievance/Arbitration Procedures for the Resolution of Complaints Re Discrimination and Harassment Under Section 13.2 of the Pacific Coast Longshore & Clerks Agreement

## 1. Section 13.2 Complaints Covered by Special Procedures

All registered and casual longshore workers and marine clerks, as well as PMA, all ILWU locals and employers covered by the PCLCA, have the right to file a complaint concerning incidents of discrimination or harassment (including hostile work environment) in connection with any action subject to the terms of the PCLCA (including at work sites, joint dispatch halls, training sites, and other locations, when reasonably related to employment covered by the PCLCA) based on race, creed, color, sex (including gender, pregnancy, sexual orientation), age (forty or over), national origin, or religious or political beliefs, or alleging retaliation of any kind for filing or supporting a complaint of such discrimination or harassment. All grievances of this type are referred to in this document generally as "Discrimination and Harassment" grievances. A detailed statement of policy, rules of conduct and penalty guidelines for proven offenses are set forth in the ILWU-PMA Equal Employment Opportunity Policy, copies of which may be obtained from any PMA or ILWU local office and joint dispatch halls. Special complaint forms for claims of Discrimination and Harassment shall be available to all persons upon request at all PMA and ILWU local offices and joint dispatch

halls. Discrimination and Harassment grievances shall be processed pursuant to the following special grievance/arbitration procedures:

## II. Brief Summary of These Special Section 13.2 Procedures

The basic steps for processing a grievance of Discrimination and Harassment under the Special Procedures are as follows. This summary only provides highlights of the Special Procedures. Please see Section III, below, for more details.

1) Grievances are to be filed within ten (10) calendar days of the incident by facsimile or mail with the AREA ARBITRATOR, with a copy sent by facsimile or mail to the JPLRC c/o the local PMA office, as stated on the Special Section 13.2 Grievance Form. (The AREA ARBITRATOR may, in his/her discretion, excuse late filings in certain circumstances, described below).

2) A hearing before the AREA ARBITRATOR, recorded by a court reporter, will be held within fourteen (14) calendar days (or, in certain circumstances described below, within thirty (30) calendar days) after the grievance is received by the AREA ARBITRATOR.

3) Any party may, no later than five (5) calendar days before the hearing, ask the AREA ARBITRATOR to direct witnesses to appear.

4) The AREA ARBITRATOR will issue a written decision within fourteen (14) calendar days after the close of the hearing.

5) Any party may, within ten (10) calendar days of being mailed the Area Arbitrator's decision, file an appeal by facsimile or mail with the COAST APPEALS OFFICER, with a copy sent by facsimile or mail to the JPLRC c/o the local PMA

office. Appeals shall be based solely on the written record of the hearing.

6) Any party may, within ten (10) calendar days of the COAST APPEALS OFFICER's receiving the appeal, file a response or opposition.

7) A ruling on the appeal shall be sent out within fourteen (14) days of the COAST APPEALS OFFICER's receiving the appeal.

## III. Detailed Special Grievance Procedures

The following are the detailed provisions of the special grievance procedures for claims of Discrimination and Harassment under Section 13.2 of the PCLCA:

1) A complaint alleging discrimination or harassment (including hostile work environment) in connection with any action subject to the terms of the PCLCA based on race, creed, color, sex (including gender, pregnancy, sexual orientation), age (forty or over), national origin, or religious or political beliefs, or alleging retaliation of any kind for filing or supporting a complaint of such discrimination or harassment shall be filed by the grievant, or the Union on his/her behalf, or by PMA or its member companies, by sending the Special Section 13.2 Grievance Form by facsimile or mail to the AREA ARBITRATOR, with a copy by facsimile or mail to the local JPLRC, c/o the local PMA office. The AREA ARBITRATOR and/or the local PMA office shall immediately send a copy of the complaint, showing date of receipt, to the local PMA office, the involved ILWU Local Union(s), the Joint Coast Labor Relations Committee ("JCLRC"), any person accused of any wrongdoing, and any involved Employer. Complaints must be filed within ten (10) calendar days of the alleged misconduct in order to be timely. The AREA ARBITRATOR may in his or her

discretion excuse any late filings only for reasons stated in Section 17.411 of the PCLCA up to six (6) months.

2) The JPLRC or the AREA ARBITRATOR may issue temporary directives pending the grievance proceedings to protect the grievant or the integrity of the investigation, including but not limited to temporary job re-assignment, dispatch, transfer, or separation of the accused from the grievant.

3) Immediately upon receipt of a complaint, the AREA ARBITRATOR shall issue a notice of hearing for a date not more than fourteen (14) calendar days after the date the complaint was received. The AREA ARBITRATOR may schedule the hearing up to thirty (30) calendar days after receipt of the grievance when his or her availability or workload so requires. The AREA ARBITRATOR shall ensure that written notice of the hearing is provided to the grievant, the accused, the involved Employer, PMA, and the appropriate ILWU Local(s).

4) The grievant and any longshore worker or clerk accused of Discrimination or Harassment may each have one registered (Class A or Class B) worker to assist and represent him/her in these proceedings. The grievant and such accused worker may also instead request in writing that their ILWU Local appoint a union representative, who is acceptable to them, to assist them, which appointment shall be made within two (2) calendar days of such request. In cases where the grievant and accused worker are represented by the same ILWU Local, the Local shall assign separate union representatives, who are acceptable to them, to assist them. Union representation will be provided in all cases where requested regardless of whether the Union agrees or disagrees with the merits of the complaint and such representation shall not be considered as any indication of the Local's position concerning the complaint.

5) The arbitration hearing shall be transcribed by a court reporter. All witnesses shall be duly sworn to testify truthfully. No attorneys shall be allowed to participate in any of the proceedings or be present in the hearing room. Only parties, (including two persons on behalf of, respectively, the involved ILWU Local(s), PMA, the involved Employer, those representatives designated under paragraph four (4)), and witnesses directly involved in the matter, may attend the hearing as the proceedings are to be treated as confidential to protect the privacy rights of those involved. Non-party witnesses shall be excluded from the hearing except when testifying, unless otherwise permitted by the AREA ARBITRATOR. The AREA ARBITRATOR may exclude participants in order to take testimony on the record of an unusually sensitive or embarrassing nature.

6) The AREA ARBITRATOR shall, on his/her own initiative or upon request by the grievant or accused, direct in writing all material witnesses to appear at the arbitration hearing Any individual, Employer, ILWU Local or PMA official who fails to appear at the hearing upon at least three (3) calendar days prior notice shall be subject to appropriate penalties as determined by the JPLRC or the AREA ARBITRATOR.

7) No post-hearing briefs shall be filed with the AREA ARBITRATOR.

8) As a condition for providing reporting services, the court reporter shall, within five (5) calendar days of each hearing date, deliver the original plus three copies of the hearing transcript, including all exhibits, as follows: The original to the AREA ARBITRATOR, and three copies to the JPLRC, c/o the local PMA office (one copy for the ILWU Local Union, one copy for PMA, and one copy for the COAST APPEALS OFFICER's use in the event of an appeal). The parties may obtain

from the JPLRC a copy of the transcript upon request. No later than fourteen (14) calendar days after the close of the hearing, the AREA ARBITRATOR shall issue his or her written decision. The AREA ARBITRATOR is empowered to issue all appropriate remedies, except that any request for elevation, registration or casual status shall be referred to the JPLRC, to be processed under §17.4 of the PCLCA as provided in §13.3 of the PCLCA. The AREA ARBITRATOR shall ensure that a copy of the decision is immediately sent to all parties.

9) The decision of the AREA ARBITRATOR in cases covered by these special procedures shall be final and binding on all parties unless a timely appeal is filed as specified below.

10) Any party may, within ten (10) calendar days of the date a copy of the AREA ARBITRATOR'S decision is mailed to such person or organization, file an appeal with the COAST APPEALS OFFICER. To be timely, the appeal must be mailed or faxed to the COAST APPEALS OFFICER, with a copy by mail or facsimile to the JPLRC, c/o the local PMA office, within the ten (10) calendar day period, and it must contain all the argument intended as support for the appeal. The COAST APPEALS OFFICER shall ensure that copies of the appeal, if timely filed, are immediately sent to the AREA ARBITRATOR, Local Union(s), PMA and all other parties involved with a cover letter specifying the right to file a response or opposition within ten (10) calendar days of when the COAST APPEALS OFFICER received the appeal. Upon receiving a copy of an appeal filed with the COAST APPEALS OFFICER, the local PMA office shall immediately forward the written record of the hearing (which is the transcript of the hearing and its exhibits, and the decision received from the AREA ARBITRATOR) to the COAST APPEALS OFFICER.

234

11) An appeal shall be based solely on the written record of the hearing and no appeal hearing shall be permitted. The COAST APPEALS OFFICER may affirm, vacate or modify the decision of the AREA ARBITRATOR, including but not limited to increasing or reducing the penalty, within his/her sound discretion.

12) A ruling on the appeal shall be sent out within fourteen (14) calendar days of when the COAST APPEALS OFFICER received the appeal. An appeal may be denied before receipt or consideration of any response or opposition at the discretion of the COAST APPEALS OFFICER. No other appeal shall be available.

13) The JPLRC shall promptly implement the remedies provided in the final decision. No other appeals or proceedings, including appeals to the JCLRC or the Coast Arbitrator, shall be allowed in cases involving Section 13.2 claims in order to ensure their final resolution with all due speed.

14) In the event the AREA ARBITRATOR is not available to hear a case within the thirty (30) calendar day time frame under these Special Procedures, the JCLRC shall appoint a Special Procedures Relief Arbitrator to timely conduct the hearing for that particular case.

15) In the event any one AREA ARBITRATOR'S workload becomes prohibitive, the JCLRC shall appoint a special arbitrator whose sole function shall be the adjudication of grievances under the Special Section 13.2 Procedures.

16) The term "days" in this document means calendar days.

17) These provisions are subject to modification by the JCLRC.

18) The procedures set forth in this Policy may be flexibly applied in particular cases when the facts and circumstances

235

SPECIAL GRIEVANCE/ARBITRATION PROCEDURES
GUIDELINES FOR REMEDIES AND PENALTIES IN CASES
OF DISCRIMINATION, HARASSMENT AND RETALIATION
UNDER SPECIAL SECTION 13.2 GRIEVANCE PROCEDURES

ADDENDA

warrant it. The time lines for accomplishing particular steps of the procedure are intended as guidelines, not strict time limits, which may be extended or waived in appropriate circumstances. Failure to strictly comply with the time lines shall not constitute a violation of the Policy.

## LETTER OF UNDERSTANDING RE GUIDELINES FOR REMEDIES AND PENALTIES IN CASES OF DISCRIMINATION, HARASSMENT & RETALIATION UNDER THE SPECIAL SECTION 13.2 GRIEVANCE PROCEDURES

Longshore workers, clerks, walking bosses/foremen, superintendents or managers, outside truck drivers, vendors, contractors, or others who violate Section 13.2 of the Agreement, as described in the ILWU-PMA Equal Employment Opportunity Policy & Procedures (referred to as the Policy), by engaging in discrimination or harassment (including hostile work environment) in connection with any action subject to the terms of the PCLCA (understood to include work sites, joint dispatch halls, training sites, and other locations, when reasonably related to employment covered by this Agreement) based on race, creed, color, sex (including gender, pregnancy, sexual orientation), age (forty or over), national origin, or religious or political beliefs, or by engaging in retaliation of any kind for filing or supporting a complaint of such discrimination or harassment (referred to generally as "Prohibited Conduct") will be subject to discipline or penalties up to and including termination, deregistration or permanent loss of dispatch privileges

or loss of access to employer sites. Likewise, PMA Employers, PMA offices and ILWU Locals are subject to all appropriate remedies for directly violating this Policy, including mandatory training, distribution of notices to employees, and changes in policies and practices found to violate this Policy.

The minimum discipline for any individual found guilty of violating this Policy shall be seven (7) days off work, and attending Diversity Training without pay. The minimum discipline for any individual found guilty of retaliating against someone for complaining of Prohibited Conduct or retaliating against someone for assisting another who complained, or for quid pro quo harassment (for example, demanding sexual favors for dispatch or job assignments) or for physical harassment shall be one month off work and attending Diversity Training without pay. Remedies may also include reassignment from a location where the victim works; time off without pay for longer periods (for example, thirty (30) days, ninety (90) days, one year); permanently being ineligible from supervisory and/or dispatcher positions; loss of steady positions; or other remedies as deemed appropriate in cases processed under the Special Section 13.2 Grievance Procedures. Anyone found guilty shall, prior to returning to work, be required to review an approved training video (such as "EEO Shapes"), without pay, and sign a statement agreeing to abide by the Policy and not to engage in Prohibited Conduct in the future.

Pursuant to the Special Section 13.2 Grievance Procedures, the Arbitrator is to consider all relevant factors in determining the appropriate remedy, including the nature

ADDENDA

and severity of the Prohibited Conduct, the degree of physical and/or mental harm, the weight of the evidence and testimony, whether there was a continuing course of conduct or a single incident, whether the accused previously committed Prohibited Conduct of any kind, and any mitigating circumstances. Where appropriate, given the nature of the violation and the parties' desire to prevent and promptly remedy discrimination and harassment, the Special Section 13.2 Grievance Procedures are to be used to punish misconduct as well as educate and provide an opportunity to correct behavior, consistent with principles of progressive discipline. However, serious penalties shall be imposed for serious violations of this Policy, and the maximum penalties of job termination, deregistration or permanent loss of dispatch privileges may be imposed on guilty employees, supervisors and managers, where found appropriate under the Special Section 13.2 Grievance Procedures. In determining penalties, a prior offense that predates by five years or more the dates of the current offense shall not be considered.

# CLRC POLICY ON ADA COMPLIANCE AND REASONABLE ACCOMMODATION

## I. Statement of Policy

It is the policy of the Joint Coast Labor Relations Committee not to discriminate against disabled workers in hiring, dispatch and promotion, and to provide reasonable accommodations for applicants and incumbent workers who have covered disabilities within the meaning of state and federal law.

Further, it is the policy of the JCLRC that the Joint Port Labor Relations Committee in each port shall engage in an

interactive process with applicants for industry employment and incumbent workers who claim to have covered disabilities to determine whether reasonable accommodations exist which would enable the applicant or incumbent worker to enter or continue working in the longshore industry.

Otherwise qualified applicants and employees found to be able to safely perform longshore and clerk work with or without reasonable accommodations as may be required by law will be so employed. Applicants and employees found to be unable to perform longshore and work safely with or without reasonable accommodation shall not be employed and shall not be eligible for dispatch to such work.

The JPLRC will provide notice of this policy prohibiting discrimination and of the procedures for considering and resolving requests for accommodation to potential applicants for industry employment, and members of the incumbent workforce (including identified casual and registered workers) as required by law.

## II. Accommodation Procedures

Requests for reasonable accommodation shall be considered and resolved by the local JPLRC's in accordance with Section 17.4 of the PCLCA as modified herein. The Joint Port LRC shall be responsible for determining the following issues:

1) whether the worker in question is qualified to perform work under the PCLCA;

2) whether the worker in question has a bona fide disability that limits his or her ability to perform satisfactorily the essential functions of the job he or she holds or desires; and

3) if so, whether the disability may be reasonably accommodated without imposing an undue hardship

on the Union or the Employers or without violating the bona fide seniority provisions of the PCLCA except to the extent as may be required by law.

All three issues must be found in the affirmative in order for the JPLRC to grant reasonable accommodation. The JPLRC has the discretion to select the accommodation it considers most appropriate, giving due consideration to the suggestions and preferences of the applicant or employee seeking accommodation.

## A. Written Request for Accommodation

Requests for accommodation by applicants for industry employment or incumbent workers who believe they are entitled to accommodation under the ADA or other applicable state law must be submitted in writing to the Joint Port LRC. In the written request, the individual seeking accommodation shall provide the Joint Port LRC with following information.

1. The nature and extent of the claimed disability;
2. The precise job-related limitations he/she believes are imposed by the claimed disability;
3. Information and/or suggestions as to any accommodation(s) that would enable the individual to overcome the job-related limitations and perform the work safely and satisfactorily.

The individual should include any medical documentation and other information which he or she believes is relevant and would assist the JPLRC in reaching a decision.

If the employee or applicant seeking accommodation requires assistance in preparing a written request for accommodation, JPLRC personnel will assist in putting

the request in writing. Further, in circumstances where it is apparent that an applicant or employee is disabled and may require reasonable accommodation, JPLRC personnel shall advise the applicant or employee of the procedure for requesting an accommodation.

## B. Interactive Process re: Accommodation Request

### 1) Initial Meeting

Within 7 days after receiving a written request for accommodation, the Joint Port LRC shall provide the individual with written acknowledgment that the request has been received along with a written request to appear before the JPLRC to review the accommodation request and to discuss alternatives. At this time, the Committee may request that the individual bring additional documentation or information to this initial meeting which the Committee believes is or may be relevant and/or would assist in reaching a decision, including, in appropriate cases, a medical release. The initial meeting should be scheduled to take place as soon as is practicable, depending on the circumstances giving rise to the accommodation request, but no later than 14 days following receipt of the written accommodation request.

### 2) Opinion of Medical Specialist

Following the initial meeting, the JPLRC may, in its discretion, obtain an opinion from a designated medical specialist regarding: 1) whether the applicant or employee suffers from a disabling condition which limits one or more major life activity, 2) the applicant or employee's functional abilities and limitations with respect to the essential functions of the job he or she holds or seeks; and 3) possible accommodations.

One medical specialist shall be designated in each port to assist the JPLRC in reviewing requests for reasonable accommodation. Each designated specialist shall be made aware and become knowledgeable of the nature and requirements of longshore and clerk work and the established conditions and waterfront operations in the industry. The designated medical specialist shall also be knowledgeable as to the legal standards and requirements related to the employment of disabled workers with or without reasonable accommodation.

In determining whether a particular applicant or employee has a disabling condition which limits one or more major life activity, the medical specialist will be asked to render an opinion based on any and all of the following s/he deems appropriate: an independent medical examination of the individual by an appropriate health care practitioner, the individual's medical history, medical reports from the individual's personal physician, reexamination of the individual, medical tests, x-rays, etc.

The medical specialist shall provide the JPLRC with a written report setting forth an opinion as to whether the applicant or employee has a disability which limits one or more major life activity along with an opinion as to the individual's functional abilities and limitations in relation to the essential functions of the job which the employee or applicant holds or seeks. Where appropriate, the medical specialist shall also issue an opinion and/or recommendation as to any accommodations that s/he believes

would enable the disabled applicant or employee to work in the industry.

In the absence of unusual circumstances, the JPLRC will schedule an appointment for the applicant or employee with the medical specialist to occur within 14 days following the initial meeting. In the absence of unusual circumstances, the medical specialist, in turn, will provide his or her written report to the JPLRC within 14 days after this appointment takes place.

### 3)  Additional Meeting Before JPLRC

Within 7 days following receipt of the medical specialist's written report, the JPLRC may, in its discretion, invite the applicant or employee to attend a further hearing before the JPLRC and/or request the individual to provide additional documentation or information relevant to the accommodation request. The JPLRC may also, in its discretion, proceed to gather any additional information it deems appropriate in determining whether a reasonable accommodation exists, including consulting with legal counsel and other technical assistance before rendering a decision.

In the absence of unusual circumstances, the JPLRC shall conclude the interactive process and prepare a written referral and recommendation to the Joint Coast LRC regarding the proper disposition of the request no later than 14 days following receipt of the medical specialists' written report. The JPLRC shall make its recommendation to the Joint Coast LRC regarding the accommodation request based on the facts developed during the interactive process.

### C. Referral and Recommendation to the JCLRC

In the absence of unusual circumstances, within 14 days following receipt of the JPLRC's written referral and recommendation, the JCLRC shall provide the applicant or employee involved written notification of its decision, including a written explanation of the basis for its decision.

If the Joint Coast LRC agrees on the disposition of the accommodation request, such decision shall be final and no appeal may be taken therefrom. If the Joint Coast LRC does not agree on the disposition of the accommodation request, the accommodation request shall be immediately referred to the Coast Arbitrator for decision. In such cases, the decision of the Coast Arbitrator shall be based solely on the written record of the JPLRC and Joint Coast LRC proceedings.

### III. Training

JPLRC members in each covered port, and the members of the Joint Coast LRC will be provided instruction as to the legal requirements related to employment of disabled employees with or without reasonable accommodations along with training as to the proper handling of requests for reasonable accommodation by disabled employees and applicants.

### IV. Scope of Procedures

The procedures described above shall be utilized in all cases where accommodations have been requested by applicants for industry employment and by incumbent workers with respect to hiring, dispatch and promotion within the industry.

This policy sets forth the procedure to be used by the local committees and the JCLRC for considering and resolv-

ing accommodation requests presented by disabled applicants and employees under the Americans With Disabilities Act and applicable state law. Nothing in this policy may be construed to require the ILWU and the PMA to provide applicants or employees with particular accommodations or to provide accommodations where, in the opinion of the Committee, none are warranted. Nor may this policy be construed as acceptance by the ILWU or the PMA of additional, greater or different legal or financial responsibilities than those which are imposed on them by law for providing accommodations to disabled applicants or employees.

The procedures set forth in this policy may be flexibly applied by the JPLRC's and JCLRC in particular cases when, in the judgment of the Committee, the facts and circumstances warrant it. The time lines for accomplishing particular steps of the procedure are intended as guidelines, not strict time limits, which may be extended or waived in appropriate circumstances. Failure of the local committees or the JCLRC to strictly comply with the time lines shall not constitute a violation of the policy.

## PICKET LINE LANGUAGE

### CLRC No. 1, January 29, 1954

Manpower Utilization and Picket Lines: There was a general discussion of language pertaining to this subject, wherein the Union stated that they did not expect longshoremen to get paid for observing picket lines, but on the other hand, did not want longshoremen necessarily ordered day after day.

It was agreed that the following language which was initialed by the parties, will be the guide to settle any claims in the future and, likewise, wipe out the meaning of past arbitration awards on the subject.

**Manpower Utilization and Picket Lines:**

A local shall, through its president or its secretary, notify PMA in writing of intention to respect a specific picket line. Delivery of such written notice shall relieve the dispatching hall of obligation to furnish men or gangs to the picketed operation until a decision under the grievance machinery is issued ordering the start or continuance of work.

Men or gangs ordered prior to or within 2 hours of such written notice to PMA shall report to work without benefit of coverage of minimum report time as provided in the Agreement.

Men or gangs ordered later than 2 hours following such receipt but prior to the issuance of a determination by the parties through grievance machinery shall, if they accept the order and report, be covered by the minimum provisions of the Agreement, provided, however, that failure of the employer to place orders following such receipt shall not constitute any waiver of the employer's position nor an acceptance of the union's position, pending decision as hereinafter provided.

Following the establishment of any picket line about the premises of an employer affecting the work of employees covered by ILWU-PMA Agreements, either party may require a meeting of the Joint Labor Relations Committee of the port affected (or an Area Committee or the Coast Committee, if such is agreed to be appropriate) and such meetings shall be held immediately.

The Committee shall promptly examine the facts and issue its written decision as to whether the picket line is legitimate and bona fide under the Agreement. Should a Committee fail to reach such a decision, then either party may refer the matter to the Area Arbitrator for prompt interim decision.

Excepting as provided in this Document, men or gangs who leave or refuse to start or continue any work because of a pick-

et line shall be paid for their actual working time only, including travel time and transportation costs as prescribed by local working or dispatching rules.

In order to minimize any further delay to an operation which has been picketed, the local dispatching hall shall make every effort to furnish men or gangs in accordance with employer orders immediately after the picket line is lifted, or as soon thereafter as possible.

## SCHEDULING OF MEETINGS

### Letter of Understanding dated July 1, 1984

With regard to the revision of Sections 12.31 and 12.311 in the 1984 negotiations:

"The Union pointed out the above understanding could present a problem in ports where three 8 hour shift operations occur under the local agreements. In such situations the start of an 8 hour shift could overlap the time period of a scheduled meeting.

"The parties agreed that if the three 8-hour shifts present a problem, it would have to be accommodated so that all members of a local are given the opportunity to attend their scheduled meeting."

## GUARANTEES, SKILLED RATES FOR ALL LONGSHOREMEN AND CLERKS

### Memorandum of Understanding, July 16, 1996

Employees shall be paid at the appropriate shift and skill rates of pay in accordance with Sections 2 and 4, PCL&CA, and the provisions herein. Individual side agreements, including paid hours in excess of the PCL&CA, as defined by Area Arbitration No. SC-29-94, between individual employees or

local Union officials and individual member companies shall be considered a Contract violation. Employer(s) found guilty of violating this provision shall be denied manpower at that terminal where the violation occurred. First offense — 24 hours loss of manpower; second offense — 48 hours loss of manpower. Any disagreements involving guilt or assessment of a penalty shall be subject to the Contract grievance machinery.

## STEADY SKILLED MEN

### CLRC No. 14, October 11, 1966 (Item 1)

The Employers inquired as to what the Union had in mind in implementing the "Steady Skilled Man" provision of the new Agreement.

There was considerable discussion following which the Employers stated they would discuss this matter further and be prepared to talk about it again in the afternoon session.

The Employers stated they reviewed the matters discussed at the morning session and feel the following proposal will meet the needs of both parties:

1.  A guarantee to skilled men regardless of category at a minimum of 173 hours per month at the 25¢ differential shall be paid to steady employees. Such guarantee shall be paid irrespective of how long an individual is retained during any month as a steady skilled man; provided, however, that should such steady skilled man be released for cause during any month, the guarantee shall be prorated over the period such employee was retained as a steady man;

2.  Should a steady man be upgraded, he will receive the applicable higher skill differential for the balance of the shift regardless of the period of time of utilization on the equipment carrying the higher differential;

248

3.  All hours worked (including dead time hours under the 8-hour guarantee) by such steady man will count against his guarantee;

4.  Travel time will not be a part of the guarantee;

5.  The guarantee is not a limitation of the employers' right to work such steady men over and above such guarantee; i.e., the guarantee represents a minimum payment for the privilege of obtaining steady skilled men;

6.  It is not intended to allow an employer to hire steady skilled men so that he may then order longshoremen to make up a basic gang, thus avoiding using a basic gang from the hall;

7.  Where a skilled man is required for a job of short duration the employer may use his steady skilled men.

The Union members of the Committee agree in principle with the above proposal and as a result thereof, it was agreed that with the above as the basis for the employment of steady skilled men, the employers may begin discussing such employment with the men and employing steady men. It was further agreed the Crane provisions of Section 14 on steady men are retained.

### SAN FRANCISCO STEADY SKILLED MEN

A.  In addition to the exceptions set forth in Section 9.432, steady skilled men cannot be assigned to operate the following:

Payloaders — On ship and on dock

Bulldozers — On ship and on dock

Tractors/Hustlers — Ondock except Ro-Ro operations

Forklifts (30,000 lbs. Capacity or less) — On dock operations except Ro-Ro and container operations

NOTE: It is understood that the local understanding as to the use of steady Utility Drivers remains in effect.

249

B. Men who are released by their steady employer for any reason, other than discharge for cause, shall be released on the basis of inverse job seniority unless the application of inverse seniority will not provide the employer with sufficient employees qualified to operate the employer's mechanical or powered equipment. If a man believes he is being released improperly, he may make such claim and have it resolved through the grievance machinery.

C. The employer shall provide to the union a notice of a steady employment position for posting in the joint longshore dispatch hall. The notice shall be posted for ten (10) days prior to selection and employment of the steady employee.

Amended July 15, 1999, Memorandum of Understanding as follows:

For San Francisco steady skilled men, the provisions of CLRC Meeting No. 14-66, Item 1, Paragraph (1,) are modified as follows:

The day and night monthly (four week) pay guarantee shall be 180 hours (45 hours per week) at the proper (first or second) shift straight-time crane rate.

All hours worked or paid shall be paid at the proper skill rate, shift rate, and prevailing over-time or straight-time rate. On each day worked, only the standard shift hours (8 hours on the first and second shifts, 5 hours on the third shift) shall be counted against the weekly or monthly guarantee.

The payment of guarantee hours in excess of those required by the PCLCD, the payment of "bonus" hours in addition to work hours, and other similar pay practices are prohibited.

In exchange for receiving the monthly (four week) guarantee, steady skilled men may not work more than two shifts out of the hall in any payroll week.

A tenth hour shall be paid to all drivers, steady and hall, when operating 9.43-rated equipment. Early starts or late finishes shall be paid in one-hour increments as provided in Section 14.521.

# SAN FRANCISCO BAY AREA CRANE BOARD

A Crane Board shall be established in the San Francisco Bay Area Longshore Dispatch Hall. (Memorandum of Understanding, dated November 23, 2002)

# SAN FRANCISCO UTILITY MAN/LIFT DRIVERS

The concept of a Utility Man/Lift Driver, which was first established by the CLRC in 1962, is also included in the San Francisco Miscellaneous Dockworkers Agreement.

With respect to the San Francisco local agreement only, the following understandings are reached:

1) The utility man/lift driver concept, contained in the local agreement, does not allow for daily employment.

2) Arbitration Award NC-35-86 is vacated. Utility man/lift drivers shall not be used as signal men in Transtainer operations.

3) All other Bay Area employment practices with respect to utility man/lift drivers shall remain in effect. (Memorandum of Understanding dated July 2, 1987)

# SAN FRANCISCO LOCAL 10 DAY AND NIGHT DOCK PREFERENCE

The purpose of this understanding is to develop job opportunities for old or disabled longshoremen in Local 10. The

intent of the parties is that jobs suitable for Dock Preference work will be identified as such when ordered by the Employers, and that longshoremen on the Dock Preference Board will be given first preference for this work. Second preference for these jobs will be given to longshoremen in the Gang Dock Preference category and to longshoremen meeting the provisions of Section 3.133 and its subsections. Consistent with this expressed intent, the parties agree to the following:

**A.** The Employers will properly order all jobs by name (Pin Man, Bus Driver, etc.) and type (e.g., ship or dock).

**B.** The parties note the following jobs are presently assigned and will continue to be assigned to "Dock Preference":

- Hook-on jobs
- Sweeper jobs
- Stickman jobs
- Gang Relief jobs
- Excess Clerk's jobs
- Dock Driving on lift-on/lift-off jobs.

In addition to the foregoing, the following additional jobs will be assigned as "Dock Preference":

- Pin Man jobs (when ordered as such)
- Pin Man jobs on wheeled container operations (1 job per crane, which will be ordered as such)
- Bus jobs (which shall be ordered as such)
- 10% of all auto drive on/off jobs (which shall be designated as "drive only")
- Other work as appropriate and agreed to by the parties (such jobs would include moving autos from storage to the staging area, lift truck and semi-tractor jobs for those having the skill and physical capability, etc.).

**C.** Concurrent with the Employers' obligation to order jobs in the foregoing manner, the parties recognize the obligation of

252

longshoremen in Dock Preference and Gang Dock Preference categories to make themselves available for and to accept this work. To this end, the following will apply to the Board:

**1. Special Provisions for PGP Eligibility**

– All longshoremen in the Dock Preference and Gang Dock Preference categories who have lost PGP eligibility due to lack of work shall be made eligible for PGP in the following manner:

– Longshoremen on the Dock Preference Board will sign in to establish availability until the end of the first full payroll quarter following ratification.

– At the end of the first quarter following ratification, eligibility will continue to be granted if the longshoreman has worked 50% of the hours in the unskilled category as defined in Section 20.5332.

At the end of the second and third consecutive quarters following ratification, the eligibility shall be also based on the 50% test which shall be applied to the cumulative full payroll quarters since ratification.

– At the end of the fourth consecutive quarter following ratification, the full provisions of Section 20 apply.

**2. Physical Examination Requirement**

– Longshoremen in the Dock Preference and Gang Dock Preference categories will be required to take a physical examination immediately after ratification of the Contract and at least annually thereafter from a neutral doctor selected by the parties. The neutral doctor will assess the physical condition of these longshoremen and determine their ability to perform regular longshore or dock preference work. The findings of the neutral doctor will be subject to the procedures outlined in SFIPLRC #68-84, October 1, 1984, and Award No. NC 17-85. Dock preference longshoremen under the age of 55 who are found to be

253

physically capable of performing longshore work shall be removed from the preference category.

An exception to the physical examination requirement will be made for longshoremen who completed physicals as agreed to in SFJPLRC #68-84, October 1, 1984, and were found by the neutral doctor to have a permanent, stationary condition. In this case, the neutral doctor will review documentation from that joint physical, and may either confirm the findings or conduct another physical examination at his sole discretion.

The annual physical examination requirement shall be waived for longshoremen whose physical condition is determined to be permanent and stationary by the initial physical examination. Where the neutral doctor establishes that the physical condition giving entitlement to the preference category is temporary, he shall establish the duration of the temporary period, not to exceed 1 year. At the end of this period, Dock Preference longshoremen shall be obliged to retake the physical examination or they shall be removed from the list.

**D.** Except for the special PGP eligibility provisions in Item C.1. of this understanding, the existing provisions of Section 20 will apply.

**E.** Conformance to this understanding will be reviewed by the CLRC quarterly.

**F.** The parties agree the foregoing understandings will be subject to Section 17 of the Agreement.

## SEATTLE EQUALIZATION OF WORK OPPORTUNITY FOR CRANE OPERATORS

Except as modified by the following, all Agreement provisions, CLRC clarifications/interpretations, and related arbitration decisions and agreements (local and Coast) pertaining to crane operators shall remain in effect.

*Equalization.* In order to achieve equalization of work opportunity in a port between steady crane operators and the comparable group of hall crane operators as hereinafter defined, the following provisions shall be applicable.

1. The maximum hours per calendar month that steady crane operators can be worked while in the steady employ of their employer shall be 176 hours, subject to the following:

(a) Application of the maximum work hours limitation to individual steady crane operators shall not preclude their completion of any shift started under the limit.

(b) Application of the maximum work hours limitation to individual steady crane operators shall not include the first extended shift hours for shifting/sailing a vessel in each payroll week.

(c) Steady crane operators shall have all crane hours worked for their steady employer on a dispatch from the dispatching hall count against the monthly maximum hours limitation. Before or after reaching the monthly maximum hours limitation, steady crane operators will be permitted to accept a dispatch from the dispatching hall to any employer. Steady crane operators shall be dispatched under the dispatch rules of the port on a 1-day only basis.

2. On the first of each calendar month the maximum hours per calendar month that steady crane operators can be worked by their employer shall be subject to adjustment as follows:

(a) A comparative review of the average number of hours worked by steady crane operators and the average number of hours worked by hall crane operators shall be made covering the combined, most recent, thirteen payroll weeks' record available closest to the fifteenth of the preceding calendar month.

(b) Excluded from the comparative review shall be all steady crane operators (and their hours) who were not employed during the full period as steady men. Excluded from the review shall be all hall crane operators (and their hours) who were not available 65 or more days during the full period.

(c) Day and night hours of the steady crane operators shall be combined and day and night hours of the hall crane operators shall be combined.

(d) For purposes of comparison, the review of work hours for the steady crane operators shall include all hours except hours related to travel time, paid holidays, vacations, or training. For purpose of comparison, the review of work hours for the hall crane operators shall include all hours except hours related to travel time, paid holidays, PGP payments, vacations, training or joint LRC employment.

(e) In relation to the steady crane operators currently being employed, the following hall skilled categories shall be used for the comparative review: Hall Deck/Crane Board—excluding those men who are not crane operators, and including all crane operators in regular gangs, who meet the qualifications of Item 2(b).

3. If in any monthly comparative review, as provided in 2(a) through (e) above, the average number of work hours of the total group of steady crane operators or the total group of the hall crane operators exceeds the other by 5% or more, either party at the local level may then propose that an immediate adjustment be made in the maximum monthly work hours in the port that steady crane operators are permitted to work.

4. If the local parties cannot agree as to the maximum monthly work limitation for steady crane operators by the 25th of the preceding calendar month, such disagreement may be submitted to the Area Arbitrator for final determination. The

Area Arbitrator must make his award by the first of the month and his award must be restricted to setting the maximum work hour limitation for steady crane operators for that month.

5. In establishing the maximum hours per calendar month that steady crane operators can be worked, the local parties and the Area Arbitrators are governed by the following:

(a) The maximum monthly work limitation for steady crane operators cannot be reduced below 156 hours.

(b) No adjusted maximum work limitation for steady crane operators can alter the application of 1(a), (b), and (c).

6. Nothing herein shall prevent the local parties at the LRC level from mutually agreeing upon any other method of equalization, if the local parties disagree such matter is not arbitrable.

7. In the acceptance of assignments from dispatching halls, steady crane operators shall be limited to working no more than a total of 6 work shifts in any calendar month.

NOTE: *Nothing in the foregoing shall dilute or negate the contractual right of Employers to employ 9.43 or crane operators without limit as to numbers.*

# LOS ANGELES/LONG BEACH CRANE OPERATORS

## A. Training

### 1. *Additional Training:*

The Employers shall, during the 6-year period commencing July 1, 2002, provide crane operator training to additional individuals from the registered work force under existing selection and training procedures, as provided by this document.

### 2. *Ongoing Training:*

Provide ongoing training so that the total number of trained and qualified crane operators in the port shall be the number of trained and qualified crane operators as of July 1, 2002, plus the training commitment referred to in the preceding paragraph. (The total number of trained and qualified crane operators on July 1, 2002 shall be the combined number of (1) steady crane operators, (2) those on the dispatch hall primary list and (3) those on the dispatch hall secondary list.) It is recognized that training cannot be provided for each vacancy as it occurs.

The number of longshoremen trained shall be equal to the number of individuals advanced from the secondary to primary hall crane list each payroll quarter. (Reference No. 5(a) Hall Crane Board)

Additional crane training can be instituted by mutual agreement, with a minimum of 100 crane operators trained during the term of the PCLCD. Disagreements concerning the number of operators to be trained in excess of the minimum may be processed through the Contract grievance machinery.

3. *Mobile Crane Training:*

Effective July 1, 1987 PMA shall discontinue providing "mobile crane" training to Los Angeles/Long Beach crane operators.

Effective July 1, 1987 future trainees shall not be required to have a Class I Driver's License.

Effective July 1, 1987 future hall dispatch of "mobile crane" jobs shall be restricted to those individuals who have completed "mobile crane" training by the PMA Training Department. If in the future it becomes necessary to provide additional "mobile crane" training, selection shall first be from those crane operators who have not received "mobile crane" training from the PMA Training Department.

4. *Selection of Trainees:*

Trainees shall be selected by the Joint Labor Relations Committee on the basis of industry seniority and in accordance with guidelines developed by the JPLRC as provided in Section 9.2 and as legally required. However, trainees shall be required to pass a physical examination. After training, men are to be certified and placed on the secondary list of certified crane operators. Any subsequent transfer of men from the secondary list to the primary list of certified crane operators shall be as determined by the JPLRC in order to meet the crane operator needs of the port and provide sufficient work opportunity to the primary list.

5. *Hall Crane Board:*

(a) In determining transfers to the primary crane list, the Joint Port Labor Relations Committee shall review the average of all crane hours worked by the hall crane board (primary list) operators who are available (checked in or working off the crane board) the first 2 weeks of the 13 week averaging period. The Joint Port Labor Relations Committee shall only transfer secondary list operators to the primary list when a minimum of 160 hours of crane work opportunity per Hall Crane Operator (per month) is available to the primary Hall Crane Board. Joint dispatch hall and PMA allocations records shall be used to confirm the number of crane jobs available in the hall.

(b) Day and night hours of the hall crane operators shall be combined in determining the hall average.

(c) All hall crane board jobs shall continue to be flop jobs, except on bulk jobs at the Metro bulk facility, Long Beach.

**B. Selection Of Steady Crane Operators**

Future selection of steady crane operators shall be made in the following sequence:

(1) the jointly certified primary crane operators' list;

(2) the jointly certified secondary crane operators' list.

Selection shall be made in accordance with the posting and application procedure required by the Bates settlement.

An applicant(s) from the primary list (1 above) must be accepted before an applicant(s) can be accepted from the secondary list (2 above).

Any applicant in accordance with the above sequence who is deemed by the employer to be unsatisfactory and who files a grievance must be given a review by the JPLRC and the grievance resolved prior to steady employment being offered. The applicant must file a grievance within 48 hours of the employer's notice to the Union of its selection or inability to fill a steady crane operator position. The JPLRC must meet within 48 hours of receipt of the grievance to review the complaint, and any disagreement must be promptly referred to the Area Arbitrator who shall render a decision within 10 days. Any grievance by an individual applicant concerning the selection process must be submitted in accordance with the above procedure or it will be deemed untimely.

The maximum hours limitation for an individual employer will not be waived under Section D(2) pending the Area Arbitrator's decision in the above procedure.

If during the term of the Agreement the employers should be unable to obtain satisfactory applicants for steady crane operators' positions from the primary, or secondary crane list, the Joint Port LRC shall immediately convene to resolve this issue. If there is failure to resolve this issue within 10 days, the issue shall be referred to the Joint Coast Labor Relations Committee which shall, within 5 days, provide for a procedure for the employer to select applicants from Class A longshoremen other than those on the primary and secondary list.

## C. Hall Crane Board Equalization Review

*Equalization:*

The crane hours of the certified Class A crane driver checked in on the primary board the first 2 weeks of the 13-week period will be divided into the total crane hours that are dispatched through the dispatch hall. This review will be used to see what impact this new formula is having on equalization of hours.

## D. Steady Crane Operators—Maximum Hours Limitation

*Maximum Hours Limitation:*

1. The maximum shifts per four PMA payroll weeks that steady crane operators can be worked while in the steady employ of their employer shall be 20 shifts, subject to the following:

(a) A calendar of 13 four consecutive payroll week periods for each 52-weeks will be published by PMA for calculating the maximum shift limitation.

(b) **Guarantee.** Steady crane operators shall be paid a maximum guarantee based upon 13 periods of four consecutive payroll weeks in each Contract year as follows:

Weekly$1,665(4 weeks = $6,660)

Daily$ _333

The guarantee for work on the first, second, or third shifts shall be $333 per shift. The monthly guarantee of $6,660 shall be payable only if the sum of the four weeks worked and guaranteed is less than $6,660.

Steady hammerhead crane operators who work 3 shifts per week shall be paid their 3 work shifts plus 2 guarantee shifts; those who work 4 shifts per week shall be paid their 4 work shifts plus 2 guarantee shifts; those who work 5 shifts per week shall be paid their 5 work shifts plus 2 guarantee shifts.

(c) **Payment for Shifts Worked.** The rate of pay for shifts worked shall be at the proper contract rate for time worked or $333, whichever is greater. Pay for work shall be counted towards the monthly guarantee.

2. The maximum shift limitation for an employer's steady crane operators shall be waived during any payroll month in which that employer is unable to fill steady crane operator positions posted in accordance with LRC Meeting No. 116-80, Item 10, and in accordance with the selection procedure in Section B.

3. An employer who pays hours in excess of the maximum shift limitation established in Item 1 to a steady crane operator shall be required to return that crane operator to the dispatch hall for the next payroll month.

(a) For purposes of this section, the maximum hours for the steady crane operators shall include all hours except hours related to travel time, paid holidays, vacations, payroll adjustments, training, or work out of the dispatch hall.

4. Nothing in the foregoing shall dilute or negate the contractual right of Employers to employ 9.43 or crane operators without limit as to numbers.

5. Nothing herein shall prevent the local parties at the LRC level from mutually agreeing upon any other method of equalization; if the local parties disagree such matter is not arbitrable.

# LOS ANGELES/LONG BEACH CONTAINER YARD (CY) EQUIPMENT BOARD

A Container Yard (CY) Equipment Board for the dispatch of all tophandlers, sidepick, portpacker and reachstacker operators shall be established in the Los Angeles/Long Beach Long-

shore Dispatch Hall and in any other major port where jointly agreed. Any tophandler/sidehandler job that is unfilled by persons on the CY Equipment Board shall be filled by any other Class "A" or Class "B" longshore worker who is PIT-certified in that piece of equipment. All tophandler equipment and reachstackers shall be designated as UTRs. Any CLRC crane designation of tophandlers and reachstackers in Los Angeles/Long Beach is hereby rescinded. (Memorandum of Understanding, dated November 23, 2002)

# LOS ANGELES/LONG BEACH UTR DRIVERS

## A. Utilization

Provide that steadily employed Utility Truck Drivers (UTR's) can be utilized on all dock operations as required by the Employer.

## B. Semitractor Dispatch Board

A "Semitractor Dispatch Board" or Boards shall be established by the JPLRC upon the basis of the following proposal.

*Semitractor Dispatch Board*

Based upon the common acknowledgment that trained skilled operators are essential to overall efficient longshore operations, the parties agree to the establishment of a Class A Semitractor Dispatch Board.

The creation of the Class A Semitractor Dispatch Board is to assure the dispatch of longshoremen who have been trained to efficiently operate the semitractors which are essential to container operations in the port.

The Semitractor Dispatch Board shall be created with dispatch priority to be given to those on the Boards as follows:

1. First priority shall be given to Class A longshoremen with over 5 years' experience, who volunteer to be on the Board.

LOS ANGELES/LONG UTR DRIVERS                    ADDENDA

2. Second priority shall be given to Class A longshoremen with less than 5 years' experience, who have completed the ILWU-PMA Semitractor Training Program.

3. The next-in-line dispatch sequence for jobs not filled by the Class A Semitractor Board shall be under the principle of low-man-first to be dispatched on the Jitney Board and then the Low Board dispatch sequence.

4. The fourth priority shall be given to Class B longshoremen who have completed the ILWU-PMA Semitractor Training Program.

With respect to those Class A longshoremen in 2 above, it is understood that time on the Semitractor Dispatch Board shall count toward meeting the "5 years in the hold" requirement (subject to the necessary waiver being granted by the Joint Coast Labor Relations Committee).

The Joint LLRC shall, in accordance with Section 9.4, provide for the appropriate number of Class A longshoremen (in 2 above) on the Semitractor Dispatch Board from longshoremen elevated to Class A status after July 1, 1987. Any disagreement shall be submitted to the Area Arbitrator for resolution.

Jobs dispatched from the Semitractor Dispatch Boards and semitractor jobs from the Class B Board must be accepted or a flop shall be given.

The next-in-line dispatch sequence for jobs not filled by the above dispatch sequence shall then go to the next recognized procedure in the Port of Los Angeles/Long Beach. Semitractor jobs shall be dispatched at least one-half hour prior to the normal shift starting time.

## C. Monthly Employment

1. UTR's shall, at the Employers' option, be employed on a monthly basis. These operators can be used against all vessels' operations as required by the Employer.

ADDENDA                    LOS ANGELES/LONG BEACH UTR DRIVERS

2. Monthly employees shall be guaranteed monthly a minimum/maximum of 195 hours of work or pay at the applicable shift UTR rate of pay.

3. These UTR operators shall report to the job one-half hour prior to the start of the shift for work other than actual handling or moving of cargo. The phrase "other than actual handling or moving of cargo" is intended to permit the preparation of equipment including chassis for movement to or from the vessel so long as there is no actual movement of cargo directly to or from the vessel.

4. Employers who elect to employ UTR operators on a monthly basis for both day and/or night operations may order up to 50% of the average daily number of UTR operators used against their operations during the previous payroll quarter as recorded by the Joint Dispatch Hall and PMA Allocations. New Employers or new container terminals may employ monthly UTR operators after a payroll quarter of operation, based on the foregoing formula.

5. All ship operations with monthly UTR operators shall start on time should the Dispatch Hall on any given day or days be unable to fill the remainder of UTR operators from the Hall at the start of any shift.

6. Monthly UTR operators shall work against vessels as directed, on all UTR rated equipment, providing full flexibility as required by the Employer. Such flexibility shall include all work before vessel's arrival and after vessel's departure on that shift. (This means cargo preparation for that vessel or dock storage of discharged cargo from that vessel.)

7. Full flexibility includes the use of monthly UTR operators for utilization between the vessel/CY and container movements to or from Container Rail Transfer Yards. Other UTR dock work remains as per past practice (i.e., container move-

ment from vessel to CY, vessel to Rail Container Transfer Yard, CY to Rail Container Transfer Yard and vice versa).

8. First preference for monthly UTR work shall be given to those individuals checked in on the Dispatch Hall C/L/UTR Board; second preference - Secondary UTR Board; third - low boards; fourth - B Board. Dispatch shall be based on "low man out" (lowest sign-in hours dispatched first). Individuals will have a timely check-in procedure for the 30-day dispatch.

9. Monthly UTR's will be responsible for arranging their own relief in accordance with Section 2.3 and subsections of the PCLCD. This allows the Dispatch Hall to dispatch relief UTR jobs on the low-man-out principle.

10. Four days prior to the end of each month, Employers will notify the Dispatch Hall of their requirement of monthly UTR operators for the subsequent month. The number of such jobs shall be posted by the joint Dispatchers in the Dispatch Hall 3 days prior to the end of the month. On the first day of each month, the dispatch of monthly UTR operators shall occur at a time so as to guarantee arrival of all monthly UTR operators to their Employer one-half hour prior to the start of the shift.

11. This procedure for the employment and use of monthly UTR operators shall be effective September 1, 1990.

12. The JPLRC shall, after September 1, 1991, review the foregoing conditions and consider expanding the utilization of monthly UTR operators by mutual agreement. Any such JPLRC agreement shall be subject to CLRC approval.

13. Practices as of July 1, 1990 with respect to the employment and the utilization of operators from the UTR category shall remain unchanged.

14. For efficiency of dispatch, monthly employees may be dispatched individually or as units. The dispatching method

shall in no way affect the Employers flexibility in utilizing UTR's as provided for in this document.

## DISPATCH HALL COSTS

Effective January 1, 1997, the PMA agrees to be obligated to pay 65% of all 1996 base year Dispatch Hall expenses and the Union agrees that each local will be obligated to pay 35% of all 1996 base year Dispatch Hall expenses. For the purpose of these obligations, the 1996 base year expenses of the Dispatch Halls shall be the January 1, 1996, to December 31, 1996, equally shared expenses which appear on the audited financial statements. Whenever, due to reduction in dispatch hall costs or increase in the PCL&CA holiday cost, the average cost of a holiday exceeds 15% of the 1996 base year expenses, the Union's 35% share shall be reduced by a proportionate amount allocated to the local dispatch halls administratively by the JCLRC. All additional jointly agreed to expenses above the base year expenses shall be shared equally between PMA and the Local Union. The formula for sharing extraordinary capital improvements shall be subject to mutual agreement of the parties.

(Notwithstanding the fact that PMA's contribution towards Dispatch Hall costs is by virtue of this Agreement greater than the contribution of the ILWU, nothing herein contained or otherwise shall in any way change or modify the basic principle and understanding of the parties as expressed in this Agreement that the Dispatch Halls shall continue in the future, as they have in the past, to be maintained and operated jointly and equally by the ILWU and the PMA.)

Amended by July 15, 1999, Memorandum of Understanding to incorporate the following:

A. The Washington Area, Oregon/Columbia River Area, Southern California Area, and Northern California Area shall have seven-day allocations, orders, and dispatch. In ports where there is presently no Sunday allocations, the dispatcher shall be compensated accordingly.

B. Upon completion of Item A, Dispatch Hall Costs Addenda, PCLCD and PCCCD, shall be amended to provide that PMA shall be obligated to pay 85% instead of 65%, and the Union shall be obligated to pay 15% instead of 35% of the 1998 base year dispatch hall expenses, and the minimum Dispatch Skill Rate shall be 10% of the Basic Longshore Rate of pay.

# EMPLOYER CONTRIBUTION TO LONGSHORE AND CLERKS' 401(k) FUND

The Employers agree to contribute to a fund each year of this Agreement an amount sufficient to provide to the 401(k) account of each registered longshoreman and marine clerk a contribution of $1.00 per hour. The payment shall be for hours paid by PMA Member Companies for work at PCL&CA longshore and marine clerk and PCWB&FA walking boss occupation codes in the previous contract year up to a maximum of 2000 hours to those who have established a pension qualifying year.

The contribution will be made to each account as soon as practicable following the end of each Contract year.

This is subject to the limitations imposed by Sections 401(a), (k) and (m) of the Internal Revenue Code and any other applicable IRS and ERISA regulations.

# PMA LETTER TO MEMBERS

July 1, 1981

To: Members

## SUPERINTENDENTS

During the course of the ILWU/PMA 1981 negotiations, the Union complained that Superintendents employed by stevedoring companies and steamship companies have been violating the ILWU/PMA Pacific Coast Longshore and Clerks Agreement by performing work which is contractually defined as jurisdiction belonging to longshoremen and clerks.

We have an obligation under our contracts to refrain from such violations by our Superintendents or other management personnel.

Very truly yours,

Edmund J. Flynn
President

## APPENDIX

# MEMORANDUM OF UNDERSTANDING BETWEEN ILWU AND IBT

This Memorandum of Understanding is entered into between the undersigned Unions for the purpose of clarifying the work jurisdiction of the undersigned Unions in the loading and unloading, handling and movement of cargo on the dock facilities owned or controlled by the members of the Pacific Maritime Association in those Pacific Coast ports where the International Longshoremen's and Warehousemen's Union represents longshoremen:

1. Nothing in the Mechanization and Modernization Agreement between the PMA and the ILWU shall be construed to permit longshoremen to load or unload trucks, whether cargo is handled piece by piece or in unit loads; nor shall longshoremen be permitted to go aboard trucks. Exception: When necessary, the truck may go directly under ship's gear to handle heavy lifts such as machinery, etc., where agreed to by the undersigned parties.

2. Cargo on the dock to be loaded on trucks.

The handling of all cargo from the ship to a place of rest on the dock shall be recognized as the work of the longshoremen when such cargo is under the control of the steamship, terminal or stevedore operator; the handling of all cargo from the place of rest on the dock onto the truck shall be recognized as the work of the teamster when such cargo is under the control of the trucking or drayage company or shipper. More specifically:

(a) Any load being handled in single lift units (packaged loads, unitized loads, pallet loads), whether on a longshore

board, a pallet board or a skip board, shall be loaded aboard trucks by teamster lift drivers, but all breaking down of high piles shall be done by longshoremen.

(b) Loose cargo may be taken piece by piece to the truck by teamsters from the skin of the dock and (1) put directly onto the bed of the truck, or (2) put onto pallet boards on the truck or (3) on a loading platform, including the apron of the dock for the purpose of loading the truck. In this last case, the loaded boards shall be placed on the truck by teamster lift fork operators.

(c) Loose cargo may not be loaded onto pallet boards by teamster lumpers prior to arrival of the trucks.

3. Cargo arriving at the dock on trucks, to be unloaded.

The handling of all cargo from the truck to a point of rest on the dock shall be recognized as the work of the teamster when such cargo is under the control of the trucking or drayage company or shipper; the handling of all cargo from the point of rest on the dock to the ship shall be recognized as the work of the longshoremen when the cargo is under the control of the steamship, stevedore, or terminal operator. More specifically:

(a) Any load being handled as a unit (packaged loads, unitized loads, pallet loads) on any kind of board, shall be taken off the truck by the teamster lift truck operators and set down on the dock one lift high.

(b) Loose cargo may be taken off the truck piece by piece by the teamster or his lumper and put onto the skin of the dock at that point at which the trucking or drayage company or shipper releases control of cargo to the steamship, stevedore, or terminal operator.

(c) Loose cargo may not be taken off the truck and put onto any kind of pallet or sling board alongside the truck or anywhere else on the dock by the teamsters when the result of such

MEMORANDUM OF UNDERSTANDING
BETWEEN ILWU AND IBT

APPENDIX

operation is to have load go to ship to be stowed by longshore-men.

(Signed) EINAR O. MOHN

WESTERN CONFERENCE OF TEAMSTERS,

International Brotherhood of Teamsters, Chauffeurs and
Warehousemen of America

(Signed) HARRY BRIDGES

INTERNATIONAL LONGSHOREMEN'S AND
WAREHOUSEMEN'S UNION

Witnesseth by:

(Signed) J. PAUL ST. SURE

7/20/61

272

---

**Pacific Coast Longshore
Contract Document**

## SUBJECT INDEX

| SUBJECT | Section | Page |
|---|---|---|
| **A** | | |
| Accident Prevention | 16.2 | 80 |
| Responsibilities of the parties | 16.1 | 80 |
| Accident Prevention and Safety | 16 | 80 |
| ADA Policy | Addenda | 238 |
| Appropriate Shift and Skill Rates | Addenda | 247 |
| Arbitrators/Arbitration Awards | 17.5 | 89 |
| | 24.3 | 122 |
| | 17.8 | 94 |
| Assault | 1.1 | 2 |
| Assignment of Work to Longshoremen | | 269 |
| PMA Letter to Members | Addenda | |
| Auto Allowance - Mileage | 4.6 | 33 |
| Availability, PGP | 20.5 | 110 |
| Availability of Men and Gangs | 2.7 | 16 |
| **B** | | |
| Basic Gang | 10.2 | 54 |
| Business Agents | 17.3 | 87 |
| **C** | | |
| Changes in Operations | 10.5 | 58 |
| | 15.1 | 78 |
| Competent Men | 14.7 | 75 |
| | 9.3 | 51 |
| Conformance and Performance | 10.9 | 61 |

273

INDEX

| SUBJECT | Section | Page |
|---|---|---|
| Container Freight Station Supplement | 12.1 | 68 |
| Wage schedule | | 156 |
| | | 186 |
| Contract Relationship and Property Rights | Preface | 1 |
| Cranes | 14 | 70 |
| Bare boat | 1.5 | 6 |
| Clarifications, exceptions, limitations | 14.3 | 72 |
| Competent men | 14.7 | 75 |
| | 9.3 | 51 |
| Definition "longshore crane" | 14.2 | 71 |
| Employment of longshoremen to drive cranes | 14.1 | 70 |
| Equalization of work opportunity/crane operators | Addenda | 254 |
| | Addenda | 257 |
| Local Rules | 14.9 | 78 |
| Manning | 14.8 | 77 |
| Shifts | 14.5 | 73 |
| Steady crane operators | 14.6 | 74 |
| | Addenda | 254 |
| Training | 9.4 | 51 |
| | Addenda | 257 |
| Wages | 14.4 | 72 |
| | 4.3 | 29 |

**D**

| SUBJECT | Section | Page |
|---|---|---|
| Days Off | 6.1 | 39 |
| Definitions | | |
| Dock | 1.9 | 10 |
| Longshore crane | 14.2 | 71 |
| Longshoreman | 1.9 | 10 |

INDEX

| SUBJECT | Section | Page |
|---|---|---|
| Disciplinary Penalties | 17.8 | 94 |
| Discipline by Return to Dispatching Hall | 17.7 | 93 |
| Discrimination, No | 13 | 69 |
| | Addenda | 222 |
| Equal Employment Opportunity Policy & Procedure: Policy Against Discrimination, Harassment & Retaliation | Addenda | 223 |
| Dispatching, Registration and Preference | 8 | 46 |
| Dispatch hall costs | Addenda | 267 |
| Dispatching hall personnel | 8.2 | 47 |
| Dispatching halls | 8.1 | 46 |
| Furnishing of gangs and supporting men | 8.5 | 50 |
| Method of dispatching to be determined by JPLRC | 10.1 | 53 |
| Preference of employment | 8.4 | 49 |
| Registration | 8.3 | 48 |
| See also Registration and Transfer | | |
| Dock Definition | 1.9 | 10 |
| Dock Preference | Addenda | 251 |
| Dock Units | 10.7 | 61 |
| Dock Work Provisions | 1.2 | 3 |
| Drug Abuse and Peddling | 17.8 | 94 |
| Drunkenness | 17.8 | 94 |

**E**

| SUBJECT | Section | Page |
|---|---|---|
| Efficient Operations | 15 | 78 |
| Disputes to CLRC | 15.5 | 80 |
| Economic feasibility | 15.4 | 79 |
| Eight-hour Guarantee | 3.1 | 16 |
| Employer Contribution to Longshore and Clerks' 401(k) Fund | Addenda | 268 |

INDEX

| SUBJECT | Section | Page |
|---|---|---|
| Employer's/employees' rights | 15.1 | 78 |
| Rule changes | 15.3 | 79 |
| Unnecessary men | 15.2 | 79 |
| Equalization of Work Opportunity | 10.1 | 53 |
| Crane operators | Addenda | 254 |
| | Addenda | 257 |
| Exceptions for Health, Safety and Onerous Workload | 11.4 | 62 |
| Existing Operations | 15.1 | 78 |
| | 10.3 | 56 |
| Existing Practices | 1.8 | 9 |

**F**

| SUBJECT | Section | Page |
|---|---|---|
| Four-hour Minimum | 3.2 | 22 |
| Furnishing of Gangs and Supporting Men | 8.5 | 50 |

**G**

| SUBJECT | Section | Page |
|---|---|---|
| Gang Boss | 10.2 | 54 |
| Gangs | 10.1 | 53 |
| | 10.2 | 54 |
| Good Faith Guarantee | 18 | 99 |
| Grievance Procedures | 17 | 81 |
| | 17.5 | 89 |
| Arbitrators and arbitration awards | 24.3 | 121 |
| Business agents | 17.3 | 87 |
| Discipline by return to dispatching hall | 17.7 | 93 |
| Informal hearings and interim rulings | 17.6 | 91 |
| Joint Labor Relations Committee | 17.1 | 81 |
| On-the-job grievances | 17.2 | 84 |
| Penalties for work stoppages, assault, pilferage, drunkenness, drug abuse and peddling, safety violations and other offenses | 17.8 | 94 |

276

INDEX

| SUBJECT | Section | Page |
|---|---|---|
| Guarantees | 3 | 16 |
| Eight-hour guarantee | 3.1 | 16 |
| Four-hour minimum | 3.2 | 22 |
| General provisions | 3.3 | 25 |
| Hours in excess | Addenda | 247 |

**H**

| SUBJECT | Section | Page |
|---|---|---|
| Health, Safety and Onerous Dispute Procedures | 11.4 | 62 |
| Hold Cleaning | 1.6 | 9 |
| Holidays | 5 | 35 |
| Observance and work schedule | 5.2 | 35 |
| Paid holidays | 5.3 | 37 |
| Recognized holidays | 5.1 | 35 |
| Hours and Shifts | 2 | 10 |
| Emergencies | 2.6 | 16 |
| Flexibility for ship operations | 2.5 | 15 |
| Meal time | 2.2 | 11 |
| Relief periods | 2.3 | 12 |
| Shift and Skill Rates of Pay | Addenda | 247 |
| Standard work shifts and work week | 2.1 | 10 |
| Three shift availability | 2.7 | 16 |
| Work shifts, exceptions and extensions | 2.4 | 12 |

**I**

| SUBJECT | Section | Page |
|---|---|---|
| ILWU-IBT Memorandum of Understanding | Appendix | 270 |
| Industry Travel System | Supplement IV | 209 |
| Informal Hearings | 17.6 | 91 |
| In Lieu of Time | Addenda | 217 |
| Interim Rulings | 17.6 | 91 |

277

INDEX

| SUBJECT | Section | Page |
|---|---|---|
| **J** | | |
| Jobs of Short Duration | Addenda | 217 |
| Joint Labor Relations Committee | 17.1 | 81 |
| Joint Port Working and Dispatching Rules | 15.3 | 79 |
| | 24.2 | 121 |
| | Preamble of Section 1 | 2 |
| Joint Promotions Committees | 9.2 | 51 |
| Jurisdiction. See Scope of Contract and Assignment of Work to Longshoremen | | |
| **L** | | |
| LASH Barge Jurisdiction | 21 | 118 |
| Assignment of work | 21.1 | 118 |
| Jurisdictional difficulties | 21.2 | 119 |
| Leaves of Absence | Supplement I | 191 |
| Lines Handling | 1.6 | 9 |
| Lockouts | 11.1 | 62 |
| Lodging Allowance | 4.5 | 33 |
| Longshoreman - Defined | 1.9 | 10 |
| Low Work Opportunity Ports | Supplement III | 204 |
| **M** | | |
| Machinery, Equipment and Other Tools | 1.5 | 6 |
| Maintenance and Repair | 1.7 | 9 |
| Manning | 10 | 53 |
| Basic ship gang, general cargo | 10.2 | 54 |
| Change from discharge to loading | 10.8 | 61 |
| Cranes | 14.8 | 77 |
| Dock units | 10.7 | 61 |
| Existing operations | 10.3 | 56 |
| New methods of operations | 10.5 | 58 |

278

INDEX

| SUBJECT | Section | Page |
|---|---|---|
| Safeguards | 10.9 | 61 |
| Shifting men when operations change | 10.4 | 58 |
| Working as directed | 10.6 | 60 |
| Meal Allowance | 4.5 | 33 |
| Meal Time | 2.2 | 11 |
| Meetings for Registered Longshoremen | 12 | 68 |
| Duties of Union and JPLRC's | 12.2 | 68 |
| Refusal to attend meetings/penalty | 12.4 | 69 |
| Registered longshoremen must know Agreement provisions | 12.1 | 68 |
| Scheduling of stop-work meetings | Addenda | 247 |
| Stop-work meetings | 12.3 | 69 |
| Methods of Dispatching | 10.1 | 53 |
| Mileage Allowance | 4.6 | 34 |
| Modification of Agreement | 24.1 | 121 |
| Movement of Cargo | 1.1 | 2 |
| Moving Expenses - Transfer from Low Work Opportunity Ports | Supplement III | 204 |
| **N** | | |
| New Equipment | 1.5 | 6 |
| New Methods of Operation | 10.5 | 58 |
| No Lay-Offs | Supplement III | 204 |
| **O** | | |
| Observance of Agreement | 11.2 | 61 |
| Onerous Dispute Procedures | 11.4 | 62 |
| Onerous Workload | 15.1 | 78 |
| On-the-Job Grievances | 17.2 | 84 |
| Organization of Gangs, Gang Sizes and Methods of Dispatching | 10.1 | 53 |

279

INDEX

| SUBJECT | Section | Page |
|---|---|---|
| **R** | | |
| Registration and Transfer | 8.3 | 48 |
| Coast provisions for transfer of | | |
| registration between Longshore and | | |
| Clerk Registered Lists | Supplement II | 201 |
| Coastwise registration and transfer | Supplement I | 191 |
| Registration and Transfer of men from | | |
| Low Work Opportunity Ports | Supplement III | 204 |
| Registration/Transfer to Clerk | Supplement I.4 | 197 |
| Relief Periods | 2.3 | 12 |
| **S** | | |
| Safety | 16 | 80 |
| Dispute procedures | 11.4 | 62 |
| Violations | 17.8 | 94 |
| Scheduled Day Off | 6 | 39 |
| Scheduling of Meetings | Addenda | 247 |
| Scope of Contract and Assignment of | | |
| Work to Longshoremen | 1 | 2 |
| Coverage, movement of cargo | 1.1 | 2 |
| Definitions | 1.9 | 10 |
| Dock work provisions | 1.2 | 3 |
| Employer coverage | 1.8 | 9 |
| Exception - Seamen | 1.3 | 5 |
| Existing practices - Other workers | 1.8 | 9 |
| Hold cleaning, stores, lines, etc. | 1.6 | 9 |
| In lieu of time | Addenda | 217 |
| Machinery, equipment and other tools | 1.5 | 6 |
| Maintenance and repair | 1.7 | 9 |
| PMA Letter to Members | Addenda | 269 |
| Waivers | 1.4 | 5 |

281

INDEX

| SUBJECT | Section | Page |
|---|---|---|
| Overtime Hours | 2.1 | 10 |
| Overtime Wage Rates | 4.1 | 26 |
| **P** | | |
| Paid Holidays | 5.3 | 37 |
| Past Practice | 1.8 | 9 |
| Pay Guarantee Plan, Rules and Administration | 20 | 101 |
| Abuses | 20.7 | 114 |
| Availability | 20.5 | 110 |
| Benefits | 20.2 | 102 |
| Eligibility | 20.4 | 107 |
| Financing | 20.1 | 101 |
| General provisions | 20.8 | 115 |
| Payment procedures | 20.3 | 105 |
| Purpose | Preamble of Section 20 | 101 |
| Work stoppages | 20.6 | 112 |
| Penalties for Work Stoppages, Assault, Pilferage, | | |
| Drunkenness, Drug Abuse and Peddling, | | |
| Safety Violations and Other Offenses | 17.8 | 94 |
| Penalty Cargo List | | 123 |
| Penalty Cargo Rates | 4.4 | 33 |
| Pension Plan | 23.1 | 121 |
| Personal Effects | 4.7 | 34 |
| Picket Lines | 11.5 | 67 |
| | Addenda | 245 |
| Pilferage | 17.8 | 94 |
| Preference of Employment | 8.4 | 49 |
| Promotions, Training and Steady Skilled Men | 9 | 50 |
| Competent men to be made available | 9 | 51 |
| Joint Promotion Committee | 9.2 | 50 |
| Promotions from the ranks | 9.1 | 50 |
| Training and employment of skilled men | 9.4 | 51 |

280

INDEX

| SUBJECT | Section | Page |
|---|---|---|
| Training Rates of Pay | 4.2 | 29 |
| Transfer Between Longshore and | | |
| Clerk Lists | Supplement II | 201 |
| Registration Transfer to Clerk | Supplement 1A | 197 |
| Transfer Between Ports | Supplement I | 191 |
| Transfer from Low Work | | |
| Opportunity Ports | Supplement III | 204 |
| Travel | Supplement IV | 209 |

**U**

| | | |
|---|---|---|
| Union Security | 19 | 100 |
| Unnecessary Men | 15.2 | 79 |
| Utility Man/Lift Driver | Addenda | 251 |

**V**

| | | |
|---|---|---|
| Vacations | 7 | 39 |
| Administration | 7.4 | 45 |
| Computation | 7.1 | 39 |
| Procedure for scheduling | 7.3 | 44 |
| Qualifying hours and years | 7.2 | 42 |
| Visiting Regulations | Supplement I | 191 |

**W**

| | | |
|---|---|---|
| Wages | 4 | 26 |
| Appropriate Shift and Skill Rates | Addenda | 247 |
| Mileage allowance | 4.6 | 33 |
| Penalty cargo list. | | 123 |
| Penalty cargo rates | 4.4 | 32 |
| Personal effects | 4.7 | 34 |
| Shift rates | 4.1 | 26 |
| Skill rates | 4.3 | 29 |
| Straight and overtime | 4.1 | 26 |

283

INDEX

| SUBJECT | Section | Page |
|---|---|---|
| Work preservation | Preamble of Section 1 | 2 |
| Seamen | 1.3 | 5 |
| Shift Rates | 4.1 | 26 |
| Shifting Men when Operations Change | 10.4 | 58 |
| Side Agreements | Addenda | 247 |
| Skill Rates | 4.3 | 29 |
| Skilled Holdmen | 10.2 | 54 |
| | Addenda | 215 |
| Standard Work Shifts and Work Week | 2.1 | 10 |
| Steady Skilled Men and Equalization of | | |
| Work Opportunity | 14.6 | 74 |
| | 9.4 | 51 |
| | Addenda | 248 |
| Stop-Work Meetings | 12.3 | 68 |
| Scheduling of | Addenda | 231 |
| Stores Handling | 1.6 | 9 |
| Straight Time Hours | 2.1 | 10 |
| Strikes, Lockouts and Work Stoppages | 11 | 61 |
| Exceptions and procedures for health, | | |
| safety and onerousness | 11.4 | 62 |
| How work shall be carried on | 11.3 | 61 |
| No strikes, lockouts or work stoppages | 11.1 | 61 |
| Observance of Agreement | 11.2 | 61 |
| PGP - Work stoppages | 20.6 | 112 |
| Picket lines | 11.5 | 67 |
| Subsistence | Addenda | 245 |
| | 4.5 | 33 |

**T**

| | | |
|---|---|---|
| Term of Agreement and Review | 22.1 | 121 |
| Training | 9.4 | 51 |
| | Addenda | 257 |

282

INDEX

| SUBJECT | Section | Page |
|---|---|---|
| Subsistence | 4.5 | 33 |
| Training rates | 4.2 | 29 |
| Wage rates | 4.1 | 26 |
| Wage Schedules | | |
| Container Freight Stations | | 174 |
| 2002-2003 Wage Schedule | | |
| *(Effective 8:00 a.m., November 23, 2002, to* | | |
| *8:00 a.m., June 28, 2003)* | | 130 |
| 2003-2004 Wage Schedule | | |
| *(Effective 8:00 a.m., June 28, 2003, to* | | |
| *8:00 a.m., July 3, 2004)* | | 134 |
| 2004-2005 Wage Schedule | | |
| *(Effective 8:00 a.m., July 3, 2004, to* | | |
| *8:00 a.m., July 2, 2005)* | | 138 |
| 2005-2006 Wage Schedule | | |
| *(Effective 8:00 a.m., July 2, 2005, to* | | |
| *8:00 a.m., July 1, 2006)* | | 142 |
| 2006-2007 Wage Schedule | | |
| *(Effective 8:00 a.m., July 1, 2006, to* | | |
| *8:00 a.m., June 30, 2007)* | | 146 |
| 2007-2008 Wage Schedule | | |
| *(Effective 8:00 a.m., June 30, 2007, to* | | |
| *8:00 a.m., June 30, 2008)* | | 150 |
| Mechanics | | 154 |
| Waivers | 1.4 | 5 |
| Welfare Plan | 23.1 | 121 |
| Work Preservation | *Preamble of Section 1* | 2 |
| Work Shifts | 2.4 | 12 |
| | 11.1 | 61 |
| Work Stoppages | 17.8 | 94 |
| | 20.6 | 112 |

INDEX

| SUBJECT | Section | Page |
|---|---|---|
| Working and Dispatching Rules | 15.3 | 79 |
| | 24.2 | 121 |
| | *Preamble of Section 1* | 2 |
| Working as Directed | 10.6 | 60 |
| | 11.3 | 61 |

NOTES

NOTES

NOTES

NOTES

NOTES

NOTES

NOTES

NOTES

NOTES

NOTES

NOTES

NOTES

NOTES

NOTES

NOTES

NOTES

NOTES

NOTES

NOTES

NOTES

NOTES

NOTES

# EXHIBIT B


PACIFIC
MARITIME
ASSOCIATION

## Press Release: PMA Agrees to Reschedule Monthly Union Meeting

Contact:
Josephine Parr
Pacific Maritime Association
(415) 576-3236
e-mail: jparr@pmanet.org

For Immediate Release

**PMA AGREES TO RESCHEDULE MONTHLY UNION MEETING**

San Francisco (April 20, 1999) -- The Pacific Maritime Association (PMA) has agreed to allow the International Longshore and Warehouse Union (ILWU) to change its monthly one-shift, work-stop meeting for the month of April. According to the ILWU-PMA contract, the union is guaranteed one shift off a month to hold union meetings. The ILWU approached the PMA last month to change the date of its April meeting to April 24. All individual port committees agreed to this change.

"The ILWU uses these meetings to conduct union business and to communicate with their members," said Phil Resch, senior vice president of operations for PMA. "How the ILWU chooses to use this meeting time is up to their discretion. When a request to change the date is made in advance and agreed upon by our members, there is little, if any, impact on the maritime industry."

The ILWU requested the meeting's date be rescheduled. The ILWU decided to use this meeting to participate in rallies supporting death row inmate Mumia Abu-Jamall, who was convicted of killing a police officer. The PMA does not support or condone any issue addressed during union meetings.

"We are communicating well with the ILWU. We want our ports to be the most productive, reliable, safe and customer-focused in the world," said Resch.

# # #

The Pacific Maritime Association is a member association of American flag operators, foreign flag operators and stevedore and terminal companies that operate in the ports of California, Oregon, and Washington. Information about the Pacific Maritime Association and the shipping industry can be found on the PMA website located at **www.pmanet.org**.

# EXHIBIT C



## SUPERCARGOES AND CLERKS UNION LOCAL 40

SECRETARY-TREASURER-BUSINESS AGENT
(503)221-0342
FAX: (503)221-0554

2401 N. W. TWENTY-THIRD AVE.
PORTLAND, OREGON 97210

DISPATCHER
(503) 221-0340

CLRC
RMcE ☐
JR ☐
RO ☐
LS ☐

2008 MAR 11 AM 10:01
RECEIVED
COAST COMMITTEE

March 6, 2008

Scott Munger
Pacific Maritime Association
101 SW Main Street, Suite 330
Portland, Oregon 97204-3211

Dear Scott Munger,

By this letter, and in keeping with Section 12, you are informed that Local 40 will move its regularly scheduled May Stop Work meeting to the day shift of May 1, 2008. Work will resume beginning with the second shift that day.

We will return to the regular schedule in June.

Sincerely,

Martha A. Hendricks
Secretary-Treasurer Business Agent
ILWU Local 40

Cc: ILWU Coast Committee

**LOCAL 50**  **INTERNATIONAL LONGSHORE and WAREHOUSE UNION**

JOHN ESTOOS
president

DAVID BREWER
secretary-treasurer

491 Industry St.  Astoria, OR  97103
503-325-2271

March 10, 2008

PACIFIC MARITIME  ASSOCIATION
AREA MANAGER

101 SW Main/Suite 330
Portland, OR   97204

Mr. Scott Munger:

By this letter, and in keeping with Section 12, you are informed that Local 50
will move its regularly scheduled May Stop Work meeting to the day shift of
May, 1 2008. Work will resume beginning with the second shift that day.

We will return to the regular schedule in June.

Sincerely,

John Estoos

Local 50 President

Cc:   Coast Committee

Coast Committee

3-13-08



CLRC
RMcE ☐
JR ☐
RO ☐
LC



*International*



# LONGSHOREMEN'S AND WAREHOUSEMEN'S UNION

*Local 8*

2435 N.W. FRONT AVE.   PORTLAND, OREGON 97209   PHONE 503-224-9310   FAX 503-224-9311

March 10, 2008



Mr. Scott Munger
Area Manager
Pacific Maritime Association
101 S.W. Main, Suite 330
Portland, Oregon  97204

Mr. Munger:

By this letter, and keeping with Section 12, you are informed that Local 8 will move its' regular scheduled May Stop Work meeting to the day shift of May 1, 2008.  Work will resume beginning with the second shift that day.

We will return to the regular schedule in June.

Sincerely,

INTERNATIONAL LONGSHORE &
WAREHOUSE UNION, LOCAL 8


Bruce A. Holte
Secretary-Treasurer

Cc:    ILWU Coast Committee


Opeiu11

2008 MAR 13 PM 2: 14

COAST COMMITTEE
RECEIVED



 *International*

# LONGSHOREMEN'S AND WAREHOUSEMEN'S UNION

*Local 8*

2435 N.W. FRONT AVE.   PORTLAND, OREGON 97209   PHONE 503-224-9310   FAX 503-224-9311

March 10, 2008

COPY

Mr. Scott Munger
Area Manager
Pacific Maritime Association
101 S.W. Main, Suite 330
Portland, Oregon  97204

Mr. Munger:

By this letter, and keeping with Section 12, you are informed that Local 8 will move its' regular scheduled May Stop Work meeting to the day shift of May 1, 2008.  Work will resume beginning with the second shift that day.

We will return to the regular schedule in June.

Sincerely,

INTERNATIONAL LONGSHORE &
WAREHOUSE UNION, LOCAL 8

Bruce A. Holte
Secretary-Treasurer

Cc:    ILWU Coast Committee

Opeiu11

2008 MAR 13 PM 2: 14

COAST COMMITTEE
RECEIVED

# INTERNATIONAL
# LONGSHOREMEN'S & WAREHOUSEMEN'S
LOCAL_____ 32 Everett Washington _____ UNION

PRESIDENT_____ Mark Sullivan_____

SECRETARY_____ Ken Hudson_____

March 14, 2008

Joseph T. Weber
Pacific Maritime Association
Area Manager
301 W. Republican
Seattle, WA.    98119

Dear Joe:

By this letter, and in keeping with Section 12, you are informed that Local 32 will
move its regularly scheduled May Stop Work meeting to the day shift of May 1,
2008. Work will resume beginning with the second shift that day.

**We will return to the regular schedule in June.**

Sincerely,

Mark Sullivan
President
ILWU Local 32
Everett, Washington

cc:   coast committee

klh

2008 MAR 19 PM 3:16

RECEIVED
COAST COMMITTEE

# EXHIBIT D



## Pacific Maritime Association
### Headquarters

RECEIVED

MAR 1 8 2008

ILWU

CLRC
RMcE ☐
JR ☐
RO ☐
LS ☐

RECEIVED
COAST COMMITTEE
2008 MAR 19 PM 4: 07

March 17, 2008

Mr. Robert McEllrath, International President
International Longshore and Warehouse Union
1188 Franklin Street, 4th Floor
San Francisco, CA 94109

Re:    **Coastwise ILWU Stop Work Meeting Scheduled May 1, 2008**

Dear Bob:

The Employers have learned that each ILWU local will hold a stop work meeting during the day shift on May 1, 2008. Along with publicized letters from the ILWU to other labor organizations regarding the work stoppage, several ILWU locals have sent letters to PMA, giving notice that they will hold a stop-work meeting during the day shift on May 1, 2008.

The Employers are not agreeable to such stop-work meetings taking place on the day shift of May 1, 2008.

As the Union is aware, Section 12.31 of the PCL&CA provides that each local has the right to hold *"...1 regularly scheduled stop-work meeting each month during overtime hours on the second shift."* Section 12.32 is clear that only through joint agreement can the Union hold stop-work meetings during periods other than the "regularly scheduled stop-work meeting." Explicit in the Agreement, and supported by decisions of Area Arbitrators and the Coast Arbitrator, is the fact that the Union does not have the right to unilaterally hold stop-work meetings in violation of the stop-work meeting provisions.

The Employers reiterate that they are not agreeable to the ILWU withholding labor and stopping all work, coastwise, during the day shift on May 1, 2008. The Employers consider the Union's unilateral job action scheduled for May 1st to be a direct violation of Sections 11.1, 11.31, 12.3 and 18.1. Absent immediate confirmation by March 26, 2008, that the ILWU will take all necessary steps to ensure the membership fully complies with its obligations under the Agreement and agrees to hold all May stop-work meetings in accordance with Section 12.31, the Employers will move the matter to the Coast Arbitrator.

Sincerely,

James C. McKenna
President and CEO

555 Market Street • Third Floor • San Francisco, California 94105
(415) 576-3200 • FAX (415) 348-8392
http://www.pmanet.org

# EXHIBIT E



## Pacific Maritime Association
### Headquarters

April 3, 2008

**RECEIVED**

APR 0 4 2008

**ILWU**

**Via First Class Mail**

Mr. Robert McEllrath, International President
International Longshore and Warehouse Union
1188 Franklin Street, 4th Floor
San Francisco, CA 94109

Re:    **Assurances and Communications Concerning Coastwide ILWU Stop Work Meeting
Scheduled for May 1, 2008**

Dear Bob:

This letter is to follow up on our conversation yesterday concerning the ILWU's planned May 1 work stoppage at all ports in California, Oregon, and Washington. As described in my letter of March 17 and again during our discussion yesterday, PMA does not consent to a stop-work meeting or any other effort to disrupt port operations. In response, you informed me that the ILWU would not hold a stop-work meeting on May 1. The ILWU's web site still indicates, however, that the May 1 work stoppage will be held as originally scheduled. Additionally, the ILWU has sent well-publicized letters to other unions asking for their support on May 1. Therefore, the Employers believe that further action by the ILWU is needed in order to ensure that a work stoppage does not occur on May 1.

Although we certainly do not object to the ILWU making a public statement or announcement concerning its views on the war in Iraq, PMA views any stop-work meeting, work stoppage, or other job action that disrupts port operations as a violation of the PCL&CA and an unlawful secondary boycott under federal labor law. PMA must take all steps necessary to protect its Member Companies against an unlawful work stoppage, and it is prepared to begin legal and contractual actions that would prevent any work stoppage from occurring. Unless the ILWU unequivocally communicates that it will not hold a stop-work meeting, work stoppage, or other job action on May 1, PMA will have no choice but to enforce its rights under the law and the PCL&CA.

Specifically, the ILWU must take the following steps by no later than April 9, 2008 or PMA will commence appropriate legal proceedings:

**Mr. Robert McEllrath**
**April 3, 2008**
**Page 2**

1.    Confirm to PMA in writing that the ILWU and its local unions will not engage in a stop-work meeting, work stoppage, or other job action on May 1;

2.    Remove all postings from the ILWU's web site that suggest a stop-work meeting, work stoppage, or other job action will occur on May 1;

3.    Immediately notify ILWU members, via announcements at the joint dispatch, the joint dispatch tape, by special bulleting, and by publication on its web site, that the May 1, 2008 stop-work meeting is cancelled and that there will be no work stoppage or job action on that date; and

4.    Instruct ILWU members to report for work as they normally would on the day shift of May 1, 2008 and fill all labor orders placed with the Joint Dispatch hall by the Employers as required by the PCL&CA.

We look forward to hearing from you regarding this matter.

Sincerely,

James C. McKenna
President and CEO

# EXHIBIT F



**INTERNATIONAL
LONGSHORE &
WAREHOUSE UNION**
AFL-CIO

1188 FRANKLIN STREET
SAN FRANCISCO
CALIFORNIA 94109
(415) 775-0533
(415) 775-1302 FAX
www.ILWU.org

ROBERT McELLRATH
President

JOSEPH R. RADISICH
Vice President

WESLEY FURTADO
Vice President

WILLIAM E. ADAMS
Secretary-Treasurer

April 8, 2008

**VIA FACSIMILE: (415) 348-8392**
**(and First Class Mail)**

James C. McKenna
President & CEO
Pacific Maritime Association
555 Market Street, 3rd Floor
San Francisco, CA 94105

Mr. McKenna:

In response to your letter of April 3, 2008 and to the letters from your Area Managers to the Longshore Division Locals of the same date, know that no local will move its regularly scheduled May stop work meeting to the day side of May 1, 2008. By this letter, any written notification by any local to so move a stop work meeting is retracted and the dictates of Section 12 of the PCL&CA will be adhered to. May stop work meetings will be conducted as regularly scheduled.

That being said, your demand that the Union communicate such to its members by a specified structure and within artificial timelines unilaterally developed by the Pacific Maritime Association is rejected. The Employers have no contractual standing to dictate the manner or method that the Union communicates with its members.

Moreover, the Industry arbitrators lack authority to hear any non contractual based issue, much less one that is speculative. The PCL&CA grievance machinery is not designed to resolve speculative issues. Doing so would lead to endless arbitrations over issues involving rumors, perceptions and posturing. Such is the case here. If any local fails to provide a work force to meet the contractual needs of the Employers on May 1 such would then and only then be a violation of the PCL&CA and appropriate contractual remedies could then be sought.

Sincerely,

Robert McEllrath
International President

cc: All Longshore Division Locals with Attachment – PMA letter dated April 3, 2008

opl/O.P.E.I.U. LOCAL 29 - AFL-CIO

# EXHIBIT G



# INTERNATIONAL
# LONGSHORE &
# WAREHOUSE UNION
### AFL-CIO

1188 FRANKLIN STREET
SAN FRANCISCO
CALIFORNIA 94109
(415) 775-0533
(415) 775-1302 FAX
www.ILWU.org

| ROBERT McELLRATH | JOSEPH R. RADISICH | WESLEY FURTADO | WILLIAM E. ADAMS |
|---|---|---|---|
| President | Vice President | Vice President | Secretary-Treasurer |

April 15, 2008

**VIA FACSIMILE: (415) 576-3297**
**(and First Class Mail)**

James C. McKenna
President & CEO
Pacific Maritime Association
555 Market Street, 3rd Floor
San Francisco, CA 94105

Mr. McKenna:

   In response to your letter of April 11, 2008, be advised that, contrary to your assertion that an "ILWU-sponsored" web site is publicizing a "planned ILWU work stoppage on May 1, 2008," the ILWU sponsors only two web sites: they are http://www.ilwu.org/ and http://contract2008.org/.

   As I told you in my April 8, 2008 letter, no ILWU Local will move its regularly scheduled May stop-work meeting to the day shift of May 1, 2008.

   That being said, as you know, the Longshore Division Caucus recently approved a resolution calling for a May 1 protest against the Iraq war. Consequently, members from various locals will participate in planned events on May 1. The level of participation will vary from port to port.

   Jim, in good faith, I informed you of the resolution immediately following the Caucus. I did so to ensure that the Industry would have ample time to formulate contingency plans. Many locals utilized the available contractual apparatus to attempt to substitute regularly scheduled May stop-work meetings for May 1. That was done in good faith to neutralize any cost to the Industry.

   Nonetheless, you denied our requests to reschedule regularly scheduled May work-stop meetings for May 1. That is your right and the ILWU acknowledged your position by letter on April 8, 2008.

   By this letter, and despite what the ILWU considers to be an irresponsible and irrational response on PMA's part, the Union's contractual obligation to Sections 8 and 11 of the PCL&CA is hereby acknowledged. Orders for work on May 1 will be accepted.

   PMA member companies should, however, take into consideration as they plan May 1 operations that manpower may be limited as members exercise their right to express themselves politically.

Sincerely,

Robert McEllrath
International President

ec/O.P.E.I.U., LOCAL 29 - AFL-CIO

# EXHIBIT H

1        BENCH DECISION AND ORDER OF THE COAST ARBITRATOR

2        There is an obligation under Section 12.2 of the

3    Agreement for the Union to inform members of their

4    responsibility under the Agreement.  When the Union took

5    an action which might have led some members to believe

6    that they had no obligation to report as normal, whether

7    a reality or not, it seems to me the Union had to go one

8    step further and tell the members, without affecting

9    their political decisions, that the ports are open, the

10   Agreement applies, and they are expected to do whatever

11   it is they are required to do under the Agreement.

12       I am not going to direct how the Union does

13   that at this point, because it seems to me it is none

14   of my business.  And it is not the Employers' business,

15   unless they have some more.

16       That is the order.

17       If something comes up with respect to the

18   matter before me as a CLRC issue, it is still before me

19   in terms of jurisdiction.

20       Given that this is an oral decision, I will ask

21   the reporter to prepare it and send it to the parties

22   and to me, and I will consider it signed by me when it

23   is prepared by the reporter.

24

25             -  -  -  -

# EXHIBIT I

IN ARBITRATION PROCEEDINGS PURSUANT TO THE
COLLECTIVE BARGAINING AGREEMENTS BETWEEN THE PARTIES

| | | |
|---|---|---|
| INTERNATIONAL LONGSHORE AND WAREHOUSE UNION, | ] ] ] | |
| Union, ] | ] | DECISION |
| | ] | of |
| and | ] ] | |
| | ] | JOHN KAGEL |
| PACIFIC MARITIME ASSOCIATION, ] | ] | Coast Arbitrator |
| | ] ] | |
| Employers. | ] ] | April 30, 2008 10:15 a.m. PDT |
| | ] | Palo Alto, California |
| Re: Employers motions re whether the ILWU and its officials are in violation of the PCLCD and PCCCD re 5/1/08 | ] ] ] ] | |

**APPEARANCES:**

For the Employers: Jim McKenna, Tom Edwards, Rich Marzano, Coast Steering

Committee, PMA

For the Union: Bob McEllrath, Joe Radisich, Leal Sundet, Ray Ortiz, ILWU

All by telephone hearing.

**BACKGROUND AND MOTIONS:**

On April 24, 2008 the Coast Arbitrator ordered the Union to inform its Locals and

members that May 1, 2008 was a normal work day as required by Section 12.2 of both

the PCLCD and PCCCD, requiring the Union to inform members of their collective and

individual responsibilities under the Agreement: To report for work as normal. That order is incorporated herein by reference.

By e-mail in the evening on April 29, 2008 the Employers notified the undersigned, as attested to to the best of their then knowledge and belief by telephone conference on April 30, 2008:

> "In Tacoma, APM Terminals has been informed that none of their steady clerks will be working on May 1st. At Washington United Terminals (WUT) management was told the steadies would be calling for replacements on May 1st. Sea Star, Husky and PCT have also provided similar reports. In Tacoma management has been told by certain steady employees that Randy Whitman and Doug Rollins, two members of the Local 23 Clerks LRC, have gone to the various terminals and instructed the steadies not to work on Thursday.
>
> In Seattle, APL's Terminal 5 reported that 11 out of 19 total steady clerks have said they were not working on Thursday (5 didn't respond when asked.) SSAT management is reporting their steady clerks have informed them they will not be working on Thursday. Same is true for the T-46 facility - no steadies reporting on Thursday.
>
> In Oakland, SSAT clerks at the Matson facility reported to management that they will not be working on Thursday, May 1st. They also advised that the direction not to work came from the Local 34 President. At another SSAT facility, the company is reporting 21 of 45 steady equipment operators and 8 of 18 steady clerks have stated they would not work on May 1st. Similar reports have come from the MTC facility in Oakland.
>
> In LA/LB certain employers have already been told steady employees will not be at work. A foreman at LBCT, where all of the steady foremen have stated they will not work on May 1st, told management that Local 94's President told him May 1st was an approved stop work meeting."

In addition the Employers assert that a Seattle newspaper and an Oakland theater marquee note that the ILWU will strike on May 1, in addition to the publicity cited by the Employers on April 24.

The Employers included the following motions in their e-mail:

"1.    The Union has failed to comply with the April 24, 2008 bench ruling, in violation of Section 17.57.

2.    The Union's deliberate and concerted action of directing longshoremen, clerks and foremen that they are not to work on May 1, 2008 is a violation of Section 11.1, 11.2, and 18.1.

3.    That there shall be no unilateral concerted job action or illegal work stoppage in violation of the Agreement during the , 2008  day shift.

4.    The Union shall take immediate and affirmative steps to notify its members of their contractual obligation and direct all members to report to work as they normally do during the day shift on May 1, 2008."

The Employers asked for a telephonic hearing on April 30, 2008 at 9 a.m. PDT. providing a call-in number and represented that calls had been placed to the International President and a Coast Committee Member advising them of their request. Because the e-mail from the Employers did not indicate it had been sent to the Union and the lateness of the hour as received by the Coast Arbitrator, 8 p.m. April 29, 2008, he forwarded copies to e-mail addresses of Union officials as he had them. As noted, Union officials participated in the telephone hearing in this matter at the appointed hour.


DISCUSSION:

According to the Union it complied with the Coast Arbitrator's April 24 order by informing its Negotiating Committee members of it and since such members represent all Locals they would communicate the order to the Locals. In addition the Union maintains that the information received by the Employers is hearsay and thus not to be credited; that if individual Union members or Local officers have violated the Agreements then it is the

requirement of the PMA to bring those issues to the Area Arbitrators and that for the Coast Arbitrator to rule that concerted activity to not work tomorrow would be an Agreement violation would be a prospective order that is both contrary to how the Parties' grievance machinery works and premature as there is no way to know if there will be such activity until it happens.

This decision is a supplement to the April 24, 2008 order. In that order the Coast Arbitrator continued jurisdiction so that evidence presented then is relevant. That evidence included that the Union caucus voted to have stop work meetings on the day shift on May 1 to protest the Iraq war. The Employers did not agree to vary the Agreement's stop work meeting provisions and the Union advised then that there might be reduced work forces available on day sift on May 1. The order of the Coast Arbitrator then was for the Union to advise its members and Locals that that day was, under the Agreements, a normal work day.

The evidence of the Employers is accepted here that since that order steady employees up and down the Coast have notified management in uncharacteristically large numbers that they would not be at work on May 1. Under all of the circumstances of this particular case where the issue was raised at the Coast level and at least four major ports are identified where this has occurred the Coast Arbitrator is required to recognize the realities of the situation and to grant the motions, as modified below. It is apparent that the Union's efforts to comply with the April 24, 2008 order fell short of the intent of the Agreements. Those realities show that concerted activity that would not treat May 1 as a normal work day would violate Sections 11.1 and 11.2 of the Agreements.

It is noted that there is a long standing practice of arbitrators not ruling on prospective possibilities of Agreement violations. That practice is not changed by this ruling which is based on the particular facts and circumstances of this case and is confined solely to it. In addition, this ruling is not based on the Coast Arbitrator's personally held views of the Iraq war. It is based solely on the provisions and requirements of the PCLCD and the PCCCD.

DECISIONS:

Given the evidence before the Coast Arbitrator Union efforts, to comply with the order of the Coast Arbitrator of April 24, 2008 appear, based on sufficient evidence, to have been ineffective, the following motions of the Employers are granted as modified below:

1.    The Union has not effectively complied with the April 24, 2008 ruling, in violation of Section 17.57.

2.    Any deliberate and/or concerted action of directing Longshoremen, Clerks and others that they are not to work, or that they are not working, on May 1, 2008 is a violation of Sections 11.1, and 11.2 of the PCLCD and PCCCD.

3.    There shall be no unilateral concerted job action or illegal work stoppage in violation of the Agreement during the May 1, 2008 day shift.

4.    The Union shall take immediate and affirmative steps to notify its Locals and members of their contractual obligation and direct all members to report to work as they normally do during the day shift on May 1, 2008.

The above orders are in effect at the date and time of this order and are effective by e-mail notice as if written, signed and served by the Coast Arbitrator.

s/_____John Kagel_____

Coast Arbitrator

# EXHIBIT J

IN ARBITRATION PROCEEDINGS PURSUANT TO THE
COLLECTIVE BARGAINING AGREEMENTS BETWEEN THE PARTIES

| | | |
|---|---|---|
| INTERNATIONAL LONGSHORE AND WAREHOUSE UNION, | ] ] ] | C-05-2008 |
| | ] | DECISION |
| Union, | ] ] | of |
| and | ] ] | JOHN KAGEL |
| | ] | |
| PACIFIC MARITIME ASSOCIATION, | ] ] | Coast Arbitrator |
| | ] | |
| Employers. | ] ] | April 30, 2008 3:15 p.m. PDT |
| | ] ] | Palo Alto, California |
| Re: Employers motions re whether the ILWU and its officials are in violation of the PCLCD and PCCCD re decision C-4-08 | ] ] ] ] | |

APPEARANCES:

For the Employers: Jim McKenna, Tom Edwards, Rich Marzano, Coast Steering

Committee, PMA

For the Union: Leal Sundet, Ray Ortiz, ILWU

All by telephone hearing.

DISCUSSION:

The Employers presented evidence in the form of tape transcripts and documents

which confirm concerted activity to not work on May 1, 2008 day shift. That evidence

shows a violation of the award issued this morning, now called C-04-2008, and

Sections 11.1 and 11.2 of the PCCCD and PCLCD.


DECISION:

The Union, its Officers and members are in violation of the orders of the Coast

Arbitrator set forth in C-04-2008 which is incorporated herein by reference.

This decision is sent by e-mail to the same effect as if written and signed by the

Coast Arbitrator.


s/_____John Kagel_____

Coast Arbitrator